# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| ROSWITHA M. SAENZ, Individually and | § | |
| on behalf of THE ESTATE OF | § | |
| DANIEL SAENZ, Deceased, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | No. 14-CV-244-PRM |
| | § | |
| G4S SECURE SOLUTIONS (USA) INC., | § | |
| OFFICER JOSE FLORES AND | § | |
| ALEJANDRO ROMERO, | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS G4S SECURE SOLUTIONS (USA) INC. AND ALENJANDRO ROMERO'S MOTION FOR SUMMARY JUDGMENT

**TO THE HONORABLE UNITED STATES DISTRICT COURT:**

COMES NOW, Plaintiff ROSWITHA M. SAENZ, Individually and on behalf of THE ESTATE OF DANIEL SAENZ, Deceased, hereinafter referred to as Plaintiff, and files this her Response in Opposition to Defendants G4S Secure Solutions (USA) Inc. and Alejandro Romero's, hereinafter referred to as Defendants, Motion for Summary Judgment (Doc. 234-2). In support of her Response, Plaintiff would show this Honorable Court as follows:

### I.   INTRODUCTION

1.     On March 8, 2013, Defendants Romero and G4S had exclusive custody and control over Saenz when transporting him to jail.    During the transport, Saenz' seatbelt came loose because of Romero's failure to properly restrain him.    Saenz stood up.    His head was repeatedly banged against the walls of the van. Saenz cried out in pain.    Romero knew the seat belt was off,

1

and Saenz was being injured. Romero refused to stop the van.  Romero refused to re-seatbelt Saenz.  Instead, Romero and his G4S partner continued to callously drive while Saenz was unprotected, causing Saenz to cruelly suffer more pain and injuries.

2.     Defendants tried to blame Flores for their deliberate indifference to Saenz injuries, claiming that El Paso had custody and control over Saenz at all times.   However, no El Paso police officer was with Romero during the transport to jail. Saenz suffered significant head injuries while under custody of defendants as shown in *Exh. A* at 1 and 2; *Exh. B* at 247: 19-248:5; 249:15-19. Romero failed to notify his supervisor of the injuries. He failed to call for medical assistance even though there was a radio with him. *Exh. B* at 99:22-100:12.   G4S policies that Romero was taught required him to call for medical assistance.

3.     Romero continued to have custody and control over Saenz when his head slammed into the door frame at the jail causing him further life threatening head injuries. Romero continued to have custody over Saenz while he dragged him for an hour through the jail bleeding, while refusing to provide medical treatment in deliberate indifference to his life threatening injuries.

4.     Romero and Flores failed to properly adjust Saenz' handcuffs, which caused him further pain and suffering, as well as the injuries depicted in Tr. Exh 9, attached hereto as part of *Exh. A*. Three different improper actions by defendants lead to those injuries: (1) The handcuffs were single locked rather than double locked causing the cuffs to continue to tighten on Saenz's wrists; (2) Saenz was double cuffed (e.g., two sets making them too loose); and (3) defendants dragged Saenz under his arms causing pressure and pain from the arms being spread apart so that the metal cuffs would painfully cut into Saenz' wrists and arms. *Exh. A*; *Exh. C* at 46:19-53:9; *Exh. D* at 118:17-119:8 ; *Exh. E* at 90:12-25.

2

5.      Of course, there was no reason to drag Saenz at all. Romero admits he could have used the radio to call for medical help for Saenz, but he did not. *Exh. B* at 99:22-100:12. Romero used the radio to call for help before when he had "unruly pedestrians." *Exh. B* at 98:18-99:21. The El Paso PD also customarily provided Romero with a hand-held radio. *Exh. B* at 91:16-21. Romero knew the purpose of the radio was to communicate, but incredibly claims G4S and EPD both failed to train him that a radio could help protect his safety, or the safety of others. Apparently, Romero claims he did not realize he could use a radio to call for help.   However, his claims are suspect because he had used a radio to call for help when he faced unruly pedestrians. *Exh. B* at 91:22-92:12; 92:16-95:23. Romero and his G4S partner Matthews also both had cell phones which would allow them to call 9-1-1 for assistance for Saenz' medical problems (and thus avoid dragging him). Exh. S at 112:3-6.   Romero also could have asked any of the jailors or other law enforcement with them at the jail to call for an ambulance as well. They refused resulting in Saenz losing consciousness and bleeding profusely.   His blood was pulsating from his head. *Exh. B* at 152:13-16. Defendants dragged Saenz for an hour while trustees mopped up blood.

6.      It was improper for the defendants to move Saenz at all as it caused further injuries. *Exh. C* at 46:12-53:9; *Exh. D* at 48:23-49:9, 148:25-151:25. It was also the security officers **duty under their policies to provide prompt medical treatment**. *Exh. D* at 148:25-151:25.

7.      If there was some need to move Saenz, the jail has transportation devices – restraint chairs, wheel chairs, stretchers and gurneys. Any of those devices could have been used by the defendants to transport Saenz without inflicting cruel and unusual pain and suffering from the handcuffs.

8.      No reasonable officer would have failed to properly cuff Saenz. No reasonable

3

officer would have kept driving when the seatbelt was off, in violation of law, and the prisoner keeps having his head bang against the walls. No reasonable officer would drag a semi-conscious prisoner for an hour through the jails, with a trail of blood puddling behind the prisoner. No reasonable officer would cruelly drag a handcuffed injured man by the arms causing the cuffs to turn the wrists purple and pink, particularly when there were restraint chairs, wheel chairs, gurneys and stretchers to avoid such pain and suffering. No reasonable police officer would fail to call immediately for life threatening injuries which the defendants realized were very serious. Moreover, all of these concepts were well defined in the law, known to Romero and Flores, and any reasonable officer would know such actions were unconstitutional. The rules have been clearly defined since 1789 when the Fourth Amendment of the Constitution was written to protect "[t]he right of the people to be secure in their persons ... against unreasonable ... seizures."   An intentional shooting of a free citizen is a "seizure" governed by the objective reasonableness standard of the Fourth Amendment.

9.     Defendants cannot escape liability by arguing that Romero was under the direction of Flores. First, Flores was not even in the van. Second, either Romero or Matthews could have called on their radios or cell phones for emergency treatment. They certainly had the ability to warn Flores he needed to immediately call for an ambulance. They could have run across the street where EMS was located. They easily could have asked one of the officers at the Sally Port who helped hold Saenz while they put their guns in the locker, to call for emergency treatment or at a minimum to bring the wheel chair, gurney or other transportation devices available.

10.     In an effort to avoid its responsibilities, Defendant Romero files a 38 page motion for summary judgment. G4S appears to limit its defense to a one paragraph argument on vicarious

liability. However, G4S failed to properly train its employees, failed to implement proper policies or procedures, and failed to provide its employees with necessary equipment like Tasers, and in some instances, police radios. Romero also failed to call for back up. There were four total G4S officers working that day on the EPPD contract alone. *Exh. B* at 227:7-18.

11.     Perhaps recognizing that the true facts impose liability and that qualified immunity does not apply, defendants' motion is misleading. Deposition passages are misstated. At other times, the testimony is accurately quoted, but it is placed into a different time period. For example, defendants pushed or otherwise allowed Saenz's head to bang into the jammed door while entering the jail, then he fell down unconscious and was unable to walk. Their motion changes these events to make it appear that Saenz would not walk after his head hit the door jam. It wasn't lack of cooperation, but rather lack of consciousness. Defendants even misstate the weight of Saenz at p. 4 of their motion. (Doc. 234-2). Daniel Saenz did not weigh 270 pounds, but rather 217 pounds. *Exh. F* at 3.

12.     Romero, repeatedly denied his original statement given March 8, 2013 and tried to lie in his deposition, claiming he never dragged Saenz. *Exh. B* at 175:5-19; *Exh. G*. Yet, Romero mentions that he "dragged" Sanez a total of 13 times in his original statement. *Exh. G*. Romero also admits giving contradictory statements about violating policy in his transportation of Saenz after meeting with his counsel. *Exh. B* at 280:17-281:18. Similarly, Romero's concerns to get Saenz medical attention were not raised until his deposition on August 9, 2017. His three (3) previous statements fail to mention anything in regards to his attempts to provide medical attention for Saenz. *Exh. G*; *Exh. H*; *Exh. I*. What Romero was most concerned about that day was that G4S had a new prisoner transportation contract with EPPD, and he was concerned that his actions and

failures to act to result in the contract being terminated and losing his job. *Exh. B* at 197:10-25, 229:4-11.

## II.  BACKGROUND FACTS

13.     Defendants spend time on irrelevant matters from March 7, 2013. The dogs were not injured, although they had salsa on their legs from jumping into the trash can. *Exh. J* at 94:8-15; *Exh. K*. Neither Romero, nor Flores was aware of the March 7th , 9-1-1 call. *Exh. L* at 16:22-17:13; *Exh. M* at 78:24-79:15. The events of March 7, 2013 are not relevant. Officers can only consider what they know. *Exh. M* at 96:1-13.

**ALBERTSON'S**

14.     On March 8, 2013, Daniel Saenz was at Albertsons Grocery Store in El Paso, Texas. While at the store, Albertson employees recognized that Daniel Saenz needed medical or psychiatric attention when he advised employees that he was feeling paranoid and began to cry and ask for hugs. El Paso Police officers were dispatched to the store along with EMS personal. Upon arrival they witnessed Daniel Saenz crying as he was slouching on a motorized shopping cart. *Exh. N.*   Daniel Saenz suffered from hypoglycemic episodes. *Exh. O* at 61:1-21. Roswitha Saenz is the only medical doctor deposed in this case. *Exh. O* at 18:16-19:2.

**SAENZ HAD ONE PAIR OF HANDCUFFS ON HIM UNTIL DEFENDANTS DECIDED TO DOUBLE CUFF HIM.**

15.     Defendants focus on events at Del Sol Medical Center where Saenz was taken for medical care from the grocery store. All of the events at Del Sol occurred before Romero started his shift at 3:00 on March 8, 2013. *Exh. B* at 104:1-7. Thus, they are irrelevant other than to show why Romero and Flores wanted to inflict pain on Saenz in violation of his civil rights. *Exh. D* at 48:23-49:9, 148:25-151:25. Officer McFarland testified the events at the hospital did not justify

defendants dragging Saenz at the jail because Officers are trained they cannot inflict punishment. *Exh. E* at 131:8-133:21.

16.     Romero and Flores were angry because Saenz punched a female officer in the face during a struggle, giving her a black eye. *Exh. E* at 11:3-12, 20:10-12. McFarland tased Saenz, and gained control of him. *Exh. E* at 15:13-15. McFarland single cuffed Saenz. *Exh. E* at 19:24-25, 47:21-24.

17.     Saenz was transported to the El Paso County Detention Facility by officers. *Exh. E* at 60:5-12. Saenz was searched repeatedly to insure he had no weapons on him. *Exh. E* at 59:25-60:4, 61:13-20, 62:4-24. Flores changed the cuffs from a single pair, to double cuffs which allowed the chain to be loose. *Exh. L* at 140:5-12. Flores and Romero decided to double cuff Saenz which was a mistake as Romero's own expert acknowledges. *Exh. Q* at p. 7 ¶ 4; *Exh. P* at 51:12-22. Romero and Flores failed to use belly chains to control and protect Saenz. *Exh. D* at 135:5-13; *Exh. L* at 38:8-39:9, 49:24-50:13. Defendants were aware of the handcuffs being too loose. *Exh. Q* at 39:7-41:3. Flores could not remember trying to single cuff Saenz to restrict movement. *Exh. L* at 140:23-25, 141:21-25. This violates procedure. *Exh. L* at 142:1-9, 282:11-18.

**G4S SECURITY OFFICERS REPEATEDLY BANG SAENZ'S HEAD AGAINST THE VAN WHILE TAKING HIM TO JAIL.**

18.     Flores and Romero were angry that Daniel Saenz punched a female officer in the face. Flores looked, "frustrated, mad, everything…." *Exh. R* at 27:17-19. The co-conspirators started their actions of revenge in the van. Flores placed Saenz in the custody of his co-conspirators from G4S, Romero and Matthews. The G4S co-conspirator drove the van without Flores, thus they had complete custody and control over Saenz. *Exh. B* at 105:24-106:2; *Exh. S* at 40:19-25. If Saenz was truly uncooperative getting into the van, Romero should have contacted his supervisor. *Exh.*

7

*D* at 106:18-22. A reasonable officer (not intent on concealing his planned revenge against a man accused of punching a female officer in the eye) would have requested additional back up for transporting Saenz to jail. *Exh. D* at 106:7-17.

20.     During the short trip to the jail, Saenz's head was banged against the inside of the transport van multiple times. The head injuries were serious. G4S Security Guard **Romero was in charge of Saenz during the transportation and was responsible for all prisoners in his custody**. *Exh. U* at 94:22-96:22. To protect Saenz, Romero should have used leg irons to prevent injuries (like banging his head in the van) and to prevent possible escape. *Exh. D* at 114:6-7, 123:22-124:10. Romero had leg restraints in his van but failed to use them as he should have done. *Exh. B* at 230:20-231:12. Romero also failed to use belly chains in the van as he should have done. *Exh. D* at 114:19-21.

21.     During the van ride, Matthews from G4S drove. Flores was not in the van, Romero was thus in charge. Matthews testified that if he was aware of Daniel Saenz banging his head he would have stopped to protect Saenz, because that is what a decent human being does. *Exh. S* at 41:1-42:3. Additionally, Matthews knew when he had a prisoner in custody he had an obligation to provide for their medical needs. *Exh. S* at 42:24-43:2. Yet, Matthews saw Saenz banging his head against the wall of the van and did not stop him. *Exh. S* at 43:3-21. After Saenz banged his head from the G4S driving, he yelled out as if he was in pain. *Exh. D* at 106:7-15. Romero was also indifferent to Saenz's medical needs. Romero saw that Saenz was standing up. Romero told Matthews that Saenz removed his seatbelt, but Matthews just continued driving. *Exh. D* at 134:5-19. If Romero properly restrained Saenz with belly chains or leg irons, he would not have been able to undo his seat belt, stand up or bang his head. It took Romero 10-15 minutes to put a seatbelt

on Saenz. *Exh. B* at 162:3-12. Romero saw Saenz bang his head against the walls and plexiglass of the van that he thought would result in injury, but never did anything to protect Saenz. *Exh. B* at 247:4-11. Romero and Matthews failed to notify their supervisor when Saenz was injured. *Exh. D* at 93:12-17. A reasonable officer would know that a prisoner was injured after banging his head against the van. *Exh. D* at 104:10-14. Concussions are not visible. Bruises do not immediately show themselves. *Exh. D* at 105:7-24.

22.     The G4S Security Guards also failed to drive the van into the Sally Port to be closer to the jail door, which decreases the length of the walk, and potential for injury. *Exh. D* at 126:9-24;129:14-130:16. Romero stated that Saenz banged his head repeatedly in the van. *Exh. D* at 131:23-25. From the time he changed Officer Machuca's handcuffs off himself, to the time at "which he put him in the van and then coming out of the van, it became apparent (that the van should have been parked in the Sally Port because) "Mr. Saenz became very aggressive and paranoid as he kept looking at me as we escorted him to the sally port." *Exh. D* at 130:3-16. The security guards, from G4S should have summoned medical assistance because of the head injury from banging his head on the metal walls of the van which could cause a contusion or concussion, not immediately apparent. *Exh. D* at 130:22-131:17.

23.     Defendants Romero and Flores walked Saenz from the van to the jail. When entering the door to the jail, Flores said to watch his head. *Exh. L* at 171:13-21. Flores claimed he had a "gut feeling" that Saenz head would be slammed into the door. *Exh. L* at 263:5-18. Of course, once Flores knew he would slam Saenz head into the door, he had a "gut feeling." After saying this, Saenz head was slammed into the door post of the jail. *Id*.; *Exh. B* at 111:21-112:1, 112:10-21, 174:2-14. If the officers had proper control over Saenz, he would not have been able to bang

his head on the door frame. *Exh. C* at 47:2-48:4. Once he was injured, defendants had a duty to immediately call for medical aid. *Id*. Romero and Flores both knew that the jail wouldn't accept Saenz after the injury. *Exh. L* at 164:24-165:1; *Exh. B* at 182:22-183:21. Instead, the officers continued to drag Saenz without any regard for his serious head injury. *Exh. C* at 47:2-48:4.

24.     After Romero and Flores slammed Saenz head against the door, he fell to his knees. Blood gushed from his head and poured all over his face. *Exh. R* at 21:24-22:2. Saenz chest was covered in blood. *Exh. R* at 24:5-9. Blood was coming from his mouth, and his nose. It was leaking onto his chest. *Exh. R* at 24:10-18. Saenz was making choking noises. He was having trouble breathing and was not speaking. *Exh. R* at 24:23-25:13. He was in need of urgent medical treatment. *Exh. B* at 151:10-25. Instead of providing medical treatment, Romero and Flores dragged and paraded Daniel while he was double cuffed through the jail. *Exh. R* at 101:9-102:22 Daniel was unconscious from the injuries inflicted upon him by the defendants. *Exh. V.*

### ROMERO WAS DELIBERATELY INDIFFERENT TO THE LIFE THREATING INJURIES FLORES AND ROMERO INFLICTED ON SAENZ. ROMERO WAITED FOR AN HOUR AND NEVER SOUGHT ANY TREATMENT.

25.     Around 5:00 p.m., Defendants Romero and Flores walked Saenz from the transport van to the jail. When entering the door to the jail, the defendants slammed Saenz's head into the door post of the jail. *Exh. B* at 112:10-21. Saenz was shot at 6:01 p.m. *Exh. W* at 2. Romero never once called for medical treatment. *Exh. B* at 157:25-158:8

**26.     Romero knew at the time, failure to properly escort a prisoner could result in a claim of constitutional violations**. *Exh. B* at 26:7-12. **Romero admitted he failed to escort Saenz properly.** *Exh. B* at 25:17-20. Saenz received his injuries when Romero had control of Saenz. *Exh. S* at 32:9-13. After the admitted failure to properly escort Saenz, Saenz fell to his

knees. Blood gushed from his head and poured all over his face. *Exh. R* at 21:24-22:2. Blood was coming from his mouth, and his nose. It was leaking onto his chest. *Exh. R* at 24:10-18. Saenz chest was covered in blood. *Exh. R* at 24:5-9. Saenz was making choking noises. He was having trouble breathing and was not speaking. *Exh. R* at 24:23-25:13. He was in need of urgent medical treatment. *Exh. B* at 151:10-25. It was life threatening. *Exh. X*; *Exh. T* at 209:1-15. There was a trail of blood mopped up by trustees. *Exh. M* at 102:15-104:15; *Exh. L* at 58:9-18.

27. The **nurse yelled "he needs to go to the ER or you need to call an ambulance," but the officers (Romero and Flores) did not respond**. *Exh. R* at 25:21-26:8. When Romero and Flores failed to call for medical attention, the nurse screamed a few more times to them, "he need to go, he need to go now. Now. He need to go" (to the ER). *Exh. R* at 27:23-28:9. Romero ignored the pleas to call for medical treatment.

28. Trooper Allick opined the head and face injuries were life threatening. *Exh. M* at 103:24-104:15. It was urgent according to Allick to provide prompt medical treatment to Daniel Saenz.   *Exh. M* at 104:13-15; *Exh. X*. According to defendant's own expert, in a situation where there's a life-threatening injury to a prisoner, it is the obligation of law enforcement to immediately get medical treatment. *Exh. M* at 105:1-7. Romero and Flores had a duty to provide that medical treatment, but they were deliberately indifferent to Daniel's needs. *Exh. T* at 62:4-10. Romero learned that illegal searches and seizures were unconstitutional. *Exh. B* at 27:25-28:10. **Flores brought discredit to the police department by failing to properly address safety concerns** at all relevant times during his interactions with Daniel Saenz. **This included** the discharge of his weapon and failing to get extra support to help control Saenz and **failing to reasonably and promptly obtain medical attention.** *Exh. T* at 64:2-23 (Emphasis added).

11

**ANOTHER G4S EMPLOYEE (MATTHEWS) CALLOUSLY DISREGARDED THE NEED TO PROVIDE MEDICAL TREATMENT TO DANIEL SAENZ AS WELL.**

29.     There was another G4S security guard there when the nurses stated that Saenz needed immediate medical treatment. That guard (Matthews) refused to help Saenz and "he just look(ed) back like, I don't care." (sic). Cuevas knew it was a G4S security officer because of his patch identification. *Exh. R* at 28:15-29:4, 29:6-23. The G4S guard made a hand gestures as if to say "this is what he (Saenz) gets." *Exh. R* at 29:24-30:3. The G4S guard's hand gesture was the hand gesture "like somebody don't care."… "that's what he get." (sic) *Exh. R* at 30:8-16. Mr. Cuevas felt bad because no one was helping Saenz's medical condition and it appeared that Saenz was not being treated right. *Exh. R* at 31:2-8. In the State of Texas, training advised that it was the duty of officers to promptly provide for the medical needs of prisoners. *Exh. M* at 97:4-8.

**RATHER THAN PROVIDE URGENTLY NEEDED MEDICAL CARE, FLORES AND ROMERO DRAGGED THE PROFUSELY BLEEDING SAENZ THROUGH THE JAIL, WITH HANDCUFFS SO TIGHT THEY CAUSED SAENZ'S HANDS TO TURN PURPLE.**

30.     After the nurse told Flores and Romero to call the ER, they refused, (as did G4S Security Guard Matthews). Instead, Romero grabbed Saenz and picked him up by the armpit in such a way that the carrying looked painful. **Saenz's hands were pink and purple because the handcuffs were so tight.** *Exh. R* at 31:16-32:11. When Romero and Flores took Saenz to the elevators on the second floor, Mr. Cuevas could still hear banging on the wall as if the officers were slamming Saenz against the walls. *Exh. R* at 32:12-25. While Romero and Flores slammed Saenz against the wall, Mr. Cuevas could hear choking sounds. *Exh. R* at 33:16-23. After Flores, Romero and Saenz disappeared from the holding tank, Cuevas could see drops of blood on the floor. *Exh. R* at 34:1-11.

31.     Flores and Romero "single locked" his hand cuffs. This means the cuffs would continue to tighten, inflicting more pain and injuries. The pictures of the injuries to Daniels Saenz's wrists, are consistent with wrist injuries from single locking cuffs. *Exh. A*; *Exh. L* at 310:3-25. Single locked cuffs can cause injuries to the wrists, with any kind of movement. *Exh. D* at 119:4-120:2. Failure to double lock handcuffs can cause injuries because they keep tightening. *Exh. D* at 122:22-24. The cuffs get tighter and there can be cruel and unusual punishment. *Exh. T* at 169:1-15. (Even if there are two pairs of cuffs, locked together, if they are single locked it harms the prisoner). *Exh. T* at 170:7-22. Double cuffing is using two cuffs. Double locking is using a key. *Id*. *Exh. T* at 170:7-22. *Exh. Y* shows double cuffed handcuffs, and *Exh. A* shows an injury consistent with single locking those cuffs. Allen depo 171:2-8; 171:19-22.

32.     The decision to double cuff Saenz was a mistake. *Exh. P* at p. 7 ¶ 4; *Exh. Q* at 38:23-40:22, 51:12-22. **Romero was responsible for the decision to single lock and double cuff Saenz even though Flores placed the cuffs on Saenz**. *Exh. D* at 118:17-119:1.

33.     Defendants also should have used belly chains for control of Saenz and to protect him. *Exh. D* at 135:5-13; *Exh. Q* at 38:8-39:9, 49:24-50:13. Romero was responsible for the safety of Saenz. *Exh. D* at 135:2-13. If Romero had properly fastened belly chains or leg irons, they would have restricted movement so that Saenz could not injure himself voluntarily or accidentally. *Id*.

**OFFICERS TEASED SAENZ ABOUT HIS SUFFERING.**

34.     Officers joked with each other and teased Saenz about his tragic condition. *Exh. X*. No one called for medical treatment. *Exh. D* at 118:17-119:15; *Exh. Q* at 28:14-30:11; 32:13-

33:12; 35:4-36:4. **When he was being dragged, Romero and Flores "messed up" Saenz's arms.** He had given up already. *Exh. R* at 36:10-15.

35.     The man that had the bleeding face (Saenz) was dragged by officers Flores and Romero. When Romero had Saenz, it sounded like Saenz's head was again banged against the wall before Saenz was shot and killed outside of the jail. *Exh. R* at 35:12-24. Dragging Saenz by the arms would cause the handcuffs to further injure his wrists. *Exh. L* at 312:10-24.

36.     The officers stayed upstairs with the profusely bleeding Saenz for 30 minutes to less than one hour. *Exh. L* at 67:10-19. They did not call for medical treatment.

**ROMERO AND FLORES SHOULD NOT HAVE DRAGGED DANIEL SAENZ.**

37.     Romero and Flores were not supposed to drag Saenz. They could have summoned fire EMS response by radio. *Exh. T* at 114:10-116:9. Nurses told Flores and Romero to call for EMS. *Exh. R* at 25:21-26:8, 27:23-28:9. Saenz was bleeding profusely. Instead of summoning medical aid, Daniel Saenz was dragged through the jail by Flores and Romero. *Exh. M* at 101:9-23; *Exh. C* at 46:12-53:9. His injuries were life threatening. *Exh. C* at 46:12-53:9, especially, 48:25-49:13. He was bleeding while being dragged from the entrances of the jail to the third story. Then he was taken while still bleeding back down and taken outside. *Exh. M* at 101:9-23; *Exh. C* at 46:12-53:9, especially, 48:25-49:13. Saenz was dragged while bleeding for about an hour before he was killed. *Exh. L* at 68:23-25.

38.     Romero was taught he could not use excessive force. If he did, it would be unconstitutional.   *Exh. B* at 29:14-22.

**DANIEL SAENZ WAS BLEEDING SO PROFUSELY THAT TRUSTEES FOLLOWED AS HE WAS DRAGGED TO MOP UP THE BLOOD.**

39.     While Saenz was dragged bleeding, jail Trustees followed behind and mopped up the blood. *Exh. M* at 101:24-102:2; *Exh. C* at 46:12-53:9. There was a trail of blood as Daniel was being dragged that was cleaned up by trustees with a mop. *Exh. M* at 102:15-22; *Exh. C* at 46:12-53:9, especially, 49:9-13. Obviously, as the defendants cruelly dragged Daniel Saenz up and down three stories, they were inflicting further pain and injury by dragging him, rather than putting him on a stretcher, gurney, wheel chair or restraint chair. *Exh. C* at 46:12-53:9, especially, 48:5-13. One of the reasons to use a stretcher on a person who has a serious injury rather than dragging him, is that it would help to prevent further injuries. *Exh. M* at 110:24-111:16. Officers in Texas have an obligation to avoid needless pain and suffering. *Exh. M* at 112:3-7.

**THERE WAS NO REASON TO CRUELY DRAG DANIEL SAENZ. IF HE HAD TO BE TRANSPORTED THE JAIL HAD WHEEL CHAIRS, RESTRAINT CHAIRS WITH WHEELS, STRETCHERS AND GURNEYS**.

40.     The El Paso jail had wheelchairs. Mr. Cuevas had been in a chair at the El Paso jail before. *Exh. R* at 111:20-23. There were wheelchairs "for handicap people." *Exh. R* at 126:22-25. The jail also had a restraining chair that Cuevas personally saw and even sat in. *Exh. R* at 127:13-22. El Paso City Police officers beat Mr. Cuevas, brought him to the county jail and then gave him a restraining chair with wheels in it. *Exh. R* at 120:3-15. There are also stretchers in the county jail that Mr. Cuevas has seen provided to the prisoners. *Exh. R* at 129:16-130:14. **If Saenz was put into a wheelchair, a stretcher or a restraining chair with wheels on it, officers Flores and Romero could have taken him through the jail, rather than dragging him painfully by the arms.** *Exh. R* at 130:15-24; *Exh. C* at 46:12-53:9. Chief Noble testified in part as follows:

> Rather than requesting medical aid for someone who is obviously seriously injured, is bleeding profusely, these two officers begin to drag Mr. Saenz who is – into the jail through the jail corridors to an elevator, up the elevator to – I believe it's the second floor where the booking facility is where the nurses are located. They continue to drag Mr. Saenz

without any regard for his serious injury to his head.

 The fact that police officers are trained to render immediate medical aid for someone who is in their care and custody and cannot access their own medical attention and, obviously, putting him through a level of pain and suffering by dragging him and risking further injury or exacerbating the injury that he has by, you know, recklessly and foolishly and carelessly dragging him through this jail facility ….

They still have not gotten on the radios to call for help or call for paramedics. They dragged him back downstairs. The amount of blood was obviously significant as the video shows … They take him back downstairs into the locked sally port area; again, still have not called for paramedics …And the fire station is located, apparently, literally across the street.

They then drag Mr. Saenz out of the sally port to just go outside the door. Officer Flores leaves Mr. Saenz who is handcuffed, who is not wearing a shirt, who had been arrested, had been searched and searched at the jail, should have been searched when he got put into a custody van. His pants were pulled down around his knees. Obviously, he had no weapon, no ability to have any weapon. *Exh. C* at 47:21-50:1.

**FLORES AND ROMERO DRAGGED SAENZ OUTSIDE OF THE JAIL, AGAIN IN VIOLATION OF ORDERS. FLORES RETURNS TO JAIL TO GET HIS GUN.**

41.     Romero and Flores then dragged Daniel outside of the jail to a loading dock in direct violation of orders from Sgt. Peralta. Flores claimed that Daniel caused him to be in fear of harm.  Inexplicably, Flores then left Romero alone with Daniel Saenz outside of the jail for multiple minutes. *Exh. L* at 84:25-85:11; *Exh. C* at 46:12-53:9. Videotape shows why. Flores went back into the jail to retrieve his gun from a locker. He returned to the loading dock, insulted and incited Daniel Saenz to create a reaction. Then, knowing that Daniel was unarmed, and that he was lying on his stomach not threatening anyone, Flores callously drew his gun, and shot Daniel Saenz in his shoulder. *Exh. L* at 203:23-204:10. The bullet entered his shoulder and penetrated into his chest cavity. Daniel Saenz was killed. *Exh. F* at 11. Noble testified in part as follows:

The shooting was intentional and unconstitutional. Flores disengages. Romero is still – a portion of Romero was holding his head in his upper should area. Officer Flores backs away. You can see in the video that he begins to reach for his TASER that's on his left side with his left hand. He does not draw his TASER. Instead he draws his handgun. He calls out to Officer Romero to watch out. As he says "watch out," he moves toward Mr. Saenz. Simultaneously, Officer Romero fires a single round, striking Mr. Saenz in the left shoulder, which ultimately results in Mr. Saenz's death.

At the conclusion of the shooting Officer Flores made statements to two sergeants who

responded. He tells Sergeant Salazar, "I had to shoot the guy." He never told Salazar that the shooting was accidental. He tells Sergeant Peralta that he didn't want to shoot, but he had no other choice. "He went crazy on me."

Ten days after the shooting Officer Flores completes a report regarding the incident. He has an attorney during the ten days. He writes his report that he fled he had no choice but to use deadly force. So this was not a report he was writing under stress; rather, he had ten days to deal with the stress of the incident, and he had an attorney to assist him in writing his report. And he still wrote nothing in his report about this shooting being somehow accidental. Rather, he wrote that he felt he had no choice but to use deadly force."
*Exh. C* at 46:12-53:9.

## THERE WAS NO JUSTIFICATION TO DRAW A WEAPON. DANIEL SAENZ NEVER CREATED AN IMMINENT DANGER TO DEFENDANTS.

42.     Drawing a gun as a show of force is very dangerous. *Exh. Z* at 5:21-6:20. Brodd, the defendants own expert, testified that "Flores' decision to unholster his firearm was a mistake – he had less lethal options. *Exh. Q* at 10:23-11:12. **At the time Officer Flores drew his firearm and pointed his weapon at Saenz, neither Officer Flores nor Mr. Romero was in imminent danger of serious bodily injury or death.** *Exh. Q* at 90:19-91:3. Officer Flores should have summoned emergency backup and attempted to control Saenz with his Taser or impact weapons... in lieu of Officer Flores drawing and pointing his firearm at Saenz." *Exh. P* at 10, ¶ 15; *Exh. Q* at 10:23-11:12; 12:2-12. **Brodd, defendants' own expert, testified the shooting of Saenz was unreasonable, unjustified and unconstitutional.** *Exh. Q* at 69:24-20:2; 84:23-85:11.

43.     Flores violated safety practices by drawing his duty weapon, placing his finger on the trigger and then re-engaging Daniel Saenz which resulted in the discharge of his weapon and ultimately the death of Daniel Saenz. *Exh. T* at 79:20-80:1. Flores used unnecessary force towards Daniel Saenz which caused his death. *Exh. T* at 132:5-10. Saenz was cooperative. Romero testified:

> **Q. He just sat there and sort of started tipping over. He wasn't fighting, yelling, screaming, running, anything of that sort, was he?**
> **A. That's correct.** *Exh. B* at 59: 22-25.

Just prior to the shooting while outside the sally port, Romero further admitted that Saenz was

unconscious or asleep. *Exh. B* at 192:9-193-7.

> ### WHEN FLORES INTENTIONALLY SHOT DANIEL SAENZ HE COMMITTED MURDER WHICH EXPLAINS WHY HE LIED TO INVESTIGATORS AND MISREPRESENTED FACTS.

44.    Flores tried to misrepresent the facts regarding his intentional shooting. *Exh. T* at

60:23-61:10. Flores tried to cover up the fact that his shooting was intentional. *Exh. T* at 61:12-22.

45.    However, Flores told both of his Sergeants that he intentionally shot Daniel Saenz.

*Exh. AA* at 5:16-19, 45:17-24; *Exh. Z* at 4:23-5:1. Flores did **not** say that he intended to draw his

weapon merely as a show of force. *Exh. AA* at 5:21-24; *Exh. Z* at 5:2-4. Flores' own expert, Texas

Ranger Wright testified that Flores' shooting Saenz intentionally was unjustified and constitutes

murder. *Exh. M* at 163:14-17. Defendant's expert, Texas Ranger Wright testified if the shooting

was intentional, it was murder, plain and simple. *Exh. M* at 161:10-23 and 163:14-17.

> ### DANIEL SAENZ CONTINUED TO SUFFER EVEN AFTER HE WAS SHOT.

46.    Romero observed even after the gunshot wound that Daniel Saenz remained alive

for some period of time. He was breathing heavily. He was wheezing. Romero could not recall if

Saenz was crying or not. *Exh. B* at 78:6-25.

> ### THE DEFENDANTS KNEW THEIR ACTIONS WERE UNCONSTITUTIONAL, SO THEY ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

47.    Romero was taught if he used too much force there would be consequences. *Exh.*

*B* at 33:19-34:1. Romero testified:

> Q. Were you taught by G4S that you could only use reasonable force based on the force
> being used against you as part of this continuum? ...
> A. They -- it was taught that, yes. *Exh. B* at 32:23-33:2

Romero was also taught the law about searches and seizures. *Exh. B* at 35:24-36:3.

### G4S IS RESPONSIBLE FOR ITS FAILURE TO PROPERLY TRAIN ITS SECURITY

48.      G4S failed to train Romero on how to deal with a combative subject. *Exh. B* at 238:11-229:3, 229:22-230:12. G4S failed to train its employee of when a prisoner might flee. *Exh. B* at 43:12-18. G4S also failed to train Romero how to use a radio, or the benefits of a radio. *Exh. B* at Page 93:11-18. After Romero took a one week course at El Paso Community College to obtain his security license, G4S did nothing to ensure Romero's proficiencies and knowledge of the course. *Exh. B* at 38:7-22. Romero testified that G4S extent on their employees' proficiencies was a follows:

> Q.   So the communications between you and G4S about your skills and abilities
> consisted of them asking you how it went and your saying it went fine. Correct?
> A.   Yes, sir. *Exh. B* at 39:23-40:2

After Romero left G4S, he had more comprehensive training. *Exh. B* at 71:11-13.

### III.      RESPONSE TO DEFENDANT'S PROPSED UNDISPUTED FACTS

49.      Plaintiff disputes the following proposed facts in Defendant's Motion for Summary Judgment:

50.      In paragraph three of their Motion for Summary Judgment, Defendants bring up events from March 7, 2013. However, these events are irrelevant because neither Flores nor Romero knew of those events. *Exh. L* at 16:22-17:13; *Exh. M* at 78:24-79:15. The events of March 7, 2013 are irrelevant as officers can only consider what they know. *Exh. M* at 94:14-24, 96:1-13.

51.      In paragraph four of their Motion for Summary Judgment, Defendants again bring up irrelevant evidence. The 9-1-1 Defendants bring up is irrelevant because neither Flores nor Romero never knew of that event. *Exh. F* at 16:22-17:13; *Exh. D* at 78:24-79:15. The events of March 7, 2013 are irrelevant as officers can only consider what they know. *Exh. D* at 96:1-13.

52.      In paragraph four, Defendants also bring up the non-existent injuries to the Saenz family dog, even though Defendants motion admits there was no injury to the dog. (Doc. 234-2).

Animal control looked at the dog and concluded the dog had gotten salsa on his leg, not blood. *Exh. F* at 94:16-23.

53.     G4S had a duty to train its employees (including Romero) to ensure that when transporting prisoners, they would not be harmed, including bumping their heads on the van, and provided that training to its employees. *Exh. U* at 65:23-66:15. G4S guards were supposed to be trained to safely handcuff a prisoner, and safely transport the prisoner, to protect the prisoner. *Exh. U* at 61:1-6, 61:11-62:21. Properly trained security guards would protect the safety of prisoners with respect to handcuffing and transportation. *Id*. Although the Most Knowledgeable Person from G4S did not know if Romero received any training on properly transporting or handcuffing a prisoner, Romero should have received such training. *Exh. U* at 32:11-19. That training included insuring that prisoners did not bang their heads during transport. *Exh. U* at 65:23-66:5.

54.     Plaintiff disputes Sepulveda's testimony about how the incident occurred in paragraph seven; e.g., claiming that Saenz tried to kick McFarland. (Doc. 234-2 at 5). Sepulveda could not see the events as described. Sepulveda was not in the room with Saenz and McFarland, and there was a door blocking the room. *Exh. AB* at 42:9-21. Sepulveda could also not see the officer because she was behind the curtains. *Exh. AB* at 69:10-13, 70:21-24. Defendants also claim that Saenz screamed profanity at the officer, citing to Sepulveda's deposition, but Sepulveda also testified he could not hear what was said between the officer and Saenz. *Exh. AB* at 54:9-21. However, he did recall the officer raised her voice at Saenz. *Id*. The prongs of the taser were removed, which is why when Daniel Saenz was tased, he did not go down. *Exh. AC* at 29:20-30:15. Expert Noble testified that if one dart is failing to make contact, the taser will not work. *Exh. C* at 96:7-97:2.

55.     Defendants' claim that Saenz grabbed McFarland by her waist causing her to fall. (Doc. 234-2 at 5). In actuality, it was Sepulveda who violently grabbed her, causing her to fall. *Exh. AB* at 67:4-20. Indeed, others at the hospital took down both Saenz and Officer McFarland. *Exh. E* at 19:8-11. Although Saenz rushed towards McFarland, McFarland defended herself so Saenz did not hit her. *Exh. AC* at 22:12-23. The only thing that Daniel Saenz punched was a sanitizer. *Exh. AC* at 33:2-7.

56.     Plaintiff disputes Defendants citation to improper speculation of McFarland's deposition, such as her saying "Saenz 'looked like he wanted to kill' her." (Doc. 234-2 at 5).

57.     Plaintiff disputes Defendants' misstatement of the facts. Saenz did not weight over 270 pounds. (Doc. 234-2 at 6). According to the autopsy report, Saenz weighed 217 pounds. *Exh. F*.

58.     Plaintiff disputes Robles testimony that Saenz punched an EMT on the arms and another on the jaw. (Doc. 234-2 at 6). Robles was a few rooms away and could not see what happened since there were walls and curtains between where he was and where Saenz and others were. *Exh. AC* at 22:24-23:21, 24:6-21, 25:13-26:20; *Exh. AD*.

59.     Plaintiff disputes Defendants false claim that Romero's "sole responsibility was to assist in the transportation of detainees between jails." (Doc. 234-2 at 7). Romero admits it was his duty to provide care and control over the subject he was transporting including protecting their safety. *Exh. B* at 153:10-154:3. G4S had a duty to train its employees (including Romero) to ensure that when transporting prisoners, they would not be harmed, including bumping their heads on the van, and provided that training to its employees. *Exh. U* at 65:23-66:15. Flores placed Saenz in the custody of G4S employees, Romero and Matthews. The G4S guards drove the van without Flores, giving the G4S guard complete custody and control over Saenz. *Exh. B* at 105:24-106:2; *Exh. S* at

40:19-25. Romero was in charge of Saenz during the transportation and was responsible for all prisoners in his custody, including insuring they were safe during transportation. *Exh. U* at 94:22-96:22. G4S officers were taught they should periodically check prisoners for signs of distress, safety risks and attempted escapes. *Exh. U* at 119:24-120:5. **If Flores did not call for medical treatment for Saenz, then Romero should have called for medical treatment**. *Exh. U* at 159:5-20.

60. Plaintiff disputes Defendants' claim that Saenz was truly uncooperative getting into the van. (Doc. 234-2 at 7). If Saenz was truly uncooperative getting into the van, a reasonable officer would have requested additional back up for transporting Saenz to jail. *Exh. D* at 10:7-17. Romero should have contacted his supervisor. *Exh. D* at 106:18-22. Romero and Matthews were the only ones from G4S to load Saenz into the van. *Exh. D* at 92:23-93:11.

61. Plaintiff disputes Defendants changing the factual sequence around in paragraph 13, making it misleading. (Doc. 234-2 at 7). Romero and Flores spent 10-15 minutes trying to put on a seat belt before ever driving; this is when they first should have called a supervisor. The second time a supervisor should have been contacted was after Saenz injured his head in the van being transported to jail. Romero and Matthews failed to notify their supervisor when Saenz was injured. *Exh. D* at 93:12-17.

62. Plaintiff disputes Defendants claim that at the time they arrived to the jail, Saenz was cooperative, so there was no need to drive down the sally port ramp to jail. In actuality, while being transported, Saenz had undone his seat belt, stood up, and banged his head just before arriving to the jail. Romero also stated that Saenz banged his head repeatedly in the van. *Exh. D* at 131:23-25. Defendants also claim that "Mr. Saenz became very aggressive and paranoid as he kept

22

looking at me as we escorted him to the sally port." *Exh. D* at 130:3-16. Thus, Saenz should have been driven down the Sally Port. *Exh. D* at 126:9-24, 129:14-130:16.

63.     Plaintiff disputes the time sequencing and facts of Defendants in paragraph 17. (Doc. 234-2 at 10). The G4S officers did have a radio in the van. *Exh. U* at 97:11-15. Romero and Flores were not supposed to drag Saenz. They could have summoned fire EMS response by radio. *Exh. T* at 114:10-116:9. Pebble Hills Regional Command Center loaned Romero a police radio. *Exh. B* at 91:16-21. There were back up officers at G-4S as well as El Paso Police Department. *Exh. D* at 108:7-17.

64.     Plaintiff disputes the facts of Defendants in paragraph 18. (Doc. 234-2 at 10-11). Defendants claim that "Saenz resisted the efforts of the jail detention officers to subdue him." (Doc. 234-2). Here is what really happened: It took around 3–5 minutes after Saenz's head was slammed against the door frame until Romero and Flores tried to put their guns into the lockers. *Exh. B* at 121:17-122:6. (Romero later Romero changed his testimony saying it took 20-30 seconds. *Exh. B* at 122:15-123:3). At that point, Saenz was propped up against the fence. *Exh. B* at 121:17-122:6. Some detention officers saw them and held Saenz. *Exh. B* at 121:17-122:6. This allowed Romero and Flores to put their guns in their lockers. *Id*. There is no mention of Saenz resisting as defendants claim. *Id*. After putting their guns away, Flores and Romero returned to the fence where Saenz was. *Exh. B* at 125:1-6. Saenz collapsed onto his knees. *Exh. B* at 125: 9-15.

65.     Plaintiff disputes Defendants misstatement of the deposition of Romero. Romero did not say that Saenz appeared like he was being "coy, acting as if he was unconscious." (Doc. 234-2 at 11). What Romero stated was "I'm not sure if he was unconscious or not." *Exh. B* at 127:22-128:6.

66.     Plaintiff disputes Defendants claim that Saenz attempted to run up the ramp to escape. (Doc. 234-2 at 15); *Exh. D* at 125:17-25; *Exh. V*. Nowhere in the video does it look like Saenz is attempting to escape. *Exh. V*.

67.     Plaintiff disputes Defendants' claim that Flores pulled out the gun as a use of force. At the time that Flores shot Saenz, no one was in imminent danger. *Exh. Q* at 91:4-11. Flores should have used a Taser rather than a gun. *Exh. Q* at 92:24-93:4. The training policies advised officers at the El Paso Police Department they could not engage in excessive force. Further, they had a duty to provide medical treatment. Failure to follow these rules could result in a civil rights lawsuit. This policy was taught to trainees. *Exh. AA* at 67:1-20, 68:3-69:7.

68.     Plaintiff's dispute Defendant's assertion that Saenz was properly controlled when he hit his head on the door frame. If Saenz was properly controlled, he would not have hit his head on the door frame. *Exh. C* at 46:2-53-9; *Exh. D* at 135:5-13; *Exh. Q* at 49:15-50:15.

## IV.     SUMMARY JUDGMENT EVIDENCE

69.     In support of this Response, Plaintiff relies on the pleadings on file in this action, on the admissible summary judgment evidence submitted by Defendant, and on the summary judgment evidence attached hereto as follows:

> **Exhibit A**: Pictures of the Injuries to Daniel Saenz
> **Exhibit B**: Deposition of Alejandro Romero
> **Exhibit C**: Deposition of Jeff Noble
> **Exhibit D**: Deposition of Scott DeFoe
> **Exhibit E**: Deposition of Christine McFarland
> **Exhibit F**: Deposition on Written Questions of Juan Contin, the Medical
>             Examiner in this case
> **Exhibit G**: Alejandro Romero's Written Statement of March 8, 2013
> **Exhibit H**: Alejandro Romero's Written Statement of May 5, 2014
> **Exhibit I**: Alejandro Romero's Statement on May 16, 2014
> **Exhibit J**: Deposition of Rodrigo Saenz
> **Exhibit K**: Animal Control Report
> **Exhibit L**: Deposition of Officer Flores

**Exhibit M**: Deposition of Kevin Wright
**Exhibit N**: Police Report 13-068147
**Exhibit O**: Deposition of Roswitha Saenz
**Exhibit P**: Brodd's Expert Report
**Exhibit Q**: Deposition of Barry Brodd
**Exhibit R**: Deposition of Omar Cuevas
**Exhibit S**: Deposition of James Matthews
**Exhibit T**: Deposition of Chief Gregory Allen
**Exhibit U**: Deposition of Jimmy Ramos
**Exhibit V**: Video of Incident
**Exhibit W**: CAD Event Chronology
**Exhibit X**: Trooper Allick's Statement
**Exhibit Y**: Photographs of Double Handcuffs
**Exhibit Z**: Deposition of Andrew Salazar
**Exhibit AA**: Deposition of Gabriel Peralta
**Exhibit AB**: Deposition of Joseph Sepulveda
**Exhibit AC**: Deposition of Arturo Robles
**Exhibit AD**: Diagram

70.     Plaintiff's evidence described above is hereby made part of this Response and is hereby incorporated by reference as if fully set forth herein.

## V.     SUMMARY JUDGMENT STANDARD

71.     Summary judgment is only appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (emphasis added); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). An issue of fact "is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.,* 340 F.3d 233, 235 (5th Cir.2003). "A factual dispute is 'genuine,' if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Crowe v. Henry,* 115 F.3d 294, 296 (5th Cir.1997).

72.     The initial burden of proof is on the movant to show that there is no genuine dispute as to any material fact. *Lynch Props., Inc. v. Potomac Ins. Co.,* 140 F.3d 622, 625 (5th Cir.1998). Only once the moving party has met this burden, must the nonmovant present evidence of a genuine dispute. *Id.*; *see also Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994). In

evaluating the summary judgment evidence, the trial court is required to view all facts and draw all reasonable inferences in the light most favorable to the nonmoving party and resolve all disputed factual controversies in favor of the nonmoving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Boudreaux v. Swift Transp. Co., Inc.,* 402 F.3d 536, 540 (5th Cir.2005); *Lynch Prop.,* 140 F.3d at 625.

### A. QUALIFIED IMMUNITY

73.     There is not a firmly-rooted history of affording qualified immunity to citizens that engage in excessive force in transporting prisoners. At common law, government actors were afforded certain protections from liability, based on the reasoning that the public good is best secured by allowing officers charged with the duty of deciding upon the rights of others to act upon their own free unbiased convictions, uninfluenced by any apprehensions. *Filarsky v. Delia*, 566 U.S. 377, 132 S. Ct. 1657, 1661-62 (2012). Such common-law protection, well-grounded in history and reason, persists under section 1983, although not specified in the statute's language. *Id.* at 1662. This is because such immunity was so firmly rooted in the common law and supported by such strong policy reasons that "Congress would have specifically so provided had it wished to abolish the doctrine." *Richardson v. McKnight*, 521 U.S. 399, 403 (1997), *quoting Wyatt v. Cole*, 504 U.S. 158, 164 (1992) (additional citations omitted).

74.     Whether a particular defendant is entitled to qualified immunity does not turn merely on whether he is publicly or privately-employed, or whether he performs public duties on a full or part-time basis. *Filarsky*, 132 S. Ct. at 1665; *Richardson*, 521 U.S. at 404. Nor does qualified immunity turn on whether the defendant acts in concert with government officials. *Wyatt*, 504 U.S. at 168. Nor is the particular function performed by a private individual determinative of whether qualified immunity exists. *Richardson*, 521 U.S. at 408-09. Instead, the test for qualified

immunity is whether a "firmly rooted" common-law tradition would have granted immunity to a person in the defendant's position. *Richardson*, 521 U.S. at 403-04. Specifically, when the defendant is a private contractor, the question is whether there is a historical tradition of affording immunity to private actors in that position, not simply to public employees performing the same function. *Id.* at 404-05. The Court must look to history and consider the purposes underlying government employee immunity to determine whether employees of a private contractor in a particular position would have been immune from liability under the common law. *Id.* at 404.

75.     This is a two-part test: In determining whether private defendants can claim qualified immunity, "we consider the immunity historically accorded the relevant official at common law and the interests behind it." *Estate of Gee ex rel. Beeman v. Johnson*, 365 Fed. Appx. 679, 682 (7th Cir. 2010). "If '[h]istory does not reveal a firmly rooted tradition of immunity' and the policy considerations underlying qualified immunity do not apply to the category of private persons of which the defendant is a part, then he is not entitled to qualified immunity." *Gregg v. Ham*, 678 F.3d 333, 340 (4th Cir. 2012), *quoting Richardson*, 521 U.S. at 404.

76.     In *Richardson v. McKnight*, the Supreme Court held that privately-employed prison guards do not possess qualified immunity. *Richardson*, 521 U.S. at 412. The Court explained that there is no firmly-rooted tradition of immunity applicable to privately-employed prison guards. *Id.* at 404. Although government-employed prison guards may have enjoyed a kind of immunity defense, the common law did not give purely private companies or their employees any special immunity from suits by mistreated prisoners. *Id.* at 405-06. Absent conclusive evidence of a historical tradition of immunity for private parties carrying out these functions, history did not provide support for the privately-employed prison guards' immunity claim. *Id.* at 407.

77.     *Richardson* also found that the purposes of the immunity doctrine did not warrant

extending qualified immunity to privately-employed prison guards. *Id.* at 408-11. The purpose of the doctrine is to protect government's ability to perform its traditional functions, by providing immunity when "necessary to preserve" the ability of government officials to serve the public good or to ensure that talented individuals were not deterred by the threat of damage suits from entering public service. *Id.* at 408, *quoting Wyatt*, 405 U.S. at 167. Most importantly, immunity protects the public from unwarranted timidity on the part of public officials. *Id.* at 408. But this concern is not present when a private company subject to competitive market pressures performs a governmental function. *Id.* at 409. In this context, a firm whose employees are too aggressive will face damages that raise costs, threatening its replacement; while a firm whose employees are too timid will face threats of replacement by other firms with records that demonstrate their ability to do both a safer and more effective job. *Id.* Marketplace pressures are therefore sufficient to provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or non-arduous job performance. *Id.* at 410.

78.     Privatization also helps meet the immunity-related policy to ensure that talented candidates are not deterred by the threat of damages suits from entering public service. *Id.* at 411. Private employers are able to provide comprehensive insurance coverage, reducing any employment-discouraging fear of unwarranted liability faced by potential applicants. *Id.* Private employers are free from many civil service law restraints, permitting a private firm to offset any increased liability risk with higher pay or extra benefits. *Id.* Since a private firm performing government duties can operate like other private firms, instead of like a typical government department, the purpose of preventing deterrence of talented candidates does not support extending immunity to privately-employed individuals. *Id.* And while potential liability may well "distract" employees from their duties, the risk of distraction alone is insufficient grounds for granting an

immunity. *Id.*

79.     Based on the *Richardson* analysis, Defendant Romero, a privately-employed person under a contract for transportation of prisoners, does not possess qualified immunity. To the extent such persons may take prisoners into custody, they are not distinct from the private prison guards at issue in *Richardson*. And as explained in *Richardson*, the competitive pressures of the marketplace are sufficient to satisfy the purposes of immunity, in the context of such a private entity's performance of its duties. The purposes of immunity are certainly not so strong in this context to justify creating a new immunity that did not exist at common law. Any relevant policy considerations in favor of immunity are offset by marketplace forces in the circumstance of private contractors, and are not sufficient to justify the creation of a new immunity.

80.     Appellant has also failed to show a common-law tradition of granting immunity to persons in his position. Even some of the cases Defendants cite to establish a firmly-rooted tradition of immunity applicable to privately-employed persons transporting prisoners under government contracts, shows how that there is no firmly-rooted tradition of immunity applicable to privately-employed persons transporting prisoners under government contracts; e.g., *Mejia v. City of N.Y.*, 119 F. Supp. 2d 232, 261 (E.D.N.Y. 2000). *Mejia* cites to *Oystead v. Shed* where the Supreme Court of Massachusetts held "[W]here the original act of the officer is unlawful in itself, any stranger who aids him in it will be liable to the party injured, although he act by the officer's command.... [I]n the case at bar the illegality of his proceedings was not so obvious; and these two defendants may be supposed to have been ignorant of the law in this respect. But this, if true, would not excuse their conduct, nor diminish in any degree the injury which the plaintiff sustained." 12 Mass. 506, ——, 1815 WL 992, at *4–5 (1815). *Mejia* also cites to *Staples v. State*, where a court of appeals in Texas held that "It was no justification that defendant was in company

and acted in concert with an officer of the law in making the arrest." *Staples v. State*, 14 Tex. App. 141. The *Staples* court also quoted *Oystead*, "If an officer be guilty of trespass, those who act by his command or in his aid will be trespassers also. When called upon, they aid him at their peril, and they are bound to know whether the officer acts under a legal and valid warrant." *Id*. at 141-42 (citing *Oystead v. Shed*, 12 Mass., 506). There was not a simple uniform common law rule on the subject of immunity for a persons who was enlisted by an officer to assist in making an arrest, as seven jurisdictions held that such persons were not immune – Arkansas, Connecticut, Indiana, Maine, New York, North Carolina, and Texas. *Mejia*, 119 F. Supp. 2d 232, 263-64.

81.     The Supreme Court has also rejected Defendants position that he may claim qualified immunity because the duties of his position were governmental functions in *Richardson*:

> The Court has sometimes applied a functional approach in immunity cases, but only to decide which type of immunity – absolute or qualified – a public officer should receive. And it never has held that the mere performance of a governmental function could make the difference between unlimited § 1983 liability and qualified immunity, especially for a private person who performs a job without government supervision or direction.  Indeed a purely functional approach bristles with difficulty, particularly since, in many areas, government and private industry may engage in fundamentally similar activities, ranging from electricity production, to waste disposal, to even mail delivery. *Richardson*, 521 U.S. at 408-09 (citations omitted).

Thus, "performance of state functions alone is insufficient to create immunity."  *U.S. ex rel. Barron v. Deloitte & Touche, L.L.P.*, 381 F.3d 438, 443 (5th Cir. 2004).

82.     After the Supreme Court's decision in *Richardson*, the Ninth Circuit has addressed the specific question of whether to grant qualified immunity to a private firm transporting prisoners or arrestees and concluded that such immunity did not exist. *Sundquist v. Philp*, No. C 06-3387-MMC (PR), 2008 WL 859452 (N.D. Cal. 2008), *aff'd*, 346 Fed. Appx. 143 (9th Cir. 2009). In *Sundquist*, the plaintiff filed a section 1983 suit alleging due process violations against Transcor, a private corporation that provided transportation services for various law enforcement authorities.

*Sundquist*, 2008 WL 859452 at *1, *12. Transcor moved for summary judgment on several bases, including qualified immunity. The district court held that Transcor, a private transportation corporation, was "acting in a context substantially similar to that of the private prison corporation in *Richardson*[.]" *Id.* at *18. Accordingly, the court concluded that Transcor was not entitled to the defense of qualified immunity. *Id.* Likewise, Defendant Romero's position that he may claim qualified immunity because the duties of his position were governmental functions, should also be denied. As such, Defendant Romero does not qualify for qualified immunity.

## VI.    ARGUMENT

A. **Romero is not entitled to qualified immunity under section 1983**.

83.     As discussed above, Plaintiff disputes that qualified immunity even applies to Defendant Romero. However, if this court were to find that Romero is protected by qualified immunity, Plaintiff has produced enough summary judgment evidence to overcome the qualified immunity defense. Assessing a defendant's entitlement to qualified immunity is a two-step inquiry. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). First, the Court asks "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier*, 533 U.S. at 201. Second, the Court asks whether the right violated was clearly established at the time. *Id.*

84.     Further, in *Kingsley v. Hendrickson*, the United States Supreme Court considered the standard for determining whether an official violated a pretrial detainee's Fourteenth Amendment right to be free from the use of excessive force. 135 S. Ct. 2466, 2470 (2015). The Supreme Court held that a pretrial detainee's claim of the use of excessive force by a police officer must only prove that the force was objectively unreasonable, and must not necessarily prove that the officer thought the force was excessive. *Id.* at 2473.

31

85.     Non-deadly force has been held constitutionally excessive in cases involving similarly-restrained detainees. In *Ramirez v. Martinez*, the 5th Circuit held that a "reasonable officer could not have concluded [a detainee] posed an immediate threat to the safety of the officers by ... laying on the ground in handcuffs." *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013). Pulling away from an officer's grasp is also "insufficient to find an immediate threat to the safety of the officers." *Id*. Thus, the Court held that an officer was not entitled to qualified immunity from excessive force claims arising from the use of a taser on a the plaintiff after he was handcuffed and lying face down on the ground. *Id.* at 379. *See also Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008) (officer used excessive and unreasonable force and was not entitled to qualified immunity when he forcefully slammed an arrestee's face into a vehicle when the arrestee was handcuffed and subdued); *Anderson v. McCaleb*, 480 Fed. Appx. 768, 773 (5th Cir. 2012) (unpublished) (no qualified immunity from excessive force suit, when force was applied after suspect handcuffed and laid on ground). As shown below, Romero and G4S's failure to properly secure Saenz while they were transporting him to the jail, Romero's decision to double cuff Saenz's hands, which caused Saenz's hands to turn pink and purple, and Romero dragging Saenz for over an hour with Flores, while Saenz was under Romero's control, was constitutionally excessive and objectively unreasonable.

1.   *Romero Pushed Saenz into a Door Post and Failed to Prevent Injury to Saenz by Transporting Him Without a Seatbelt, Which Caused Saenz's Head Injury.*

86.     At the time Romero transported Saenz, he knew that failure to properly escort a prisoner could result in a claim of constitutional violations. *Exh. B* at 26:7-12. Romero admitted he failed to escort Saenz properly. *Exh. B* at 25:17-20.

87.     While transporting Saenz from Pebble Hills Regional Command Center to jail, Defendants Romero and Matthews, an employee of G4S, had exclusive custody and control over Saenz. *Exh. B* at 105:24-106:2; *Exh. S* at 40:19-25. No El Paso police officer was with them during the cruel and unusual transport where Saenz's head was repeatedly banged against the walls of the van causing him to cry out as if in pain. *Exh. S* at 39:4-12; 43:3-21, 103: 12-14; *Exh. B* at 247:4-11, 169:7-170:8; *Exh. G* at 3. **Romero was in charge of Saenz during the transportation and was responsible for all prisoners in his custody** while Matthews drove. *Exh. U* at 94:22-96:22. G4S, Romero, and Matthews had a duty to ensure Saenz was properly secure in order to eliminate foreseeable risks of injury. *Exh. Q* at 237:4-18.

88.     To protect Saenz, Romero should have used leg irons to prevent injuries like this to Saenz and to prevent possible escape. *Exh. D* at 114:6-7, 123:22-124:10. Romero had belly chains and leg restraints in his van but failed to use them like he should have. *Exh. B* at 114:19-21, 230:20-231:12. Even after Saenz's seatbelt came loose, and he was standing in the van, G4S Officers Romero and Matthews knew of the injuries, but callously allowed the transportation to continue resulting in pain and suffering for Saenz. *Exh. G* at 3. If Saenz's was properly restrained, the seatbelt would not have come off. At the very least, Romero could have called for medical assistance or notified his supervisors. However, Romero failed to notify his supervisor of the injuries suffered by Saenz and failed to call for medical assistance. *Exh. B* at 157:17-158:8, *Exh. U* at 97:11-99:19. Romero had a radio with him to call for assistance. *Exh. B* at 99:22-100:12.

89.     Matthews testified that if he was aware of Daniel Saenz banging his head he would have stopped to protect Saenz, because that is what a decent human being does. *Exh. S* at 41:1-42:3. Additionally, Matthews knew when he had a prisoner in custody he had an obligation to

provide for their medical needs. *Exh. S* at 42:24-43:2. Yet, Matthews saw Saenz banging his head against the wall of the van and did not stop him. *Exh. S* at 43:3-21. Romero and Matthews failed to notify their supervisor when Saenz was injured. *Exh. D* at 93:12-17. A reasonable officer would know that a prisoner was injured after banging his head against the van. *Exh. D* at 104:10-14. No reasonable officer would have kept driving when the seatbelt was off, in violation of law, and the prisoner keeps having his head bang against the walls for concussions are not visible and bruises do not immediately show themselves. *Exh. D* at 105:7-24.

90.    Defendant G4S' expert Brodd testified that Romero and Matthews were supposed to eliminate foreseeable risks of injuries, but failed to do so:

> Q.   And you understood that Daniel was able to bang his head against the walls because of the seatbelt not being on him; correct?
> A.   I don't know that was the reason.
> Q.   Was Saenz able to remove his seatbelt from his waist and no longer seatbelted?
> A.   Yes.
> Q.   Did Matthews continue driving the van to the county jail when that happened?
> A.   I believe so, yes.
> Q.   Do you believe that when a person is standing up, not in a seatbelt and the van is driving, that can cause them to strike their head against the walls of the van?
> A.   It could.
> Q.   Does a police officer or security agent with the custody of a prisoner have a duty to protect the prisoner from that kind of injury?
> A.   I don't know.
> Q.   Nevertheless, in this case, they failed to do anything to protect Mr. Saenz when the seatbelt was off and they continued to drive; right?
> A.   They did continue to drive, yes.
> Q.   Do you think that caused any kind of danger?
> A.   Depending upon traffic, speed limits, it could.
> Q.   When someone has a prisoner in custody, are they supposed to take steps to eliminate foreseeable risks of injury?
> A. When possible.
> Q.   So when a person is not in a seatbelt and they're no longer seated in a van, one way to make sure you protect them is you stop the van and you secure them again; agreed?
> A.   You could.
> Q.   But in this case, the security guards did not do that, did they?
> A.   That's correct. *Exh. Q* at 235:13-237:18; objections omitted.

91.     The G4S Security Guards also failed to drive the van into the Sally Port to be closer to the jail door, which decreases the length of the walk, and potential for injury. *Exh. D* at 126:9-24;129:14-130:16. Romero stated that Saenz banged his head repeatedly in the van. *Exh. D* at 131:23-25. From the time he changed Officer Machuca's handcuffs off himself, to the time at "which he put him in the van and then coming out of the van, it became apparent (that the van should have been parked in the Sally Port. *Exh. D* at 130:3-16. G4S's security guards should have summoned medical assistance because of the head injury from banging his head on the metal walls of the van which could cause a contusion or concussion, not immediately apparent. *Exh. D* at 130:22-131:17. Moreover, Romero continued to have custody and control over Saenz when Saenz's head slammed into the door frame at the jail causing Saenz life threatening head injuries as shown in *Exh. A*. *Exh. B* at 247:19-248:5; 249:15-19.

92.     A reasonable jury, drawing all inferences in favor of Plaintiff, could determine that by Romero's admission that he knew that failure to properly escort a prisoner could result in a claim of constitutional violations, *Exh. B* at 26:7-12, that he admitted he failed to escort Saenz properly, the callous treatment of Saenz leading to him slamming his head against the door frame, *Exh. B* at 25:17-20, and Romero's failure to properly restrain Saenz while he was being transported to the jail was a violation of a constructional right that was clearly established at the time to overcome qualified immunity, and was objectively unreasonable.

   *2.  Romero Improperly Used a Double Set of Handcuffs, and Failed to Double Lock Them, Causing Saenz's Hands to Turn Purple.*

93.     Flores and Romero "single locked" Saenz's hand cuffs, which means the handcuffs were too loose. *Exh. Q* at 45:24-46:5. Single locked cuffs can cause injuries to the wrists, with any

kind of movement. *Exh. D* at 119:4-120:2. Failure to double lock handcuffs can cause injuries because they keep tightening. *Exh. D* at 122:22-24. The cuffs get tighter and there can be cruel and unusual punishment. *Exh. T* at 169:1-15. Dragging Saenz by the arms would cause the handcuffs to further injure his wrists. *Exh. L* at 312:10-24. Officers joked with each other and teased Daniel about his tragic condition. No one called for medical treatment even though Saenz's **hands were pink and purple because the handcuffs were so tight.** *Exh. D* at 118:17-119:15; *Exh. Q* at 28:14-30:11, 32:13-33:12, 35:4-36:4; *Exh. V.*

94.     Defendants' own expert, testified that the decision to double cuff Saenz was a mistake. *Exh. P* at p. 7 ¶ 4; *Exh. Q* at 38:23-40:22, 51:12-22. **Romero was responsible for the decision to single lock and double cuff Saenz even though Flores placed the cuffs on Saenz.** *Exh. D* at 118:17-119:1. No reasonable officer would have failed to properly cuff Saenz. Defendants should have used belly chains for control of Saenz and to protect him. *Exh. D* at 135:5-13; *Exh. Q* at 38:8-39:9, 49:24-50:13. Romero was responsible for the safety of Saenz. *Exh. D* at 135:2-13. If Romero had properly fastened belly chains or leg irons, they would have restricted movement so that Saenz could not injure himself voluntarily or accidentally. *Id.*

95.     The handcuffs were not properly adjusted, which caused further pain and suffering to Saenz, as well as the injuries depicted in *Exh. A*. Three different improper actions by defendants lead to those injuries: (1) The handcuffs were single locked rather than double locked causing the cuffs to continue to tighten on Saenz's wrists; (2) Saenz was double cuffed (e.g., two sets making them too loose); and (3) defendants dragged Saenz under his arms causing pressure and pain from the arms being spread apart so that the metal cuffs would painfully cut into Saenz's wrists and arms. *Exh. C* at 46:19-53:9; *Exh. D* at 118:17-119:8 ; *Exh. E* at 90:12-25. The dragging of Saenz,

which is discussed further below, exacerbated the improperly adjusted handcuffs.

96.     A reasonable jury, drawing all inferences in favor of Plaintiff, could determine that because Romero's decided to double cuff Saenz, a decision his own expert testified was a mistake, which caused Saenz's hands to turn pink and purple, was a violation of a constructional right that was clearly established at the time to overcome qualified immunity, and was objectively unreasonable.

*3.     Romero's Actions Dragging Saenz Were Objectively Unreasonable. Rather than Provide Urgently Needed Medical Care, Romero Caused Further Pain and Suffering by Callously Dragging a Profusely Bleeding Saenz through the Jail, with Handcuffs so Tight They Caused Saenz's Hands to Turn Purple.*

**97.     Again, Romero knew at the time that he was transporting Saenz, that failure to properly escort a prisoner could result in a claim of constitutional violations**. *Exh. B* at 26:7-12. **Romero admitted he failed to escort Saenz properly.** *Exh. B* at 25:17-20. After the admitted failure to properly escort Saenz, Saenz fell to his knees with blood gushing from his head and pouring all over his face. *Exh. R* at 21:24-22:2. Blood was also coming from his mouth, his nose, covering his chest in blood. *Exh. R* at 24:5-18. Saenz was making choking noises. He was having trouble breathing and was not speaking. *Exh. R* at 24:23-25:13. He was in need of urgent medical treatment. *Exh. B* at 151:10-25. It was life threatening. *Exh. X*; *Exh. T* at 209:1-15. The nurse yelled **"he needs to go to the ER or you need to call an ambulance, but the officers (Romero and Flores) did not respond**. *Exh. R* at 25:21-26:8.

98.     Instead, Romero grabbed Saenz and picked him up by the armpit in such a way that the carrying looked painful. At this time, Saenz's **hands were pink and purple because the handcuffs were so tight.** *Exh. R* at 31:16-32:11; *Exh. M* at 101:9-102:22; *Exh. V*. When Romero and Flores took Saenz to the elevators on the second floor, Mr. Cuevas could still hear banging on

the wall as if the officers were slamming Saenz against the walls. *Exh. R* at 32:12-25. While Romero and Flores slammed Saenz against the wall, Mr. Cuevas could hear choking sounds. *Exh. R* at 33:16-23. After Flores, Romero and Saenz disappeared from the holding tank, Cuevas could see blood on the floor. *Exh. R* at 34:1-11. At this time, Romero still had control over Saenz. **Romero stated that he "dragged" Saenz a total of 13 times** in his original statement. *Exh. G*. The injuries to Saenz were so severe, that while he was dragged bleeding, jail Trustees followed behind and mopped up the blood. *Exh. M* at 101:24-102:2; *Exh. C* at 46:12-53:9. As the defendants cruelly dragged Daniel Saenz up and down three stories, they were inflicting further pain and injury by dragging him, rather than putting him on a stretcher, gurney, wheel chair or restraint chair. *Exh. C* at 46:12-53:9, especially, 48:5-13. Saenz had already given up. *Exh. R* at 36:10-15; *Exh. A*.

99.     There was no reason to drag Saenz. Romero admits he could have used the radio for Saenz but did not. *Exh. B* at 99:22-100:12. Romero used the radio to call for help before when he had "unruly pedestrians." *Exh. B* at 98:18-99:21. Romero could have asked any of the jailors or other law enforcement with them at the Sally Port to call for an ambulance as well. Jeff Noble testified that with Saenz's obvious injuries, it was improper for the defendants to move him at all as doing so would cause further injuries. *Exh. C* at 46:12-53:9; *Exh. D* at 48:23-49:9, 148:25-151:25. Scott DeFoe testified that it is the security officers' **duty under their policies to provide prompt medical treatment**. *Exh. D* at 148:25-151:25. If there was some urgent need to move Saenz, the jail houses over 1,000 inmates each day and has transportation devices – restraint chairs, wheel chairs, stretchers and gurneys. Any of those devices could have been used by the defendants to transport Saenz without inflicting cruel and unusual pain and suffering from the handcuffs. No

38

reasonable officer would drag a semi-conscious prisoner for an hour through the jails, with a trail

of blood puddling behind the prisoner. No reasonable police officer would fail to call immediately

for life threatening injuries that they realized were serious. **If Saenz would have been put into a**

**wheelchair, a stretcher or a restraining chair with wheels on it, officers Flores and Romero**

**could have taken him through the jail, rather than dragging him painfully by the arms.** *Exh.*

*R* at 130:15-24; *Exh. C* at 46:12-53:9. Chief Noble testified in part as follows:

> Rather than requesting medical aid for someone who is obviously seriously injured, is
> bleeding profusely, these two officers begin to drag Mr. Saenz who is – into the jail through
> the jail corridors to an elevator, up the elevator to – I believe it's the second floor where
> the booking facility is where the nurses are located. They continue to drag Mr. Saenz
> without any regard for his serious injury to his head.
>  The fact that police officers are trained to render immediate medical aid for someone who
> is in their care and custody and cannot access their own medical attention and, obviously,
> putting him through a level of pain and suffering by dragging him and risking further injury
> or exacerbating the injury that he has by, you know, recklessly and foolishly and carelessly
> dragging him through this jail facility ….
> They still have not gotten on the radios to call for help or call for paramedics. They dragged
> him back downstairs. The amount of blood was obviously significant as the video shows
> … They take him back downstairs into the locked sally port area; again, still have not called
> for paramedics …And the fire station is located, apparently, literally across the street.
> They then drag Mr. Saenz out of the sally port to just go outside the door. Officer Flores
> leaves Mr. Saenz who is handcuffed, who is not wearing a shirt, who had been arrested,
> had been searched and searched at the jail, should have been searched when he got put into
> a custody van. His pants were pulled down around his knees. Obviously, he had no weapon,
> no ability to have any weapon. *Exh. C* at 47:21-50:1.

Romero and Flores then dragged Daniel outside of the jail to a loading dock in direct violation of

orders from Sgt. Peralta where Flores intentionally shot Saenz, killing him.

100.    A reasonable jury, drawing all inferences in favor of Plaintiff, could determine that

Romero dragging Saenz for an hour through the jail bleeding while refusing to provide medical

treatment in deliberate indifference to his injuries with Saenz under his custody, *Exh. L* at 68:23-

25, was a violation of a constructional right that was clearly established at the time to overcome qualified immunity, and was objectively unreasonable.

## VII.   CONCLUSION AND PRAYER

101.   After drawing every reasonable inference in favor of Plaintiff and with all doubts resolved in favor of Plaintiff, Plaintiff has created genuine issues of material fact to the above claims. Accordingly, Defendants' Motion for Summary Judgment should be denied.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendants' Motion for Summary Judgment be denied, that trial of this cause proceed forward with Plaintiffs' claims as pled in her Petition, and that the Court grant such other and further relief, at law or in equity, to which Plaintiff may show herself justly entitled.

Respectfully submitted,

**SCHERR & LEGATE, PLLC**
Attorneys for Plaintiff
109 N. Oregon, 12th Floor
El Paso, Texas 79901
(915) 544-0100 voice
(915) 532-1759 facsimile
omendez@scherrlegate.com


  _/s/ Oscar Mendez Jr._
**SAM J. LEGATE**
State Bar No. 12166600
**OSCAR MENDEZ JR.**
State Bar No. 24058473

In Association With
**LAW OFFICES OF GOLDBERG & GAGE**
A Partnership of Professional Law Corporations
Bradley C. Gage, Esq. S.B. No 117808
23002 Victory Boulevard
Woodland Hills, California 91367
Tel: (818) 340-9252
Fax: (818) 340-9088
bgage@goldbergandgage.com


  _/s/ Bradley C. Gage_
**Bradley C. Gage**
State Bar No. 117808

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 11th day of May, 2018, a true and correct copy of the foregoing was emailed to:

FRANCISCO J. ORTEGA
HENRY J. PAOLI
Scott Hulse, PC
1100 Chase Tower
201 E. Main St.
El Paso, Texas 79999
(915)546-8333 Facsimile
Attorneys for Defendants G4S Secure Solutions (USA) Inc.
fort@scotthulse.com
hpao@scotthulse.com

JEEP DARNELL
JIM DARNELL, P.C.
310 N. Mesa, Suite 212
El Paso, Texas 79901
(915)532-4549 Facsimile
jedarnell@jdarnell.com

_/s/ Oscar Mendez Jr._
**OSCAR MENDEZ JR.**