# EXHIBIT
# B

1                IN THE UNITED STATES DISTRICT COURT

2                    WESTERN DISTRICT OF TEXAS

3                        EL PASO DIVISION

4

5    ROSWITHA M. SAENZ,
     Individually and on behalf of
6    THE ESTATE OF DANIEL SAENZ,
     Deceased,
7
              Plaintiff,
8
     v.                          14-CV-244PRM
9
     G4S SECURE SOLUTIONS (USA)
10   INC., OFFICER JOSE FLORES AND
     ALEJANDRO ROMERO,
11
              Defendants.
12

13

14       The Videotaped Deposition of ALEJANDRO ROMERO,

15   taken at the request of the Plaintiff, pursuant to

16   Federal Rules of Civil Procedure, on Wednesday, August

17   9, 2017, from 9:56 a.m. to 6:19 p.m., at 109 N. Oregon,

18   Suite 700, El Paso, Texas 79901.

19

20

21

22

23

24   Reported by:

25   Teri C. Finnegan, TX & NM CSR, RPR

```
                                                        2
 1            A P P E A R A N C E S
 2  For the Plaintiff:
 3      Bradley C. Gage
        Goldberg & Gage
 4      23002 Victory Boulevard
        Woodland Hills, California 91367
 5      E-Mail: bgage@goldbergandgage.com
                    and
 6      Oscar Mendez
        Scherr & Legate, PLLC
 7      109 N. Oregon, 12th Floor
        El Paso, Texas 79901
 8      E-Mail: omendez@scherrlegate.com
 9  For Defendants G4S Secure Solutions (USA) Inc. and
    Alejandro Romero:
10
        Francisco J. Ortega
11      Scott Hulse, P.C.
        201 East Main, Suite 1100
12      El Paso, Texas 79901
        E-Mail: fort@scotthulse.com
13
    For Defendant Officer Jose Flores:
14
        Jim Darnell
15      Jeep Darnell
        310 N. Mesa, Site 212
16      El Paso, Texas 79901
        E-Mail: jdarnell@jdarnell
17              jedarnell@jdarnell.com
18
19  Also present:  Roswitha M. Saenz
                   Leo Betancourt (Videographer)
20
21
22
23
24
25
```

```
                                                        4
 1  Requested Items:
 2  Page 51, Line 2
 3  Page 210, Line 16
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                        3
 1              I N D E X
 2  WITNESS:                              PAGE:
 3  ALEJANDRO ROMERO
 4      Examination by Mr. Gage                5
 5      Examination by Mr. Jeep Darnell      258
 6      Further Examination by Mr. Gage      261
 7      Further Examination by Mr. Jeep Darnell  267
 8      Examination by Mr. Ortega            268
 9      Further Examination by Mr. Gage      274
10
11  CHANGES AND SIGNATURE PAGE               287
12  CERTIFICATE OF COURT REPORTER            288
13
14  EXHIBIT            DESCRIPTION          PAGE:
15  No. 39A El Paso Police Department Witness  160
            Statement, Bates Flores 000264 - Flores
16          000275
17  No. 40  Audio Transcription, Shooting Review  167
            Board, Officer Alejandro Romero
18
    No. 41  El Paso Police Department, Shooting  254
19          Review Team, Administrative Statement -
            Witness/Sworn, Bates Def City 00512 -
20          Def City 00514
21  No. 42  Color Copy of Photograph          256
22  No. 43  Color Copy of Photograph          256
23  No. 44  Color Copy of Photograph          256
24  No. 45  Color Copy of Photograph          256
25  No. 46  Color Copy of Photograph          256
```

```
                                                        5
 1              THE VIDEOGRAPHER:  Today's date is
 2  August 9, 2017.  The time is 9:56 a.m.  This is the
 3  videotaped deposition of Alejandro Romero in the matter
 4  of Roswitha M. Saenz, et al. versus G4S Secure
 5  Solutions, Inc., et al.
 6              Would the counsel please introduce
 7  yourselves after which the court reporter will swear in
 8  the witness.
 9              MR. GAGE:  Bradley Gage, Goldberg and
10  Gage, on behalf of the plaintiff.
11              MR. MENDEZ:  Oscar Mendez, as well, on
12  behalf of plaintiff.
13              MR. JIM DARNELL:  We don't have to do
14  this.  We've been here for three days.
15              MR. GAGE:  I know.  Well, he wants it.
16              MR. ORTEGA:  Good morning.
17  Francisco Ortega for Defendants G4S Secure Solutions
18  and Alejandro Romero who's here today.
19              MR. JIM DARNELL:  Jim Darnell and Jeep
20  Darnell for Jose Flores.
21              MR. GAGE:  And the reason for the
22  one-hour delay in starting is we got called by Jeep
23  that there was a delay on their end.
24              All right.  You can swear him in.
25
```

6

1              ALEJANDRO ROMERO,
2 sworn by the Certified Court Reporter, testified as
3 follows:
4                    EXAMINATION
5 BY MR. GAGE:
6      Q.  Have you ever had your deposition taken
7 before?
8      A.  I have not, sir.
9      Q.  A deposition is a statement under oath.  It
10 carries with it the same obligation to tell the truth
11 as if you're testifying in a court of law.  Do you
12 understand that?
13     A.  Yes, sir.
14     Q.  For that reason it's important that you listen
15 carefully to all questions asked of you.  If at any
16 time you're asked a question that you do not
17 understand, don't answer, simply tell us that you don't
18 understand.  Will you do that for us?
19     A.  Yes, sir.
20     Q.  Have you understood everything so far?
21     A.  Yes, sir.
22     Q.  Is there any reason why you cannot give us
23 the -- your best testimony here today?  That could be
24 anything:  Drugs, alcohol, medication, lack of sleep?
25     A.  Lack of sleep, sir.

7

1      Q.  Do you believe that that's going to prevent
2 from you giving us your best testimony here today?
3      A.  I'm not entirely sure, we'll just have to
4 go --
5      Q.  Well, it's very important.  If you tell us you
6 can't give us your best testimony here today, I'm not
7 going to proceed, you're going to have to come back.
8      A.  No, sir, it won't affect it, sir.
9      Q.  All right.  This is an important event.
10 You're testifying under penalty of perjury.  You
11 understand that?
12     A.  Yes, sir.
13     Q.  You have an obligation to tell the truth and
14 give us your best testimony here today.  You understand
15 that.  Correct?
16     A.  Yes, sir.
17     Q.  So if there's any reason why you cannot do
18 that, we need to know right now, otherwise we'll
19 proceed because you're the person that can tell us if
20 you're capable of going or not.
21     A.  No, sir.
22     Q.  You're ready to go?
23     A.  Yes, sir.
24     Q.  Were you tired and angry after dragging
25 Daniel Saenz around the jail?

8

1           MR. ORTEGA:  Objection, form, vague.
2      Q.  (By Mr. Gage)  Go ahead.
3      A.  No, sir, I was not angry, I was only tired and
4 exhausted, sir.
5      Q.  Did Flores appear angry or upset to you?
6           MR. ORTEGA:  Objection, calls for
7 speculation.
8      A.  I'm not sure what Mr. Flores was thinking,
9 sir.
10     Q.  (By Mr. Gage)  Have you seen a person that
11 looked angry before?
12     A.  I have, sir.
13     Q.  They have certain characteristics that you've
14 observed.  Right?
15     A.  I have, sir.
16     Q.  Did you look at Officer Flores to see whether
17 or not he exhibited those signs that you've seen and
18 associated with being angry?
19     A.  He did not, sir.
20     Q.  You did not look?
21     A.  No, he --
22     Q.  My question is did you look?  Yes or no.
23     A.  Oh.  Yes, sir.
24     Q.  You did look.  Because it was a concern for
25 yours, your wanted to know if he was an angry person or

9

1 not at that point.  True?
2      A.  Yes, sir.
3      Q.  The reason you were concerned and wanted to
4 know if Flores was angry was based on all the events
5 that were happening.  True?
6      A.  Yes, sir.
7           MR. ORTEGA:  Objection, vague.
8      Q.  (By Mr. Gage)  And what were those events that
9 were happening that caused you to have a concern that
10 Flores might be angry?
11     A.  Can you repeat --
12          MR. JIM DARNELL:  Objection, form,
13 assumes facts not in evidence and misstates the
14 testimony of the witness.
15     Q.  (By Mr. Gage)  What were the events that you
16 saw or that were happening that caused you to have a
17 concern whether or not Flores was angry?
18          MR. JIM DARNELL:  Same objection.
19     A.  I don't understand your question, sir.  Can
20 you rephrase your question, please.
21     Q.  (By Mr. Gage)  Sure.  You told us that you
22 looked to see if Flores was angry.  Remember that
23 testimony a couple minutes ago?
24     A.  Yes, sir.
25     Q.  And you looked to see if Flores was angry

10

1  because of the events that were happening at the time.
2  True?
3      A.   That is correct, sir.
4      Q.   Where were you when you looked to see if
5  Flores was angry?
6      A.   I do not recall, sir.
7      Q.   Were you -- did you look to see if Flores was
8  angry while still at the regional center, the station
9  at Pebble Hills?
10     A.   I do not recall, sir.
11     Q.   Did you look to see if Flores was angry before
12 taking Daniel Saenz into the jail while walking in
13 between the van and the entrance to the jail?
14     A.   No, I do not recall, sir.
15     Q.   Okay.  So then you looked to see if Flores was
16 angry while you were inside of the jail.  Right?
17     A.   I don't recall that either, sir.
18     Q.   So you just recall at some point while you
19 were transporting Daniel Saenz, you looked to see if
20 Flores was angry, but you can't remember where you
21 were.  Is that correct?
22     A.   That is correct, sir.
23     Q.   The reason why you looked to see if Flores was
24 angry was it was a concern of yours whether he was
25 angry or not.  True?

11

1      A.   No, sir, it wasn't a concern of mine.
2      Q.   One of the reasons you would be concerned
3  about a partner of yours taking a prisoner into the
4  jail system if they're angry or not is an angry person
5  can do things that you've been taught would be
6  impermissible or unlawful.  Correct?
7           MR. ORTEGA:  Objection, vague, calls for
8  speculation.
9           MR. JIM DARNELL:  Same objection.
10     A.   I'm -- I'm not sure what Mr. Flores was
11 thinking at the time, sir.
12     Q.   (By Mr. Gage)  You've heard the term
13 "hothead," haven't you?
14     A.   Yes, I have.
15     Q.   What is your understanding what a hothead is?
16     A.   A hothead person, to my understanding in my
17 opinion, is someone who possibly doesn't keep their
18 cool, that doesn't -- or that blows up, has a very
19 short fuse, in other words.  That gets agitated,
20 irritated quickly.  That's my understanding, sir.
21     Q.   In law enforcement if you have an officer who
22 is a hothead that's working with you, that causes you
23 to have a concern, doesn't it?
24           MR. ORTEGA:  Objection, lack of
25 foundation, vague, calls for speculation.

12

1      A.   I'm not sure what other others are thinking,
2  sir.
3      Q.   (By Mr. Gage)  I'm just asking if you know a
4  person has a short fuse, is an angry hothead, does that
5  cause you a concern if you're working with them in law
6  enforcement?
7           MR. ORTEGA:  Objection, vague.
8      A.   Obviously, there are times that, you know, you
9  see an officer or a partner that does have that type of
10 personality or that presents themself like that way,
11 you would have -- it would be in the back of your mind,
12 yes, of course.
13     Q.   (By Mr. Gage)  Why would the fact that your
14 partner is a hothead be in the back of your mind?
15     A.   It just depends on officers.  I can't speak
16 for every officer but --
17     Q.   I'm asking about you.
18     A.   I'm sorry?
19     Q.   I'm asking about you.  Why is it in the back
20 of your mind if you're working with someone who's a
21 hothead or an angry person?
22     A.   In my opinion to get mentally prepared for any
23 situation that might arise.
24     Q.   When you're talking about an incident that
25 might arise, hotheads can create a more dangerous

13

1  situation for you in the way they're handling a
2  prisoner.  Correct?
3           MR. ORTEGA:  Objection, vague, calls for
4  speculation.
5           MR. JIM DARNELL:  Same objection.
6      A.   Can you repeat the question, please.
7           MR. GAGE:  We'll have it read back.
8           I stipulate on all read backs your
9  objection is preserved.  You don't have to say them
10 again.
11           (The Court Reporter read back:  And when
12           you're talking about an incident that
13           might arise, hotheads can create a more
14           dangerous situation in the way they're
15           handling a prisoner.  Correct?)
16     A.   Not in -- not in every situation, but there's
17 different situations, there's different circumstances,
18 but you still have to be mindful on those type of
19 things.
20     Q.   (By Mr. Gage)  I understand you want to be
21 mindful.  But one of the differences between working
22 with a partner who has what's known as a long fuse and
23 working with someone with a short fuse is, if you're
24 working with a partner with a short fuse, they're more
25 likely to fly off the handle.  Correct?

14

1          MR. ORTEGA:  Objection, vague, calls for
2    speculation.
3          MR. JIM DARNELL:  Same objection.
4      **A.   I'm not sure, sir, it depends on the**
5    **circumstances.**
6          (Discussion off the stenographic record.)
7      Q.   (By Mr. Gage)  Have you in your life
8    experienced situations where you saw people that got
9    angry, upset, and because of that did something that
10   was rash or not really proper?
11         MR. ORTEGA:  Objection, vague.
12     **A.   Have I ever in my life experienced it?**
13     Q.   (By Mr. Gage)  Correct.
14     **A.   Yes, I have, sir.**
15     Q.   What kinds of situations have you seen in
16   general when that happened?
17     **A.   Personal situations, family matters, friends.**
18     Q.   People that get upset, angry, they can engage
19   in acts of violence that normally they would not do.
20   Agreed?
21         MR. ORTEGA:  Objection, vague, calls for
22   speculation.
23     **A.   Not all the time, sir.**
24     Q.   (By Mr. Gage)  Sometimes.  Right?
25         MR. ORTEGA:  Objection vague, calls for

15

1    speculation.
2      **A.   I don't know, sir.  It just -- it would depend**
3    **on the situation.**
4      Q.   (By Mr. Gage)  I'm not asking for a specific
5    situation.  I'm just asking you if in your life's
6    experience, you are aware of the fact that people, when
7    they get angry, tend to go into a violent situation
8    without thinking ever.  Has there ever been an
9    experience in your lifetime?
10         MR. ORTEGA:  Objection, vague, calls for
11   speculation.
12         MR. JIM DARNELL:  Same objection.
13     **A.   I don't know, sir.  There's --**
14     Q.   (By Mr. Gage)  Go ahead.  Finish.
15     **A.   No, no.  Go ahead, sir.**
16     Q.   No, I want you to finish, please.
17     **A.   I lost my train of thought.  I forgot what I**
18   **was going to say.  I'm sorry.**
19     Q.   How old are you?
20     **A.   I'm 26 -- I'm sorry -- 27.**
21     Q.   In your 27 years of life's experience, have
22   you ever seen a person that was angry that then engaged
23   in acts of violence?
24         MR. ORTEGA:  Objection, vague.
25     **A.   Yes, I have.**

16

1      Q.   (By Mr. Gage)  So based on your own
2    experience, you know that a person that is angry can
3    engage in acts of violence more frequently than a
4    person not angry.  True?
5          MR. ORTEGA:  Objection, vague, calls for
6    speculation.
7      **A.   Yes, sir.**
8      Q.   (By Mr. Gage)  You also know that if a person
9    is really tired and exhausted, it impacts their ability
10   to think clearly.  Right?
11         MR. ORTEGA:  Objection, vague, calls for
12   speculation, lack of foundation.
13     **A.   I would assume that it would -- it would**
14   **affect their ability, yes.  It just -- it depends on**
15   **person to person.**
16     Q.   (By Mr. Gage)  You've been trained in your
17   life in law enforcement that if you're in a situation
18   where you're tired, exhausted, angry or otherwise not
19   thinking right, you should immediately call for
20   assistance.  Correct?
21         MR. ORTEGA:  Objection, lack of
22   foundation, vague, calls for speculation.
23         MR. JIM DARNELL:  Same objection.
24     **A.   No, not necessarily, no.**
25     Q.   (By Mr. Gage)  When you say "not necessarily,"

17

1    that tells me sometimes you're told you are and
2    sometimes you're told you're not.  Correct?
3      **A.   Told I'm not what, sir?**
4      Q.   In need of calling for assistance when you're
5    tired, angry, exhausted and unable to think clearly.
6          MR. ORTEGA:  Objection, vague, lack of
7    foundation, calls for speculation.
8          MR. JIM DARNELL:  Same objection.
9      **A.   I wouldn't know how to answer that, sir,**
10   **because it just depends on that instance and what**
11   **that -- what your supervisors tell you and what the**
12   **policies are in place for that.**
13     Q.   (By Mr. Gage)  Have you ever been trained or
14   policies and procedures anywhere in law enforcement?
15     **A.   I have, sir.**
16     Q.   Where did you get training?
17     **A.   Where did I get training?**
18     Q.   Correct.
19     **A.   Are you -- okay.  So are you asking me --**
20     Q.   Have you had -- you told us you had training
21   some place in law enforcement.  I want to know where
22   that was.
23     **A.   Okay.  It was Dona Ana County Detention**
24   **Center.**
25     Q.   Spell that for me.

18

1    A.    D-O-N-A and then A-N-A County Detention
2 Center.
3    Q.    When did you get that training?
4    A.    That was January of 2012 through -- January --
5 January of 2012 through February of 2012.
6    Q.    Just one month?
7    A.    Yes, approximately one month.
8    Q.    Were you working for that detention center at
9 the time?
10    A.    I was, sir.
11    Q.    And then did you get fired in February of
12 2012?
13    A.    From the detention center?
14    Q.    Yes.
15    A.    No, sir, I did not get fired, I resigned.
16    Q.    Why did you resign?
17    A.    To go on to G4S, sir.
18    Q.    So you had one month's training in law
19 enforcement in your career.  Correct?
20    A.    At that time, yes, sir.
21    Q.    In that exhaustive month of training, did you
22 learn about escalation and de-escalation of uses of
23 force?
24    A.    That is correct, sir.
25    Q.    You were taught --

20

1 training academy, in July of 2013.
2    Q.    So between the day you were born and July of
3 2013, your entire training experience was the one month
4 working at Dona Ana County Detention Center.  True?
5    A.    Plus -- plus the -- the El Paso Police
6 Department training.
7    Q.    You start that in July of 2013.
8    A.    That's correct.
9    Q.    Until you start with El Paso, the entire
10 amount of training that you have had in law enforcement
11 was the one month at Dona Ana County Detention Center
12 for your entire life.  Correct?  Yes or no.
13    A.    Additionally, the G4S training as well.
14    Q.    Tell us what you learned in the one month at
15 Dona Ana County Detention Center regarding
16 de-escalation of force.
17    A.    I do not recall, sir.
18    Q.    You don't recall anything at all from that
19 training.  Is that correct?
20    A.    I recall -- I recall the -- the use of force
21 continuum and other training, but it's -- it happened a
22 very long time ago.
23    Q.    What were you taught at Dona Ana County
24 Detention Center regarding the use of force continuum?
25    A.    The -- I was taught the use of force, the --

19

1         MR. JIM DARNELL:  Object to sidebar.
2    Q.    (By Mr. Gage)  -- that with respect to uses of
3 force, you had to assess the situation so that you as a
4 law enforcement officer can make a situation less
5 dangerous.  Correct?
6         MR. ORTEGA:  Objection, vague.
7    A.    Yes, sir.
8    Q.    (By Mr. Gage)  What information were you
9 taught on how to de-escalate force so the situation
10 would be safer?
11         MR. JIM DARNELL:  Are you asking in that
12 one-month training or any time?
13    Q.    (By Mr. Gage)  Any time.
14    A.    I've had -- after the -- the county detention
15 center, I've had the El Paso Police Department training
16 and DHS training, Department of Homeland Security
17 training, as well, in the use of force -- training in
18 the use of force, sir.
19    Q.    All right.  In the year of 2012, the only
20 training you received was the one month at Dona Ana
21 County Detection Center.  Is that true?
22    A.    That's correct.
23    Q.    In 2013 did anybody give you any training?
24    A.    Yes, sir.  At that time it was -- I started my
25 job at -- for the El Paso Police Department, the

21

1 the proper techniques as far as self-defense,
2 handcuffing, cell extractions, prisoner escorts, things
3 of that nature, sir.
4    Q.    What do they teach you regarding prisoner
5 escorts?
6    A.    How to hold a prisoner, how to -- yeah, how to
7 escort a prisoner, how to deal with a combative
8 prisoner.
9    Q.    How were you taught to hold a prisoner?
10    A.    It was to have -- do you want me to
11 demonstrate?
12    Q.    Sure.
13    A.    It was -- to my recollection it was to put
14 your arm under theirs.  If they're like this, to put
15 your arm underneath or through here and then have --
16    Q.    Indicating underneath the armpit area.
17    A.    Yes, the armpit area or this -- the
18 bicep/tricep area.  And then to have your other hand
19 like this.
20         THE WITNESS:  Do you mind if I show on
21 you?
22         MR. GAGE:  Go for it.
23         MR. ORTEGA:  No.
24    A.    Then -- yeah.
25         MR. GAGE:  Maybe our videographer could

22

1 volunteer and you could show it on him.
2           If you can stand next to him, it should
3 be close enough.
4           MR. ORTEGA:  Well, I object to the
5 demonstration.  He's explained to you visually and
6 verbally how he was taught to hold prisoners at
7 Dona Ana County.
8           MR. GAGE:  It doesn't matter whether
9 you're objecting, he can still do it.  So if you're
10 available.  Demonstrations are allowed.
11          MR. ORTEGA:  I understand that.
12 Objections are as well.
13     Q.   (By Mr. Gage)  Stay in that general location,
14 stand up, and show us how you do the hold.
15     **A.   If he has his -- his arm behind his back like**
16 **this, which they should --**
17          **If they have their arm behind their back**
18 **like as such, it's like this.**
19     Q.   All right.  So you're describing --
20     **A.   Or your arm around their -- their bicep/tricep**
21 **area or underneath their armpit area.**
22     Q.   Okay.  We're going to do two things.  Let's
23 stay standing.
24          You have a prisoner, they're
25 handcuffed -- or you just put their hands behind their

23

1 back whether they're handcuffed or not?
2     **A.   If they're -- no, if they're -- they have to**
3 **be handcuffed.**
4     Q.   All right.
5          MR. GAGE:  So if our videographer could
6 put his hands behind his back.
7     Q.   (By Mr. Gage)  Now, you've showed us two
8 different ways that you were taught to do the hold.
9 Show the first one again, please.
10    **A.   Like this.**
11    Q.   So what you have is around the left arm of
12 the -- keep your hands there -- of the videographer,
13 you were taught to put your right arm --
14         Keep it the first way so I can describe
15 it for the record.
16         -- right arm underneath the -- the area
17 by the armpit and you'd hold with your right arm on the
18 elbow, your left arm would come across your body and
19 hold on the biceps/triceps area of the left arm.  Is
20 that correct?
21    **A.   That's correct.**
22    Q.   Now show us the second way.
23    **A.   Well, on this way and then --**
24    Q.   The second way which you are showing us --
25         Keep your hands there.

24

1           -- your left arm comes across your body
2 and goes underneath the armpit area of a prisoner
3 facing towards his back area and, then the right hand
4 would be --
5     **A.   Right here on the tricep area.**
6     Q.   -- on the tricep of him from your body.
7 Correct?
8     **A.   That's correct.**
9     Q.   All right.
10          MR. GAGE:  Thank you very much both of
11 you.
12    Q.   (By Mr. Gage)  Were you ever taught afterwards
13 that that way of escorting a prisoner was different; in
14 other words did your training change on how you should
15 escort a prisoner or has it always been the same?
16    **A.   At that time it was the same, sir.**
17    Q.   All right.  So on March 8, 2013, that was your
18 method.  Correct?
19    **A.   That's correct.**
20    Q.   Did you drag Daniel Saenz through the jail on
21 March 8th, 2013?
22    **A.   No.**
23          MR. ORTEGA:  Objection, vague.
24    Q.   (By Mr. Gage)  You did not.  All right.  Did
25 you escort Daniel Saenz in a standing position the

25

1 entire time that you went through the jail?
2     **A.   I attempted to, sir.**
3     Q.   My question is not what you attempted.  My
4 question is what you did do.
5           MR. JIM DARNELL:  Please don't interrupt
6 his answer.
7     Q.   (By Mr. Gage)  My question again is what did
8 you do.  Did you walk him through the jail at all
9 times?
10    **A.   I attempted to escort Mr. Saenz at various**
11 **points through the jail, he was very uncooperative and**
12 **combative with me and Officer Flores.**
13          MR. GAGE:  Move to strike, nonresponsive.
14    Q.   (By Mr. Gage)  Simple question.  Did you walk
15 Mr. Saenz through the jail at all times?  Yes or no.
16    **A.   No.**
17    Q.   Did you at all times escort Mr. Saenz under
18 either of the two methods that you were taught was the
19 proper way of escorting a prisoner?  Yes or no.
20    **A.   No.**
21    Q.   Were you told that if you don't properly
22 escort a prisoner that could result in some kind of
23 Constitutional claim against you?
24          MR. ORTEGA:  Objection to form, calls for
25 speculation, lack of foundation and calls for a legal

26

1  conclusion.
2          MR. JIM DARNELL:  Same objection.
3      Q.  (By Mr. Gage)  Go ahead.
4      A.  It's --
5          THE WITNESS:  Can you please repeat the
6  question.
7          (The Court Reporter read back:  Were you
8          told that if you don't properly escort a
9          prisoner, that could result in some sort
10         of Constitutional claim against you?)
11     A.  It was -- it wasn't told.  It was common sense
12  for me.
13     Q.  (By Mr. Gage)  All right.  So at least as part
14  of your common sense, you knew that it was required to
15  properly transport a prisoner, otherwise it could
16  result in a Constitutional claim against you.  Correct?
17         MR. ORTEGA:  Objection, form, vague,
18  calls for speculation and calls for a legal conclusion.
19     A.  It would just depend on the instance and
20  circumstance, sir, that's all.
21     Q.  (By Mr. Gage)  So what you know is there are
22  times if you don't handle a prisoner in the correct
23  fashion that could result in a Constitutional violation
24  claim against you.  True?
25         MR. ORTEGA:  Objection, vague, calls for

27

1  speculation and calls for a legal conclusion.
2          MR. JIM DARNELL:  Same objection.
3      A.  Again, sir, it would have to depend on the
4  situation.
5      Q.  (By Mr. Gage)  Sometimes it could, sometimes
6  it couldn't is what you understood.  True?
7          MR. ORTEGA:  Objection vague, lack of
8  foundation, calls for a legal conclusion and
9  speculation.
10         MR. JIM DARNELL:  Same objection.
11     A.  Again, sir, it just depends on the
12  situations -- on different situations.
13     Q.  (By Mr. Gage)  When you say it depends on the
14  situation, that's an unclear answer.  Are you saying it
15  depends on the situation so that in some situations the
16  way you handle a prisoner could result in a
17  Constitutional violation and in other instances it
18  would not?
19         MR. ORTEGA:  Objection, calls for
20  speculation, it's vague, calls for a legal conclusion.
21         MR. JIM DARNELL:  Same objection.
22         MR. ORTEGA:  He's not an attorney.
23     A.  I can't decide what happens at the end of, you
24  know, every action, sir.  I can't decide that.
25     Q.  (By Mr. Gage)  You've worked at various law

28

1  enforcement places in your long career.  Correct?
2      A.  Three different places, sir.
3      Q.  All of them taught you about Constitutional
4  law, didn't they?
5          MR. ORTEGA:  Objection, lack of
6  foundation.
7      A.  Yes, sir, I would have to say yes.
8      Q.  (By Mr. Gage)  They all taught you about
9  illegal searches and seizures as an example.  True?
10     A.  That is correct.
11     Q.  You knew from the teachings that you received
12  that if you did not properly handle a prisoner, that
13  could be a violation of the Constitution, either the
14  Fourth, Eighth or Fourteenth Amendments.  True?
15         MR. ORTEGA:  Objection, vague, calls for
16  speculation and calls for a legal conclusion.
17         MR. JIM DARNELL:  Same objection.
18     A.  Those -- those teachings were taught, but I
19  mean I can't decide.  It's up to the courts to decide
20  that.
21     Q.  (By Mr. Gage)  I'm not asking you to decide.
22  I'm only asking you what you were taught.  And you've
23  told us now, I believe, that you were taught about
24  Constitutional law and that there were times that if
25  you did not properly handle a prisoner, you could be

29

1  sued for civil rights violations or Constitutional
2  violations.  True?
3          MR. ORTEGA:  Objection, speculation, lack
4  of foundation, vague and calls for a legal conclusion.
5          MR. JIM DARNELL:  Same objection.
6      A.  I do not recall, sir.
7      Q.  (By Mr. Gage)  You don't recall one way or
8  another if you were taught now about Constitutional
9  law?
10     A.  No, I recall that I was taught about
11  Constitutional law, I just don't recall if they were --
12  if they ever mentioned it would be -- there would be
13  litigations.
14     Q.  Were you told it was improper to use excessive
15  force?
16     A.  Yes, sir.
17     Q.  Were you told that if you used excessive
18  force, that could create liability for you?
19         MR. ORTEGA:  Objection, vague, calls for
20  legal conclusion.
21         MR. JIM DARNELL:  Same objection.
22     A.  Yes, sir, I don't recall.
23     Q.  (By Mr. Gage)  You've given me two answers.
24  You said, "Yes, sir," and you said, "I don't recall."
25         My question is -- needs to be answered

30

1  clearly.  Were you taught that if you used excessive
2  force that could be a violation of law?  Yes or no.
3           MR. ORTEGA:  Objection, vague, calls for
4  speculation, calls for legal conclusion.
5           MR. JIM DARNELL:  Same objection.
6           MR. ORTEGA:  And asked and answered.
7      Q.  (By Mr. Gage)  You can answer.
8           MR. ORTEGA:  He's asking you to give him
9  a legal opinion as to whether something would lead to a
10 legal violation.
11     Q.  (By Mr. Gage)  I asked what you were taught.
12     A.  **Taught where?**
13     Q.  I'll make it even more specific.
14          Did you ever go through any training at
15 G4S where they taught you about Constitutional law?
16 Yes or no.
17     A.  **I don't recall, sir.**
18     Q.  You don't recall getting such training?
19     A.  **At G4S?**
20     Q.  I'm going to focus on G4S for a number of
21 questions now, okay, so you're clear what I'm focusing
22 on.
23          Did G4S ever advise you if you engaged in
24 excessive force, that could lead to liability for you?
25          MR. ORTEGA:  Objection, calls for a legal

31

1  conclusion and speculative.
2      A.  **No, sir, I don't recall.**
3      Q.  (By Mr. Gage)  Did G4S teach you what would be
4  considered the proper use of force in various
5  situations?
6           MR. ORTEGA:  Objection, vague.
7      A.  **They sent me to training in -- at the Mission**
8  **Valley Community College, sir.**
9      Q.  (By Mr. Gage)  That's not answering my
10 question.
11          MR. GAGE:  Move to strike.
12          I'll have it read back to you.
13          (The Court Reporter read back:  Did G4S
14          teach you what would be considered the
15          proper use of force in various
16          situations?)
17          MR. ORTEGA:  What was his answer?
18          (The Court Reporter read back:  They sent
19          me to training at the Mission Valley
20          Community College, sir.)
21          MR. GAGE:  It's not a response to my
22 question.  So I want my question answered.
23          MR. ORTEGA:  Do you want the question
24 read back to you again?
25          THE WITNESS:  I do, please.

32

1           (The Court Reporter read back:  Did G4S
2           teach you what would be considered the
3           proper use of force in various
4           situations?)
5      A.  **I'll have to say yes.**
6      Q.  (By Mr. Gage)  What did they teach you?
7      A.  **The company, like I said, sent me to the**
8  **Mission Valley Community College to get the Level 3**
9  **security guard licensing.  That's where they sent me.**
10     Q.  That's not answering my question.
11          What did G4S teach you, if anything,
12 regarding the proper use of force?
13     A.  **They presented the use of force continuum,**
14 **sir.**
15     Q.  What is your understanding of the use of force
16 continuum?
17     A.  **It's a -- to my understanding in my opinion,**
18 **it's -- it's a process, steps for escalation or**
19 **de-escalation of certain situations, sir.**
20     Q.  What situations?
21     A.  **When dealing with -- with detainees, prisoners**
22 **or arrestees.**
23     Q.  Were you taught by G4S that you could only use
24 reasonable force based on the force being used against
25 you as part of this continuum?

33

1           MR. ORTEGA:  Objection, vague.
2      A.  **They -- it was taught that, yes.**
3      Q.  (By Mr. Gage)  Were you advised that if you
4  used more than reasonable force, that could create any
5  kind of liability for you?
6           MR. ORTEGA:  Objection, vague, calls for
7  speculation and calls for a legal conclusion.
8           MR. JIM DARNELL:  Same objection.
9      A.  **No, sir, I don't recall that.**
10     Q.  (By Mr. Gage)  What were you told, if
11 anything, would be the consequence to you if you
12 engaged in excessive force?
13          MR. ORTEGA:  Objection, asked and
14 answered, calls for a legal conclusion, vague and
15 speculative.
16     Q.  (By Mr. Gage)  Go ahead.
17          MR. JIM DARNELL:  Same objection.
18     A.  **To my understanding it would be termination.**
19     Q.  (By Mr. Gage)  Has any law enforcement agency
20 ever explained to you what would happen if you used too
21 much force on a prisoner?
22          MR. ORTEGA:  Objection, vague and lack of
23 foundation.
24     A.  **Yes, sir, they have.**
25     Q.  (By Mr. Gage)  What have they told you?

34

1   A.   There would -- there would be be consequences
2   for -- for myself and my -- my job, my career.
3        Q.   What consequences were you taught?
4        A.   Termination, suspension, things of that
5   nature.
6        Q.   You were taught you could be sued as well?
7        A.   That the -- the entity could be sued, yes.
8        Q.   You were taught that your employer could be
9   sued if you used excessive force.  Correct?
10            MR. ORTEGA:  Objection, vague, calls for
11  a legal conclusion.
12       A.   That's what they mentioned, sir.
13       Q.   (By Mr. Gage)  G4S gave that you training as
14  well.  True?
15       A.   I don't recall, sir.
16       Q.   It's possible, you just can't recall one way
17  or another.  Is that what you're telling us?
18       A.   Yes, sir.
19       Q.   When you were told that the entity could be
20  sued if you used excessive force, did they explain to
21  you that you could be sued for any kind of a civil
22  rights violation?
23            MR. ORTEGA:  Objection, vague.
24       A.   It's a possibility, sir, yes.
25       Q.   (By Mr. Gage)  What did they tell you

35

1   regarding the possibility of being sued for civil
2   rights violations if you used excessive force?
3            MR. ORTEGA:  Objection, vague.
4        A.   I'm sorry.  Can you rephrase the question,
5   sir.
6        Q.   (By Mr. Gage)  What did they say were the ways
7   you could be sued for a civil rights violation?
8            MR. ORTEGA:  Objection, vague.
9            MR. JIM DARNELL:  Same objection.
10       A.   I don't recall, sir.
11       Q.   (By Mr. Gage)  When you went through the risks
12  of being sued in this training, were you told it could
13  also result in a lawsuit, at least against the
14  employer, for Constitutional violations like the
15  Fourth, Eighth or Fourteenth Amendments?
16            MR. ORTEGA:  Objection, vague, lack of
17  foundation, calls for a legal conclusion.
18            MR. JIM DARNELL:  Same objection.
19       A.   You're asking if I was told or was I trained
20  in that?
21       Q.   (By Mr. Gage)  Either.
22       A.   Just like I said before, that the entity could
23  be liable for that since I'm part of them.
24       Q.   You were taught about searches and seizures.
25  Correct?

36

1        A.   Where at, sir?
2        Q.   Anywhere.
3        A.   Yes, sir.
4        Q.   Did G4S give you such training?
5        A.   I don't recall, sir.
6        Q.   You don't recall any training by G4S about
7   searches and seizures.  True?
8        A.   No, sir, I don't recall.
9        Q.   But other law enforcement agencies have given
10  you training on searches and seizures.  Correct?
11       A.   That is correct.
12       Q.   What have these other agencies provided to you
13  regarding the laws of search and seizure?
14            MR. JIM DARNELL:  Object, overbroad.
15            MR. ORTEGA:  Same objection.
16       A.   I don't recall, sir.  It's been -- it's
17  happened over a course of many years and many
18  training -- many training sessions and things of that
19  nature, sir, I don't recall.
20       Q.   (By Mr. Gage)  You can't recall a single thing
21  that you've learned in any of these agencies that
22  you've worked in for the past several years.  Is that a
23  true statement?
24       A.   No.  PowerPoints.  I recall PowerPoints,
25  pamphlets, stuff like -- not pamphlets -- handouts.

37

1        Q.   Now you're giving us the methods, PowerPoints,
2   pamphlets and handouts.  What did those PowerPoints,
3   pamphlets or handouts say?
4        A.   I don't remember all of them, sir.
5        Q.   Do you remember anything that you learned
6   about search and seizure from any of your agencies that
7   taught you about it?
8        A.   Yes, that if you violate some- -- well, you
9   can't just -- you can't just stop anybody on the street
10  and -- without any -- any justification.
11       Q.   Is that the extent of what you can recall?
12       A.   Yes, sir.
13       Q.   What is a Level 3 security guard license?
14       A.   It's -- to my recollection it's a license that
15  you have to get that's issued by the State of Texas in
16  order to work as a security guard anywhere in the state
17  of Texas.
18       Q.   The training to become a security guard is
19  considerably less than the training to become a police
20  officer to your understanding.  Correct?
21            MR. ORTEGA:  Objection, vague.
22       A.   From my recollection, yes.
23       Q.   (By Mr. Gage)  How many different classes did
24  you take at the colleges to get your Level 3 security
25  guard license?

38

1    A.   I don't remember the amount of classes, but it
2    was in a week span.
3    Q.   All right.  So the training that was provided
4    to you by G4S through the Mission Valley Community
5    College lasted an entire week.  Correct?
6    A.   To my recollection, yes.
7    Q.   About how many hours per day did you go to
8    these training sessions during this exhaustive one-week
9    session?
10   MR. ORTEGA:  Object to sidebar.
11   MR. JIM DARNELL:  Object to sidebar.
12   Q.   (By Mr. Gage)  How many hours per day you did
13   take -- spend for this class at the college?
14   A.   If I remember correctly, it was eight.
15   Q.   Eight hours?
16   A.   Yes, sir.
17   Q.   Did you go through any kind of a test with G4S
18   to demonstrate your proficiencies and knowledge?
19   A.   The community college provided the testing.
20   Q.   Did G4S provide you any testing is my
21   question?
22   A.   Not to my recollection, no, sir.
23   Q.   Did you provide any tests to G4S that you took
24   at the community college so they could review it and
25   confirm your qualifications?

39

1    A.   I assume the college forwarded all that
2    information to G4S.
3    MR. GAGE:  Move to strike, nonresponsive.
4    Q.   (By Mr. Gage)  Based on your personal
5    knowledge, did G4S ever look at any of your testing to
6    see your knowledge, skills or abilities?
7    MR. JIM DARNELL:  Object, calls for
8    speculation.
9    MR. ORTEGA:  Same objection and vague.
10   A.   I do not -- I do not know if G4S took a look
11   at those records.
12   Q.   (By Mr. Gage)  Did you provide any of your
13   test results to G4S personally?
14   A.   No, sir, I did not.  That was all provided by
15   the community college.
16   Q.   Did G4S ask you about any of your test
17   results?
18   A.   They asked me how it went.
19   Q.   What you did say?
20   A.   If I remember correctly, I would have said --
21   I said something like, "It went well."  We were
22   there -- that's all I -- that's what I can remember.
23   Q.   All right.  So the communications between you
24   and G4S about your skills and abilities consisted of
25   them asking you how it went and your saying it went

40

1    fine.  Correct?
2    A.   Yes, sir.
3    Q.   You worked from when to when for G4S?
4    A.   I believe late September of 2012 to
5    July 2013.
6    Q.   Why you did leave in July 2013?
7    A.   Because I started the police academy in
8    July 2013.
9    Q.   Which police academy?
10   A.   El Paso Police Academy.  I'm sorry.
11   Q.   During what times you did go through the
12   El Paso Police Academy?
13   A.   From July 2013 to my graduation date of
14   February -- February 10th, 2014.
15   Q.   Typically when someone goes through the
16   El Paso Police Academy, that's because they're going to
17   get a job working as a police officer.  Correct?
18   A.   That's correct.
19   Q.   Did you get a job working as an El Paso police
20   officer?
21   A.   Yes, sir, I graduated.
22   Q.   And when did you work for the El Paso PD?
23   A.   I officially became a police officer
24   February -- yeah -- February 2014 and I lasted there
25   from February 2014 to August 2014.

41

1    Q.   What happened then?
2    A.   I resigned.
3    Q.   Why you did resign?
4    A.   Because I got a job with the DHS, sir.
5    Q.   What's DHS?
6    A.   Department of Homeland Security.
7    Q.   Had you made it through probation at the time
8    you resigned?
9    A.   With the police department?  No, I was still
10   on probation.
11   Q.   Was it a voluntary resignation or involuntary
12   one?
13   A.   It was a voluntary, sir.
14   Q.   Did you have any internal affairs complaints
15   or investigations against you when you resigned?
16   A.   No, sir.
17   Q.   Did you ever have a complaint against you in
18   any law enforcement agency?
19   A.   Yes, sir, with my current job.
20   Q.   What happened there?
21   A.   It was at U.S. Customs and Border Protection,
22   they were saying -- this lady said that I broke her --
23   her LPR card, her I 551.
24   Q.   What is that?
25   A.   It's a lawful permanent resident card.  And

Romero, Alejandro  08-09-2017

42

1 she -- she made the allegation that I broke it on
2 purpose.
3      Q.   What happened in that allegation?
4      A.   It was unfounded.
5      Q.   When did that happen?
6      A.   When did it happen?
7      Q.   Yes.
8      A.   Sometime in 2015, sir.  I don't recall.
9      Q.   Was her card broken?
10     A.   It was broken, yes.
11     Q.   Even though you had training in the past in
12 law enforcement, including through G4S, when you went
13 to the El Paso Police Academy, the department
14 determined you needed to go through training between
15 July 2013 and February 2014.  Correct?
16     A.   Yes.  Because it's part of their training,
17 yes.
18     Q.   In other words the El Paso Police Department
19 did not say, "Well, gee, you've had all this training
20 in the past with G4S and other agencies, therefore you
21 know everything that you need to know to work with the
22 police department so we're going to waive that
23 training."  Did they do something like that?
24     A.   No, we had to go through the training.
25     Q.   Did you ever talk with the police chief

43

1 regarding your training and experience, that is, the
2 El Paso police chief?
3      A.   No, sir, I never recall -- I never talked to
4 him about it.
5      Q.   You knew that taking a prisoner outside of the
6 jail would increase the risk that prisoner could flee
7 from when they were inside of the jail.  Correct?
8           MR. ORTEGA:  Objection, vague, calls for
9 speculation.
10     A.   No, sir.  It just depends on the situation.  I
11 don't know if they're going to flee or not.
12     Q.   (By Mr. Gage)  You have not been told any
13 kinds of signs to see if a person might flee or not
14 when they're a prisoner.  Is that your testimony?
15     A.   No, I don't recall, sir.
16     Q.   You don't recall ever being taught that.
17 Correct?
18     A.   That's correct.
19     Q.   So when you're escorting a prisoner, you don't
20 know any signs or cues that would help to tell you if
21 someone's about to flee or not, do you?
22           MR. ORTEGA:  Objection, vague, calls for
23 speculation.
24     A.   I don't know what that person's thinking at
25 the time.  So they could display a different type of

44

1 emotion, sir, but I don't know what that person's
2 thinking at the time.
3      Q.   (By Mr. Gage)  I'm going to ask you a
4 hypothetical question here.  Do you believe if someone,
5 the same person, wants to run away from you, it's
6 easier for them to run away from you if they're in a
7 locked location, kind like this conference room if
8 all the doors were locked, than if they were outside on
9 the street?
10          MR. ORTEGA:  Objection, vague, calls for
11 speculation.
12     A.   Like I said it depends on that person and --
13 and -- and I'm not in their head, I don't know they're
14 thinking, so they can attempt to run out of this place
15 if they wanted to also versus being outside.
16     Q.   (By Mr. Gage)  So you don't think -- do you
17 believe it's easier for a person if they're inside of a
18 jail cell locked in to flee or if they're out on the
19 street to flee when you're escorting them?
20          MR. ORTEGA:  Objection, calls for
21 speculation.
22     A.   I'm not sure, sir.
23     Q.   (By Mr. Gage)  You're not sure.
24     A.   No.
25     Q.   Did anybody ever teach you the purpose of

45

1 putting somebody who is a flight risk into a locked
2 location as opposed to leaving them out on the streets
3 unlocked?
4           MR. ORTEGA:  Objection, vague.
5      A.   Yes, sir.
6      Q.   (By Mr. Gage)  What do they tell you?
7      A.   If the person's under arrest or detained, they
8 have to be in a secured location.
9      Q.   Why you did understand that was a requirement?
10     A.   To further the investigation of that person,
11 the questioning and -- because obviously they're not
12 free to leave until said otherwise.
13     Q.   That's the only purpose --
14     A.   I'm sorry?
15     Q.   -- that you're --
16          That's the only purpose you're aware of
17 to keep a person locked up is so it can help you with
18 the investigation.  Correct?
19     A.   Or the questioning of that person.
20     Q.   How tall are you?
21     A.   I'm about five-seven, five-eight, sir.
22     Q.   How much do you weigh?
23     A.   Right now I weigh approximately 185, 190.
24     Q.   Do you ever weight lift?
25     A.   I do not.

46

1    Q.   Do you work out at all?
2    A.   **About maybe two, three times a month.**
3    Q.   What do you do?
4    A.   **I run, calisthenics.**
5    Q.   Have you ever received any training in
6 self-defense?
7    A.   **Yes, sir, I have.**
8    Q.   What have you received?
9    A.   **It's -- how to get -- how to tactically fall**
10 **if you're being rushed by a sus-- a subject, how to**
11 **get -- how to get away from them and then bring it to a**
12 **logical conclusion.**
13    Q.   Who taught you that?
14    A.   **This is Department of Homeland Security, sir.**
15    Q.   Is that the first time you received any
16 training like that?
17    A.   **And my previous trainings as well, El Paso**
18 **Police Department, Dona Ana County and G4S.**
19    Q.   What was the self-defense training that you
20 received from G force itself -- G4S itself?
21    A.   **How to escape the grapplings of a subject if**
22 **they're on you or if they have ahold of you somehow,**
23 **just try to get away from that person as fast as you**
24 **can and just -- and bringing the situation under**
25 **control.**

47

1    Q.   You told us a few moments ago that you could
2 not get into the mind of a person.  I take it, then,
3 you never believed that Daniel Saenz was going to run
4 away or try to escape.  Is that a true statement?
5    A.   **Well, I don't know what that person was**
6 **thinking.  I just know he wanted to get away from us.**
7    Q.   You told us you don't know what's in the mind
8 of anybody so you don't know when they're going to try
9 to flee or not.  Remember that testimony?
10    A.   **That's correct, yes.**
11    Q.   So that testimony that you said as to everyone
12 else applied to Daniel as well.  Correct?
13         MR. ORTEGA:  Objection, vague, assumes
14 facts not in evidence.
15    Q.   (By Mr. Gage)  You can answer.
16    A.   **It could apply to him.**
17    Q.   Right.  So you had no knowledge or
18 understanding at any time that Daniel Saenz was going
19 to try to flee or escape.  True?
20         MR. ORTEGA:  At what point?
21    Q.   (By Mr. Gage)  Any point.
22    A.   **Like I said before, I don't know what he was**
23 **thinking, but his actions gave me some indication.**
24    Q.   But you weren't sure.  Correct?
25    A.   **No, I wasn't sure.**

48

1    Q.   Did G4S ever tell you when you were allowed to
2 engage in deadly force?
3    A.   **According to the policies that they had, it**
4 **was only in -- in situations where either my life or**
5 **the life of an officer or someone else's life was in**
6 **danger.**
7    Q.   Did you provide a witness statement on
8 March 8th, 2013?
9    A.   **Yes, I did.**
10    Q.   Was that statement truthful and correct in all
11 manners?
12    A.   **Yes, that's correct.**
13    Q.   Was it your intent to include all important
14 information in your statement?
15    A.   **That is correct.**
16    Q.   One of the important things that you would
17 want to include in your statement is the amount of
18 force you used.  Correct?
19    A.   **That is correct.**
20    Q.   You would want to indicate injuries that your
21 prisoner received.  Correct?
22    A.   **That's correct.**
23    Q.   You would want to include your knowledge of
24 how those injuries occurred.  Right?
25    A.   **That's correct.**

49

1    Q.   You would also want to include the
2 justification for any force that you used on a
3 prisoner.  True?
4    A.   **That's correct.**
5    Q.   You'd want to include the justification of any
6 force used by others in your presence on the prisoner.
7 Correct?
8    A.   **That's correct.**
9    Q.   Did you ever put into your March 8th statement
10 that was true, complete and correct, any justification
11 for Officer Flores using deadly force on Daniel Saenz?
12    A.   **I did not.**
13    Q.   The reason you did not put in any such
14 justification is you did not see any justification for
15 Officer Flores using deadly force on Daniel Saenz at
16 the time he used it.  True?
17    A.   **I don't know what Mr. Flores was thinking at**
18 **the time, sir, so I can't say if he was justified or**
19 **not.**
20    Q.   If you had seen items that justified the use
21 of deadly force when Flores pulled the trigger, you had
22 an obligation to write that in your report.  True?
23         MR. ORTEGA:  Objection, calls for
24 speculation, vague.
25    A.   **What items are you talking about, sir?**

50

1    Q.   (By Mr. Gage)  Anything.  Anything that you
2    saw on the sally port that would justify deadly force
3    by Flores, you understood you were supposed to put into
4    your witness statement.  True?
5                MR. ORTEGA:  Objection, lack of
6    foundation, vague.
7    **A.   I would only put into my statement what my --**
8    **what I saw.**
9    Q.   (By Mr. Gage)  Of course.
10   **A.   Yes.**
11   Q.   If you saw something -- as an example, if you
12   saw that Daniel Saenz had a baseball bat and was
13   swinging it at Flores' head the second before Flores
14   shot him, that would be something you would want to put
15   in your report because it would show a use of
16   potentially deadly force justifying a shooting.  Right?
17   **A.   That's correct.**
18   Q.   In the case of Mr. Flores and Daniel Saenz,
19   you did not put down any information that you saw that
20   Daniel Saenz was engaging in to justify him being
21   killed.  Isn't that a true statement?
22               MR. ORTEGA:  Mr. Romero, I'll caution you
23   to answer if you could recall.  For the record you
24   don't have that statement that plaintiff's counsel is
25   referring to.  If you could recall, answer the

51

1    question.  If not, answer freely.
2                MR. GAGE:  I think that's an improper
3    instruction.  We'll mark that.
4    Q.   (By Mr. Gage)  And please answer my question.
5    **A.   Can you repeat the question, please.**
6                (The Court Reporter read back:  In the
7                case of Mr. Flores and Daniel Saenz you
8                did not put down any information that you
9                saw that Daniel Saenz was engaging in to
10               justify him being killed.  Isn't that a
11               true statement?)
12   **A.   I do not recall, sir, I'd have to see the**
13   **statement in front of me to make sure.**
14   Q.   (By Mr. Gage)  You don't recall any facts
15   sitting here today either that would justify the use of
16   deadly force.  Isn't that true?
17   **A.   I would have to see the statement that you're**
18   **talking about and then --**
19   Q.   I'm not asking you about your statement.  I'm
20   asking you about the day in question.
21               MR. ORTEGA:  He's answering your
22   question.  He's telling you he can't answer unless he's
23   got the statement, he can't recall.
24   Q.   (By Mr. Gage)  Okay.  So let's make sure we're
25   clear here.  It's your testimony that you do not have

52

1    enough recollection of what happened on March 8th,
2    2013, to say whether there was a fact that would
3    justify Flores using deadly force on Mr. Saenz when he
4    shot him.  Correct?
5    **A.   That happened a long time ago, sir, four years**
6    **to be exact, but it happened a long time ago so I don't**
7    **remember everything, I'd have to look at the statement.**
8    Q.   I just want to --
9                MR. GAGE:  I move to strike as
10   nonresponsive.
11               I'll have my question read back.
12               (The Court Reporter read back:  Let's
13               make sure we're clear here.  It's your
14               testimony that you do not have enough
15               recollection of what happened on March
16               8th, 2013, to say whether there was a
17               fact that would justify Flores using
18               deadly force on Mr. Saenz when he shot
19               him.  Correct?)
20   **A.   No, sir, I don't recall.**
21   Q.   (By Mr. Gage)  All right.  So the only
22   information that you can testify to here today about
23   what happened on the sally port between yourself and
24   Mr. Flores and Mr. Saenz is that information that
25   you've put into your written statement.  Correct?

53

1    **A.   That's correct.**
2    Q.   Because outside of reading your statement,
3    your mind is basically a blank on what happened that
4    day.  True?
5    **A.   No, sir, but as I mentioned before, it**
6    **happened a long time ago.**
7    Q.   I understand.  So is it true that your mind is
8    a blank now -- because it's been a few years -- you
9    just can't recall anything that happened that day other
10   than whatever you wrote down?
11   **A.   I recall events of that day, yes, but I do not**
12   **recall every little detail about the event, no, sir.**
13   Q.   Well, let's focus on the time frame after you
14   are outside on the sally port with Daniel Saenz, it's
15   just the two of you on there.  Do you have any
16   recollection of that happening?
17               MR. ORTEGA:  This is after the exit at
18   the jail.  Correct?
19               MR. GAGE:  Correct.
20   **A.   Yes.**
21   Q.   (By Mr. Gage)  You do remember some parts of
22   that.
23   **A.   Yes, I do.**
24   Q.   I want you to tell me in as much detail as you
25   can recall the events that happened in sequence.

54

1        You're outside, Daniel Saenz is outside.
2  Is he standing, sitting or lying down?
3      A.   He's sitting with his -- with his back against
4  my knees.
5      Q.   Okay.  And what are you doing?
6      A.   I'm standing over him just with my hands on
7  his -- on his shoulders keeping him balanced, that way
8  he doesn't tip over.  I'm trying to catch my breath at
9  the time because I was pretty exhausted, I was -- my --
10 I remember having a hard time catching my breath and
11 breathing.  I was heavily breathing [sic].  I was
12 wiping the sweat off of my -- my forehead and at the
13 same time, I was trying to keep Mr. Saenz just with his
14 back against my knees, that way he doesn't fall over to
15 the side.
16     Q.   Did it appear to you that Mr. Saenz was
17 unconscious?
18     A.   No, it did not.
19     Q.   Why were you concerned if he's conscious that
20 he was going to fall over?
21     A.   Because he kept tipping over, sir.
22     Q.   Did you say anything to him?
23     A.   I don't recall, sir.
24     Q.   You don't recall saying anything to Daniel.
25 Is that correct?

55

1      A.   That's correct.
2      Q.   Did Daniel say anything to you?
3      A.   No, he did not.
4      Q.   After the two of you are in the sally port
5  with your knees in his back, what happened next?
6           In fact let me go back a moment.  You had
7  your knees in his back when it was just the two of you
8  there.  Correct?
9      A.   My knees weren't in his back.  His back was
10 resting against my knees.
11     Q.   His back against your knees.  Correct?
12     A.   Yes.
13     Q.   Were you exerting any kind of pressure with
14 your knees on him?
15     A.   I was not.  He was just -- he was, like I
16 said, just -- I don't want to say relaxing, but his
17 back was just against my knees, it was no pressure at
18 all.
19     Q.   You did need to exert some pressure so that he
20 could stay balanced and upright?
21     A.   Not from my knees, just my hands to keep him
22 upright.
23     Q.   Were your hands exerting some kind of
24 pressure?
25     A.   Enough to keep him from tipping over or

56

1  slouching to the side.
2      Q.   What happened next?
3      A.   At that point Officer Flores came out after
4  retrieving his equipment and we were both communicating
5  and we knelt down next to Mr. Saenz.  At that point
6  when I knelt down his back was kind of against my chest
7  and my inner part of my thigh to keep him upright.
8      Q.   How were you and Flores communicating?
9      A.   Verbally, we were talking.
10     Q.   What were you saying?
11     A.   If I remember correctly, Mr. Flores was
12 telling me that we had to -- we were going to wait
13 for -- we were going to have to get a medical release
14 for Mr. Saenz.  And in between Mr. Flores was telling
15 Mr. Saenz, you know, "Hey, buddy," you know, "you've
16 got to calm down, relax and cooperate with us."
17          And then he told me, "We're going to
18 stand him up so we can pull his pants up and get him
19 ready for a transport."
20     Q.   When Flores said, "You've got to calm down,
21 relax and cooperate," was Daniel Saenz calm at that
22 point?
23     A.   He wasn't saying anything, he was -- I
24 remember that he looked up at me like this and then put
25 his head back down, but he wasn't --

57

1      Q.   So he was calm?
2      A.   He was calm, yes.
3      Q.   He was relaxed.  Correct?
4      A.   I would say yes.
5      Q.   In fact he was so relaxed, you had to exert at
6  least a little bit of pressure with your knees and your
7  hands to keep him from falling over.  True?
8           MR. ORTEGA:  Objection, mischaracterizes
9  the witness' testimony.  He told you he didn't exert
10 any pressure with his knees.
11          MR. GAGE:  That's an improper objection.
12     Q.   (By Mr. Gage)  You can answer.
13     A.   I did not exert any pressure with my knees at
14 all on his back.
15     Q.   In fact your knees weren't even touching his
16 back.  Is that correct?
17     A.   No, they -- they were in contact with each
18 other, I just wasn't using any pressure at all to keep
19 him upright, it was all with my -- my hands.
20     Q.   Well, if his back was touching your knees,
21 there would be some pressure.  It might have been
22 slight, but there would be at least a little pressure.
23 True?
24     A.   His back against mine, mine not against his.
25     Q.   Still there's pressure in that situation,

58

1  isn't there?

2     A.   Slight pressure.

3     Q.   All right.  So my question stands.  At the

4  time that Flores was telling you that -- withdraw.

5          At the time that Flores was telling Saenz

6  that he needed to relax, Saenz was so relaxed that you

7  were putting at least a little bit of pressure between

8  his back and your knees and your arm -- hands on his

9  shoulders.  True?

10    A.   Once again, sir, I did not put any pressure on

11 his back.  It was all -- it was -- his back was in

12 contact with my knees and no -- no pressure was applied

13 to his back with my knees.

14    Q.   Not even a tiny bit?

15         MR. ORTEGA:  Objection, asked and

16 answered.

17    A.   Like I said, sir, his back was in contact with

18 my knees, no pressure was applied.

19    Q.   (By Mr. Gage)  Not even a tiny little

20 pressure.  Is that your testimony now?

21         MR. ORTEGA:  Objection, asked and

22 answered.

23    Q.   (By Mr. Gage)  Go ahead.

24    A.   I do not recall, sir.

25    Q.   So when you say you don't recall that's you

59

1  don't recall if there was pressure between your knees

2  and his back.  Is that what you're saying?

3     A.   Yes, sir, I don't recall.

4     Q.   With respect to -- at the time that Flores was

5  telling Daniel to relax, Daniel was so relaxed you were

6  trying to keep him from falling over.  Correct?

7          MR. ORTEGA:  Objection, calls for

8  speculation.

9     A.   I don't know if he was relaxed or not, I just

10 remember he was -- his back was against my knees and my

11 hands were on his shoulders in an attempt to keep him

12 upright and have him -- from having him fall over to

13 the side.

14    Q.   (By Mr. Gage)  Daniel appeared relaxed at the

15 time that Flores came out and said for him to relax.

16 True?

17    A.   I would assume he was relaxed.

18    Q.   Daniel was cooperating with you while you were

19 out there with him and Flores.  Correct?

20    A.   He was just sitting there, he didn't say much

21 or do much.

22    Q.   He just sat there and sort of started tipping

23 over.  He wasn't fighting, yelling, screaming, running,

24 anything of that sort, was he?

25    A.   That's correct.

60

1     Q.   Indeed, you were left alone in the sally port

2  with Daniel by Flores for a few minutes.  Correct?

3     A.   That is correct.

4     Q.   Did you feel any kind of fear being left alone

5  in the sally port with Daniel for a few minutes while

6  Flores was inside the jail?

7     A.   I did, sir.

8     Q.   Did you tell anybody about that fear?

9     A.   I did later on in the grand jury -- yeah, the

10 grand jury testimony.

11    Q.   What you did say?

12    A.   If I remember correctly, I told them that what

13 I was experiencing that day as far as me being

14 concerned with him -- with me being alone with him

15 after having struggled with him and that I was thinking

16 if he does -- if he attempts to do something against

17 me, it's just going to be me against him.

18    Q.   Was that the first time you ever expressed

19 such fear?

20    A.   I believe I may have expressed it at the

21 shooting review and the mediation on later -- later

22 dates.

23    Q.   What mediation?

24    A.   The -- I don't recall the date.  I think it

25 was September of 2016 -- 2015.  I'm sorry.

61

1     Q.   Where was this mediation?

2     A.   Here in El Paso.

3          MR. ORTEGA:  Are you thinking mediation

4  or arbitration?

5          THE WITNESS:  I'm sorry.  Arbitration.

6     A.   Yes, arbitration.

7     Q.   (By Mr. Gage)  Whose arbitration?  Flores'?

8     A.   That's correct.

9     Q.   Do you have a copy of your grand jury

10 testimony?

11    A.   I do not, sir.

12    Q.   When have you last looked at it?

13    A.   I have never looked at it.

14    Q.   Did you review any documents to prepare for

15 your deposition today?

16    A.   Yes, I did, sir.

17    Q.   What you did look at?

18    A.   I looked at the statement I gave -- I provided

19 to the -- to Detective Lozano at CAP for the El Paso

20 Police Department.

21    Q.   That's the March 8th statement that you said

22 you needed to look at because you can't remember

23 anything from it.  Correct?

24    A.   That's correct.

25    Q.   Okay.  What else you did review?

62

1    A.    I also reviewed the -- some questioning and
2  statements that were asked by internal affairs while I
3  was a police officer regarding that incident on
4  March 8th.
5    Q.    El Paso PD?
6    A.    That's correct.
7    Q.    Did those documents help refresh your
8  recollection for your testimony here today?
9    A.    Somewhat, yes, sir.
10   Q.    When did you look at your statements by
11 internal affairs from El Paso PD?
12   A.    When did I look at them?
13   Q.    Yes.
14   A.    It must have been in the last 72 hours.
15   Q.    So within the past --
16   A.    I'm sorry.  No -- yeah, 72 hours.
17   Q.    Within the past three days.  Correct?
18   A.    That's correct.
19   Q.    How much time you did spend reading that
20 statement?
21   A.    I don't remember, sir.
22   Q.    Did you spend more or less than five hours
23 total reading that statement?
24   A.    I'm sorry?
25   Q.    Did you spend more or less than a total of

63

1  five hours reading that statement in the past three
2  days?
3    A.    I'd have to say less.
4    Q.    When did you last most recently look at the
5  March 8, 2013, statement that you testified to you
6  couldn't recall anything about here today?
7    A.    The day before yesterday, sir.
8    Q.    So within the past two days, you spent how
9  much time looking at that March 8, 2013, statement of
10 yours that you've told us you can't remember anything
11 about here today?
12   A.    I'm not sure, sir.  Between an hour, hour and
13 a half.
14   Q.    You read it carefully.  Right?
15   A.    Yes, sir.
16   Q.    You wanted to make sure you recalled events
17 from it so that you could give your best testimony here
18 today.  True?
19   A.    That's correct, sir.
20   Q.    It was important for you to know the contents
21 of that statement of yours before testifying here
22 today.  True?
23   A.    That's correct.
24   Q.    Nevertheless, it's your testimony under
25 penalty of perjury that you can't remember a single

64

1  thing from that March 8th statement.  Correct?
2          MR. ORTEGA:  Objection, mischaracterizes
3  the witness' testimony.
4          MR. JIM DARNELL:  Same objection.
5    A.    No, sir, I didn't say that I don't remember
6  anything about that statement.
7    Q.    (By Mr. Gage)  Tell us, what do you recall
8  about the questions and statements that you gave to
9  internal affairs that you reviewed the last three days?
10   A.    All of the questions you want me to tell you?
11   Q.    Whatever you can recall, if anything.
12   A.    I believe one of the questions was what was
13 the communication between me and Officer Flores and did
14 he -- what was the communication between him and I.
15         The other question was after I felt --
16 oh, that if -- in my statement I said that I was kicked
17 by Saenz.  They asked me if that was an accurate
18 statement.  I said no, that was not an accurate
19 statement after -- after viewing of the video that they
20 provided that day, sir, of the event.
21         And, also, they asked me to provide any
22 other information regarding that event and, yes, I
23 provided some information saying that Mr. Flores --
24 Mr. Saenz was -- when he was on the ground, he was
25 attempting to bash his head on the ground and I put my

65

1  hand -- my right hand underneath his head to further
2  prevent injury to his head and then at that time, I had
3  to remove it because he started biting my fingers.
4    Q.    Did Flores tell you to do that or did you do
5  that on your own?
6    A.    It was -- it was by Flores, sir.
7    Q.    So he instructed you to put your hand under
8  the head?
9    A.    That's correct.
10   Q.    Did you say that in your statement that you
11 were instructed by Flores?
12   A.    Not in my March 8th statement, no.
13   Q.    You were asked about the communication between
14 you and Flores.  What did you say?
15   A.    That when he was sitting down, he was --
16 before he told me to stand -- we were going to stand
17 him up to -- to get his pants up and get him ready for
18 transport, he said, "Watch out."  Just watch out
19 because he knows what he's doing, because the -- the
20 whole time we were transporting him or during the jail,
21 he -- he was being uncooperative and being combative
22 with us, sir.
23   Q.    The entire time from the time you started your
24 transport all the way until the time he was shot was
25 Daniel Saenz being uncooperative and combative?

66

1    A.    That's correct, sir.

2    Q.    Was Daniel Saenz being uncooperative and

3 combative when Flores left you alone with him?

4    A.    No, not that point, sir.

5    Q.    So then your statement that Flores --

6 withdraw.

7          Your statement that Daniel Saenz was

8 uncooperative and combative the entire time was an

9 exaggeration?

10    MR. ORTEGA:  Objection, argumentative.

11    A.    I wouldn't say it was an exaggeration.  I

12 might have -- it was most of the time during the

13 transportation, sir.

14    Q.    (By Mr. Gage)  Your statement that

15 Daniel Saenz was uncooperative and combative the entire

16 time is not a true statement, was it?

17    A.    When I said the entire part, no.

18    Q.    So you told various individuals that you were

19 afraid when Flores left you alone with Daniel.  You

20 remember that testimony?

21    A.    That's correct.

22    Q.    Did you ever tell Flores, "Don't leave me

23 alone," or, "I need backup," something like that?

24    A.    I did not, sir.

25    Q.    Did you tell Flores, "I'm afraid if I'm going

67

1 to be left alone with Daniel"?

2    A.    No, I did not, sir.

3    Q.    Did you have the opportunity to speak to

4 Flores while you were together?

5    A.    During which part?

6    Q.    At any time.

7    A.    Did I have the opportunity to speak with him?

8    Q.    Yes.

9    A.    Yes.

10    Q.    Did you ever tell Flores, "I'm afraid of this

11 guy, maybe we should get some backup"?

12    A.    No, sir.

13    Q.    Did you ever tell Flores, "Make sure you don't

14 leave me alone, I'm afraid of this guy"?

15    A.    No, I never told him that.

16    Q.    Were you surprised when Flores all of a sudden

17 left you alone with Daniel?

18    MR. ORTEGA:  You're talking about the

19 sally port.  Right?

20    Q.    (By Mr. Gage)  Go ahead.

21    A.    I was surprised at the amount of time he

22 was -- he was gone and I was out there with him.

23    Q.    Did Flores tell you that he was going to leave

24 you alone before he just left you alone out there?

25    A.    He didn't say, "I'm going to leave you alone."

68

1 It was once he walked into the jail, he said he was

2 going to get his -- his items, his equipment, I -- I --

3 I knew I was going to be alone out there with him.

4    Q.    Did you say anything to him when he said that?

5    A.    I did not, sir, no.

6    Q.    Did you --

7    A.    I said, "Okay."

8    Q.    So you said that was okay.

9    A.    Well, I said as in being affirming, "Okay,

10 I'm" --

11    Q.    At that point you never told Flores, "Gee, I'm

12 afraid to be left alone with this man," something like

13 that, did you?

14    A.    I did not.

15    Q.    So you told us that Flores came out and wanted

16 to pull up the pants of Daniel.  Did you feel there was

17 an urgent need to pull up his pants at that time?

18    MR. ORTEGA:  Objection, vague.

19    A.    No, sir.  I don't know if it was urgent, no.

20    Q.    (By Mr. Gage)  In fact Daniel's underwear was

21 covering any of his private areas.  Correct?

22    A.    Was his underwear covering his private areas?

23    Q.    Yes.

24    A.    Yes, it was.

25    Q.    There actually was a tactical advantage for

69

1 you as a law enforcement officer having the pants

2 around Daniel's legs, wasn't there?

3    MR. ORTEGA:  Objection, lack of

4 foundation, calls for speculation and vague.

5    MR. JIM DARNELL:  Same objection.

6    Q.    (By Mr. Gage)  Go ahead.

7    A.    I don't know if there was a tactical advantage

8 to it and apart from that I wasn't a law enforcement

9 officer at the time.

10    Q.    Do you know what -- withdraw.

11          Have you received any training on tactics

12 at any time?

13    A.    Tactics as far as what, sir?

14    Q.    Tactics as to how to best control a suspect

15 who's uncooperative.

16    A.    At that time I had received the training from

17 Dona Ana, yes, sir.

18    Q.    All right.

19    A.    And the G4S training, yes.

20    Q.    As part of that training, you were taught that

21 if a person is potentially dangerous or combative, one

22 way to help protect you as a police officer would be to

23 restrain his legs in some way.  True?

24    A.    That is correct.

25    Q.    As an example, there are different devices

70

1  that you're aware of to control a person's leg, like
2  leg irons.  Correct?
3      A.   Yes, sir.
4          MR. ORTEGA:  Objection, vague, calls for
5  speculation.
6      Q.   (By Mr. Gage)  There's also hogties that were
7  available to you to control a person's legs.  Correct?
8          MR. ORTEGA:  Objection, vague, calls for
9  speculation.
10     A.   No, I don't know if there was any hogties
11 available to us, sir.
12     Q.   (By Mr. Gage)  What is your understanding of
13 what a hogtie is?
14     A.   My understanding of a hogtie is when you tie
15 the subject's arms to their legs having -- when you
16 bring up the subject's legs up to their arms and hogtie
17 them both -- I'm sorry -- tie them both together.
18     Q.   The benefit of that is if a person is trying
19 to take their arms while in custody from behind their
20 back in front of their back, that prevents it from
21 happening.  True?
22         MR. ORTEGA:  Objection, calls for
23 speculation.
24     A.   I don't know, sir.  I don't know about that.
25     Q.   (By Mr. Gage)  You've never been taught that.

71

1      A.   No, we were taught not to hogtie.  Hogtie
2  was -- is -- yes, we were taught to hogtie.
3      Q.   All right.  Were you taught ever in your life
4  about a way to prevent a suspect from taking their
5  handcuffs behind their back and putting them in front
6  of them?
7      A.   At that point, sir, no, sir.
8      Q.   Have you since been taught of any ways to do
9  that?
10     A.   Yes, sir.
11     Q.   So the training was more comprehensive after
12 March 2013 than what you received from G4S.  True?
13     A.   That's correct.
14     Q.   What have you been taught after the fact on
15 how to restrain a person so that their arms cannot go
16 from behind their back to in front of their back in
17 handcuffs?
18     A.   You put the -- the handcuff through one of the
19 pant loops and then handcuff them -- handcuff the
20 subject.  That's one way.  Or leg irons, sir.  I
21 mean -- I'm sorry -- not leg irons, belly chains.
22     Q.   What are billy chains?
23     A.   Belly chains.
24     Q.   What are belly chains?
25     A.   Belly chains is when you put a chain around

72

1  the subject's waist, you put -- there's a -- a hook
2  that's on the chain, you put the handcuff through it
3  and you -- and you put the handcuffs on the subject and
4  it sits like such here and it restrains the movement
5  of -- it restrains the subject's movement completely.
6      Q.   Did the El Paso jail have any type of belly
7  chains you were aware of in 2013?
8          MR. JIM DARNELL:  Object, calls for
9  speculation.
10     A.   I'm not sure.
11     Q.   (By Mr. Gage)  Have you ever taken prisoners
12 to the El Paso jail at any other time in your life
13 besides March 8th?
14     A.   No, just with the -- just in the G4S capacity.
15     Q.   And it was only one time ever that you took a
16 person to jail?
17     A.   No, sir, it was multiple times.
18     Q.   Multiple times.  During any of those times,
19 did you ever learn of or see any belly chains at that
20 jail?
21         MR. ORTEGA:  This is after he left G4S.
22 True?
23     Q.   (By Mr. Gage)  Any time.  Any time in your
24 life have you ever seen belly chains?
25     A.   At the county jail?

73

1      Q.   Correct.
2      A.   I don't recall, sir.
3      Q.   You don't recall one way or another?
4      A.   No.
5      Q.   You never saw a prisoner walking around with a
6  belly chain ever at the jail?
7      A.   At the county jail, no, I don't recall that.
8      Q.   When you were a prison guard, did they have
9  belly chains that one month you served as a guard in
10 2012?
11     A.   I served as a detention officer from
12 January 2012 to September 2012.
13     Q.   Where did you work?
14     A.   The Dona Ana County Detention Center.
15     Q.   Did they have belly chains there?
16     A.   We had belly chains, yes, sir.
17     Q.   Is that something that you understand that's
18 fairly common that jails traditionally would have belly
19 chains available?
20         MR. ORTEGA:  Objection, vague and calls
21 for speculation.
22     A.   At that jail I knew we had belly chains
23 because we used them quite frequently.  However, I mean
24 the El Paso County jail, other jails, have different
25 policies and procedures.  I'm not sure, sir.

74

1    Q.   (By Mr. Gage)  Have you been in any other
2 jails besides the two you've told us about?
3         MR. ORTEGA:  At any time?
4    Q.   (By Mr. Gage)  At any time.
5    A.   No, that's -- those are the only two jails
6 I've been in.
7    Q.   After Flores said to stand up Daniel, did he
8 explain any purpose other than to pull up his pants?
9    A.   To get him -- he just said to get him ready
10 for transport.
11   Q.   Leaving the pants down by the legs would be a
12 way of helping prevent Daniel from fighting or running.
13 True?
14   A.   I'm not sure, sir.
15   Q.   You don't think that having something tied
16 around his legs like a pair of pants would prevent him
17 from being able to run as easily as if his pants were
18 fully up?
19        MR. ORTEGA:  Objection, calls for
20 speculation.
21   A.   Yes, sir, I don't know.
22   Q.   (By Mr. Gage)  You don't know?
23   A.   I'm sorry?
24   Q.   You don't know that?
25   A.   Well, I don't know if it would have prevented

75

1 it or not, no.
2    Q.   Have you ever in your life had something
3 wrapped around your legs and tried to walk or run?
4    A.   I have.
5    Q.   Did it make it more difficult for you to walk
6 or run when you had something around your legs?
7    A.   That was -- that was me, though, sir.  I don't
8 know about everybody else.
9    Q.   Did it make it more difficult for you to walk
10 or run when you had something wrapped around your legs?
11 Yes or no.
12        MR. ORTEGA:  Objection, vague.
13   A.   Not -- not that I remember, no.
14   Q.   (By Mr. Gage)  What was wrapped around your
15 legs that did not impact your ability to walk or run at
16 all?
17   A.   I don't remember.  It might have been shorts.
18 I don't remember.
19   Q.   Right.  So in your experience whether your
20 shorts are around your waist, around your thighs or
21 around your calves, it has absolutely no impact on you
22 in your abilities to walk and run.  Is that a true
23 statement?
24        MR. ORTEGA:  Objection, mischaracterizes
25 prior testimony.

76

1    Q.   (By Mr. Gage)  Go ahead.
2         MR. ORTEGA:  And vague.
3    A.   Like I said, sir, I don't remember at the time
4 what I had.  It might have been shorts, but I had no
5 issue.
6    Q.   (By Mr. Gage)  All right.
7    A.   No issue moving around or walking around.
8    Q.   All right.  Shorts around your ankles also had
9 no impact or your abilities to walk or run in your
10 experience.  Correct?
11        MR. ORTEGA:  Objection, mischaracterizes
12 earlier testimony.
13   Q.   (By Mr. Gage)  Go ahead.
14   A.   I don't remember, sir, about the -- if it
15 impacted it or not, but I would have to say no.
16   Q.   All right.  So you pull you up the pants and
17 then what do you recall happening?
18   A.   Well, we stood him up.  We didn't completely
19 get his pants up.  At that moment Mr. Saenz started
20 being combative with us and -- and pulling his arms
21 quite heavily from us and we tried getting control of
22 him and I remember at that point we -- we went to the
23 ground, all three of us.
24   Q.   Then what happened?
25   A.   We were still struggling with Mr. Saenz, he

77

1 was trying to get his arms away from us.  I remember he
2 started bashing his head on the ground.  At that point
3 I put my arm underneath his head to further prevent the
4 injury and we were still struggling with him.  I
5 remember I was thinking to myself I'm losing control of
6 him.
7         At that point I see from my peripheral
8 Mr. Flores disengage and at that point I felt like it
9 was a kick but the video shows otherwise.  It was not a
10 kick.  What happened was he -- Mr. Saenz propped his --
11 his feet up on the curb and pushed me off.
12        Obviously, I lost my balance, so what I
13 tried doing was putting my hands behind me so I could
14 catch my fall, which at that point I heard a loud bang
15 and I thought I fell on my -- on -- on my behind, but I
16 guess I did catch my fall, came back around, and I saw
17 Mr. Saenz laying face down.
18   Q.   What happened next?
19   A.   Me and Mr. Flores went to go to Mr. Saenz to
20 assist him and see what was going on.  I was still
21 disoriented.  When we flipped him around, I saw a
22 gunshot to his -- to his chest.  I saw blood.  At that
23 point I held Mr. Saenz's head or stabilized his head
24 and Mr. Flores started doing chest compressions.
25        He called out on the radio, "Subject

78

1   down, shots fired," and that's when other units
2   arrived -- other police officers arrived.  And then
3   shortly after the EMS personnel came out through the
4   sally port and then there was a van -- or an ambulance
5   that rolled down the -- ramp.
6       Q.   You observed, even after the gunshot wound,
7   for some period of time Daniel Saenz appeared to be
8   alive.  Correct?
9       A.   Yes.
10           MR. ORTEGA:  Objection, calls for
11  speculation.
12           MR. JIM DARNELL:  Same objection.
13      Q.   (By Mr. Gage)  And what did you observe that
14  made you believe that Daniel was alive?
15      A.   He was breathing.  He was breathing heavily
16  and I could hear him wheezing or breathing -- wheezing.
17  After that I don't know --
18      Q.   Was he moaning or crying at all?
19      A.   Not -- not that I remember, no, sir.
20      Q.   So Daniel was breathing heavily and wheezing
21  for a couple of minutes.  Right?
22      A.   I would assume so.
23      Q.   That's your best recollection from watching.
24  Correct?
25      A.   That's correct.

79

1            MR. JIM DARNELL:  Calls for speculation.
2            MR. ORTEGA:  Same objection.
3            MR. JEEP DARNELL:  Brad, can we take a
4   break?
5            MR. GAGE:  In a minute or two.
6       Q.   (By Mr. Gage)  You were able to see him
7   breathing heavily, right, after he was shot?
8       A.   That's correct.
9       Q.   You were able to hear him breathing heavily
10  after Daniel was shot.  Correct?
11      A.   That's correct.
12      Q.   You were able to hear Daniel wheezing for a
13  couple of minutes after he was shot.  Correct?
14      A.   I don't know if it was a couple minutes or
15  not, sir, I don't.
16      Q.   But you could hear the wheezing?
17      A.   But I could hear the wheezing, yes, sir.
18      Q.   All right.  And you explained a number of
19  events that was going on.  Was there anything that you
20  saw or heard before Daniel was shot that in your mind
21  justified the use of deadly force based on your
22  training?
23           MR. ORTEGA:  Objection, calls for
24  speculation, vague, calls for a legal conclusion.
25           MR. JIM DARNELL:  Same objection.  It

80

1   also calls for an expert opinion.
2       Q.   (By Mr. Gage)  Go ahead.
3       A.   No, sir, I did not.  All I saw was -- we were
4   engaged with Mr. Saenz and I saw Mr. Flores trying to
5   get -- do this (indicating) and then disengage, but I
6   was -- that was out of my peripheral, so I -- I was
7   still trying to get ahold of Mr. Saenz.
8       Q.   You said you saw Mr. Flores do this.  That's
9   reaching down towards either his gun belt or his taser?
10      A.   No, it was around his thighs, his crotch area.
11      Q.   Did Flores say anything when he reached
12  towards his thigh?
13      A.   Not during -- not -- not at his thigh, no.
14      Q.   All right.  So it's clear, then, you did not
15  see anything that Daniel Saenz did just before he was
16  shot that you -- you would have used deadly force on.
17  Is that a true statement?
18           MR. ORTEGA:  Objection, calls for
19  speculation, calls for a legal conclusion and expert
20  testimony.
21           MR. JIM DARNELL:  Same objection.
22      A.   No, sir, I don't know what -- I don't know
23  if -- I don't know if I could say that there was
24  something that -- I mean because we had different -- I
25  have a different perspective, Mr. Flores has a

81

1   different perspective.
2       Q.   (By Mr. Gage)  I'm just trying to get a clear
3   answer to a clear question.  Did you see anything just
4   before Daniel was shot that made you believe deadly
5   force was necessary?  Yes or no.
6            MR. ORTEGA:  Objection, speculation,
7   vague, calls for a legal conclusion and requires expert
8   opinion.
9            MR. JIM DARNELL:  Same objection.
10      Q.   (By Mr. Gage)  Answer, please.
11      A.   I can't say -- I'm only saying something --
12  what I experienced.  So I don't know if there was a
13  need for it.  I don't know.  I'm not sure, sir.
14      Q.   There's nothing that you saw that you can
15  point to --
16      A.   Other than -- other than -- I'm sorry.  Other
17  than --
18           MR. ORTEGA:  Excuse me.  Let him ask the
19  question.
20      Q.   (By Mr. Gage)  Let me finish my question.
21           Is it true there's nothing that you saw
22  that you believed demonstrated deadly force was
23  necessary at the time that Daniel was shot?
24           MR. ORTEGA:  Objection, vague, calls for
25  speculation, calls for a legal conclusion and expert

82

1  opinion.

2      **A.   I'm not sure, sir.**

3      Q.   (By Mr. Gage)  You're not sure of anything.

4  Correct?

5      **A.   I'm not sure of what your -- what the -- no,**

6  **I'm not sure of -- of that -- that instance of what**

7  **you're asking if I saw anything, no.**

8      Q.   You were trained when you could use deadly

9  force.  Correct?

10     **A.   That's correct, sir.**

11     Q.   You've been taught that.  That's a very

12 important item for you to be well aware of as a law

13 enforcement officer.  True?

14          MR. ORTEGA:  Objection, vague.

15     **A.   That is correct.**

16     Q.   (By Mr. Gage)  You're still working today as a

17 law enforcement officer.  Right?

18     **A.   That's correct.**

19     Q.   So you have training, knowledge and

20 information as to when you can or cannot use deadly

21 force.  Right?

22     **A.   That is correct.**

23     Q.   So based on what you have been trained, did

24 you see anything that you believe justified the use of

25 deadly force when Daniel was shot?  Yes or no.

83

1          MR. ORTEGA:  Objection, vague, calls for

2  speculation, calls for a legal conclusion and expert

3  opinion.

4          MR. JIM DARNELL:  Same objection.

5      **A.   Other than the fact that I saw Mr. Saenz reach**

6  **down here near his thigh, near the belt, that's all I**

7  **saw, sir.**

8      Q.   (By Mr. Gage)  Reaching down near his belt --

9      **A.   Mr. Flores' belt, yes.**

10     Q.   Did you see what he grabbed or did?

11     **A.   I don't recall, sir, no.**

12     Q.   Were you taught that if a person in handcuffs

13 being detained reaches down by the thigh area of a

14 police officer that that is justification for killing

15 them?

16          MR. ORTEGA:  As of what date?

17     Q.   (By Mr. Gage)  Ever.

18     **A.   Not the -- not the -- I don't know about the**

19 **thigh area, but the belt area, especially if the**

20 **subject's trying to go for any -- any of the weapons**

21 **that are on the officer's belt.**

22          MR. GAGE:  Move to strike as

23 nonresponsive.

24     Q.   (By Mr. Gage)  The simple question is were you

25 taught that the act of a person reaching for the thigh

84

1  of a police officer justifies killing them?  Yes or no.

2          MR. JIM DARNELL:  Objection to asked and

3  answered.

4          MR. ORTEGA:  And calls for a legal

5  conclusion and speculation.

6      **A.   I don't know.  It would depend on that**

7  **officer's engagement and what he perceived.**

8      Q.   (By Mr. Gage)  I'm asking you about your

9  teaching, not what some other officer did or saw or

10 perceived.  Do you understand the distinction?

11     **A.   Yes.**

12     Q.   Were you taught that if a suspect simply

13 reaches by your thigh, you're allowed to kill them?

14 Yes or no.

15          MR. JIM DARNELL:  Objection, asked and

16 answered twice.

17          MR. ORTEGA:  Same objection.

18     **A.   No, I don't recall ever -- ever getting that**

19 **training --**

20     Q.   Okay.

21     **A.   -- or ever being told that.**

22     Q.   Other than reaching the thigh, did you see

23 Daniel touching any other portion of Officer Flores

24 before Flores shot Daniel?

25     **A.   No, just his thigh and crotch area, sir.**

85

1          MR. JEEP DARNELL:  I'm ready to take a

2  break.

3          MR. GAGE:  Two more minutes.

4          MR. JEEP DARNELL:  You said that five

5  minutes ago.

6          MR. GAGE:  Well, I'm going to finish this

7  line of --

8          MR. JEEP DARNELL:  I don't care.  You

9  said that five minutes ago.  I really need to take a

10 break.

11          MR. GAGE:  I waited for you for an hour.

12 I agreed to give you a lunch break when you wanted to

13 see your wife.

14          MR. JEEP DARNELL:  We've been going for

15 an hour and a half, Brad.

16          MR. GAGE:  I'm going to finish this

17 series.

18          MR. JEEP DARNELL:  You keep starting a

19 new series.

20     Q.   (By Mr. Gage)  Were you taught that it would

21 be appropriate to shoot and kill someone when they

22 touch a person by the crotch?

23     **A.   Was I ever taught that?**

24     Q.   Yes.

25     **A.   No, sir.**

86

1    Q.   Did you ever touch Flores when his gun was out
2 at any time before he shot?
3    A.   I don't know, sir.  I don't recall that, no.
4    Q.   You don't recall doing that.
5    A.   No.
6    Q.   Did you in any way cause Flores to fire that
7 shot on Daniel?
8         MR. ORTEGA:  Objection, calls for
9 speculation.
10        MR. JIM DARNELL:  Same objection.
11   A.   No, sir, I don't recall or I don't remember.
12 I don't know if I ever came in contact with Mr. Flores
13 while that weapon was out.
14   Q.   (By Mr. Gage)  What you're telling us is you
15 don't know whether you caused Flores to shoot or not or
16 that you did not cause him to shoot?
17   A.   No, I'm telling you I'm not --
18        MR. JIM DARNELL:  Object to misstatement.
19   Q.   (By Mr. Gage)  Go ahead.
20   A.   What I'm saying is I don't -- I don't know if
21 I ever came in contact with Mr. Flores while the weapon
22 was out.
23   Q.   And my question is a little bit different now.
24 Is there anything that you did that you believe caused
25 Mr. Flores to shoot Daniel Saenz?

87

1         MR. JIM DARNELL:  Object, speculation.
2    A.   Is there anything what?  I'm sorry.
3    Q.   (By Mr. Gage)  Is there anything that you did
4 that you believe caused Flores to shoot Mr. Saenz?
5         MR. JIM DARNELL:  Object, speculation.
6         MR. ORTEGA:  Same objection.
7    A.   I don't know what Mr. Flores saw, but, no, I
8 don't think so.
9         MR. GAGE:  All right.  We can take a
10 break now.
11        THE VIDEOGRAPHER:  The time is 11:43 a.m.
12 We are now off the record.
13        (A recess was had.)
14        THE VIDEOGRAPHER:  The time is 12:02 p.m.
15 We are back on the record.
16   Q.   (By Mr. Gage)  Are you aware there are
17 techniques to help avoid the possibility of a suspect
18 fighting or fleeing.  True?
19   A.   Yes, sir.
20   Q.   What techniques are you aware of?
21   A.   Escort holds -- escort holds, pressure points.
22 Yeah, things of such nature, yeah.
23        (Discussion off the stenographic record.)
24   Q.   (By Mr. Gage)  By the way, you spoke of those
25 belly chains.  Correct?

88

1    A.   That is correct.
2    Q.   Do they have those belly chains at the Pebble
3 [sic] regional center?
4         MR. ORTEGA:  At the time on March 8,
5 2013?
6    A.   I don't recall, sir.  I don't remember if we
7 did or not.
8    Q.   (By Mr. Gage)  You've seen them there at the
9 regional center, you just can't remember the date that
10 you saw belly chains.  Correct?
11        MR. JIM DARNELL:  Object to misstatement.
12   A.   No, I don't remember or I don't recall seeing
13 them there.
14   Q.   (By Mr. Gage)  Did you have any belly chains
15 in the van with you?
16   A.   We -- I remember we had extra handcuffs and
17 shackles.
18   Q.   Shackles for the legs?
19   A.   That's correct.
20   Q.   Shackles would help to prevent the opportunity
21 for a person to take the handcuffs from behind their
22 legs and put them in front.  True?
23   A.   No, sir.
24   Q.   They go along the legs?
25   A.   They go -- it's like -- it acts like a

89

1 handcuff but on the ankles of the legs.  It doesn't --
2 it wouldn't prevent someone from slipping their
3 handcuffs from the back to the front.
4    Q.   Is there a way to use extra cuffs to then
5 attach the handcuffs around the wrists to the shackles
6 on the legs so that the handcuffs could not get in
7 front?
8         MR. ORTEGA:  Objection, calls for
9 speculation.
10   A.   I don't -- I don't know if there is or not but
11 that would be considered a hogtie.
12   Q.   (By Mr. Gage)  So you could do it, you just
13 don't know if you were allowed to do it.  Is that what
14 you're saying?
15   A.   I was not allowed to do it.
16   Q.   Physically you could stop cuffs from going
17 behind the back to the front if you had handcuffs
18 attached to the shackles.  True?
19        MR. ORTEGA:  Objection, calls for
20 speculation.
21   A.   I'm not sure if it would stop or not, but you
22 can't -- that would be considered, like I said, a
23 hogtie since you're tying -- either in the front or in
24 the back, you're tying that person's hands to their
25 legs, so that would be considered a hogtie, which is

90

1  prohibited.
2      Q.  (By Mr. Gage)  What's your understanding of
3  the purpose of shackles?
4      A.  The -- my purpose -- or I mean I'm sorry -- my
5  understanding for the purpose of -- of shackles is
6  to -- to prevent that person from having a longer
7  stride when they're walking or -- or for -- to keep
8  them from -- from -- I guess having an advantage if
9  they're trying to escape or if they're escaping.
10     Q.  It prevents running away as easily.
11     A.  That's correct, yes.
12     Q.  Did you at any time fear that Daniel was going
13  to try to run away from your custody?
14         MR. ORTEGA:  At any point?
15     Q.  (By Mr. Gage)  At any time.
16     A.  Once outside, yes.  It was -- yes.
17     Q.  And you felt that way when you were left all
18  alone by Mr. Flores.  True?
19     A.  It -- it crossed my mind, yes, that he could
20  run away.
21     Q.  Did you consider putting shackles on Daniel at
22  that point so you could prevent him from running away?
23     A.  At that point while sitting outside with him?
24     Q.  Yes.
25     A.  I didn't have the ability to -- I didn't have

91

1  shackles on me to put on him.
2      Q.  Did you think of having shackles is my
3  question?
4      A.  No, I did not think of it.
5      Q.  Because, obviously, even if you didn't have
6  shackles with you at that point, you had a radio on you
7  that you could call someone for them.  Correct?
8         MR. ORTEGA:  Objection, calls for
9  speculation.
10     A.  No, I don't know if anybody would have --
11  would have brought them or it would have been easily
12  attainable to have shackles there.
13     Q.  (By Mr. Gage)  Did you have a radio with you
14  at the sally port?
15     A.  I don't remember, sir, if I did or not.
16     Q.  Was it part of your uniform to carry a radio
17  when you worked for G4S?
18     A.  It wasn't part of the uniform, but Pebble
19  Hills would assign or lend us a radio.  Sometimes we
20  didn't have -- sometimes Pebble Hills did not have the
21  ability to lend out a radio to us.
22     Q.  Were you taught any law enforcement purposes
23  for having a radio?
24         MR. ORTEGA:  Objection, vague.
25     A.  Yes, of course, it's -- it's --

92

1         MR. ORTEGA:  If that's your answer say,
2  "Yes."
3      Q.  (By Mr. Gage)  What were you taught?
4      A.  Yes.
5      Q.  What were you taught -- what were you taught
6  was the purpose of having a radio?
7      A.  To communicate, obviously.
8      Q.  What is your understanding of the purpose of
9  being able to communicate with a police radio?
10     A.  To -- to let people know what your location
11  is, what you're doing at that time, what you're going
12  to do at that time, yes.
13     Q.  Were you aware in March of 2018 that you could
14  use a radio to ask for assistance?
15     A.  You said March of 2018, sir?
16     Q.  Were you aware in March of 2013 that you could
17  use a radio to ask for assistance?
18         MR. ORTEGA:  Objection, vague.
19     A.  Yes, I was aware of it, yes.
20     Q.  (By Mr. Gage)  Were you aware in March of 2013
21  that a radio -- having one with you was important for
22  your safety?
23         MR. ORTEGA:  Objection, vague.
24     A.  It was -- it was part of -- it was part of
25  what we needed to carry, but I don't remember if I had

93

1  it or not and I don't know if it would have helped my
2  safety.  I don't know.
3      Q.  (By Mr. Gage)  That's partially nonresponsive.
4  My question for you is simply did you know from any
5  training or experience that you had by March 8th, 2013,
6  that a radio could assist for any officer's safety
7  purpose at all?
8         MR. ORTEGA:  Objection, vague.
9      A.  No, sir, I'm not sure if it would have
10  assisted with officer safety.
11     Q.  (By Mr. Gage)  Were you taught by G4S any
12  benefits of having a radio with you when you were
13  working?
14     A.  No, sir.
15     Q.  Did G4S teach you how to use a radio?
16     A.  Not G4S directly, but the El Paso Police
17  Department had a -- a -- they -- they trained us on how
18  to use -- how to communicate with them, yes.
19     Q.  Did you learn how to communicate with the
20  El Paso Police Department on the radio while you were a
21  G4S security officer?
22     A.  That is correct.
23     Q.  What did they train you?
24     A.  They trained us on how to call out -- excuse
25  me -- use their call signs to -- to say where we were

94

1  going from, with how many prisoners, if they were
2  either female or male, and then the times of our
3  arrival -- or to say how do we arrive -- how we arrived
4  at that point -- or when we arrived at that location.
5      Q.   Were you taught the purpose of why the El Paso
6  Police Department had an interest in where you were
7  located?
8      A.   No.
9      Q.   Did anyone advise you that one of the reasons
10 why law enforcement wants to know your whereabouts is
11 that if you become in a situation where there's a call
12 for help and you are unable to say where you're at,
13 help can come to you?
14         MR. ORTEGA:  Objection, vague, calls for
15 speculation.
16     A.   At that time or any event?
17     Q.   (By Mr. Gage)  Let's start at that time.
18         MR. ORTEGA:  Same objection.
19         MR. JIM DARNELL:  Same objection, plus I
20 didn't understand it.
21     A.   It was only -- it was -- to my recollection it
22 was taught to -- for us to communicate with the PD
23 to -- for us to let them know what we were doing and
24 where we were at and at what location we were -- we had
25 arrived -- at what time we had arrived at that

95

1  location, yes.
2      Q.   Were you taught the reason why you had to
3  explain your location to dispatch?
4      A.   No, I wasn't taught that.
5      Q.   So G4S never explained to you a reason why you
6  had to tell them where your location was.  Correct?
7          MR. ORTEGA:  Objection, vague.
8      A.   No.
9      Q.   (By Mr. Gage)  Is that a correct statement?
10         MR. ORTEGA:  Same objection.
11     A.   Did they ever explain to us why --
12     Q.   (By Mr. Gage)  Did G4S tell you why you had to
13 give a location that you were at on the radio?
14     A.   No.
15     Q.   Were you ever trained that you could use a
16 radio to call for assistance when you needed help as a
17 law enforcement officer?
18         MR. ORTEGA:  Objection, vague.
19     A.   At what point, sir?  At that -- at that time
20 as a G4S security officer or any time?
21     Q.   (By Mr. Gage)  Let's start up until March
22 2013, were you ever trained that?
23     A.   Yes.
24     Q.   You were.  What were you told was the benefit
25 of being able to use a radio to call for help, if

96

1  anything, as of March 2013?
2      A.   Obviously, I would -- I would let them know
3  what the situation -- what the situation is at that
4  moment in time and if at -- if at -- if at all
5  possible, give my location.
6      Q.   What was the purpose of using a radio to call
7  for help?  So you could be protected if you needed it?
8      A.   I don't know about protected, but to get
9  assistance.
10     Q.   Did you believe that calling for assistance
11 would help to protect your health and safety at times?
12         MR. ORTEGA:  Objection, vague, calls for
13 speculation.
14     A.   I don't know -- I don't know if it would help
15 my safety or my health, sir.
16     Q.   (By Mr. Gage)  I'll give you a hypothetical.
17 Suppose you're in a situation where you have two bad
18 guys shooting at you and you're barricaded safe, but
19 you're afraid they're going to come around.  You're all
20 by yourself.  You have your gun and you have a radio.
21         Do you think if you get on that radio and
22 you call for help other officers might arrive and help
23 to protect you from these two bad gunmen?
24         MR. ORTEGA:  Objection, calls for
25 speculation.

97

1      A.   I don't know if they would arrive or not, no.
2      Q.   (By Mr. Gage)  All right.  That's fine.
3      A.   Yeah.
4      Q.   Suppose -- withdraw.
5          Has anyone ever called on the radio for
6  assistance when you came to help them as a law
7  enforcement officer?
8          MR. ORTEGA:  At any point.
9      Q.   (By Mr. Gage)  Any time.
10     A.   Yes.
11     Q.   When you were called to give assistance, were
12 you able to help that officer?
13     A.   I think by the time I got there, the situation
14 had already -- either the situation was under control
15 or -- or -- I don't know if I had helped much, but I
16 mean I was still in -- I would still go en route to --
17 to assist.
18     Q.   So it's your experience that officers calling
19 for assistance, at least to you, did not receive any
20 aid or assistance.  Is that a correct statement?
21         MR. ORTEGA:  Objection,
22 mischaracterization of his testimony.
23         MR. JIM DARNELL:  Same objection.
24     A.   No, they -- I'm sure they received aid or some
25 type of assistance, just not maybe when I got there

98

1 because it was already under control, like I said.

2     Q.  (By Mr. Gage)  So you've never given aid or

3 assistance to an officer who's called for help ever in

4 your career.  Is that a true statement?

5           MR. JIM DARNELL:  Objection,

6 misstatement.

7     **A.  I've been called to assist, but like I said,**

8 **whenever I would get there, things were under control**

9 **already.  I would -- I would assist maybe in taking**

10 **down names from other people, things of that nature,**

11 **yes.**

12     Q.  (By Mr. Gage)  Have you ever been called for

13 help on a radio and provided help to protect the safety

14 of an officer?

15           MR. ORTEGA:  At any point.

16     Q.  (By Mr. Gage)  Ever.

17     **A.  No, I have not.**

18     Q.  Have you ever heard of other officers who have

19 called for help on a radio where some other person in

20 law enforcement came and helped them to avoid a

21 potentially dangerous or life-threatening situation?

22           MR. ORTEGA:  At any point.  Correct?

23     **A.  Yes.**

24           MR. GAGE:  That's what "ever" means.

25           MR. ORTEGA:  That's what we're trying to

99

1 find out.

2     Q.  (By Mr. Gage)  Your answer was "Yes"?

3     **A.  Yes.**

4     Q.  What was that situation?

5     **A.  Well, in this case, obviously, Officer Flores**

6 **called out over the radio, "Shots fired, subject down,"**

7 **officers came to assist.  While working as a police**

8 **officer, an officer called out, "Subject with a gun,"**

9 **we obviously went over to assist.  Working for CBP**

10 **sometimes there's unruly pedestrians or people in**

11 **traffic areas, so they would -- oh, I'm sorry -- for an**

12 **armed and dangerous, we go over to the lane to assist.**

13     Q.  (By Mr. Gage)  So you've used the radio to

14 call for help when there were unruly pedestrians.  Is

15 that accurate?

16     **A.  Have I -- have I used it?  Yes, I have.**

17     Q.  All right.  And the reason why you would use

18 your radio to call for help when there were unruly

19 pedestrians is in part for your safety from these

20 unruly folks.  Right?

21     **A.  Yes.**

22     Q.  And you were aware that if you had an unruly

23 prisoner, calling for help on a radio could help you in

24 that situation, too.  Is that true?

25           MR. ORTEGA:  That's as of March 8, 2013?

100

1           MR. GAGE:  Yes.

2           MR. ORTEGA:  He's asking if you knew that

3 at the time you were working at G4S on March 8, 2013.

4     Q.  (By Mr. Gage)  Any time up to that point,

5 including that day.

6     **A.  Yes, I could have used the radio.**

7     Q.  You did not use a radio ever to call for any

8 assistance, did you?

9     **A.  At what point, sir?**

10     Q.  On March 8, 2013, all the way until after

11 Daniel was shot.

12     **A.  No, sir.  No.**

13     Q.  Did you ever hit, kick or punch Daniel?

14     **A.  No, sir, I did not.**

15     Q.  Did you ever push him?

16     **A.  No, sir, I did not.**

17     Q.  You knew that kicking, hitting, punching or

18 pushing Daniel, especially when handcuffed and not

19 resisting, would be improper.  Correct?

20     **A.  That's correct, sir.**

21           MR. ORTEGA:  Objection, vague, calls for

22 speculation, calls for an expert opinion and a legal

23 conclusion.

24           MR. JIM DARNELL:  Same objection.

25     Q.  (By Mr. Gage)  Why did you believe that

101

1 kicking, hitting, punching or pushing Daniel when he

2 was handcuffed and not resisting is improper?

3           MR. ORTEGA:  Same objections as before.

4           MR. JIM DARNELL:  Same.

5     Q.  (By Mr. Gage)  Go ahead.

6     **A.  This is -- that's only coming from -- that's**

7 **only -- I mean it would be common sense to anybody.**

8 **You can't kick, hit or push anybody, so why would it be**

9 **done to a -- especially to a handcuffed prisoner.  So,**

10 **no, it's improper.**

11     Q.  Were you -- did you learn that you could not

12 inflict cruel or unusual punisment on someone in

13 handcuffs under your control?

14           MR. ORTEGA:  Objection, calls for expert

15 opinion and a legal conclusion.

16     **A.  Can you rephrase the question.**

17     Q.  (By Mr. Gage)  Did you learn it was improper

18 to inflict cruel or unusual punishment on a person in

19 your custody?

20           MR. ORTEGA:  Same objections and vague.

21     **A.  I don't think that's for me to decide, it's --**

22 **I'm already seeing this now where --**

23     Q.  (By Mr. Gage)  Did you believe on March 8,

24 2013, it was okay for you to use cruel or unusual

25 punishment on a person in custody?

102

1           MR. ORTEGA:  Objection, vague, calls for
2 expert opinion and legal conclusion.
3           MR. JIM DARNELL:  Same objection.
4      **A.   I'm sorry.  Can you repeat the question,**
5 **please.**
6           MR. GAGE:  We'll have it read back and
7 the objections are preserved.
8           (The Court Reporter read back:  Did you
9           believe on March 8, 2013, it was okay for
10          you to use cruel or unusual punishment on
11          a person in custody?)
12     **A.   No, sir.**
13     Q.   (By Mr. Gage)  Why did you think it was not
14 proper?
15     **A.   I don't think it's ever been proper to do**
16 **those kinds of things, no.**
17     Q.   It's not proper what?
18     **A.   I don't think it's ever been proper to do**
19 **that, no.**
20     Q.   You also felt it's never been proper to use
21 excessive force on a person in custody.  Correct?
22     **A.   That's true.**
23          MR. ORTEGA:  Objection, calls for expert
24 opinion, legal opinion and speculation.
25          MR. JIM DARNELL:  Same objection.

103

1      Q.   (By Mr. Gage)  Why did you believe it was
2 improper to use excessive force on a person in custody?
3      **A.   Why did I believe it was proper?**
4      Q.   Improper, wrong.
5      **A.   Oh.  It goes back to training.  It goes back**
6 **to common sense.  Like you won't -- you're not going to**
7 **inflict any type of bodily injury to anybody, so why**
8 **would you do it to a prisoner?**
9      Q.   Were you ever taught that inflicting excessive
10 force, bodily injury on a prisoner that was not
11 justified was unconstitutional?
12     **A.   That's correct.**
13     Q.   And you were also taught that it could result
14 in a civil rights violation claim.  Correct?
15     **A.   To my knowledge, yes, sir.**
16     Q.   When did you first learn that using excessive
17 force on someone would be unconstitutional?
18     **A.   I don't recall, sir.  I don't remember.**
19     Q.   But you knew that when you worked for G4S.
20 Correct?
21     **A.   I had a vague understanding of it, yes, sir.**
22     Q.   You also had a vague understanding at least
23 when working for G4S by March of 2013 that excessive
24 force could result in a civil rights claim.  Correct?
25     **A.   Yes, sir.**

104

1      Q.   When you entered the jail initially -- well,
2 let's back up.  What time did you go on duty on
3 March 8th, 2013?
4      **A.   At approximately 15:00 hours.  I was late that**
5 **day, sir.**
6      Q.   So that would be 3:00 p.m.?
7      **A.   That's correct.**
8      Q.   What was your assignment when you got there?
9      **A.   My assignment was to be a transport officer**
10 **that day.**
11     Q.   Once you arrived did you start to prepare to
12 do transportation of some prisoners?
13     **A.   Once I arrived at the Pebble Hills station, I**
14 **went to go dress -- dress out in my uniform, to put my**
15 **uniform back on -- or to put it on and then go to the**
16 **cell area and get ready for transport, yes.**
17     Q.   At what time were you ready to start
18 transporting prisoners that day?
19     **A.   I don't remember, sir.**
20     Q.   Was Daniel Saenz the first prisoner you
21 transported?
22     **A.   That is -- no, no, no, not him.**
23     Q.   Where did you go from Pebble Hills?
24     **A.   From Pebble Hills we went to the Mission**
25 **Valley Regional Command Center.**

105

1      Q.   How far away is that?
2      **A.   About seven miles, eight miles.**
3      Q.   How long did it take?
4      **A.   I don't recall, sir, but -- yeah, I don't**
5 **recall.**
6      Q.   What time did you return back from Mission
7 Valley Regional Command Center to Pebble Hills?
8      **A.   I don't recall the exact time, no, I don't.**
9      Q.   What's your best estimate?
10     **A.   Well, I got there at approximately 3:00.  I**
11 **would say we got back to Pebble Hills around 4:30,**
12 **quarter to 5:00.  That's my approximate.**
13     Q.   All right.  Then what time did you leave
14 Pebble Hills to drive to the county jail at?
15     **A.   I would say about 5:00 -- between 5:00, 5:15.**
16     Q.   What time did you arrive at the county jail at
17 approximately?
18     **A.   About 4:00 -- I mean I'm sorry -- 5:30.**
19     Q.   Did the shooting take place around 6:30?
20     **A.   I don't remember, sir.**
21     Q.   Were you at the jail for about an hour before
22 the shooting took place?
23     **A.   That is correct.  Approximately.**
24     Q.   When you arrived to the jail, you were in a
25 van with Mr. Matthews, another prisoner and Daniel

106

1 Saenz, just the four of you.  Correct?

2    A.   That's correct.

3    Q.   Were there any policies, regulations or rules

4 that you were aware of that required when you were

5 driving in a van with prisoners, a police officer from

6 the El Paso Police Department was required to be with

7 you in the van?

8    A.   Not in the van.  They could be in the van or

9 escorting us in their police unit.

10    Q.   Have you ever taken a prisoner to jail without

11 an El Paso police officer in the van or in a car behind

12 while you worked for G4S?

13    A.   No, sir.

14    Q.   What were you told was the reason why an

15 El Paso police officer had to be with you when you were

16 transporting a prisoner?

17         MR. ORTEGA:  Objection, lacks foundation.

18    A.   From what I remember, the -- what we were told

19 about that was that the sheriff, Sheriff Wiles -- I

20 don't know if demanded, but he -- yeah, he wanted a

21 peace officer to accompany -- accompany us whenever we

22 go to booking at any of his jails.

23    Q.   Did he tell you why?

24    A.   Sheriff Wiles?

25    Q.   Yes.

107

1    A.   I did not have any contact with Sheriff Wiles,

2 sir.

3    Q.   Did anybody explain to you why Sheriff Wiles

4 wanted a peace officer accompanying you whenever

5 booking at any of his jails?

6    A.   Because we weren't considered peace officers,

7 we were civilian transporters, civilian transport

8 guards.

9    Q.   Was it also because of the concern that you

10 did not have the proper training while working for G4S?

11         MR. ORTEGA:  Objection, vague and calls

12 for speculation.

13         MR. JIM DARNELL:  Same objection.

14    A.   I don't know if that was the reason why, sir.

15    Q.   (By Mr. Gage)  When you arrived to the jail in

16 the transport van at around 5:30 p.m., what did you

17 next do?

18    A.   When we arrived at the county jail, we parked

19 on the Campbell Street -- yeah, Campbell Street, we got

20 out of the van, and I was waiting for Officer Flores to

21 meet me at the -- at the van -- at the side of the van

22 where Mr. Saenz was located to proceed to get him out

23 of the van so we can take him into booking.

24    Q.   Why did you have to wait for Officer Flores

25 before taking the prisoners out of the van?

108

1    A.   Because I didn't want to take Mr. Saenz out by

2 myself.

3    Q.   How long did you wait for Mr. Flores?

4    A.   I think a couple minutes.

5    Q.   Then what did you do?

6    A.   After that we -- we opened up the -- the

7 compartment doors to where Mr. Saenz was and proceeded

8 to escort Mr. Saenz out of the -- out of the van, have

9 him step down out of the van.

10    Q.   And then did you proceed to walk towards the

11 jail?

12    A.   That is correct.

13    Q.   How far away was the van parked from the door

14 to enter the jail?

15    A.   I would say at least 40 yards.

16    Q.   40 yards?

17    A.   Approximately.

18    Q.   Who went with you when you walked Daniel Saenz

19 to the jail?

20    A.   It was just me and Officer Flores escorting

21 Mr. Saenz.  Mr. Matthews was escorting Detainee Johnson

22 at the time.

23    Q.   Did Matthews stay with Detainee Johnson at all

24 points that you observed while outside?

25    A.   When I had -- when I had Mr. -- Mr. Matthews

109

1 in -- in -- in sight, yes.

2    Q.   All right.  So you never learned that Matthews

3 left Mr. Johnson alone to give any assistance to you or

4 Flores with Daniel Saenz?

5    A.   No.

6    Q.   Double negative.

7         Did you ever learn of Mr. Matthews

8 leaving his prisoner to assist you or Mr. Flores?

9    A.   No.  I think he might have just held the door

10 for us at one point, that's about it.

11    Q.   Did you see Matthews ever leaving his prisoner

12 to assist you and Flores with Daniel Saenz?

13    A.   No.  No.

14    Q.   If you were in need of assistance at the sally

15 port at any time taking Daniel into the jail, could

16 Mr. Matthews have assisted you and Flores?

17         MR. ORTEGA:  Objection, vague, calls for

18 speculation.

19    A.   I don't know if he could have or not, no.

20    Q.   (By Mr. Gage)  Was he authorized to do that?

21    A.   He was authorized, yes.

22    Q.   Was it part of the duties of a transport

23 officer, as you understood them, that if you see one of

24 your partner transport officers struggling with a

25 prisoner and in need of assistance that you are

110

1  supposed to go over there and render aid?

2    A.   That's correct.

3    Q.   All right.  You were trained to do that.

4  Right?

5    A.   Yes, I was.  Yes.

6    Q.   There was nothing that blocked the view of

7  Mr. Matthews observing you and Flores as you walked

8  from the van to the entrance of the jail.  True

9  statement?

10          MR. ORTEGA:  Objection, calls for

11  speculation.

12          MR. JIM DARNELL:  Same objection.

13    A.   Yes, sir, I don't know if there was anything

14  blocking his view or not.

15    Q.   (By Mr. Gage)  Well, between the van and the

16  door, was there a wall, a building, a tree, a car?

17    A.   There's -- there's trees, there's a wall, but

18  I don't know if that was in his line of sight, I'm not

19  sure.

20    Q.   All right.  Did Matthews ever tell you that he

21  would have assisted you, but he couldn't see you at any

22  time?

23    A.   No, sir, I did not have -- he did not tell me

24  that.

25    Q.   How long did it take you to walk the 40 yards

111

1  from the van to the jail?

2    A.   My approximate guess would be about five to

3  ten minutes.

4    Q.   It took five to ten minutes to walk 40 yards?

5    A.   That's correct.

6    Q.   What was going on during those five to ten

7  minutes while you walked 40 yards?

8    A.   Well, we were -- we were attempting to escort

9  Mr. -- Mr. Saenz and we kept having to stop because he

10  kept -- he kept jumping and stop -- like stopping

11  himself and kept having to re- -- re- -- regain control

12  of his arms and having to talk to him and having to

13  escort him physically.  And then it's a ramp, it's a

14  pretty steep ramp, so we can't just haul -- haul down

15  it, we have to walk carefully.

16    Q.   A downhill ramp?

17    A.   Yes, that's correct.  Yes.

18    Q.   Did Daniel appear scared to you as you were

19  taking him into the jail?

20    A.   He seemed paranoid and -- and scared, yes.

21    Q.   When you got to the door you did not see

22  Daniel striking his head at all, did you?

23    A.   I did, sir.

24    Q.   You saw it?

25    A.   That he struck his head on the door frame?

112

1    A.   Yes.

2    Q.   You saw the actual event?

3    A.   Yes, I did.

4    Q.   That's a very important event to record.

5  Right?

6    A.   That's correct.

7    Q.   You recorded all of the important events in

8  your statement of March 8th, didn't you?

9    A.   That's correct.

10    Q.   But you never put into your statement of

11  March 8th that you personally observed him striking the

12  door, did you?

13    A.   Yes, sir, I did, I put it in my statement.

14    Q.   What -- what did you see Daniel doing to

15  strike his head?

16    A.   He was -- he was kind of swinging his head

17  back and forth, front to back and side to side, his

18  arms still flailing against us.  And then it -- it felt

19  like he dropped to his knees, and then while the door

20  was being held open, he -- he like swung his head

21  towards the door frame and hit it pretty hard.

22    Q.   You put all that information into your report

23  because that was important information.  Correct?

24    A.   That is correct.

25    Q.   You put into your report arms flailing, head

113

1  going side to side.  Correct?

2    A.   Back and forth, yes.

3    Q.   It was also important to note how long it took

4  you to walk with Daniel down the sally port to enter

5  the jail.  Correct?

6          MR. ORTEGA:  Objection, vague.

7    A.   I don't know if it was important to note the

8  time, but I wasn't asked that at the time.

9    Q.   (By Mr. Gage)  Did you note the time?

10    A.   No, I did not.

11    Q.   When you were taking Daniel to the county jail

12  down the ramp, do you know what your partner Matthews

13  was doing?

14    A.   He was coming down the ramp with Detainee

15  Johnson.

16    Q.   So you could see him?

17    A.   Peripherals, that's about it.

18    Q.   How far behind you was he?

19    A.   I'm going to say approximately between ten

20  and -- sorry -- seven to ten yards.

21    Q.   Did -- as you were taking these five to ten

22  minutes to walk down the ramp and start and stop, did

23  Matthews ever go around you since you were taking such

24  a long time to go a short distance?

25    A.   No, not that I recall, sir.

114

1    Q.    When you stopped did he just stop behind you?
2    A.    Mr. Matthews?
3    Q.    Yes.
4    A.    Yes.
5    Q.    So the way the scene unfolded is you and
6  Flores were walking down this short hill to the jail
7  with Daniel.  Daniel would stop.  You and Flores would
8  stop.  Matthews, who was a few yards behind you, would
9  also stop.  Correct?
10   A.    I don't know if he would stop or not.
11   Q.    Did he ever bang into you --
12   A.    No.
13   Q.    -- when you guys were stopping?
14   A.    No.
15   Q.    Did he ever go around you when you guys were
16 stopping?
17   A.    Not that I remember.
18   Q.    The only logical explanation, then, is if he
19 didn't reach you, as you're stopped for a significant
20 period of time, is Mr. Matthews stopped as well.
21 Agreed?
22          MR. ORTEGA:  Objection, calls for
23 speculation.
24   A.    It depends on how long we were stopped for.  I
25 mean if we were stopped for one or two seconds and we

115

1  kept walking, he's not going to catch up.
2    Q.    (By Mr. Gage)  You were stopped for five to
3  ten minutes.  Is that --
4    A.    No, it took -- no, I said that we -- it took
5  us five to ten minutes to walk towards the door, not
6  stopped for five to ten minutes.
7    Q.    When the county jail --
8          MR. ORTEGA:  I'm sorry, Mr. Gage, I think
9  the -- Mr. Romero needs to use the restroom.
10          THE WITNESS:  Yes, sir.  I'm sorry.  I've
11 been drinking a lot of water.  Can I use the --
12          MR. GAGE:  If you need to go.  Just the
13 last break took over 20 minutes and I'm going to insist
14 that it not be so long this time.  Just two or three
15 minutes should be --
16          THE WITNESS:  That's fine, yes, sir.
17          MR. GAGE:  Thank you.  Off record.
18 Change the tape, please.
19          THE VIDEOGRAPHER:  The time is 12:41 p.m.
20 We're now off the record.
21          (A recess was had.)
22          THE VIDEOGRAPHER:  The time is 12:46 p.m.
23 We're back on the record.
24   Q.    (By Mr. Gage)  When the door was -- when you
25 got to the door, was the door opened by Officer Flores

116

1  to your observation?
2    A.    Yes, to my observation the door was open.  He
3  pressed the button to contact the -- the head officer
4  at the county jail that we had -- we were arriving with
5  prisoners.
6    Q.    What did you next see?
7    A.    That Mr. Flores opened -- excuse me -- opened
8  the door and he was -- he was opening it.  That's what
9  I saw.
10   Q.    And what happened immediately after he opened
11 the door?
12   A.    As -- as he opened -- was holding the door
13 open, Mr. Saenz was, like I said, struggling with us,
14 he was being combative with us, and I saw Mr. Saenz
15 drop to his knees and -- it seemed like he dropped to
16 his knees and then he -- he struck his head with great
17 force on the -- on the -- on the door frame.
18   Q.    So the first thing you saw was Mr. Saenz
19 dropping to his knees.
20          MR. ORTEGA:  Objection, mischaracterizes.
21   Q.    (By Mr. Gage)  And the second thing you saw
22 was him striking his head on the door.  Is that
23 accurate?
24          MR. JIM DARNELL:  Object, misstatement.
25          MR. ORTEGA:  Objection,

117

1  mischaracterization of his testimony.
2    A.    It seemed like he dropped to his knees, sir,
3  but --
4    Q.    (By Mr. Gage)  And after dropping to his
5  knees, then he hit his head.  Correct?
6          MR. ORTEGA:  Objection, mischaracterizes
7  his testimony.
8          MR. JIM DARNELL:  Same objection.
9    A.    It seemed like Mr. Saenz dropped to his knees
10 and he was -- he was swinging his head back and forth,
11 side -- side to side, back and forth.  And at that
12 point as we were crossing the threshold of the door,
13 that's when he struck his head.  I believe it was at
14 the topside -- yeah, he struck the topside of his head
15 on the door frame.
16   Q.    (By Mr. Gage)  He was on his knees when you
17 saw that happen.  Correct?
18          MR. JIM DARNELL:  Object to
19 mischaracterization of testimony.
20          MR. ORTEGA:  Same objection.
21   A.    I don't know if he was on his knees or not.
22 It seemed like he was because of his weight.
23   Q.    (By Mr. Gage)  So what happened is you were
24 trying to get ahold of Mr. Saenz's arms, at which point
25 you saw him drop to the ground and fall on his knees.

118

1  Is that true?

2     A.   No, that's not true, sir.

3     Q.   It's not true.

4     A.   It seemed like he dropped to his knees.

5     Q.   After he dropped to the ground and fell on his

6  knees, did both Officer Flores and you grab ahold of

7  Mr. Saenz?

8           MR. JIM DARNELL:  Object to the

9  misstatement of the testimony.

10          MR. ORTEGA:  Same objection.

11     A.   We always had control of Mr. Saenz whether he

12  was standing or on his knees, sir.

13     Q.   (By Mr. Gage)  So tell me if this is a true

14  statement or not a true statement from your

15  recollection.  That:  Once the door was opened, Officer

16  Flores kept it open, at which time Arrestee Saenz

17  dropped to the ground and fell on his knees.  Both

18  Officer Flores and I grabbed ahold of Arrestee Saenz's

19  arms and did not let him drop completely to the ground.

20          Is that a true statement?

21     A.   That's the statement I gave to the El Paso

22  police detective and --

23     Q.   I'm asking is that a true statement?

24     A.   Whether or not he dropped to his knees?

25     Q.   Is it a true statement that Mr. Saenz dropped

119

1  to the ground, fell on his knees, then both you and

2  Officer Flores grabbed ahold of him, of his arms, and

3  did not let him drop completely to the ground?  Is that

4  a true statement of what occurred?

5           MR. ORTEGA:  Is that before or after

6  Mr. Saenz struck his head?

7     Q.   (By Mr. Gage)  Answer my question as framed.

8           MR. ORTEGA:  Objection, vague.

9           MR. JIM DARNELL:  May he see his

10  statement?

11     Q.   (By Mr. Gage)  Answer my question as framed,

12  please.

13          MR. ORTEGA:  If you could recall.

14     A.   Yes, I don't -- I don't recall if he was

15  either standing or dropped to his knees, sir.

16     Q.   (By Mr. Gage)  Did you drag Mr. Saenz through

17  the county jail door after he fell onto his knees?

18     A.   No, sir, we didn't drag him, we carried him.

19     Q.   After you started to carry Mr. Saenz through

20  the door, did you see him at that point shake his head

21  to the left and hit the door frame?

22     A.   After we passed the door?

23     Q.   Correct.

24     A.   No, he struck it at -- at the threshold, not

25  after.

120

1     Q.   Did you keep dragging him past the door so

2  that he would not hit himself again?

3           MR. ORTEGA:  Objection,

4  mischaracterize -- mischaracterize -- mischaracterizes

5  his testimony.

6           MR. JIM DARNELL:  Same objection that he

7  said.

8     A.   No, sir.

9     Q.   (By Mr. Gage)  Your answer is "No, sir?"

10     A.   No, we didn't drag him.  We attempted to carry

11  him.

12     Q.   Did you drag Mr. Saenz past the gun lockers?

13     A.   No, sir, we did not drag Mr. Saenz past the

14  gun lockers.

15     Q.   After the gun lockers, did you have Mr. Saenz

16  stand up against the metal doors?

17     A.   That is correct, sir.  After the -- we passed

18  the gun lockers, we had Mr. Saenz stand up against the

19  metal doors or the -- the chain link fence.

20     Q.   When you were over by the door with Mr. Saenz

21  as you were entering and he hit his head, did you see

22  his head bleeding at all --

23     A.   I saw --

24     Q.   -- at that point?

25          Go ahead.

121

1     A.   Yes, at that point when he was against the

2  chain link fence, that's when I saw -- when I noticed

3  Mr. Saenz was bleeding.

4     Q.   My question is you said you saw him entering

5  the jail, hit his head.  Did you see it bleeding after

6  that?

7     A.   Yes.

8     Q.   You did.  And it was -- his face was full of

9  blood at that point.  Correct?

10     A.   I don't remember if it was his face, but I

11  know it was part of his forehead.

12     Q.   All right.  How far is it from the door where

13  you saw the blood from the forehead of -- of Daniel

14  until you got to where the gun lockers were?

15     A.   The door from the gun locker is about

16  approximately five feet from each other.

17     Q.   How much time passed between the time that

18  Daniel hit his head and the time that you tried to put

19  your guns into the lockers?

20     A.   How much time had passed?

21     Q.   Yes.

22     A.   I would say roughly an approximate amount of

23  time of three minutes.

24     Q.   It took you three minutes to go five feet.

25  Correct?

122

1    **A.   No.  It was -- we passed the gun lockers with**
2    **Mr. Saenz propping him up against the -- the -- the**
3    **chain link fence and some detention officers saw us,**
4    **they -- they held Mr. Saenz at that point.  At which**
5    **time me and Officer Flores went back to the gun lockers**
6    **and put our equipment up.**
7        Q.   How long was it from the time that you saw
8    Daniel -- Daniel's head start to bleed until you got
9    him to the chain link fence that he was held up on by
10   you?
11   **A.   How much time had passed since I had --**
12       Q.   Yes.
13   **A.   -- since I had noticed him bleeding and**
14   **then --**
15       Q.   How much time from when you enter the door --
16   you said you saw his head injured at that point.
17   Correct?
18   **A.   Yes.**
19       Q.   How much time passed from then until he was
20   propped against the chain link fence?
21   **A.   And it happened in a matter of seconds.  I**
22   **would have to say about 20 to 30 seconds.  I'm not too**
23   **sure.**
24       Q.   And the three of you walked to that fence.
25   Correct?

123

1    **A.   We escorted Mr. Saenz to the fence, yes.**
2        Q.   He was walking as you escorted him?
3    **A.   Yes.**
4        Q.   At any point did you notice that Daniel's face
5    was full of blood?
6    **A.   I noticed it when we were in the elevators.**
7        Q.   That was the first time?
8    **A.   That was the first time I noticed it.**
9        Q.   How long was it from the time that you took
10   him to the fence to stand him up until he got to the
11   elevators.
12   **A.   About five to eight minutes.**
13       Q.   So it was approximately six to nine minutes
14   from the time that Daniel's head hit the door frame
15   until you first noticed the blood all over his face,
16   that his face was full of blood.  Is that correct?
17   **A.   Approximately, yes.**
18       Q.   When you had Daniel up against the fence or
19   door by the lockers, how was he acting at that point?
20   **A.   He was pushing off the fence with his knees,**
21   **being combative against me and Flores, and also the**
22   **detention officers, grunting and making -- I guess**
23   **noises, grunting noises, yelling.**
24       Q.   All that would be important information to put
25   into your witness statement as well.  Correct?

124

1           MR. ORTEGA:  Objection, vague.
2    **A.   I would assume so, sir.**
3        Q.   (By Mr. Gage)  Pardon me?
4    **A.   I would -- I would think so, yes.**
5        Q.   That was important enough for you to want to
6    document the grunting noises, his using his knees,
7    things of that sort.  Correct?
8    **A.   That's correct.**
9        Q.   After those detention officers were there,
10   they kept track of Daniel while you and Flores put your
11   guns and ammunition into the locker.  Correct?
12   **A.   They had ahold of Mr. Saenz, that's correct.**
13       Q.   Where was Matthews at that point?
14   **A.   I believe -- while me and Flores were putting**
15   **up our stuff.**
16       Q.   Correct.
17   **A.   I don't recall where he was, sir, no.**
18       Q.   Did you see him behind you at all or in front
19   of you or anything at all?
20          MR. JIM DARNELL:  Object, asked and
21   answered.
22          MR. ORTEGA:  And calls for speculation.
23       Q.   (By Mr. Gage)  Go ahead.
24   **A.   No, sir, I don't know where he was.  I don't**
25   **recall where he was, sir.**

125

1        Q.   Once you secured your guns and ammunition,
2    what did you do next?
3    **A.   Me and Mr. -- after we -- me and Mr. Flores**
4    **put up -- put up our equipment, we went back to --**
5    **to -- to gain control of Mr. Saenz as he was in the**
6    **El Paso Police Department custody.**
7        Q.   What did you do?
8    **A.   I'm sorry?**
9        Q.   What did you do to gain control of him at that
10   point?
11   **A.   We again grabbed him by the arms like we had**
12   **him before and he -- we had to pick him up, actually,**
13   **because he was -- he was on the ground.  I believe he**
14   **had gone to his knees at that point or sat down, so we**
15   **attempted to gain control of him again.**
16       Q.   Again, that's something that would be
17   important for you to have noted in your statement from
18   March 8th.  Correct?
19   **A.   That's correct.**
20       Q.   Did any of the detention officers remain
21   assisting you with Daniel after you came back from
22   securing your guns and ammunition?
23   **A.   I believe one of them did.  He -- he stayed**
24   **with us in the -- in the elevator once we got him into**
25   **the elevator.**

126

1    Q.   How did he assist you?
2    A.   **Just watching us.**
3    Q.   Is that assistance, just watching?
4    A.   **In his mind, I guess.**
5    Q.   In your mind?
6    A.   **In my mind?  I guess his presence.**
7    Q.   Did you and Flores then drag Daniel to the
8    elevators?
9    A.   **Did we --**
10   Q.   Did you drag him?
11   A.   **No, sir, we did not.**
12             MR. JIM DARNELL:  Object to misstatement.
13   Q.   (By Mr. Gage)  Did you and Flores drag Daniel
14   to the elevators from the door or fence where he had
15   dropped down face up to the ground?
16             MR. ORTEGA:  Objection, misstates his
17   testimony.
18             MR. JIM DARNELL:  Same objection.
19   Q.   (By Mr. Gage)  Go ahead.
20   A.   **No, sir, we did not drag him from where he had**
21   **injured his head at the door frame to the elevators --**
22   **or to the chain link fence.**
23   Q.   Had Daniel dropped face down -- withdraw.
24             Had Daniel dropped down but face up to
25   the ground by the door or fence area?

127

1    A.   **To my recollection, he did, sir.**
2    Q.   When you went into the elevator, do you know
3    where Matthews was?
4    A.   **He was right there with us in the elevator.**
5    Q.   When you were inside of the elevator, what did
6    you do with Daniel?
7    A.   **We had him -- we had him -- I believe we had**
8    **him sitting up against the -- the back -- yeah, the**
9    **back wall of the elevator just propping him up.**
10   Q.   He was against the wall --
11             MR. ORTEGA:  Hold on.  I don't think he's
12   done yet.
13   Q.   (By Mr. Gage)  Finish, please.
14   A.   **To my recollection we had Mr. Saenz's back**
15   **against the -- the wall of the -- we sat him up against**
16   **the back of the wall of the elevator and then just held**
17   **him, that way he didn't fall over.**
18   Q.   All right.  So his back was against the wall
19   and then you were holding him to make sure he didn't
20   keel over as if he was falling down.  Correct?
21   A.   **To my recollection, yes, sir.**
22   Q.   And the reason why you were holding him so he
23   wouldn't fall over is it appeared at that point that
24   Daniel was unconscious.  Correct?
25             MR. ORTEGA:  Objection, calls for

128

1    speculation.
2             MR. JIM DARNELL:  Same objection.
3    A.   **I'm not sure if he was unconscious or not**
4    **because he -- he would -- he would -- his head would be**
5    **like this and then he would look up at us and then put**
6    **his head back down.**
7    Q.   (By Mr. Gage)  Did you keep your hands on
8    Daniel the whole time you were in the elevator?
9    A.   **I did, sir.**
10   Q.   What was Flores doing with his hands at that
11   point?
12   A.   **Also the same, just keeping him balanced -- or**
13   **keeping him upright -- attempting to keep him upright.**
14   Q.   When the elevator doors opened, what happened
15   next?
16   A.   **We -- we proceeded attempting to carry him**
17   **back -- or into the holding tank where all the**
18   **detainees, when they first arrive, that's where they**
19   **go, the holding tank.**
20   Q.   Were you dragging him or carrying him?
21   A.   **No, we were attempting to carry him, sir.**
22   Q.   So you weren't dragging him.
23   A.   **No, sir.**
24   Q.   After you got him to the holding tank, what
25   happened next?

129

1    A.   **After we got to the holding tank, once again I**
2    **believe I dropped down to my knees and attempted -- and**
3    **had his -- his back against my torso to keep him**
4    **upright, and we were -- we sat him in there and we were**
5    **waiting for the nurses to come and assist, but they**
6    **didn't, they just stayed away and I -- I didn't have**
7    **any contact with them, they just -- I just saw them**
8    **shake their head like this (indicating) and do this**
9    **(indicating).**
10   Q.   As if saying no and moving their finger.  Is
11   that what you --
12   A.   **That's correct.**
13   Q.   So when you had Daniel in the holding tank,
14   you sat him on a bench.  Right?
15   A.   **No, not -- no, not the bench.  It was on the**
16   **ground still.**
17   Q.   How were you holding or carrying Daniel while
18   taking him through the jail?  Can you describe that for
19   us, please.
20   A.   **It was -- I had -- I attempted to have my**
21   **elbow pit under his -- either his bicep area or his**
22   **armpit area.**
23   Q.   Were you carrying him the way that you
24   demonstrated earlier today with the videographer?
25   A.   **That's correct.**

130

1    Q.   And was it your right arm or your left arm on
2  Daniel's bicep?
3    A.   I don't remember what arm it was, sir.
4    Q.   Were you in front of him, to the side of him
5  or behind him as you were carrying him in the jail?
6         MR. ORTEGA:  At what point?
7    Q.   (By Mr. Gage)  At any point in the jail.
8    A.   I was always on the side, on either -- we
9  would trade off.
10   Q.   One side or another?
11   A.   Yeah.
12   Q.   So as you were taking Daniel through the jail,
13 he was upright as opposed to be go dragged.  Correct?
14   A.   Throughout the whole time of the jail upright?
15   A.   Yes.
16   A.   You mean walking?
17   Q.   Right.  Or you were carrying him.
18   A.   No, we -- we had to physically attempt to
19 carry him because he wasn't being cooperative at all.
20 It felt like we were carrying deadweight.
21   Q.   Was his face down or up as you were taking
22 him?
23   A.   It -- it -- it changed throughout different
24 points in the jail or as we were trying to carry him.
25   Q.   Did you ever hook his armpit in any way?

131

1    A.   Yes.  Once we were -- once we got back down to
2  the jail, we did -- I -- I put both of my arms
3  underneath his two armpits and attempted to do what
4  they typically call a fireman's carry.
5    Q.   And where was that that you did this fireman's
6  carry?
7    A.   When we went back downstairs.
8    Q.   So it was only after you got downstairs that
9  you started the fireman's carry with your arms under
10 his armpit.  Correct?
11   A.   That's correct.
12   Q.   Did you ever see Officer Flores hook his arm
13 under Daniel's armpit at any time?
14   A.   Not that I recall, no.
15   Q.   Was there a time when Daniel was face up on
16 the ground with his hands cuffed behind his back where
17 you hooked your arm under his armpit and lifted him in
18 some way while he was cuffed or with the cuffs?
19   A.   There was so many different times when we --
20 it was -- there wasn't a set point where -- where
21 that's what we were attempting to do, but there was
22 just so many different times, I don't recall.
23   Q.   And those cuffs were able to be used to assist
24 you in dragging or carrying or lifting Daniel at times.
25 Correct?

132

1    A.   The cuffs?
2    Q.   Yeah, the chain of the cuff.
3    A.   No.  We don't carry by the cuffs, no.
4    Q.   That would be cruel.  Right?
5         MR. ORTEGA:  Objection, vague.
6    A.   It's not proper, no.
7    Q.   (By Mr. Gage)  Why?
8    A.   It's not proper escorting techniques.
9    Q.   Why is it not proper to drag someone with
10 their cuffs?
11   A.   Because it could inflict bodily injury on them
12 and on us.
13   Q.   What kinds of bodily injuries are you familiar
14 with that dragging someone by the cuff can cause on the
15 prisoner?
16   A.   Severed fingers.
17   Q.   Also cuts to the wrist area?
18   A.   Yes.  Or broken wrist.
19   Q.   Did you put the handcuffs on Daniel?
20   A.   I did not, sir.
21   Q.   You never handcuffed him?
22   A.   No.
23   Q.   Who handcuffed Daniel, do you know?
24   A.   I have -- I have no clue, sir, who it was.
25   Q.   Was he already cuffed when you got to the

133

1  Pebble station?
2    A.   That's correct.  Once we came back from
3  Mission Valley Regional Command Center, Mr. Saenz was
4  already cuffed.
5    Q.   Who did you understand was -- had control of
6  Mr. Saenz while you and Matthews were gone, so that
7  they would be the person or group of people that could
8  have been the ones to cuff Daniel?
9         MR. JIM DARNELL:  Object to speculation.
10        MR. ORTEGA:  Same objection.
11   A.   I wouldn't know who had control of him,
12 because we were at -- away at the Mission Valley, so...
13   Q.   (By Mr. Gage)  Did you ever see Flores change
14 the cuffs that were on Saenz and put on his own cuffs?
15   A.   No, sir, I do not recall that.
16   Q.   So whoever's cuffs were on Daniel when you
17 left the police station, it was that same set of cuffs
18 that was on him all the way until he was shot.
19 Correct?
20   A.   That's correct.
21   Q.   Did anyone tell you why he was double cuffed
22 with two handcuffs rather than one handcuff?
23   A.   Because he had broad shoulders and it would
24 hurt him if he only had one.  So to give him more
25 flexibility on his -- on his shoulders and arms, he was

134

1 double handcuffed, that way he wouldn't, I guess -- I
2 don't want to say cramp up, but I mean it would be
3 uncomfortable for him to have one set of handcuffs
4 given -- given his size.
5      Q.   Who told you that?
6      A.   I'm sorry?
7      Q.   Who told you that?
8      A.   Nobody told me that, sir.
9           MR. GAGE:  Let's read the question before
10 that answer, which I'm going to move to strike as
11 nonresponsive.
12           (The Court Reporter read back:  Did
13           anyone tell you why he was double cuffed
14           with two handcuffs rather than one
15           handcuff?)
16      A.   No, nobody told me.
17      Q.   (By Mr. Gage)  Did anyone tell you whether
18 they attempted to handcuff Daniel with one set of cuffs
19 at any time?
20      A.   No.  Not to my knowledge, no.
21      Q.   Did you at any time check to see whether he
22 could comfortably be handcuffed with just one set of
23 cuffs rather than two?
24      A.   I did not.
25      Q.   Did you ever see Flores looking to see if

135

1 Daniel could be handcuffed with one cuff comfortably
2 rather than two?
3      A.   I did not.
4      Q.   Did you ever learn of Daniel taking his arms
5 while handcuffed behind his back and moving them to the
6 front of his body?
7      A.   Did I ever observe him do that?
8      Q.   Yes.
9      A.   No, but I had heard he had.
10      Q.   Okay.  You never saw that happen.  Is that a
11 true statement?
12      A.   That's correct.
13      Q.   You were with him the entire time from the
14 time that you entered the jail until he was shot other
15 than a few seconds when you were putting your gun in
16 the locker.  Correct?
17      A.   That's correct.
18      Q.   And even in those few seconds, you were just a
19 few feet away from Daniel.  Correct?
20      A.   That's correct.
21      Q.   And during those few seconds, when you put
22 your gun into the locker, his arms were behind his back
23 handcuffed.  Right?
24      A.   Yes.
25           MR. ORTEGA:  Objection, calls for

136

1 speculation.
2      Q.   (By Mr. Gage)  When you returned after those
3 few seconds, his arms continued to be behind his back
4 handcuffed.  True?
5      A.   After I put up my equipment?
6      Q.   Yes.
7      A.   That's correct.
8      Q.   So at all times when Daniel was in the jail,
9 you saw his arms remaining behind his back handcuffed.
10 Is that a true statement?
11      A.   That is correct.
12      Q.   Going back in time from the time you left the
13 van until the time you entered the jail, did you ever
14 see Daniel take his handcuffs from behind his back and
15 put them in front of him?
16      A.   No.  He did not successfully put them in front
17 of him, no.
18      Q.   While he was in the van being taken from
19 Pebble Hills to the county jail, at any time did you
20 see Daniel take his arms from behind his back in
21 handcuffs and put them in front?
22      A.   No.  Not successfully, no.
23      Q.   At any time at the station at Pebble Hills,
24 did you ever see Daniel take his arms from behind his
25 back and put them in front of him?

137

1      A.   No, I did not observe that, no.
2      Q.   At any time from the time you got into the van
3 until you -- until he was shot, did anyone tell you
4 that they saw Daniel actually move his arms from behind
5 his back and put them in front?
6      A.   That's correct.
7      Q.   Who told you they saw that?
8      A.   I believe it was Matthews, sir.
9      Q.   But Matthews did -- was there a time when
10 Matthews was alone with Daniel?
11      A.   They were in the cell together.  Because I got
12 there late, so Matthews was --
13      Q.   Sorry.  Finish your answer, then I'll move to
14 strike.
15      A.   As I said before, I got there late, so it was
16 the transport officer Matthews, at that time the
17 processing officers, and also Pebble Hills police
18 officers in the cell area with Mr. Saenz.
19           MR. GAGE:  Move to strike, nonresponsive.
20           Let's hear the question back.
21           (The Court Reporter read back:  But
22           Matthews did -- was there a time when
23           Matthews was alone with Daniel?)
24           MR. GAGE:  No, before that.
25           (The Court Reporter read back:  Who told

138

1        you they saw that?)
2        MR. GAGE:  Before that.
3        (The Court Reporter read back:  At any
4        time from the time you got into the van
5        until you -- until he was shot, did
6        anyone tell you that they saw Daniel
7        actually move his arms from behind his
8        back and put them in front?)
9   A.   Mr. Matthews.
10  Q.   (By Mr. Gage)  Did anyone tell you that during
11 the time frame that Daniel first entered the van until
12 the time he was shot, in that time sequence, that
13 Daniel had ever moved his arms from behind his back to
14 the front of his back while handcuffed?
15  A.   While he was in the van towards the -- and
16 then from the van all the way to the county jail?
17  Q.   Correct.  Did he ever do it at that point in
18 time?
19  A.   No.  Not successfully, no.
20  Q.   When you say "not successfully," that is he
21 might have tried --
22  A.   He might have --
23  Q.   -- but it was not able to be done by him.
24 Correct?
25  A.   That's correct, he was attempting to.

139

1   Q.   When you took Daniel into the holding tank,
2 did both you and Flores remain in the holding tank with
3 Daniel at all times?
4   A.   That's correct.
5   Q.   Were there any other people in the holding
6 tank besides the three of you?
7   A.   I believe just Mr. Johnson.  And at various
8 points I believe Mr. Matthews would walk in and out of
9 the tank.
10  Q.   While you were in the tank, was Daniel saying
11 anything?
12  A.   Not that I remember, no.
13  Q.   Was he fighting you at all?
14  A.   Not in the tank, no.
15  Q.   Was he uncooperative at all?
16  A.   We were trying to keep him upright and we kept
17 telling him, "Daniel, sit up, sit up," and he wouldn't
18 sit up, he just kept slouching.
19  Q.   And that's something that would be important
20 to put into your statement as well.  Correct?
21       MR. ORTEGA:  Objection, vague.
22  Q.   (By Mr. Gage)  Your statement of March 8th,
23 2013.  Correct?
24  A.   There was a lot of different things that
25 happened that day, I don't remember all -- everything.

140

1   Q.   Isn't it a fact that all that Daniel was doing
2 in the holding tank was staying silent, occasionally
3 looking up and around and then dropping his head back
4 down?
5   A.   That's what he was doing, yes.
6   Q.   And how long was Daniel in this holding tank
7 doing nothing more than looking up and down and then
8 putting his head back down?
9        MR. JIM DARNELL:  Misstatement of the
10 testimony.
11       MR. ORTEGA:  Same objection.
12  Q.   (By Mr. Gage)  Go ahead.
13  A.   I don't recall how much time it was, sir.
14  Q.   Five minutes?  Ten minutes?  What's your best
15 estimate?
16  A.   My best estimate would be about five, six
17 minutes.
18  Q.   And Flores was with you that entire time.
19 Correct?
20  A.   To the best of my knowledge, yes.
21  Q.   Then what happened?
22  A.   What happened after what, sir?
23  Q.   After those five to six minutes, what happened
24 next?
25  A.   We were there and then Mr. Flores said, "We're

141

1 going to have to get a -- medical release."  So we
2 said, "We're going" -- he said, "We're going to have to
3 take him back downstairs."  And that's when I said -- I
4 believe I said -- I believe I said -- I affirmed with
5 him and -- or said okay and we went back downstairs
6 with Mr. Saenz.
7   Q.   Did you hear any of the nurses or detention
8 officers yelling to, "Get him out of here," that is to
9 get Mr. Saenz out of there?
10  A.   I don't remember them yelling that, no.
11  Q.   Did you talk with anyone at the nurses'
12 station after taking Daniel upstairs?
13  A.   I did not because I was taking care of
14 Mr. Saenz.
15  Q.   Did you hear Flores at any time speaking to
16 anybody at the nurses' station?
17  A.   Not that I remember, no.
18  Q.   Did you see Flores speaking with anyone at the
19 nurses' station?
20  A.   Not -- not that I remember, sir.
21  Q.   From the time that you, Flores and Daniel
22 entered the jail until the time that you left the
23 holding tank upstairs, at any time did you hear Flores
24 calling for medical treatment for Daniel?
25  A.   From the time we entered to the holding tank,

142

1   no.
2       Q.   Did you believe that Daniel needed medical
3   treatment during that time?
4       A.   Yes, because of his wound.
5       Q.   Did you -- was he under your care, control and
6   custody as well as Officer Flores'?
7            MR. ORTEGA:  Objection, calls for a legal
8   conclusion.
9            MR. JIM DARNELL:  Same objection.
10      Q.   (By Mr. Gage)  Go ahead.
11      A.   I believe that he was under control of -- he
12  was under custody of the El Paso police and I was -- we
13  were trying to get him help as far as getting him to
14  the nurses' station, but they --
15           MR. GAGE:  Move to strike, nonresponsive.
16      Q.   (By Mr. Gage)  Did you take control over
17  Daniel personally while he was handcuffed at any time?
18      A.   Did I take control of him?
19      Q.   Yes.
20           MR. ORTEGA:  Objection, vague.
21           MR. JIM DARNELL:  Calls for a legal
22  conclusion.
23           MR. ORTEGA:  I join the objection.
24      A.   No, I never had -- as far as us having custody
25  of him, complete custody of him, no.

143

1       Q.   (By Mr. Gage)  Was there ever a time where you
2   were keeping Daniel in a control hold while you were
3   with him in the jail?
4            MR. ORTEGA:  Objection, vague.
5       A.   We were attempting to have control.
6       Q.   (By Mr. Gage)  Not we.  I'm asking you about
7   you personally, Mr. Romero.
8       A.   Did I ever have control of Mr. Saenz?
9       Q.   Yes.
10           MR. ORTEGA:  No.  The question was did
11  you have a control hold over him?
12           MR. GAGE:  Correct.
13           MR. ORTEGA:  If you know what a control
14  hold is.
15      A.   I'm not sure what a control hold is, no.
16      Q.   (By Mr. Gage)  Really?  So in all of the
17  training that you've had as a law enforcement officer
18  all the way until today, August 8, 2017, you have no
19  understanding of what a control hold is of a suspect.
20  Is that your testimony?
21      A.   I think a control hold could be anything to
22  anybody.  We -- they would call it different things,
23  just not control holds.
24      Q.   All right.  So you've never been trained in
25  any training that you've gone through as a law

144

1   enforcement officer on what a control hold is.  That's
2   your testimony.  Correct?
3            MR. ORTEGA:  Objection, vague.
4       A.   I've been trained on what escort holds are,
5   yes.
6       Q.   (By Mr. Gage)  I'm asking you a control hold.
7   That's a term that until today you had no knowledge
8   what that was.  Correct?
9       A.   I don't know what you mean by "control hold,"
10  sir.
11      Q.   All right.  When you were a detection officer
12  back before working for G4S security, in that job they
13  did not teach you about control holds.  That's your
14  testimony.  True?
15           MR. ORTEGA:  Objection, vague.
16      A.   They taught us how to escort detainees.
17      Q.   (By Mr. Gage)  Did they teach you control
18  holds?  Yes or no.
19      A.   I don't know what a control hold is.
20      Q.   That's fine.  At G4S, including in the
21  college, did they ever teach you what a control hold
22  is?  Yes or no.
23      A.   No.
24      Q.   During the six months when you were in the
25  academy with the El Paso Police Department, did they

145

1   ever teach you what a control hold is?
2            MR. ORTEGA:  Objection vague.
3       A.   No, sir.
4       Q.   (By Mr. Gage)  After working for El Paso PD,
5   did you get any further training in law enforcement by
6   any agency anywhere in the world?
7       A.   Did I receive any training --
8       Q.   Correct.
9       A.   -- after El Paso Police Department?
10      Q.   Yes.
11      A.   That is correct, I did.
12      Q.   Where did you get that training?
13      A.   What training are you talking about?
14      Q.   Any training in law enforcement.
15      A.   Okay.  U.S. Customs and Border Protection.
16      Q.   What kind of training did you go through with
17  them?
18      A.   I went through physical training, firearms
19  training, ground tactics, OC, baton, taser.
20      Q.   How to control a suspect?
21      A.   And how to escort one, yes.
22      Q.   How to hold a suspect?
23      A.   Yes.
24      Q.   During that training did you learn about a
25  control hold?

146

1        MR. ORTEGA:  Objection vague.
2    A.   With the U.S. Customs and Border Protection?
3    Q.   (By Mr. Gage)  Correct.
4    A.   To the best of my knowledge, we -- yes, I
5 believe so we did.
6    Q.   So what is your understanding of what a
7 control hold is since you finally got that training
8 recently with the U.S. Customs?
9    A.   How to escort a subject.
10   Q.   All right.  Did you hear anyone calling for
11 medical assistance for Daniel from the time that you
12 entered the jail, as you went up the elevator, stayed
13 in the holding cell, came back down the elevator, but
14 before leaving the door to go outside in the driveway,
15 did you hear anyone at any time calling for medical
16 assistance for Daniel?
17   A.   Mr. Flores, yes.
18   Q.   When did you hear him calling for medical
19 assistance?
20   A.   When we were back down near the gun lockers.
21   Q.   What did you hear him say?
22   A.   I don't remember what he was saying, sir.
23   Q.   Who did he ask for assistance from?
24   A.   To the best of my knowledge and recollection,
25 I believe he was on the phone with his supervisor and

147

1 then I believe he was on the radio with the dispatch.
2    Q.   What time of night was it when you heard
3 Flores for the first time calling for any assistance
4 medically for Daniel?
5    A.   I would say it would have had to be
6 approximately close to 18:00 hours, 6:00.
7    Q.   The shooting itself happened about 6:30 p.m.
8 Correct?
9    A.   I -- I believe so, sir.
10   Q.   What happened between the time that you heard
11 Flores on dispatch and the shooting --
12        That's a bad question.  Withdraw.
13        After you were upstairs in the holding
14 cell, did you have a conversation with Flores as to
15 what to do next?
16   A.   Once we got back downstairs, yes.
17   Q.   Okay.  How did you know to go from upstairs in
18 the holding cell to downstairs?
19   A.   Because Mr. Flores said, "We're going to go
20 back downstairs.  Let's take Mr. Saenz back downstairs
21 to -- so we can get a medical release on him."
22   Q.   What's the difference between a medical
23 release and medical attention to your mind?
24   A.   In my opinion a medical release is taking
25 someone to the hospital and saying, "He's okay."  We

148

1 present that he's in good health -- or that's what I
2 assume they would say -- they give us that paperwork,
3 we take him back to the county jail, and then that's
4 when the county jail nurses accept it as a medical
5 release.
6        Medical attention, in my opinion, is
7 someone that's suffering from a medical emergency and
8 they need to have medical attention at that point or
9 right away.
10   Q.   So what you heard Flores saying on the radio
11 is, "We need to get a medical release for Daniel," as
12 opposed to getting medical attention.  Is that
13 accurate?
14   A.   I don't remember him saying that on the radio
15 or if he ever said that on the radio.
16   Q.   Do you remember whether when Flores was on the
17 radio downstairs calling about something medical for
18 Daniel whether he was asking about a medical release or
19 medical attention?
20   A.   He just -- I remember him just requesting
21 medical EMS, which is an ambulance, basically.  I don't
22 know if he was requesting either a medical release or
23 medical attention.
24   Q.   Have you ever learned that jails will have
25 wheelchairs for the inmates that have some disability

149

1 and can't walk well on their own?
2    A.   No, sir, I didn't know that.
3    Q.   You've never heard of that happening?
4    A.   No.
5    Q.   When you worked in the detention center that
6 one-month period of time, did you see any wheelchairs
7 there?
8    A.   No, I didn't.
9        MR. JIM DARNELL:  Object to the
10 misstatement.
11   Q.   (By Mr. Gage)  Were there any stretchers,
12 gurneys or other ways to help a prisoner that had
13 difficulties walking when you worked in that first
14 facility?
15        MR. ORTEGA:  Objection, calls for
16 speculation.
17   A.   No, sir, not that I remember.
18   Q.   (By Mr. Gage)  Have you ever heard of the
19 Americans With Disabilities Act?
20   A.   I have.
21   Q.   Do you understand under the Americans With
22 Disabilities Act, there's a law to help accommodate
23 people with disabilities in general?
24        MR. ORTEGA:  Objection, calls for a legal
25 conclusion.

150

1       MR. JIM DARNELL:  Same objection.
2  A.  I don't know, I've never read through their
3  policies or what their -- what they call for.
4  Q.  (By Mr. Gage)  Was it your understanding that
5  in the custody situations, to help comply with the
6  Americans With Disabilities Act, there had to be some
7  device available to assist prisoners that had
8  difficulties walking?
9       MR. ORTEGA:  Objection, calls for a legal
10 conclusion and speculation.
11      MR. JIM DARNELL:  Same objection.
12 A.  No, sir, not that I remember.  The only device
13 we saw was a restraint chair.
14 Q.  (By Mr. Gage)  What is a restraint chair?
15 A.  A restraint chair is something we use on a
16 combative subject that's kicking, spitting or being --
17 having assaultive behavior against a -- a person
18 or that -- yeah.
19 Q.  Describe what a restraint chair looks like.
20 A.  It's basically a chair that has a metal plate
21 at the bottom for the feet and it has, say, like belts
22 that go around the -- the wrists and they go around the
23 ankles and also there's a loop on the back where you
24 can put the -- the handcuffs through there, that way
25 they don't move around.  It also comes with a -- it's

151

1  usually a system with a spit mask and also has a belt
2  that goes -- that can go around the -- the waist and
3  also over the shoulders.  That -- that is -- and only
4  has one set of wheels.
5  Q.  It has a set of wheels so that you can carry a
6  prisoner around with those wheels.  It's kind of like
7  tilting a wheelbarrow and you can then push them.
8  Correct?
9  A.  That's correct.
10 Q.  And the El Paso County Jail had a restraint
11 chair in 2013.  Correct?
12 A.  I'm not sure if they did or not.
13 Q.  Have you seen a restraint chair in any jail
14 facilities?
15 A.  The one I used to work at, yes.
16      MR. ORTEGA:  Lunch break?
17      MR. GAGE:  I am just looking at this.
18 Q.  (By Mr. Gage)  Did you ever see Officer Flores
19 asking the nurse about assisting medically with Daniel?
20 A.  No, sir, I don't remember.  Not to my
21 knowledge.
22 Q.  Did you ask Daniel to stand up as you were
23 leaving the holding cell?
24 A.  Yes, we did.
25 Q.  Did he do that?

152

1  A.  No, he did not.
2  Q.  What -- how did he respond?
3  A.  He didn't say anything, he just -- he just
4  kept -- he didn't say anything and kept on the floor.
5  Q.  Did you then drag him from the holding tank to
6  the elevators?
7  A.  No, sir, we did not drag him.
8  Q.  How did you take him?
9  A.  We attempted to carry him by his arms.
10 Q.  Was Daniel bleeding profusely from his head
11 while you were in the holding cell?
12 A.  Yes, he was.
13 Q.  Did you see blood pulsating out of his
14 forehead and down his face while he sat in that holding
15 cell with you?
16 A.  That is correct.
17 Q.  Did you believe he was in need of medical
18 treatment and attention?
19      MR. ORTEGA:  Objection, calls for
20 speculation and expert testimony.
21      MR. JIM DARNELL:  Same objection.
22 Q.  (By Mr. Gage)  You can answer.
23 A.  Well, just from looking at him, I mean any
24 reasonable person seeing someone bleeding like that,
25 yes.

153

1  Q.  Did you understand that you had a
2  responsibility for protecting the safety of prisoners
3  when you were transporting them?
4       MR. ORTEGA:  Objection, calls for a legal
5  conclusion.
6       MR. JIM DARNELL:  Same objection.
7       MR. ORTEGA:  And speculation.
8  A.  In what situation are you talking about?  This
9  situation?
10 Q.  (By Mr. Gage)  Any situation.  Was it part of
11 your duties in transporting a prisoner to protect their
12 safety and well-being?
13      MR. ORTEGA:  Objection, vague, calls for
14 a legal conclusion and speculation.
15      MR. JIM DARNELL:  Same objection.
16 A.  To my understanding it's -- it's a duty of an
17 officer to have control and have care over that -- of
18 that subject.
19 Q.  (By Mr. Gage)  You were taught at some point
20 in your law enforcement career, one of your obligations
21 in transporting a prisoner is to protect his or her
22 safety.  Correct?
23      MR. ORTEGA:  This is after March 8, 2013?
24      MR. GAGE:  Ever.
25      MR. ORTEGA:  Not specifically to Daniel

154

1  Saenz?

2                    MR. GAGE:  Ever.

3      A.  That is correct, yes.

4      Q.  (By Mr. Gage)  When did you first learn that

5  you had a responsibility as a law enforcement officer

6  to protect the safety of someone that you were

7  transporting?

8      A.  That would have to be when I was -- when I

9  became an officer, police officer, and so on.

10     Q.  So you did not learn about an obligation to

11 protect the safety and well-being of a prisoner until

12 after July 2013.  Is that your testimony?

13     A.  To the best of my knowledge, yes, sir.

14     Q.  So what did G4S tell you, if anything, about

15 your responsibilities for the care and treatment of

16 prisoners when transporting them?

17     A.  That we were basically processing officers and

18 transport officers directed under the -- the police

19 officers -- the El Paso police officers since they were

20 the ones that had custody and they were the ones

21 giving us directives on what to do.

22     Q.  When you were in the transport van with

23 Mr. Matthews and the two prisoners -- it was just the

24 four of you -- who did you believe had custody of the

25 prisoner at that point?

155

1                    MR. JIM DARNELL:  Object, calls for a

2  legal conclusion.

3                    MR. ORTEGA:  Same objection.  And

4  speculation.

5      Q.  (By Mr. Gage)  Go ahead.

6      A.  To my understanding and my knowledge, it was

7  still under the police department's custody.

8      Q.  If you're in a van transporting prisoners with

9  Mr. Matthews and a prisoner needs medical attention

10 while in the van -- it's just the four of you -- what

11 was your understanding of your obligations when you

12 worked for G4S to protect that prisoner or help him?

13                   MR. ORTEGA:  Objection, calls for a legal

14 conclusion.

15                   MR. JIM DARNELL:  Same objection.

16     A.  If there was -- if the need for a medical

17 emergency arose while transporting a prisoner, we'd

18 have to notify the officer that was escorting us or a

19 law enforcement -- yeah, an official law enforcement

20 officer what was going on at that time or in that

21 moment.

22     Q.  (By Mr. Gage)  And why did you understand you

23 had to notify others about a medical emergency?

24                   MR. ORTEGA:  Objection.  He didn't say

25 others, he said the El Paso Police Department.

156

1      Q.  (By Mr. Gage)  Go ahead.

2      A.  I'm sorry.  Repeat the question, please.

3                    (The Court Reporter read back:  And why

4                    did you understand you had to notify

5                    others about a medical emergency?)

6      A.  It was part of the policy, sir, the G4S

7  policy.

8      Q.  (By Mr. Gage)  So the G4S policies told you

9  that if there was a medical emergency, you had an

10 obligation to notify someone about that emergency.

11 Correct?

12                   MR. ORTEGA:  Objection, misstates his

13 testimony.

14     A.  The -- the directive was if there was a -- a

15 need for a medical emergency, the police officer would

16 have -- or law enforcement officer would have to be

17 notified about that and they would the make the

18 decision what to do.

19     Q.  (By Mr. Gage)  So it was your obligation under

20 the policies of G4S to notify some law enforcement

21 officer when you believed there was a need for medical

22 treatment on a prisoner that you were transporting.  Is

23 that accurate?

24                   MR. ORTEGA:  Objection, misstates his

25 testimony.

157

1                    MR. JIM DARNELL:  Same objection.

2                    MR. ORTEGA:  He told you at the time he

3  was transporting him in the van --

4                    MR. GAGE:  I don't want to hear -- while

5  you're saying it, that's coaching.  You've made your

6  objection, he can answer, the judge will rule on it.

7                    MR. ORTEGA:  I'm not coaching, I'm --

8                    MR. GAGE:  Then don't give me your

9  testimony.

10                   MR. ORTEGA:  You're misstating his

11 testimony.

12                   MR. GAGE:  That's fine.  You've made your

13 objection, now I want my question answered.

14     A.  What was your question, sir?

15                   MR. GAGE:  We'll have it read back.

16                   The observations are preserved.

17                   (The Court Reporter read back:  So it was

18                   your obligation under the policies of G4S

19                   to notify some law enforcement officer

20                   when you believed there was a need for

21                   medical treatment on a prisoner that you

22                   were transporting.  Is that correct?)

23     A.  Yes.  According to our policy and if it was

24 feasible at the time, yes.

25     Q.  (By Mr. Gage)  Did you comply with that policy

158

1 and notify any law enforcement officer that
2 Daniel Saenz needed medical treatment on March 8th,
3 2013, at any time before he was shot?
4    **A.   At any time before he was shot?**
5    Q.   Correct.
6    **A.   While being transported?**
7    Q.   Did you --
8    **While being transported, no.**
9    Q.   You went downstairs on the elevators.  How
10 long did it take from the time you exited the elevator
11 until you took Daniel outside?
12   **A.   Approximately between 10 to 15 minutes.**
13   Q.   What happened during that 10- to 15-minute
14 period?
15   **A.   We had -- we were -- we came back down to**
16 **where the gun lockers were at.  At that point Mr. Saenz**
17 **was -- was seated with his -- with his back against my**
18 **knees with no pressure, he was just -- his back was**
19 **just in contact with my knees and I was keeping him**
20 **balanced with my hands as well and Officer Flores, from**
21 **what I recall, was on the phone and the dispatch.**
22   Q.   Do you know who he spoke to on the phone?
23   **A.   I do not know.**
24   Q.   Do you know who he spoke to at dispatch?
25   **A.   A dispatch officer.  I'm not sure who -- who**

159

1 it was exactly.
2    Q.   Did you ever learn that he was instructed --
3 this is Flores -- was instructed by a superior to keep
4 Daniel in that area by the gun locker and not to take
5 him outside until help arrived?
6    **A.   No, I don't recall.**
7            MR. JIM DARNELL:  Object to speculation.
8    I don't know if that happened or not, sir.
9    Q.   (By Mr. Gage)  Why did you after this 10- to
10 15-minute time lapse decide to take Daniel outside away
11 from the gun locker?
12           MR. JIM DARNELL:  Object to misstatement
13 of the evidence.
14           MR. ORTEGA:  Same objection.
15   **A.   I was instructed by Officer Flores.**
16   Q.   (By Mr. Gage)  Did Officer Flores tell you why
17 he wanted to take Daniel outside from the jail at that
18 point?
19   **A.   No, he did not.**
20   Q.   This was -- about what time was it that you
21 took Daniel outside from the jail on to the driveway?
22   **A.   I don't remember the time, sir.**
23   Q.   Around 6:10, 6:15?
24   **A.   I don't remember the time.  I would say**
25 **approximately.**

160

1    Q.   And then you've already told us everything
2 that took place from the time that you got outside of
3 the jail until the shooting occurred.  True?
4    **A.   That's correct.**
5            MR. GAGE:  Let's go for lunch.
6            THE VIDEOGRAPHER:  The time is 1:44 p.m.
7 We are now off the record.
8            (A recess was had.)
9            THE VIDEOGRAPHER:  The time is 3:07 p.m.
10 We're back on the record.
11           MR. GAGE:  All right.  Back on the
12 record.
13           (Exhibit marked, No. 39A.)
14   Q.   (By Mr. Gage)  I think I'll show you
15 Exhibit 39 [sic] now.
16           For the record, Exhibit 39 is the
17 statement that you gave on March 8th, 2013, the day of
18 the shooting.  Correct?
19   **A.   That is correct.**
20   Q.   You were being truthful and accurate on it
21 when you gave that statement.  Right?
22   **A.   Yes, sir, I believe I was.**
23   Q.   Let's go to the second page.
24           You believe that Mr. Saenz was scared
25 looking.  Correct?

161

1    **A.   Where do you see that, sir?**
2    Q.   Just I'm asking you.  Did you believe he was
3 scared looking.  Scared.  He looked scared, worried,
4 afraid.  Did that -- is that true?
5            MR. ORTEGA:  At what point, Mr. Gage?
6    Q.   (By Mr. Gage)  At any point did he look scared
7 to you?
8    **A.   At any point during the whole --**
9    Q.   Yes.
10   **A.   Yes, there were points that -- that he looked**
11 **as if someone was scaring him.**
12   Q.   When did he first appear to look scared to
13 you?
14   **A.   The first time I saw it was when we had just**
15 **come back from the Mission Valley Regional Command**
16 **Center and -- and the transport officer -- actually**
17 **processing officer, Planas, and then Officer Flores**
18 **were bringing him out of the station on -- and**
19 **proceeding to go to the van, that's when I first saw**
20 **it.**
21   Q.   When else did he look scared to you that day?
22   **A.   When else?**
23   Q.   Yes, when else.
24   **A.   During the transport from Pebble Hills**
25 **Regional Command Center to the county jail, when**

162

1  walking -- when escorting him from the van into the
2  county jail.
3      Q.   Did you have any troubles getting a seat belt
4  on him getting into the van?
5      A.   I did.
6      Q.   About how much time passed before you could
7  get the seat belt on?
8      A.   Just the approximate time that we took -- it
9  took to get the seat belt on him, I want to say about
10  10 to 15 minutes.
11     Q.   10 to 15 minutes?
12     A.   Yes, sir.
13     Q.   So what was he doing during that time frame?
14     A.   What time frame, sir?
15     Q.   During that 10 to 15 minutes when you were
16  trying to seat belt him.
17     A.   Well, when we finally got him into the
18  transfer van to sit down, he kept trying to stand up
19  and he kept extending his body -- yeah, he kept
20  extending his body and pushing up against -- with his
21  back against the wall compartment of the van and that's
22  how we were having issues getting the lap belt around
23  him.
24     Q.   He was doing that for about 10 to 15 minutes
25  you told us.  Correct?

163

1      A.   That's correct.
2      Q.   Look at page 3 of your statement, which is
3  Exhibit 39.
4           The first paragraph.  Do you see the
5  second line: Arrestee Saenz -- Saenz (different
6  pronunciation) was pushing with his back against the
7  compartment wall -- doing all these other things --
8           (Reading) -- elevate his waist off the
9  seat so that we could not snap the seat belt around his
10  waist.
11          Do you see that area?
12     A.   Yes, sir, I see it.
13     Q.   That's what you were explaining to us was the
14  10- to 15-minute time frame.  Right?
15     A.   Yes, sir.
16     Q.   But you stated in your statement: He was
17  doing this for less than one minute.
18          Do you see that?
19     A.   Okay.  I see it.
20     Q.   So were you being truthful and accurate when
21  you said that it lasted less than one minute?
22     A.   I was being -- I was attempting to be accurate
23  about it.  I don't remember exactly all the times.  I
24  had -- to be quite honest, that was a pretty traumatic
25  event that I wasn't going to remember -- I was trying

164

1  to remember all these things -- all these facts that
2  the detective was asking me.
3           MR. GAGE:  Move to strike, nonresponsive.
4      Q.   (By Mr. Gage)  The question was a simple one.
5  Were you being truthful and accurate when you wrote
6  your statement on March 8?  Yes or no.
7           MR. ORTEGA:  Objection, argumentative.
8      A.   Like I said I was trying to be as truthful and
9  as recalling [sic] as I could about the whole incident.
10     Q.   (By Mr. Gage)  All right.  So Exhibit 39 you
11  were being truthful and accurate is your statement.
12  Right?
13     A.   That's correct.
14     Q.   The handcuffs themselves, were they loose or
15  tight on him?
16     A.   No, they were loose, sir.
17     Q.   By having loose handcuffs, that could increase
18  the opportunity for Daniel to move his arms and get
19  them from his back to his front to your knowledge.
20  Correct?
21           MR. ORTEGA:  Objection, calls for
22  speculation.
23           MR. JIM DARNELL:  And asked and answered.
24     Q.   (By Mr. Gage)  I'm sorry?
25     A.   The -- I'm not sure if having the handcuffs

165

1  loose around his wrists, if that's what you mean, would
2  enable him or at least facilitate him moving his -- his
3  handcuffs from behind his back to the front of him.  I
4  just know that he was able to move his wrists inside
5  the handcuffs.
6      Q.   Did you check to see if the handcuffs were
7  double locked?
8      A.   I do not recall that, no.
9      Q.   Do you know what double locking handcuffs
10  means?
11     A.   Yes, I do.
12     Q.   What is your understanding?
13     A.   Double locking of the handcuffs is -- is when
14  you put the handcuffs on the -- on the subject, you
15  secure it to where they can properly move their --
16  their -- their wrists without having it to be so tight.
17  And then also there's a button there or a little latch
18  that you move with your -- with your handcuff key,
19  activate it, and that prevents it from -- that prevents
20  the clamps or the -- the clamps from the handcuffs to
21  become tighter in the event that the subject sits on
22  them or does some type of act that -- that will tighten
23  up the -- the handcuffs.
24     Q.   Did you make sure to -- that the handcuffs
25  were double locked so that they could not press on

166

1 Daniel's hand and cause an injury?

2    **A.  If I remember correctly, if I recall**

3 **correctly, I had seen that the -- or -- yeah, that the**

4 **button was pushed so that the -- yeah, the button was**

5 **pushed so that told me that the handcuffs were double**

6 **locked.**

7    Q.  All right.  I'm going to show some photos now.

8             Starting with Exhibit 8, can you show

9 us -- and we'll put it on the video -- where the button

10 is for double locking handcuffs.

11             So once you locate it, show -- point to

12 it and show it on the video, please.

13    **A.  It's going to be a latch that's inside this**

14 **little crevice right here and it's a latch that you**

15 **either -- I believe it's to the -- pull it this way.**

16    Q.  Okay.  So if you can just --

17    **A.  And it's --**

18    Q.  Go ahead.

19    **A.  No, no.  Oh, it's -- if you look in there, you**

20 **can see that the latch -- if it's visible that means**

21 **it's not double handcuffed -- I mean not double locked.**

22 **If it's not visible, then it's double locked.**

23    Q.  And in these cuffs do you see it visible or

24 not visible?

25    **A.  I cannot tell, sir.**

167

1    Q.  All right.  I'm going to now show you

2 Exhibit Number 9.  I'd like you to pay attention to the

3 injury on the wrist near the ruler.  Tell me if that

4 injury is representative of an injury that could be

5 caused from a handcuff to your knowledge.

6           MR. ORTEGA:  Objection, vague, lack of

7 foundation and calls for speculation.

8           MR. JIM DARNELL:  And calls for an expert

9 opinion.

10    **A.  I'm not sure, sir.  It would have to depend --**

11 **just depends on the situation.  Even if the handcuff**

12 **isn't -- they're still loose, the way Mr. Saenz was**

13 **moving around and being combative, it was causing**

14 **strain on the handcuffs and on his wrists.**

15    Q.  (By Mr. Gage)  So you don't know if that

16 injury is consistent with a failure to double lock the

17 handcuffs or not is your testimony.  Is that correct?

18    **A.  That's correct.**

19    Q.  Did you know that Mr. Saenz had slipped his

20 cuffs easily at Pebble Hills station from the back to

21 the front and front to the back again without any

22 assistance?

23    **A.  Did I know of that?**

24    Q.  Yes.

25    **A.  Yes, after Matthews mentioned it.**

168

1           (Exhibit marked, No. 40.)

2    Q.  (By Mr. Gage)  Let's mark as Exhibit 40 the

3 statement that you gave to the shooting review board on

4 April 29th, 2016, which is approximately 40 pages in

5 length.

6           When you gave that statement, were you

7 truthful and accurate?

8    **A.  To the best of my knowledge, yes, sir.**

9    Q.  Let's turn to page 25, lines 17 to 22.

10           I'll read the question and you read the

11 answer where it says, "Officer Romero."  Okay?

12    **A.  Uh-huh.**

13    Q.  Yes?

14    **A.  I'm sorry?**

15    Q.  Yes, you'll do that?

16    **A.  Yes.**

17    Q.  All right.

18           Question:  Did you know that he had

19 slipped his cuffs easily at Pebble Hills station from

20 the back to the front and front to the back again

21 without any assistance?

22           What was your testimony under oath?

23    **A.  "Oh, no, I didn't know that, sir."**

24    Q.  Question:  You didn't know that?

25           Answer?

169

1    **A.  "No."**

2    Q.  Did you ever change that testimony or correct

3 it?

4    **A.  I do not recall, sir.**

5    Q.  You do not recall doing that.  Correct?

6    **A.  Yes.**

7    Q.  Were there times when Daniel was under your

8 custody and control where he would yell as if he was in

9 pain for some reason?

10           MR. ORTEGA:  Objection, assumes facts not

11 in evidence and calls for speculation.

12    Q.  (By Mr. Gage)  You can answer.

13    **A.  As if he was in pain?**

14    Q.  Correct.

15    **A.  No, I don't know if he was in pain or not.**

16    Q.  Okay.  Let's go back to your statement in

17 Exhibit 39.

18           At page 3 of the statement, second to

19 last paragraph from the bottom, "While we are en

20 route."

21           Do you see that portion?

22    **A.  What paragraph?  I'm sorry.**

23    Q.  Second to last.

24    **A.  Okay.**

25    Q.  Second to last.  If you go to the --

170

1    A.   I see it now.  I see it.

2    Q.   The fourth line after the statement, "Is that

3  a Lincoln car or Hummer?" did you write, "He kept

4  yelling like if he was in pain for some reason"?

5    A.   That's -- that's the statement I gave, yes.

6    Q.   Okay.  And you wrote that referring to

7  Mr. Saenz.  True?

8    A.   That is correct.

9    Q.   When you were walking into the jail with

10  Officer Flores, did he ever tell you -- before you

11  learned of an injury to Daniel's head, did he ever tell

12  you, "Watch his head, watch his head," words to that

13  effect?

14    A.   No, I don't remember him telling me.

15    Q.   Was there anything that you saw as you were

16  walking with Daniel indicating to you that you had to

17  watch out for Daniel's head?

18    A.   Was Mr. Saenz doing something that indicated I

19  had to watch out for his head?

20    Q.   Yes.

21    A.   Besides him -- him moving his head around, no,

22  sir, I -- no.

23    Q.   In other words it was a surprise to you when

24  Daniel's head wound up striking the doorjamb.  Correct?

25    A.   That is correct, it was.

171

1    Q.   The only way that you were aware that

2  Officer Flores would know to tell you in advance,

3  "Watch his head," would be if Officer Flores was about

4  to push Daniel so that his head would strike the

5  doorjamb.  Correct?

6         MR. ORTEGA:  Objection, calls for

7  speculation.

8         MR. JIM DARNELL:  Same objection.

9    A.   I don't know if Mr. Flores knew that Mr. Saenz

10  was going to create that type of injury to himself.

11    Q.   (By Mr. Gage)  I don't know if that's

12  answering my question.  We'll have it read back and you

13  can answer a second time, please.

14         (The Court Reporter read back:  The only

15              way that you were aware of that Officer

16              Flores would know to tell you in

17              advance, "Watch his head," would be if

18              Officer Flores was about to push Daniel

19              so that his head would strike the

20              doorjamb.  Correct?)

21         MR. ORTEGA:  You already gave an answer.

22    Q.   (By Mr. Gage)  You can answer.  Yes or no.

23         MR. ORTEGA:  He gave an answer already.

24         MR. GAGE:  It was not unresponsive.

25         MR. ORTEGA:  He doesn't have to give you

172

1  a yes or no answer.  He said that he doesn't know what

2  was in the mind of Officer Flores at the time.

3    Q.   (By Mr. Gage)  I still want to know.  A yes or

4  a no.

5    A.   Like I said, sir, he didn't -- he didn't say

6  anything about watching -- watch -- watching out or

7  anything like that.  I don't recall him saying that.

8  And I don't know what he was thinking at the time

9  either.

10    Q.   When you got to the door, it was opened by

11  Officer Flores to enter the jail.  Correct?

12    A.   That is correct.

13    Q.   And it was at that time that Daniel Saenz

14  dropped to the ground and fell on his knees.  Is that

15  correct?

16         MR. JIM DARNELL:  Object to form,

17  misstatement of the evidence.

18         MR. ORTEGA:  Same objection.

19    Q.   (By Mr. Gage)  You can answer.

20    A.   It seemed like Mr. Saenz dropped to the -- to

21  the ground.  That's what it seemed like and that's when

22  we proceeded to continue to attempt to escort him

23  through the -- the -- the door and that's when he hit

24  his head on the threshold.

25    Q.   So drops to the knees, escorting him, hits his

173

1  head on the threshold.  That's the sequence.  True?

2         MR. ORTEGA:  Objection --

3         MR. JIM DARNELL:  Misstatement of

4  evidence.

5         MR. ORTEGA:  Same.

6    A.   It seemed, once again, that he dropped to his

7  knees, sir.

8    Q.   (By Mr. Gage)  Then you escorted him and then

9  he bangs his head.  That's the sequence.  Correct?

10    A.   The door opens and we attempt to escort him,

11  that's when he begins to do the movements that he does

12  side to side, back and forth, and that's when he hits

13  his head on the door frame.

14    Q.   So what you're saying is my statement is the

15  correct sequence.  Right?

16    A.   What statement is that?

17    Q.   The door is opened, he -- Daniel dropped

18  towards the ground, you start to escort him, and then

19  he bangs his head.

20         MR. ORTEGA:  Objection, misstates his

21  testimony.  Asked and answered.

22    Q.   (By Mr. Gage)  Go ahead.

23         MR. JIM DARNELL:  Same objection.

24    A.   Like I said I don't know if he dropped to the

25  ground.  That's the only -- that's the only part

174

1  that --
2    Q.  (By Mr. Gage)  Sequence is door is opened by
3  Flores, Daniel goes towards the ground at least
4  partway, you and Flores escort him, and then his head
5  hits the doorjamb.  Correct?
6        MR. ORTEGA:  Objection, misstates his
7  testimony, asked and answered.
8    Q.  (By Mr. Gage)  Go ahead.
9        MR. JIM DARNELL:  Same objection.
10   **A.  Like I said before, it seemed like Mr. Saenz**
11 **had dropped to the floor because of his weight;**
12 **however, I do not -- I'm not certain that he did or**
13 **not.  As we proceeded to continue to escort Mr. Saenz**
14 **through the door, that's when he hit his -- his head on**
15 **the door frame.**
16   Q.  (By Mr. Gage)  Was there anything that
17 Daniel Saenz was doing at the time that his door [sic]
18 hit the door frame that would have justified either you
19 or Mr. Flores putting his head into the door frame in
20 any way, that use of force?
21       MR. ORTEGA:  Objection, calls for
22 speculation, calls for a legal conclusion.
23   **A.  No, I don't know if Mr. Saenz was doing**
24 **anything like that.  The -- how he created that injury,**
25 **it appeared to me that he created it to himself,**

175

1  **because me and Mr. Flores only had -- we were**
2  **attempting to gain control of him, but he -- he, like I**
3  **said, was swinging his head side to side, back and**
4  **forth, and that's when he went into the door frame.**
5    Q.  Before lunch, remember, I asked you a series
6  of questions at different points whether you had
7  dragged Daniel Saenz at any point.  Do you remember
8  those?
9    **A.  I remember those questions.**
10   Q.  And each time you told us that you did not
11 drag him, you carried him.  Right?
12   **A.  That is correct.**
13   Q.  So I want to look at your statement now at
14 page 4 of Exhibit 39.
15       We're in the large paragraph sort of at
16 the middle, it says, "Once we were by the county jail
17 doors."  That's the start of the paragraph.  Do you see
18 it?
19   **A.  I see it, sir.**
20   Q.  If you go down, you can count one, two, three,
21 four, five, six -- seven lines down, in the middle, it
22 says, "Once the door was opened, Officer Flores kept it
23 open as best he could as we were trying to get ahold of
24 Arrestee Saenz's arms."
25       Do you see where I am?

176

1    **A.  I see it, sir.**
2    Q.  The next sentence says, "At this time Arrestee
3  Saenz dropped to the ground and fell on his knees.
4  Both Officer Flores and I grabbed ahold of Arrestee
5  Saenz's arms and did not let him drop completely to the
6  ground."
7        That's truthful and accurate.  Correct?
8    **A.  Yes, sir.**
9    Q.  Next it says, "We then dragged Arrestee Saenz
10 in through the county jail door."
11       Do you see that?
12   **A.  I see it, sir.**
13   Q.  So that's testimony of dragging as opposed to
14 carrying different than what you've testified to this
15 morning.  Correct?
16   **A.  Yes, sir.**
17       MR. ORTEGA:  Objection, argumentative.
18       MR. JIM DARNELL:  Same objection.
19   **A.  At the time that's what it felt like, but we**
20 **were attempting to carry Mr. Saenz.  And that's --**
21 **that's what I remember, they -- them asking that -- the**
22 **officers -- or the detectives asking me at the time.**
23   Q.  (By Mr. Gage)  Dragging is different than
24 carrying.  Agreed?
25   **A.  I agree.**

177

1    Q.  Your statement continues:  After we then
2  dragged Arrestee Saenz in through the county jail door,
3  as Arrestee Saenz was right inside the threshold of the
4  county jail entrance door, I saw that he started
5  shaking his head from side to side.
6        So it was after he was being dragged, you
7  saw his head being shaked.  Correct?
8        MR. JIM DARNELL:  Object to form,
9  misstatement of the evidence.
10       MR. ORTEGA:  Same objection.  And best
11 evidence rule as it pertains to the video.
12   Q.  (By Mr. Gage)  You can answer.
13   **A.  I'm sorry.  Can you repeat the question,**
14 **please.**
15       (The Court Reporter read back:  Your
16       statement continues:  After we then
17       dragged Arrestee Saenz in through the
18       county jail door, as Arrestee Saenz was
19       right inside the threshold of the county
20       jail entrance door, I saw him and he
21       started shaking his head from side to
22       side.
23       So it was after he was being dragged, you
24       saw his head being shaked.  Correct?)
25   **A.  It was during that process, sir.**

178

1    Q.   (By Mr. Gage)  So is that a yes or a no?

2    A.   Like I said it was during that process, so I

3 would have to say yes.

4    Q.   Then you continue at the last sentence of the

5 same paragraph, "We kept dragging him past the door so

6 he would not hit himself again."

7         Do you see that?

8    A.   I see it.

9    Q.   Again, earlier before lunch, you claimed you

10 were carrying him, not dragging him.  Do you remember

11 that testimony?

12   A.   I remember.

13   Q.   Next paragraph, "We dragged him past the gun

14 lockers and we had him stand up against the metal

15 doors."

16        Is that the statement you wrote,

17 including the words "dragged"?

18   A.   This is a statement I provided to the

19 detective, yes, sir.

20   Q.   Did Officer Flores ever tell you "Watch out,"

21 before he shot Daniel?

22   A.   No, not to my recollection.

23   Q.   Did you receive any training on what to do to

24 avoid a situation where you would not be physically

25 able to keep up with a prisoner based on his behavior?

179

1    A.   At that point?

2    Q.   Did you receive any training ever?

3    A.   That I recall, no, sir.

4    Q.   On March 8, 2013, you felt that the behavior

5 of Daniel combined with his physical fitness, that it

6 should be elevated so that greater precautions should

7 have been taken care of.  Correct?

8         MR. ORTEGA:  Objection, vague.

9         MR. JIM DARNELL:  Same objection.

10   A.   As far as what -- what actions of Mr. Saenz?

11   Q.   (By Mr. Gage)  Before you left Pebble Hills,

12 did you feel that the behavior of Daniel or the

13 behavior -- and his extreme physical fitness elevated

14 the level of care that you should have taken that day?

15   A.   Before leaving Pebble Hills?

16   Q.   Correct.

17   A.   It heightened my -- my awareness and concern,

18 yes.

19   Q.   What did you do to take greater care and

20 precaution because your awareness was heightened?

21   A.   We -- at the -- at the Pebble Hills station

22 you're asking?

23   Q.   Correct.

24   A.   We placed him directly behind us -- in the

25 compartment behind us to keep a direct line of sight on

180

1 him.

2    Q.   And that's the only thing you did the entire

3 time that you were transporting or escorting Daniel is

4 putting him behind you.  Correct?

5    A.   As far as to prevent what, sir?

6    Q.   Having greater caution and care because of the

7 way Daniel looked and acted.

8    A.   From -- at transporting, yes, putting him

9 in -- putting him directly behind the passenger seat of

10 the van.  And when he was bashing his head on the

11 ground outside the county jail, putting my arm

12 underneath his head to prevent further injury.

13   Q.   Did you have a discussion with anyone involved

14 in the transport of Daniel to have greater care or

15 caution because of the way he looked and acted?

16   A.   I believe it -- I believe it was only

17 expressed with Mr. Flores.

18   Q.   So you did have a conversation about greater

19 caution.  Correct?

20   A.   Yes.

21   Q.   Let's have you look at your statement in

22 Exhibit 40.

23        And this is a statement that you looked

24 at within the past two or three days.  Correct?

25   A.   This statement?

181

1    Q.   Yes.

2    A.   No.

3    Q.   All right.  In any event this is a statement

4 you gave under oath.  Right?

5    A.   I don't remember if I was under oath or not,

6 sir.

7    Q.   You had an obligation to tell the truth as a

8 police officer.  Right?

9    A.   Yes, sir.

10   Q.   Let's have you look at page 4, lines 16 to 24.

11 You can read that to yourself.  I'm going to summarize

12 it just to help set up my question for you, but you can

13 confirm my summary.

14        This is a question asked of you about the

15 behavior of Daniel, what you saw and his fitness,

16 whether or not you thought there should be a greater

17 level of precaution and you indicated that, yes, you

18 thought it should be.

19        Do you see that testimony which I have

20 summarized?

21   A.   That's correct.

22   Q.   Then you're asked at line 25 to page 5, line

23 2.

24        Question:  But nobody ever asked about

25 that at the time?

182

1              As far as greater caution.
2              And your answer was, "No, sir."
3              Do you see that?
4     A.   I saw it, sir.
5     Q.   All right.  So you did not say at that point
6  that you had a conversation with Officer Flores about
7  greater precaution, did you?
8     A.   At what point, sir?
9     Q.   When you were asked the question there in your
10  interview?
11     A.   That you're asking me about the interview or
12  at the time of the -- of March 8th?
13     Q.   You were asked a question during the shooting
14  review board whether you spoke to anybody about the
15  need for greater precaution and you said no.  Correct?
16     A.   That's correct, sir, according to the
17  statement.
18     Q.   You did not say at that time that you had a
19  conversation with Officer Flores about greater
20  precautions, did you?
21     A.   I did not, sir.
22     Q.   When Daniel hit his head on the door or
23  someone hit his head on the door, did you believe that
24  the jail was going to accept him or not accept him as a
25  prisoner?

183

1     A.   I didn't know at the time, sir.
2     Q.   You thought he might be accepted?
3     A.   Like -- like I said I don't know at the -- I
4  didn't know at the time if he was going to be accepted
5  or not.
6     Q.   Let's look at page 6 of Exhibit 40, lines 5
7  through 10.  I'll read the question, you read your
8  answer.
9              Question --
10     A.   What page?  I'm sorry.
11     Q.   Page 6, line 5.  Your answer is at line 10.
12              Question: Officer Romero, my name is
13  George Atkins.  When Mr. Saenz hit his head on the
14  door, you being a G4 at the time, you're aware that the
15  jail would not accept a prisoner with an injury.
16              What did you respond?
17     A.   "Yes, sir."
18     Q.   So you knew that the injury to the head of
19  Mr. Saenz was going to result in the jail not accepting
20  him.  Correct?
21     A.   According to this statement, yes, sir.
22     Q.   Did you ever tell Officer Flores that there
23  would be no need to take Mr. Saenz upstairs because he
24  was just going to be called back?
25     A.   No, I did not, sir.

184

1     Q.   All right.  You can turn that over.  You don't
2  need to keep reading that until I get to it again.
3              Were you thinking when you saw the blood
4  on Daniel that the jail was not going to accept him?
5     A.   No, I was not thinking that.
6     Q.   You weren't.
7              Let's look at your answer on page 6
8  starting at line 22 is the relevant portion.
9              MR. ORTEGA:  Which exhibit?
10              MR. GAGE:  Page -- it's Exhibit 40, page
11  6.
12     Q.   (By Mr. Gage)  Line 22, on the right side,
13  your answer, it says:  As we were going upstairs to go
14  to booking or to see the nurse, I kept thinking to
15  myself, man -- when I saw the blood on Mr. Saenz, I
16  said, "I don't think they're going to take him, but I
17  just kept that in myself."
18              That was your testimony.  Correct?
19     A.   According to this statement, yes, sir.
20     Q.   So you really did think that the jail was not
21  going to accept him.  Correct?
22     A.   Yes, sir, I thought that, but I -- my only
23  concern was to get him medical attention to the nurses.
24              MR. GAGE:  Move to strike as
25  nonresponsive.

185

1     Q.   (By Mr. Gage)  You thought the jail was not
2  going to accept him.  Right?
3     A.   According to this statement, yes, sir.
4     Q.   According to your recollection as well.
5  Right?
6     A.   That's correct.
7     Q.   All right.  You can close that for a moment
8  again.
9              When you got to Pebble Hills, did you
10  have any information as to why Daniel was arrested that
11  day?
12     A.   From my recollection I believe it was because
13  he had assaulted some -- an off-duty officer and some
14  people at a -- at a medical facility.
15     Q.   How did you learn that?
16     A.   I don't remember who told me that, sir.
17     Q.   When you saw Daniel, did you think this would
18  be a difficult transport, at Pebble Hills?
19     A.   At what point?
20     Q.   When you were still at Pebble Hills?
21     A.   I know.  At the point of the transport or when
22  I first got there?
23     Q.   Any time from the time you first arrived to
24  Pebble Hills until he went to the van.
25     A.   When we were about to transfer Mr. Saenz, I --

186

1  I -- I thought to myself it was going to be a difficult
2  transport.
3     Q.   Did you take any special precautions since you
4  thought it was going to be a difficult transport?
5     A.   Other than sitting him in the back directly
6  behind the passenger's seat, no, sir.
7     Q.   Did you have a heightened level of awareness
8  because of the situation that you saw Daniel in while
9  at Pebble Hills?
10    A.   That is correct, sir.
11         MR. JIM DARNELL:  Brad, can we take just
12 one moment.  I'm going to give Jeep this stuff.  You
13 don't need to stop, let me just --
14         MR. GAGE:  You can switch sides, I'll
15 just keep asking questions.
16    Q.   (By Mr. Gage)  In your mind when -- Daniel,
17 when his head hit the doorjamb, was that an intentional
18 act?
19    A.   On whose behalf, sir?
20    Q.   Did you believe it was intentional on Daniel's
21 part to injure himself?
22    A.   I don't know what he was thinking, sir, but it
23 seemed like he -- it seemed like he wasn't thinking at
24 the time, but I don't know what he was thinking when he
25 injured himself.

187

1     Q.   So you do not know that it was an intentional
2  act.  Is that what you're telling me?
3     A.   I do not know, sir.  Yes, sir.
4     Q.   I'm sorry?
5     A.   I do not know, yes.
6     Q.   All right.  Did you say anything to Daniel
7  from the time that you walked him from the van until
8  the time that you had put your weapons away?
9     A.   From the time that we arrived at the county
10 facility --
11    Q.   Correct.
12    A.   -- then walked into the facility?
13         I don't remember.  I don't remember
14 saying anything to him.
15    Q.   Did he say anything to you that you can
16 recall?
17    A.   No, he was just making grunting noises and
18 groaning noises.
19    Q.   Did you hear Flores say anything?
20    A.   I don't -- I don't recall, sir.
21    Q.   You don't recall him saying anything?
22    A.   I don't recall.
23    Q.   When you got outside on the sally port, did
24 you hear any conversations between Officer Flores and
25 Mr. Saenz?

188

1         MR. ORTEGA:  As they're going in or
2  leaving the jail?
3     Q.   (By Mr. Gage)  After you left the jail when
4  he's outside.
5         MR. JEEP DARNELL:  Object, hearsay.
6     A.   When we went back down?
7     Q.   (By Mr. Gage)  Yeah.  Yeah.
8     A.   I don't know if they had any conversation.
9     Q.   You didn't hear anything.  Correct?
10         MR. JEEP DARNELL:  Same objection.
11    A.   I don't recall, sir.
12    Q.   (By Mr. Gage)  When you say you don't recall,
13 that is you do not recall any conversation between
14 Officer Flores and Daniel Saenz when they were outside
15 in the sally port after Flores had gone to retrieve his
16 guns and came back outside.  Is that a true statement?
17         MR. JEEP DARNELL:  Same objection.
18    A.   No, I don't recall any -- any interaction --
19 well, anything said from Mr. Saenz to Mr. Flores or
20 vice versa.
21    Q.   (By Mr. Gage)  Did you and Mr. Saenz have a
22 conversation at any time from the point you dragged him
23 outside and Flores went in until he was shot?
24    A.   No, sir.
25         MR. JEEP DARNELL:  Brad, real fast.  By

189

1  agreement of the parties, I, Jeep Darnell, is taking
2  over objections and questions here.
3         MR. GAGE:  Right.
4         MR. JEEP DARNELL:  Just so we don't
5  forget or anything like that, there was no objection to
6  that from any of the parties.
7         MR. GAGE:  We said that was fine.
8     Q.   (By Mr. Gage)  Did Officer Flores tell you
9  that his supervisor told him to keep Daniel on the
10 ground waiting for medical services rather than to
11 stand him up?
12         MR. JEEP DARNELL:  Objection, hearsay.
13    A.   No, sir, I don't know if -- what -- what was
14 said.
15    Q.   (By Mr. Gage)  So Officer Flores did not tell
16 you that.  Is that correct?
17    A.   That is correct.
18    Q.   Let's have you look at page 10 of your
19 testimony, Exhibit 40.  Never mind.
20    A.   Page 10 you said?
21    Q.   I misread it.  I'm not going to follow up on
22 that.  I misread it.  It would be misleading you if I
23 went down that path so I'm not going to do that.
24         Did you ever hear Flores say that he was
25 going to pull up Daniel's pants so it would be more

190

1 humane?

2 **A.   If -- you're asking me if he ever said those**

3 **words exactly?**

4 Q.   Yes.

5 **A.   No, I don't recall him saying that.**

6 Q.   When Daniel injured his head, did it appear to

7 you that he was trying to strike you in any way?

8 **A.   I don't know if he was trying to strike me or**

9 **not.  I don't know what Mr. Saenz was thinking.**

10 Q.   It did not appear to be against you, did it?

11 **A.   No, not that I -- I could recall.**

12 Q.   All right.  So there's no double negative in

13 it.  Did it appear to you that Daniel tried to strike

14 you ever with his head?

15 **A.   No.**

16 Q.   When you were outside the sally port, Daniel

17 was sitting down leaning against your legs, at that

18 point did you feel that you were in danger?

19 **A.   I felt concerned, yes.**

20 Q.   And what were you concerned about, your job?

21 **A.   My job and the fact that Mr. Saenz could at**

22 **any one moment get up and either be combative with me**

23 **or run away.**

24 Q.   Were you saying anything to him at that point?

25 **A.   Not that I recall, sir, no.**

191

1 Q.   When you were with him, he was sitting down,

2 were you able to have control of him while in the sally

3 port when it was just the two of you?

4 **A.   When I was with who, sir?**

5 Q.   You and Daniel.  Did you feel that you had

6 control of him at that point?

7 **A.   Outside of the sally port?**

8 Q.   Correct.

9 **A.   When it was just him and me?**

10 Q.   Yes.

11 **A.   I had the most -- I believe I had the most**

12 **basic control.**

13 Q.   So you're saying yes, you did have control of

14 him.  Correct?

15 **A.   What do you mean by "control," sir?**

16 Q.   You don't know what having control over him

17 means?

18 **A.   I mean I couldn't control what his actions**

19 **were, but I mean I had -- I had him in my view and I**

20 **was only attempting to -- I was trying my best to keep**

21 **him upright.**

22 Q.   So are you saying you had control or you did

23 not have control?

24 **A.   I would have to say at that moment, yes, I**

25 **did.**

192

1 Q.   Do you remember talking to Daniel while it was

2 just the two of you outside in the sally port, patting

3 him, saying "Everything's going to be okay"?

4 **A.   I was trying to encourage him, give him**

5 **encouragement as far as to cooperate with us.  I**

6 **remember saying something along the line that --**

7 Q.   So is that a yes or a no to the question?

8 **A.   Yes.**

9 Q.   When you were outside in the sally port with

10 Daniel, did it appear to you that he was either

11 unconscious or asleep?

12 **A.   I'm not sure, sir, I don't know if he was**

13 **unconscious or asleep.**

14 Q.   Did it feel to you like he was asleep or

15 unconscious?

16 **A.   I don't know.  He had -- the only thing I**

17 **could see was that he had his eyes closed.**

18 Q.   Let's go to page 12 of your statement in

19 Exhibit 40.

20       At line 2 you said, "And I was holding

21 him like this and at one point I leaned against the

22 wall."

23       Question:  Right.

24       Then you answer, "And then he kind of

25 started squirming around and I was kind of active, hold

193

1 him back down again.  But I felt like I -- I felt like

2 he was asleep."

3       Do you see that?

4 **A.   I see it.**

5 Q.   So you did at the time when you were outside

6 with him feel like he was asleep.  True?

7 **A.   That's correct.**

8 Q.   You can close that again.

9       With respect to when the two of you were

10 on the ground -- well, withdraw.

11       Flores comes out.  He decides to stand

12 Daniel up with your assistance.  Correct?

13 **A.   That is correct.**

14 Q.   Then a little struggle ensues where all three

15 of you fall on to the ground.  Correct?

16 **A.   That's correct.**

17       MR. JEEP DARNELL:  I'm going to object to

18 facts not in evidence.

19 Q.   (By Mr. Gage)  Then when you're on the ground,

20 you're in this struggle, what were you thinking,

21 feeling, at that point?

22 **A.   Well, I was already winded, my back was**

23 **hurting from -- I remember my back was feeling sore and**

24 **my legs were -- my legs were really sore, burning.  I**

25 **was getting winded and I was having trouble getting**

194

1  control of Mr. Saenz and that's when he started, once
2  again, bashing his head on the ground and all I could
3  think of is what he told me -- Officer Flores told me
4  to put my hand underneath his head.  I gained some
5  control of that, but the rest I did not have control.
6  And I remember thinking I'm not going to be heavy
7  enough to -- to keep my weight on his -- on his -- on
8  his -- on his body to gain control of him.
9      Q.  Let's read your statement, page 12, line 20 to
10  page 13, line 5 from Exhibit 40.
11      A.  Page 12, line what?  I'm sorry.
12      Q.  Line 20.
13      A.  Yes, sir.
14      Q.  Question:  He's going back to the ground and
15  now you're in a struggle.  What were you feeling?  What
16  was running through your head at that point in time?
17          Answer:  Here we go again, that we --
18  here we go again.  I was thinking that I needed to get,
19  you know, the strongest grip I could on him and try to
20  put my -- my whole weight on top of him, that way he
21  could stop, you know, moving around.  And I was feeling
22  tired.  I was feeling windy -- winded, actually.
23          That was your testimony to that question
24  previously under oath.  Correct?
25      A.  That is correct.

195

1      Q.  All right.  You can close that again.
2          When you were struggling with Daniel, did
3  you have any feelings as to what his intent was?
4          MR. ORTEGA:  Objection, calls for
5  speculation.
6      A.  No.
7          MR. JEEP DARNELL:  Same objection.
8      Q.  (By Mr. Gage)  I'm sorry?
9      A.  I'm not sure what Mr. Saenz was attempting to
10  do, sir.
11      Q.  Did you believe he was trying to harm you at
12  that point?
13          MR. ORTEGA:  Objection, calls for
14  speculation.
15      A.  I'm not sure if -- what he was trying to do,
16  sir, no.
17      Q.  (By Mr. Gage)  You have no idea one way or
18  another.  Is that your testimony?
19      A.  Yes, sir.
20      Q.  Did you think he was trying to get away from
21  you at all?
22      A.  It seemed that way, sir.
23      Q.  Okay.  And that's the only thing that you
24  thought his intent was was to get away from you rather
25  than to cause you any harm.  True?

196

1      A.  I'm not sure, sir, once again what Mr. Saenz
2  was thinking.
3      Q.  Let's go to page 40 -- I'm sorry -- Exhibit
4  40, page 13.
5          Line 14 is the question:  I guess the
6  question the commander has, at this point in time, what
7  was -- what do you believe his intent to be?  Do you
8  believe his intent was to harm you or to affect some
9  sort of escape just to get away from you guys?
10          You said, "By banging his head on the
11  ground or" --
12          Question:  No.  The whole deal to going
13  down on the ground.
14          What did you testify to?  You can answer.
15      A.  (Reading) Yeah, I think he was trying to
16  get -- just -- to just get us off of him and get away
17  from us as fast as -- as he could somehow.
18      Q.  So that's what -- at the time you were asked
19  that question before you were able to give an opinion
20  on his intent, weren't you?
21      A.  That is correct.
22      Q.  And you were not aware of an intent by
23  Mr. Saenz to harm you, what you were expecting was he
24  was trying to get away from you.  Correct?
25          MR. ORTEGA:  Objection, calls for

197

1  speculation.
2          MR. JEEP DARNELL:  Same objection.
3      Q.  (By Mr. Gage)  Go ahead.
4      A.  Whether or not he was trying to hurt me or
5  Officer Flores or somebody else or himself, I don't
6  know if he was trying to do that.
7      Q.  You just knew he was trying to get away.
8  Correct?
9      A.  That's correct.
10      Q.  And what you were most concerned about with
11  respect to if Daniel got away was that there was a new
12  contract between G4S and the El Paso Police Department
13  and you thought if he got away, you could get fired.
14  Correct?
15          MR. JEEP DARNELL:  Objection, calls for
16  speculation.
17          MR. ORTEGA:  Same objection.
18      A.  Whether or not the contract was going to -- or
19  I was going to get fired or not was -- I don't know,
20  but I had concerns for my job.
21      Q.  (By Mr. Gage)  Were you concerned that Daniel
22  was going to get away from you, that it was a new
23  contract and that you worried that then you were
24  not going to get to continue working?
25      A.  It was a concern, yes.

198

1    Q.   Do you believe that when a person is double
2  cuffed rather than single cuffed, it's much easier for
3  that person to get their hands in front of them than --
4           MR. ORTEGA:  Objection, calls for
5  speculation.
6           MR. JEEP DARNELL:  Same objection.
7    **A.   Than what?**
8    Q.   (By Mr. Gage)  Do you believe it's easier if a
9  person is double cuffed, that is two sets of handcuffs
10 are used rather than one set, is it easier for them to
11 get their hands from behind their backs to front of
12 them?
13          MR. ORTEGA:  Objection, calls for
14 speculation.
15   **A.   I don't know, sir.  It just depends on -- that**
16 **person's ability.**
17   Q.   (By Mr. Gage)  So you don't know if it's
18 easier when it's double cuffed versus a single set of
19 handcuffs.  Correct?
20          MR. ORTEGA:  Objection, calls for
21 speculation.
22          MR. JEEP DARNELL:  Same objection.
23   **A.   It just depends on different people's ability.**
24   Q.   (By Mr. Gage)  Let's read the relevant portion
25 of your testimony before at page 15 of Exhibit 40.

199

1  Lines 10 through 15 are the relevant items.
2           Question:  Why were you afraid he was
3  going to slip his hands in front of him?
4           Answer:  Because he was double cuffed.
5  And it's much easier for a person to get their hands
6  back in front of them with two cuffs.
7           Do you see that testimony of yours?
8    **A.   I see it, sir.**
9    Q.   So when you gave your statement in April of
10 2016, you knew that it's easier for a person when
11 they're double cuffed to get their hands in front of
12 them than when you're single cuffed.  True?
13   **A.   That is correct, according to this statement.**
14   Q.   Your statement -- this statement is your
15 statement that you gave under oath a year ago.  Right?
16   **A.   That's correct, sir.**
17   Q.   When you saw Daniel on the pavement --
18          MR. JEEP DARNELL:  I'm going to object to
19 that last question as misstating the facts.
20   Q.   (By Mr. Gage)  When you saw Daniel on the
21 pavement, did you feel that he could cause some injury
22 to his own head?
23   **A.   At what point when he was on the --**
24   Q.   After you guys stood him up and you went back
25 down again in the sally port?

200

1           MR. ORTEGA:  Objection, calls for
2  speculation.
3    **A.   Can you rephrase the question, please.**
4    Q.   (By Mr. Gage)  I'll be happy to.  You are out
5  in the sally port alone with Daniel, Flores comes back,
6  decides to stand Daniel up.  A little struggle ensues,
7  the three of you all fall on the ground.
8           Are you with me so far?
9    **A.   I am.**
10   Q.   After that point you saw what you thought was
11 Daniel's head hitting the ground.  Correct?
12   **A.   He was hitting the ground, yes, sir.**
13   Q.   So you decided on your own to put your hand
14 under his head to protect him.  Right?
15   **A.   That is correct.**
16   Q.   You didn't have anybody telling you to do
17 that, you just knew to do that based on your own
18 observations.  True?
19   **A.   Officer Flores mentioned it, yes, sir.**
20   Q.   So it wasn't that you saw Daniel with his head
21 on the ground that you thought would cause an injury,
22 it's that Officer Flores told you to put your hand
23 under him and that's why you did it.  Is that correct?
24   **A.   I do not recall completely, but yes, sir.**
25   Q.   Let's go to page 15 at the bottom and I'm just

201

1  going to have you look at the questions and answers
2  starting at line 21 to orient yourself on the time
3  frame of the question I'm going to ask you about.
4           MR. JEEP DARNELL:  What page?  I'm sorry.
5           MR. GAGE:  Page 15, line 21.
6    Q.   (By Mr. Gage)  So this is talking about a
7  struggle.  You had your hand by his face and then you
8  saw him on the pavement.  So you know where we're at
9  now.  Correct?
10   **A.   Yes.**
11   Q.   And your testimony at page 16, starting at
12 line 3 and going through line 7 is as follows --
13 actually line 4:  When I saw him doing that on the
14 pavement --
15          That is with his head.
16          (Reading) -- I was like, oh, this guy is
17 going to -- you know, he's going to cause more injury
18 to himself, so I put my hand underneath him like that.
19          Do you see that portion of your answer?
20   **A.   I see it, sir.**
21   Q.   So this is your saying that you saw Daniel
22 potentially hurting his head and you on your own
23 decided to put your hand under it.  Correct?
24          MR. ORTEGA:  Objection, misstates the
25 facts.

202

1           MR. JEEP DARNELL: Same objection.
2       Q.   (By Mr. Gage)  Go ahead.
3       A.   No, sir.  Officer Flores mentioned it and
4   that's when I put -- put my hand underneath his head.
5       Q.   Do you see anywhere in your testimony at pages
6   15 or 16 that Officer Flores had told you to put your
7   hand under his head?
8       A.   No, sir, I do not.
9       Q.   Before lunch we talked about whether you
10  carried or dragged Daniel and you said that you did not
11  drag him, that you carried him.  Do you remember that?
12      A.   I remember that, sir.
13      Q.   So let's go to page 17 now.  At line 3, on the
14  right side, you say:  My arms were -- they felt like
15  noodles, basically from having to drag Mr. Saenz from
16  the door all the way up.
17           Do you see that?
18      A.   I see it, sir.
19      Q.   So this is another statement you gave
20  previously under oath where you use the term "drag"
21  instead of "carry."  Correct?
22           MR. ORTEGA:  Objection, assumes facts not
23  in evidence.
24           MR. JEEP DARNELL:  Same objection.
25           MR. ORTEGA:  I don't know that you've

203

1   established that this was a statement under oath.
2       Q.   (By Mr. Gage)  You can answer my question.
3       A.   I'm sorry.  What was your question?
4           MR. GAGE:  I'll have it read back.
5           (The Court Reporter read back:  So this
6                is another statement you gave previously
7                under oath where you use the term "drag"
8                instead of "carry."  Correct?)
9       A.   According to this statement, yes, sir.
10      Q.   (By Mr. Gage)  Okay.  You can close that.
11           And how many employees worked for the
12  El Paso Police Department in 2013?  Since you worked
13  there you should probably know that.
14           MR. JEEP DARNELL:  Objection.
15           MR. ORTEGA:  Objection, lacks foundation,
16  calls for speculation.
17      Q.   (By Mr. Gage)  Go ahead.
18      A.   I don't know how many employees worked at the
19  El Paso Police Department in 2013.
20      Q.   Do you know how many sworn police officers
21  there were in 2013 when you worked there?
22           MR. JEEP DARNELL:  Same objection.
23      A.   No, sir.
24      Q.   (By Mr. Gage)  Do you have an estimate?
25           MR. JEEP DARNELL:  Same objection.

204

1       A.   No, sir, I don't.
2       Q.   (By Mr. Gage)  Do you know if it was more than
3   10?
4           MR. JEEP DARNELL:  Objection, ridiculous.
5       A.   Do I know if it was more than 10 officers that
6   worked for the El Paso Police Department back in 2013?
7       Q.   (By Mr. Gage)  Yes.
8       A.   Yes, sir, I knew that.
9       Q.   Do you know if it was less than 1,000?
10      A.   I don't know, sir.
11      Q.   Do you have any better estimate than it was
12  more than 10 and either more or less than 1,000?
13           MR. ORTEGA:  Objection, asked and
14  answered.
15           MR. JEEP DARNELL:  Objection.  There is
16  no proper answer to that question.
17      A.   I don't know how many officers were working at
18  the time for the El Paso Police Department -- how many
19  sworn officers were working for the El Paso Police
20  Department back in 2013.
21      Q.   (By Mr. Gage)  Do you know how many people
22  worked for the county and the county jail in March of
23  2013?
24           MR. JEEP DARNELL:  Objection, foundation.
25  Objection, speculation.

205

1       A.   No, sir, I do not know how many people worked
2   at the county jail.
3       Q.   (By Mr. Gage)  How many people were working
4   for G4S in March of 2013 to your understanding?
5       A.   At the company as a whole?
6       Q.   Yes.
7       A.   I do not know how many people were working for
8   G4S, sir.
9       Q.   Do you have any estimate?
10      A.   I do not, no, sir.
11      Q.   If you go to page 34, Exhibit 40, lines 10
12  through 14, do you see you're questioned about:  How
13  did you feel when you dragged him out and then
14  Officer Flores went back in and that double door closed
15  and you're outside with him by yourself?
16           You said, "I was concerned, sir."
17           Do you see that area?
18      A.   I see it, sir.
19      Q.   So once again the term dragging Daniel was
20  being used.  Correct?
21      A.   Where, sir?  In -- where?
22      Q.   Line 11.
23      A.   Yes, sir, I see it.
24      Q.   What you were concerned about when Flores left
25  was if Daniel was to get up and to come at you or take

206

1 off, you were going to lose your job.  True?
2                 MR. ORTEGA:  Objection, asked and
3 answered.
4                 MR. JEEP DARNELL:  Same objection.
5      A.   I'm not sure where you're seeing that, sir.
6      Q.   (By Mr. Gage)  I'm just asking a question
7 right now.  I'll have the question read back.  You can
8 close that for a moment to focus on my question.
9      A.   Your question was that if he got up and ran
10 would I lose my job?
11     Q.   Let me have the question read back for you so
12 you'll understand it.
13                MR. GAGE:  The objections are preserved.
14                (The Court Reporter read back:  What you
15                were concerned about when Flores left was
16                if Daniel was to get up and commence to
17                take off, you were going to lose your
18                job.  True?)
19     A.   That was one concern, yes, sir.
20     Q.   (By Mr. Gage)  That's the main concern that
21 you testified to in 2016.  True?
22                MR. JEEP DARNELL:  Objection, foundation.
23 Objection, assumes facts not in evidence.  Objection,
24 misstatement of the transcript.
25                MR. ORTEGA:  Same objections.

207

1                 MR. JEEP DARNELL:  And best evidence.
2      Q.   (By Mr. Gage)  Go ahead.
3      A.   That was -- like I said that was one concern
4 that if he gets up, that -- that'll -- that'll be my --
5 my job.  That was one concern, yes.
6      Q.   And if he -- if Daniel had gotten up and you
7 were left alone, did you have any thoughts of what you
8 were going to do?
9      A.   If Mr. Saenz got up?
10     Q.   Yes.
11     A.   At the moment I don't recall, sir, no.
12     Q.   Did you have a plan of what you were going to
13 do -- Flores leaves you alone, you were with Daniel --
14 what you were going to do if he should get combative
15 again?
16     A.   I don't recall at the time thinking any of
17 that, sir.
18     Q.   What do you think you would have done if
19 Daniel had gotten up?
20                MR. ORTEGA:  Objection, calls for
21 speculation.
22     A.   This is --
23                MR. JEEP DARNELL:  Same objection.
24     A.   This is hindsight, correct.
25                Now, thinking back on it, I would have --

208

1 if he had gotten up, I think I would have tried to gain
2 control of Mr. Saenz again, bang on the door to have --
3 or yell out for Flores, use some type of equipment on
4 my belt, things of that nature, yes.
5      Q.   (By Mr. Gage)  All right.  Let's have you turn
6 to page 36 of Exhibit 40.
7                 At the very top, they're talking about
8 you're there without a weapon, it's just you and
9 Daniel, what are you thinking.  Do you see that at the
10 very top?
11     A.   Yes, I see it.
12     Q.   Your answer was:  I was thinking I hope
13 Officer Flores gets back out here as fast as possible.
14 Like I said my main concern -- and I was -- I was
15 really concerned with the fact that if he -- that he
16 was going to get back up.  After I saw him kind of
17 jitter --
18                Question:  Define concerned.
19                Answer:  Concerned.  Like afraid he was
20 going to get up and, you know, come at me or take off
21 and there goes my job.
22                Do you see that?
23     A.   I see it, sir.
24     Q.   So the concern that you testified to about if
25 Daniel was to get up and do something when you were

209

1 alone was about your job with G4S security.  Correct?
2      A.   That's correct.
3                 MR. JEEP DARNELL:  Objection,
4 misstatement of the evidence.
5                 MR. ORTEGA:  Same objection.
6      Q.   (By Mr. Gage)  You were then asked, the very
7 next question:  What would you have done if he would
8 have got back up?
9                 Your answer:  I probably would have, you
10 know, started fighting him to keep him on the ground
11 again, sir.
12                Do you see that?
13     A.   I see it, sir.
14     Q.   And that's how you felt.  True?
15                MR. JEEP DARNELL:  That's an -- I'm going
16 to object as an improper impeachment.  He's testified
17 as to 20/20 hindsight, not what he thought at the time.
18                MR. GAGE:  That's not what the question
19 and answer is.
20                MR. JEEP DARNELL:  It's an improper
21 impeachment.
22     Q.   (By Mr. Gage)  Your testimony in front of this
23 board was not telling them, "Gee, this is my 20/20
24 hindsight."  You were testifying about how you felt at
25 the time.  True, sir?

210

1          MR. JEEP DARNELL:  He just testified
2  about that a minute ago.
3          MR. GAGE:  I don't want to hear your
4  testimony, I want to hear his.
5          MR. JEEP DARNELL:  I don't care what you
6  want to hear.  I'm going to keep my objection that it's
7  an improper impeachment.  His prior testimony today --
8          MR. GAGE:  You can say improper
9  impeachment.  I just don't want you to have --
10          MR. JEEP DARNELL:  His prior testimony
11  today was that --
12          MR. GAGE:  Wait a second.
13          MR. JEEP DARNELL:  -- what he answered
14  was from 20/20 hindsight.  He did not recollect what he
15  was thinking at the time.  Improper.
16          MR. GAGE:  Let's mark this, please, in
17  case we have to go in front of the judge.
18          MR. JEEP DARNELL:  Are you threatening
19  me?
20          MR. GAGE:  I'm going to let you know --
21  I'm telling you that if you keep making speaking
22  objections trying to coach a witness, I'll take you
23  into court.  This is a meet and confer, it's not a
24  threat.
25          MR. JEEP DARNELL:  That's a threat,

211

1  number one.
2          MR. GAGE:  It's an action that I'm going
3  to do --
4          MR. JEEP DARNELL:  That's a threat,
5  number one.  Number two --
6          MR. GAGE:  Let me finish my statement.
7          MR. JEEP DARNELL:  Number two --
8          MR. GAGE:  Let me finish.  I will give
9  you the courtesy, I'll let you say everything you want,
10  I expect the same from you.
11          MR. JEEP DARNELL:  You have it.
12          MR. GAGE:  Here is what I'm telling you
13  so it's crystal clear.
14          There are rules of evidence and there are
15  rules of decorum during a deposition.  You have the
16  right to make a legal objection.  You can say any legal
17  objection that you deem is proper.
18          What you do not have the right to do,
19  however, is to start to make a speech in which you're
20  trying to coach a witness -- especially when it's not
21  even yours -- into how to respond to a question.
22  There's no legitimate purpose for you to do that.
23          All you have to do is make your legal
24  objection.  You can say it's improper impeachment.  The
25  nice thing about that is later on you might come up

212

1  with 10 different reasons and you only have one today
2  and you get to explain all that to a judge.
3          If it's improper impeachment, then it's
4  not going to be usable.  But what I'm not going to
5  tolerate -- and this is part of my meet and confer --
6  is I'm not going to allow you to start to try to
7  suggest an answer to the witness.  It's just not going
8  to happen.
9          MR. JEEP DARNELL:  I did not suggest an
10  answer to the witness.  Number one, you argued with my
11  objection, so when you argued with my objection, I
12  argued with you.  I was not coaching the witness.  You
13  accuse me of being unethical again and we will have an
14  issue in front of the judge.  Do not threaten me.
15  Don't accuse me of being unethical.  You argued, I
16  responded to your argument.  The witness is free to
17  testify as he wants to.
18          MR. GAGE:  I'm not accusing you of being
19  unethical --
20          MR. JEEP DARNELL:  You absolutely did.
21          MR. GAGE:  -- but I am certainly accusing
22  you of misconduct in connection with the way that you
23  are coaching a witness.
24          MR. JEEP DARNELL:  I did not coach the
25  witness.

213

1          MR. GAGE:  And if you want to try to
2  bring this transcript in front of the judge, I welcome
3  it.
4          MR. JEEP DARNELL:  I did not coach the
5  witness.
6          MR. GAGE:  And if you keep coaching the
7  witness, we will bring this in front of a judge.
8          MR. JEEP DARNELL:  Again, you're
9  threatening me.  I did not coach the witness.  I
10  responded to your argument to my objection.
11          MR. GAGE:  Can you read back the
12  question, please.
13          (The Court Reporter read back:  Your
14          testimony in front of this board was not
15          telling them, "Gee, this is my 20/20
16          hindsight."  You were testifying about
17          how you felt at the time, sir.)
18    Q.   (By Mr. Gage)  Correct?
19    A.   I felt that the board was asking me how I felt
20  at that time, sir, and what -- what I thought and what
21  I saw at that time and what I would have done
22  differently.  That's what I -- that's what I felt the
23  shooting -- shooting review board was about.
24    Q.   Right.  What -- how you were feeling at the
25  time the events took place.  Correct?

214

1    A.   That's correct.

2    Q.   When you were outside in a struggle with

3 Daniel and Officer Flores, from the time that you stood

4 Daniel up all the way until he was shot, did Flores

5 ever tell you that he was being hurt at any time or in

6 any way by Daniel?

7         MR. JEEP DARNELL:  Objection, hearsay.

8    A.   I'm sorry.  That he was being what?  I'm

9 sorry.

10   Q.   (By Mr. Gage)  Hurt.  Did -- did Flores ever

11 tell you that Daniel hurt him?

12   A.   Not that -- not to my knowledge he didn't

13 express that.

14   Q.   Did Flores ever tell you that Daniel was

15 grabbing him anywhere?

16   A.   At any point?

17   Q.   Yes.

18   A.   No, sir.

19        MR. JEEP DARNELL:  Objection, hearsay.

20   Q.   (By Mr. Gage)  Did Flores ever tell you that

21 Daniel grabbed his crotch or testicles?

22        MR. JEEP DARNELL:  Objection, hearsay.

23   A.   No, sir, Mr. Flores never expressed that.

24        I said, no, Mr. Flores never expressed

25 that he was -- that Mr. Saenz grabbed him in the

215

1 crotch.

2    Q.   (By Mr. Gage)  Did Mr. Flores ever tell you

3 that Daniel bent his fingers back at all?

4    A.   No, Mr. --

5         MR. JEEP DARNELL:  Same objection.

6    Q.   (By Mr. Gage)  You said what?

7    A.   Not -- not to my knowledge, no.

8    Q.   You've seen the videotape of the shooting many

9 times.  Correct?

10   A.   Yes, sir.

11   Q.   When is the most recent time that you looked

12 at the video?

13   A.   Again, within -- within the last 72 hours.

14   Q.   About how much time did you spend looking at

15 the videotapes of the shooting?

16   A.   About an hour, what the video lasts more or

17 less.

18   Q.   Did you view it on YouTube or elsewhere?

19   A.   Since I viewed the -- I viewed the

20 video, yes, on YouTube, social media and during the --

21 during when I was called at the -- to the IA -- IA

22 office with the El Paso Police Department, they -- they

23 afforded the -- the opportunity to look at the video

24 then.

25   Q.   I'm going to ask you a few questions and it

216

1 may be difficult for you to answer these questions the

2 way I'm asking them.  I want to explain what I'm doing.

3 I first want to ask you your recollection of a few

4 events based on what you saw without viewing the

5 video -- if that's possible -- and then what you saw in

6 the video if it's different.

7         There may be times in the series of

8 questions you cannot distinguish the two.  That's okay.

9 All I ask for you is that you let us know whether your

10 answer is based on your memory of events right then

11 without the video or if it's based on your viewing the

12 video or it's a combination.

13        So you understand what I'm doing?

14   A.   Yes, sir.

15   Q.   Okay.  After -- and this is first from your

16 recollection without seeing the video.

17   A.   I understand.

18   Q.   After Daniel was shot, did you see

19 Officer Flores reholstering his gun?

20   A.   No, sir, not to my knowledge, no.

21   Q.   Again, from your recollection of the scene.

22 After Flores shot Daniel and his gun was in the

23 holster, did you see him pulling his taser out from his

24 gun belt?

25   A.   I don't recall, sir.

217

1    Q.   Did Officer Flores talk to you at a time that

2 he was patting his gun and then his taser that you saw?

3         MR. JEEP DARNELL:  Objection, hearsay.

4 Objection, assuming facts not in evidence.  And

5 objection, misstates the prior testimony.

6    A.   I'm sorry.  You said patting his gun?

7         MR. GAGE:  I'm going to -- the right

8 objection is it was compound.  I'm going to reframe the

9 question.

10        MR. JEEP DARNELL:  I was going to give

11 you that one.

12        MR. GAGE:  Well, you forget but that's

13 okay.

14   Q.   (By Mr. Gage)  Did you see from your personal

15 recollection after the shooting took place,

16 Officer Flores patting his gun and then patting his

17 taser?

18   A.   Not to my knowledge, sir.

19        Not to my knowledge, sir.

20   Q.   Now I'm going to ask you about your

21 recollection of events with the benefit of having

22 watched the video multiple times.

23        In the video after the shooting took

24 place, did you see Officer Flores reholstering his gun?

25   A.   I did, sir.

218

1    Q.   Did you after that see him pulling out his
2  taser?
3    A.   Yes, sir.
4    Q.   Then did you or he or both of you perform CPR
5  on Mr. Saenz?
6    A.   Mr. Flores performed the CPR, sir.
7    Q.   As the CPR was taking place, did the two of
8  you talk to one another that you can recall from your
9  independent recollection without the video?
10   A.   When I lost my balance, I came back up, I
11 remember asking him what had happened and that was
12 about the extent of -- of us communicating then.  And
13 then I remember pointing to him, "There's the --
14 there's the shell."  That's what I remember.
15   Q.   At this time as looking at the video, did you
16 see Officer Flores look like he was talking to you,
17 patting his gun and then patting his taser during the
18 CPR?
19   A.   With the benefit of the video?
20   Q.   Correct.
21   A.   It looked like he was, but I don't recall what
22 was said.
23   Q.   So you don't recall what he said to you at
24 that point, if anything.  Correct?
25   A.   No.  Not that point, no.

219

1    Q.   Were you trained in the use of a taser?
2    A.   At that time?
3    Q.   Yes.
4    A.   Yes, I was, sir.
5    Q.   Were you taught that a taser was a way to help
6  a police officer control a combative suspect without
7  having to use deadly force?
8    A.   To the best of my knowledge, yes, sir.
9    Q.   Did you have any information when you were
10 escorting Daniel through the jail on March 8th, 2013,
11 as to whether or not a taser would be effective in
12 stopping Daniel at all?
13   A.   Did I know that if a taser would have an
14 effect to stopping him?
15   Q.   Yeah.
16        MR. ORTEGA:  Objection, calls for
17 speculation.
18        MR. JEEP DARNELL:  Same objection.
19   A.   No, sir, I don't know if a taser would have
20 stopped Mr. Saenz at any point.
21   Q.   (By Mr. Gage)  Had anyone told you that
22 Mr. Saenz was somehow immune to the 50,000 volts of
23 electricity that a taser inflicts on a person?
24        MR. JEEP DARNELL:  Objection, foundation.
25   A.   No, sir.

220

1        MR. JEEP DARNELL:  And objection,
2  hearsay.
3    Q.   (By Mr. Gage)  When you learned of his --
4  Daniel's arrest earlier in the day, did anyone tell you
5  that he was somehow impervious to a taser blast?
6    A.   I don't recall, sir.
7    Q.   You don't recall that happening.  Correct?
8    A.   That Mr. Saenz was --
9    Q.   Impervious?  In other words was not affected
10 by.
11   A.   No, sir, I don't recall.
12   Q.   You've been tased before.  Correct?
13   A.   Yes, sir.
14   Q.   And how did it feel?
15   A.   You're referring to at that point in time or
16 up to this point?
17   Q.   I don't understand your question.
18   A.   You're asking me if I had been tased prior to
19 that situation happening on March 8th or up to this
20 point, since then?
21   Q.   I wasn't really distinguishing, but now you've
22 got me curious.  When were you tased in your life?
23 Better yet, how many times have you been tased in your
24 life?
25   A.   I've been tased twice, sir.

221

1    Q.   When was the first time?
2    A.   The first time was with the Dona Ana County
3  Detention Center.
4    Q.   And the second time?
5    A.   The second time was with the El Paso Police
6  Department.
7    Q.   Why were you tased the first time?
8    A.   The first time was -- as the instructors said,
9  it was to -- for us to gain knowledge and to see how it
10 feels when a subject is being tased, that's what the
11 instructors said, and basically to know what a taser
12 feels like and what 50,000 volts of electricity feels
13 like.
14   Q.   What did it feel like?
15   A.   It was not pleasant.  Obviously, it felt like
16 shock going through your body and your muscles tensing
17 up.  It was excruciating pain.
18   Q.   Did it incapacitate you?
19   A.   It did, sir.
20   Q.   The second time that you were tased by El Paso
21 PD, why were you tased then?
22   A.   For the same reason, sir.
23   Q.   Did it feel like excruciating pain the second
24 time as well?
25   A.   That is correct, sir.

222

1    Q.   It incapacitated you the second time as well?
2    A.   That is correct.
3    Q.   Another couple of questions where I'm asking
4  about your memory at the time as opposed to what you
5  saw on the video and then we'll go to the video.
6         As the events unfolded on the loading
7  dock, did you know Officer Flores had pulled out his
8  gun?
9    A.   I'm sorry.  The loading dock?
10   Q.   The loading dock where you left -- this is the
11 place where Daniel was shot.  Correct?
12   A.   You mean the ramp on the sally port?
13   Q.   The sally port.  Okay.  If that's -- let's --
14 let's make sure you and I are using the same terms.  We
15 can call it a driveway.  Will that be a good
16 description of where the shooting took place?
17   A.   If you want to.
18   Q.   Okay.  When you were on the driveway, did you
19 know that Officer Flores had pulled his gun when he
20 disengaged from the struggle?
21   A.   No, sir, I did not.
22   Q.   Did you see out of the corner of your eye
23 Officer Flores going off of Daniel?
24   A.   That is correct, sir.
25   Q.   At that time did you think he was going to use

223

1  his taser on Daniel?
2         MR. ORTEGA:  Objection, calls for
3  speculation.
4    A.   I don't know if he was or not.  I just felt
5  like -- it's -- I felt like that was going to happen,
6  but I'm not entirely sure.
7    Q.   (By Mr. Gage)  Why did you feel it was like
8  there would be a tasing used by Flores on Daniel?
9    A.   I can't really say, sir, just for some reason
10 it went through my mind.
11   Q.   Is it because based on the training that you
12 received, you thought that a taser would be an
13 appropriate use of force to help control the situation
14 with Daniel when you were tired with arms like noodles
15 and winded?
16        MR. ORTEGA:  Objection, calls for
17 speculation and expert testimony and a legal
18 conclusion.
19        MR. JEEP DARNELL:  Same objection.
20   A.   I'm not sure, sir, because it just depends on
21 the situations.  It just depends on situations,
22 circumstances -- different circumstances.  I wouldn't
23 know if that's why Mr. Flores pulled out the taser or
24 was about to tase -- or why I thought that was going to
25 be a -- there was going to be a tasing involved.

224

1    Q.   (By Mr. Gage)  Well, you recall believing a
2  tasing was going to take place.  Correct?
3    A.   I had thought it, yes, sir.
4    Q.   And the reason that you were thinking a tasing
5  was going to take place at that point is that is a
6  method of gaining control from a combative subject.
7  True?
8         MR. ORTEGA:  Objection, vague, calls for
9  speculation.
10   A.   Once again, for the training at that point
11 that I had, I -- I would have to say I recall that
12 that's why I thought it, but -- but I don't know if
13 that would have helped or not.
14   Q.   (By Mr. Gage)  I wasn't really asking you yet
15 whether you knew it would help or not.  I'm just asking
16 you thought that a taser could be used because that is
17 a method that you were taught is useful for a combative
18 subject in a situation like you found yourself in with
19 Mr. Saenz.  Right?
20        MR. ORTEGA:  Objection, vague.
21   A.   Not necessarily.  A combative subject can mean
22 all different -- can mean different things and you can
23 use different types of tools for that, for that subject
24 or that circumstance.  It just depends on the
25 circumstance.

225

1    Q.   (By Mr. Gage)  It was a complete shock and
2  surprise to you when you heard a gunshot from
3  Mr. Flores.  Correct?
4    A.   Yes, that is correct.
5    Q.   At that point you were not thinking, "Gee, we
6  need to shoot this man," were you?
7    A.   At that -- at that point did I think we need
8  to shoot him?
9    Q.   Correct.
10   A.   No, sir, that never crossed my mind.
11   Q.   There was a time even -- I guess the most pain
12 that you found yourself in at any time from Daniel was
13 when he was biting one of your fingers through a glove.
14 Is that accurate?
15   A.   That's one point.  And then when I felt what I
16 thought was a kick, I had a -- I had a -- excuse me --
17 I had a hard time breathing and I felt a pain in my
18 chest.
19   Q.   At either of those times, did you ever think
20 about raising your level of force against Daniel to get
21 better control of him when he was on the ground, such
22 as striking him?
23   A.   Did I think I had to do that?
24   Q.   Correct.
25   A.   No.

226

1    Q.   In the morning we talked about the use of
2  force continuum and you were trained on that.  Right?
3    **A.   Yes, sir.**
4    Q.   That use of force continuum which you were
5  taught was depending on the amount of force someone is
6  using on you, you would use the appropriate amount of
7  force that was sort of consistent with what they were
8  using.  Correct?
9    **A.   That's correct, sir.**
10   Q.   And you were taught you could punch, kick or
11 strike someone when they were engaging in that kind of
12 action towards you essentially.  Correct?
13   **A.   To the best of my knowledge, you met force --**
14 **you met the same amount of force with what you were**
15 **receiving.**
16   Q.   I think that's correct.  I think that is
17 something universal in police departments all over this
18 country, actually.
19             MR. JEEP DARNELL:  Objection to
20 testifying.
21             MR. GAGE:  You're right.  I sustain your
22 objection.
23             MR. JEEP DARNELL:  Thank you, Judge.
24   Q.   (By Mr. Gage)  When you were walking Daniel
25 into the jail from the van, from then all the way until

227

1  the time of the shooting, at any time did you think of
2  calling for additional assistance from your own
3  company, G4S, the police department, or anyone else?
4             MR. JEEP DARNELL:  Objection, asked and
5  answered.
6    **A.   No, sir, I don't recall ever thinking that.**
7    Q.   (By Mr. Gage)  With respect to G4S, the reason
8  you didn't think of calling them is it was a new
9  contract and G4S did not have enough people, it was
10 just two officers per transport and two officers at the
11 station.  Correct?
12   **A.   That is correct, there was only two officers**
13 **on transport, two officers on processing.**
14   Q.   So a total of four officers at -- G4S.
15 Correct?
16   **A.   Per shift.**
17   Q.   Per shift.
18   **A.   On that specific contract.**
19             MR. JEEP DARNELL:  Are you talking per
20 station or in the entire city, Brad, the question?
21             MR. GAGE:  I was just asking him from his
22 testimony before.  I mean his statement is consistent
23 with what he testified to previously.
24             MR. JEEP DARNELL:  Okay.
25   Q.   (By Mr. Gage)  The other prisoner,

228

1  Mr. Johnson, did he have any difficulties walking?
2    **A.   He did, sir.**
3    Q.   Was he using a cane?
4    **A.   I believe he was not using the cane at -- his**
5  **cane at the time, no.**
6    Q.   What kinds of training did you receive from
7  G4S in dealing with a combative or resistant prisoner?
8             MR. ORTEGA:  Objection, vague.
9             MR. JEEP DARNELL:  Same objection.
10   Q.   (By Mr. Gage)  Go ahead.
11   **A.   To my recollection G4S, when they sent us to**
12 **their training, we got the training for escort holds**
13 **and -- and using maneuvers on the -- on the legs to --**
14 **to hook them, that way they wouldn't throw people off.**
15 **That's -- that's what I can recall.**
16   Q.   Let me have you look at Exhibit 40, page 22,
17 line 24 to page 23, line 6.  I'll read the question,
18 you read your answer.  Okay?
19   **A.   I'm sorry.  Page what?  I'm sorry.**
20   Q.   Page 22, line 24 to page 23, line 6.
21   **A.   Okay.**
22   Q.   Question:  Officer Romero, what type of
23 training did you receive through G4S as far as dealing
24 with either a combative or resistant prisoner?
25             You can answer.

229

1    **A.   (Reading) Just from what I remember, sir, was**
2  **baton training, but my training came from when I used**
3  **to work as a detention officer in Dona Ana County.**
4    Q.   One of your main concerns -- you say it many
5  times in your testimony -- and you can look at this,
6  page 24, lines 1 through 7 -- you again emphasize that
7  one of your main concerns was the fact you were working
8  for a company with a new contract, you didn't want to
9  do anything that would potentially jeopardize that
10 contract.  Correct?
11   **A.   That's correct, sir.**
12             MR. JEEP DARNELL:  I'm going to object
13 because it misstates the transcript.
14   Q.   (By Mr. Gage)  So --
15             You can close that for a moment.
16             -- G4S was in the business of
17 transporting prisoners.  Right?
18   **A.   I would assume they were in that type of**
19 **business, yes, sir.**
20   Q.   That was your job?
21   **A.   That was my job, yes, sir.**
22   Q.   You knew at some point you would run into one
23 or more prisoners that were going to resist or try to
24 escape.  Right?
25             MR. ORTEGA:  Objection, calls for

230

1 speculation, foundation.

2    A.    I knew I was going to be dealing with

3 prisoners, I just -- I just didn't know -- or I

4 couldn't foresee what kind of prisoners I was going to

5 deal with on a daily basis.

6    Q.    (By Mr. Gage) So you didn't understand that

7 you might have someone trying to escape or fight?

8         MR. ORTEGA: Objection, lack of

9 foundation, calls for speculation.

10        MR. JEEP DARNELL: Same objection.

11   A.    No, sir, I didn't know if -- if -- if I was

12 going to be dealing with those type of prisoners, sir.

13   Q.    (By Mr. Gage) Let's -- I'll read the

14 question, you read your answer. Make sure you're slow

15 enough so it's understandable.

16   A.    What page? I'm sorry.

17   Q.    Page 24 of Exhibit 40, lines 10 through 16.

18         Are you ready?

19   A.    Yes, sir. Go ahead.

20   Q.    Question: Being in the business of transport,

21 inevitably you're going to run into somebody like

22 Mr. Saenz that either is going to resist or out and out

23 try to escape and all that, and the expectation I'm

24 sure through the G4S would be you've got to take some

25 sort of action. Correct?

231

1         What was your answer?

2    A.    "Yes, sir."

3    Q.    In the transport van on March 8, 2013, did you

4 have leg irons?

5    A.    I don't recall, sir.

6    Q.    Have you ever used leg irons while working for

7 G4S?

8    A.    I -- I don't recall, sir.

9    Q.    Did you ever use leg irons before working with

10 Mr. Saenz?

11   A.    While on G4S? Yes, to my knowledge, we did

12 actually use leg irons at the Pebble Hills station,

13 sir.

14   Q.    Did you use leg irons after Mr. Saenz with

15 G4S?

16   A.    Yes, sir, we did.

17   Q.    And you had leg irons in the transport van.

18 Right?

19   A.    I'm not sure, sir.

20   Q.    Go to page 26 of Exhibit 40, lines 11 through

21 13 first. I'll read the question, you read your

22 answer. Okay?

23   A.    Yes, sir.

24   Q.    Question: Are there leg irons in the

25 transport vans?

232

1    A.    "Yes, ma'am."

2    Q.    You also testified that you had used them both

3 before Mr. Saenz and after. Correct?

4    A.    Yes, sir.

5    Q.    But you chose not to use them with Mr. Saenz.

6 True?

7    A.    That is correct.

8    Q.    Do you recall telling Mr. Matthews that Daniel

9 was not going to listen or that he was going to listen

10 for about two seconds and then he would keep doing what

11 he was doing so just don't talk to him?

12   A.    I remember telling Mr. Matthews that, yes.

13   Q.    Did you have any similar conversations with

14 Mr. Flores along that line?

15   A.    No, sir.

16   Q.    When you were on the ground in the driveway

17 and after leaving the jail, did Daniel say anything

18 that you thought was threatening like, "I'm going to

19 kill you," or, "Beat you up," anything like that?

20   A.    Not that I recall, no.

21   Q.    When you and Flores secured your guns and

22 ammo, do you know where Matthews was at that point?

23        MR. JEEP DARNELL: Objection, asked and

24 answered.

25   Q.    (By Mr. Gage) Go ahead. I think that maybe

233

1 was asked earlier before lunch and you said it was

2 unknown. Do you recall saying that?

3    A.    I believe you asked me that, yes.

4    Q.    And you did not know. Correct?

5    A.    Do you want me to answer again?

6    Q.    Yeah.

7    A.    I'm not sure where he was, sir.

8    Q.    All right. If you go to --

9         MR. GAGE: And by the way saying asked

10 and answered, I have no problem with that, that's the

11 correct thing. It's only if you say, "He said blah

12 blah blah," that I have an issue with.

13   Q.    (By Mr. Gage) Go to page 5, please, of

14 Exhibit 39, your statement from March 8, 2013.

15   A.    Page 5 you said?

16   Q.    Yes. That's the area that says -- the top

17 paragraph begins, "Officer Flores and I secured our

18 guns and ammo in the gun lockers," et cetera.

19        Do you see that?

20   A.    I see it, sir.

21   Q.    Your testimony before was: At this time my

22 partner Matthews was behind us with Arrestee Johnson.

23        Do you see that?

24   A.    I see it, sir.

25   Q.    So at that point you actually did know where

234

1  he was.  True?

2    **A.    That is correct.**

3    Q.    Before lunch I asked you if one of the

4  detention officers remained assisting with Mr. Saenz

5  and if Officer Flores and you proceeded to drag

6  Mr. Saenz to the elevators from the door/fence area

7  where he dropped down face up on the ground again.  Do

8  you recall that?

9    **A.    The question about the detention officer being**

10  **with us?**

11    Q.    Yes.

12    **A.    Yes, sir, I remember that.**

13    Q.    And before lunch you told us that did not

14  happen.  Right?

15    **A.    That the detention officer wasn't with us?**

16    Q.    That you did not drag him into the elevators.

17  Remember that?

18    **A.    Yes, sir, I remember that.**

19    Q.    But in fact your statement indicates that:

20  Officer Flores and I proceeded to drag Arrestee Saenz

21  to the elevators from the doors/fence where he dropped

22  down face up to the ground again.

23        Do you see that?

24    **A.    I see it, sir.**

25    Q.    Before lunch I asked you about the ride up the

235

1  elevator and you indicated that Mr. Saenz's back was

2  against the wall.  Remember that testimony?

3    **A.    I remember, sir.**

4    Q.    But if you look at Exhibit 39, in the next

5  paragraph, middle of it, you say:  Once we were inside

6  the elevator we sat Arrestee Saenz down toward the back

7  of the elevator but not against the wall of the

8  elevator.

9        Do you see that?

10    **A.    I see it, sir.**

11    Q.    Again, different testimony in your statement

12  than what you said before lunch under oath.  Correct?

13    **A.    Yes, sir.**

14    Q.    Then I asked you about when the elevator doors

15  opened if Officer Flores and you proceeded to drag

16  Mr. Saenz out of the elevator door and you said you

17  were not dragging him.  Remember that testimony before

18  lunch?

19    **A.    I remember.**

20    Q.    But if you look at your statement here, it

21  says:  Officer Flores and I proceeded to drag Arrestee

22  Saenz out of the elevator doors.

23        Do you see that?

24    **A.    I see it, sir.**

25    Q.    I then asked you if -- before lunch I asked

236

1  you if Mr. Saenz was face up and if you proceeded to

2  drag him into the holding tank and you said that did

3  not happen.  Do you remember your testimony before

4  lunch?

5    **A.    Yes, sir.**

6    Q.    Yet in this statement of yours it says:  Saenz

7  was face up.  We proceeded to drag him into the holding

8  tank.

9        Do you see that?

10    **A.    I see it.**

11    Q.    Did either you or Mr. Flores, to your

12  knowledge, speak with the county jail nurse to see if

13  they were going to accept Mr. Saenz?

14    **A.    I did not speak with the nurses at all at the**

15  **county jail and I do not recall if Mr. Flores did or**

16  **not.**

17        MR. JEEP DARNELL:  Objection, asked and

18  answered.

19    Q.    (By Mr. Gage)  In fact you do not -- do you

20  recall speaking with Detective Lozano?

21    **A.    Do I recall speaking with Detective Lozano?**

22    Q.    Correct.

23    **A.    The night of March 8th?**

24    Q.    Yes.

25    **A.    Yes, sir, I do.**

237

1    Q.    Did he ask you if either you or Flores advised

2  the county jail nurse if they were going to accept

3  Mr. Saenz?

4    **A.    If he asked me that?**

5    Q.    Yes.

6    **A.    I don't remember, sir.**

7    Q.    Do you recall telling him, "No, I didn't go

8  ask the nurse and I did not see Officer Flores ask the

9  nurse either"?

10    **A.    That is correct, sir.**

11    Q.    And you know that's correct because you just

12  looked at the Exhibit 39 to refresh your memory.

13  Correct?

14    **A.    Yes, sir.**

15    Q.    Before lunch I asked you about after leaving

16  the holding tank whether or not you dragged Daniel from

17  the holding tank to the elevator.  Do you remember

18  that?

19    **A.    Yes.**

20    Q.    And you said that you did not drag him from

21  the holding tank to the elevator.  Remember that

22  statement of yours under oath?

23    **A.    I remember.**

24    Q.    Let's now look at page 6 of Exhibit 39, the

25  second paragraph, second sentence:  At this time we

238

1 proceeded to drag Arrestee Saenz from the holding tank
2 to the elevators.
3          Do you see that?
4     A.   I see it, sir.
5     Q.   There were many times as you're going through
6 these events that Daniel was not responding to you.
7 Right?
8     A.   That's correct, sir.
9     Q.   You characterized him as being uncooperative.
10 True?
11    A.   Yes.
12    Q.   But another reason why a person would not
13 respond you know is if they were unconscious.  Correct?
14          MR. JEEP DARNELL:  Objection, asked and
15 answered.
16    A.   I wouldn't know if they would be able to
17 answer if they were unconscious or not, sir.
18          MR. JEEP DARNELL:  And lack of
19 foundation.
20    Q.   (By Mr. Gage)  You testified earlier that
21 Officer Flores told you to put your hands on the head
22 of Daniel to prevent him from injuring his head.  Do
23 you recall that?
24    A.   No, sir, not on -- on his head, under his
25 head.

239

1     Q.   Under his head.  If you go to page 8 of
2 Exhibit 39, the top paragraph, second sentence says:
3 Arrestee Saenz started banging his head against the
4 pavement and I attempted to place my hands on his head
5 to prevent him from injuring his head.
6          Do you see that?
7     A.   I see it, sir.
8     Q.   You don't have any mention of Flores telling
9 you to do that here, do you?
10    A.   I do not, sir.
11    Q.   And in fact you do say in your statement that
12 you placed your hand on his head as opposed to under
13 it.  Correct?
14    A.   That's correct.
15    Q.   The third paragraph, page 8, says:  Arrestee
16 Saenz was face down, he was combative and resisting us.
17 At this point I felt a kick to my chest and I remember
18 that I fell back and fell on my buttocks.
19          That's your statement.  Correct?
20    A.   That is correct.
21    Q.   And that's the statement you told us more than
22 once today probably that was incorrect.  True?
23    A.   That is correct.
24    Q.   That statement you determined was not accurate
25 after you looked at the videotape.  Right?

240

1     A.   And when I was asked by internal affairs,
2 that's correct.
3     Q.   All right.  So what happened, then, is is this
4 is a situation where you had a recollection one way,
5 but after you looked at the video, you thought that
6 your recollection of events was off a little bit at
7 least in that regard.
8     A.   That's correct.
9     Q.   After the shooting took place, you indicate
10 that you saw that he had a gunshot wound on the front
11 of his left shoulder and you can read along if you'd
12 like.
13          This is the fourth paragraph:  I saw that
14 Arrestee Saenz was lying on his back with his hands
15 cuffed to his back.  I saw that Arrestee Saenz was
16 breathing.  Arrestee Saenz had a heavy breathing.  I
17 could hear him wheezing like if he had liquid in his
18 throat or mouth.
19          That is what you observed.  Correct?
20    A.   That is correct.
21    Q.   So he was alive for some period of time after
22 he got shot from your personal observation.  Correct?
23          MR. JEEP DARNELL:  Objection, asked and
24 answered.
25    A.   That's correct, sir.

241

1     Q.   (By Mr. Gage)  And after he was shot, Daniel
2 was turning his head from side to side you saw.
3 Correct?
4     A.   That is correct.
5     Q.   After the shooting took place, you walked up
6 the ramp to the top area where Officer Flores was
7 located.  Correct?
8     A.   That is correct.
9     Q.   At that time Officer Flores told you not to
10 speak to anyone about the shooting.  Correct?
11    A.   That is correct.
12          MR. JEEP DARNELL:  Objection, hearsay.
13    Q.   (By Mr. Gage)  There is an interesting
14 statement at the bottom of page 9 I want to ask you
15 about.  It says:  I have read this statement and even
16 though it is not in my exact words, I find it to be
17 true and correct to the best of my knowledge.
18          Then there's a signature.  Is that your
19 signature?
20    A.   That is correct, sir.
21    Q.   What in the statement was not in your exact
22 words, if you know?
23    A.   I'm not sure, sir.  I'd have to go back and
24 read the whole statement or the whole -- yeah, the
25 whole statement.

242

1      Q.   Who prepared this statement for you?

2      A.   It was Detective Lozano, sir, he's the one

3   that typed it.  I just --

4      Q.   Do you remember the topics in which your exact

5   words were changed by him in any way?

6      A.   I'm not sure, sir.  I'd have to go back and

7   look at the statement, but like I said I'm not the one

8   that typed it.

9      Q.   Did you have a chance to read and review it to

10  make sure everything was accurate in your statement,

11  Exhibit 39, before you signed it?

12     A.   That night, yes, I did.

13     Q.   And you satisfied yourself that it was still

14  truthful even if some of your statements had been

15  altered somehow by the detective.  Correct?

16     A.   I have to say yes, sir.

17         MR. JEEP DARNELL:  There's been a change

18  in the law since then.  Now they actually have to like

19  let people write out their own statement and do all

20  that good stuff.

21         MR. GAGE:  Okay.  When we're off the

22  record, I'll be interested to hear about that.

23     Q.   (By Mr. Gage)  When Daniel was being loaded

24  into the van, did he -- did you ever hear him say the

25  words "Shoot me," or anything similar?

243

1      A.   No, sir.

2      Q.   At the time you were taking Daniel into the

3   jail and you saw him shaking his head, at that time did

4   you feel he was engaged in an assaultive movement

5   towards yourself or Officer Flores?

6      A.   No, sir.

7      Q.   Before being knocked back by Daniel, did you

8   hear Flores state, "Watch out," or anything similar?

9      A.   No, sir.

10     Q.   Did Officer Flores tell you he was drawing his

11  gun at all?

12     A.   No, he did not, sir.

13     Q.   Did Flores ever tell you he was pulling his

14  gun to try to catch the attention of Daniel?

15     A.   No, sir, he did not.

16     Q.   Did you hear Flores making any statements to

17  Daniel, "I am pulling this gun, you better comply or

18  else," or words to that effect?

19     A.   No, sir.

20         MR. GAGE:  All right.  Let's go off

21  record.  Take a break.  I might be done.

22         THE VIDEOGRAPHER:  The time is 5:05 p.m.

23  We are now off the record.

24         (A recess was had.)

25         THE VIDEOGRAPHER:  The time is 5:21 p.m.

244

1   We're back on the record.

2      Q.   (By Mr. Gage)  At times when you were dragging

3   Daniel through and around the jails, you would have him

4   a little in front of where Flores had him or behind

5   where he had him.  Correct?

6         MR. ORTEGA:  Objection, compound.

7         MR. JEEP DARNELL:  Objection, vague.

8      A.   Our positions changed constantly throughout

9   the time -- throughout the time we were at the county

10  jail with Mr. Saenz.

11     Q.   (By Mr. Gage)  Since your positions changed as

12  you were holding Daniel's arms and he was in handcuffs,

13  that could put pressure on his arms or his wrists.

14  Agreed?

15         MR. ORTEGA:  Objection, calls for

16  speculation.

17     A.   No, sir, I don't know if that would put any

18  pressure on his -- on -- if the changing of positions

19  would put any pressure on his -- on his arms or wrists.

20     Q.   (By Mr. Gage)  You don't know one way or

21  another.  Is that what you're saying?

22     A.   If changing positions would put pressure on

23  his arms or wrists, no, I don't know that.

24     Q.   As an example, if you were two feet ahead of

25  Mr. Flores at the time that you were dragging Daniel,

245

1   that distance of two feet would put pressure on his

2   wrists and the handcuffs.  Agreed?

3      A.   I'm not entirely sure, sir.  It just

4   depends -- it would depend on the person and how -- to

5   my knowledge how -- how much they can stretch out or

6   things of that nature, sir.

7      Q.   If you were five feet ahead of Mr. Flores, you

8   had one arm of Daniel and Flores had the other arm, do

9   you think that might put pressure on him that much

10  distance?

11         MR. ORTEGA:  Objection, calls for

12  speculation.

13     A.   I'm not certain, sir.  It just depends on the

14  situation.

15     Q.   (By Mr. Gage)  Let's say you somehow were able

16  to be 100 feet away from one another.  You grab one arm

17  in handcuffs 100 feet away and Flores with the other

18  arm 100 feet away, do you think that much distance with

19  that sort handcuffs would put pressure on the arms?

20         MR. JEEP DARNELL:  Objection, ridiculous.

21         MR. ORTEGA:  Objection, calls for

22  speculation.

23     Q.   (By Mr. Gage)  Go ahead.

24     A.   At that -- given those figures, I would have

25  to say that's impossible.

246

1    Q.   The only way it would be possible is if an arm
2 was severed or something.  Right?
3    A.   That's correct, sir.
4    Q.   Because there's a certain length of distance
5 between yourself and Flores at which point you know
6 it's going to put so much pressure on Daniel's arms,
7 they'd have to be taken off or get cut from the
8 handcuffs.  Agreed?
9         MR. ORTEGA:  Objection calls for
10 speculation.
11        MR. JEEP DARNELL:  Same objection.
12   A.   I don't know if the distance -- the short
13 distance between me and Mr. Flores would put any
14 pressure on Mr. Saenz's handcuffs, sir.
15   Q.   (By Mr. Gage)  All right.  You don't know one
16 way or another.
17   A.   I don't know, sir.
18   Q.   So I'm going to show photos in a moment, but I
19 want to ask a couple of last questions before I do.
20        When you had Daniel at the Pebbles
21 regional center [sic] and you transported him to the
22 jail, did he have any injuries that you saw anywhere on
23 his body?
24   A.   Not that I recall, sir, no.
25   Q.   After Daniel banged his head somehow entering

247

1 the jail, you were only aware of one injury near the
2 top of the front of his head.  Correct?
3    A.   That is correct, sir.
4    Q.   Did you ever see Daniel doing anything that
5 would result in another injury anywhere else on his
6 body?
7    A.   Yes, sir.  He was -- when we were transporting
8 him in the van, during that course he would bang his
9 head in the compartment walls on the plexiglass that
10 was directly behind my left over -- directly over my
11 left shoulder, sir.
12   Q.   But you already told us that after he exited
13 the van and before going to the jail, you did not see
14 any visible injuries from that alleged activity.
15 Correct?
16   A.   That's correct, sir.
17   Q.   All right.  Now I'm going to show you some
18 photographs and ask you some questions.
19        Exhibit 1 is a picture of Daniel.  Do you
20 recognize this as Daniel's face?
21   A.   Yes, sir, I recognize it.
22   Q.   Do you know where the blood all over his face
23 came from?
24   A.   I would have to -- I would have to assume
25 based on what happened -- the events that day, it came

248

1 from the top of his head, sir.
2    Q.   Is that the way that you saw Daniel's face
3 when you were bringing him upstairs to the holding
4 tank?
5    A.   His face was full of blood, yes, sir.
6    Q.   Just like that?
7    A.   I don't recall.  Not like this, sir, no.
8    Q.   All right.  Because that kind of injury to a
9 his face shows the need for immediate medical
10 treatment.  Agreed?
11        MR. ORTEGA:  Objection, calls for
12 speculation and expert opinion.
13   A.   If I saw a person like that, bleeding like
14 that, yes, I would assume that they were in need of
15 medical attention.
16   Q.   (By Mr. Gage)  If one of your prisoners looked
17 the way that Daniel's face looks there in Exhibit 1,
18 you would have immediately called for medical
19 treatment.  Correct?
20        MR. JEEP DARNELL:  Objection, calls for
21 speculation and incomplete hypothetical.
22        MR. ORTEGA:  Same objections.
23   A.   I would -- I would have to think that that
24 person needs medical attention.
25   Q.   (By Mr. Gage)  What would you have done?

249

1 Called for help?
2    A.   I would try to get him to -- try to get him
3 help.
4    Q.   How would you do that?
5    A.   Well, in this circumstance on March 8 with
6 Mr. Saenz, we were trying to get him help with the
7 nurses.
8    Q.   Do you think that the injuries that are
9 depicted there in Exhibit 1 were minor enough that the
10 nurse in the jail would be able to help him?
11        MR. ORTEGA:  Objection calls for
12 speculation and expert opinion.
13   A.   I'm not sure what the nurses -- how the nurses
14 gauge what injuries they can take care of or not, sir.
15   Q.   (By Mr. Gage)  Exhibit 2, is this a fair and
16 accurate representation of the head injury that you
17 believe Daniel had from the head bang on the side of
18 the door?
19   A.   That is correct.
20   Q.   Let me show you Exhibit 7.
21        Do you know who is in this picture?
22   A.   I forgot her last name, but it's Officer
23 Christine at Pebble Hills.
24   Q.   Did you -- when did you know, first, Christine
25 Aguirre?

250

1   A.   Gary?

2   Q.   Aguirre or whatever her last name is.  When

3 did you know this person?

4   A.   Oh, Aguirre.

5        MR. JEEP DARNELL:  Objection, improper

6 predicate.

7        MR. GAGE:  I don't know what that even

8 means but --

9        MR. JEEP DARNELL:  Foundation.

10   Q.   (By Mr. Gage)  When did you first know who the

11 woman in Exhibit 7 is?

12   A.   During my course of -- of employment with G4S

13 working at the Pebble Hills station, sir.  I don't

14 recall exactly what date and time, but it was during

15 that course.

16   Q.   Next is Exhibit 10.

17        This is a picture of Daniel Saenz.  You

18 recognize him.  Correct?

19   A.   Yes, sir.

20   Q.   In the left shoulder, that's the bullet wound

21 that he suffered after being shot by Mr. Flores.

22 Correct?

23   A.   That is correct.

24   Q.   Around the bullet wound on his shoulder, there

25 are a number of markings.  Do you know what the cause

251

1 of those markings is?

2   A.   I'm not entirely certain, sir, but I would

3 have to say they were from when we were on the ground

4 struggling with him.

5   Q.   So you believe that that injury around the

6 bullet wound of Daniel was inflicted on him while you

7 and Officer Flores were struggling with him.  Is that

8 correct?

9        MR. ORTEGA:  Objection, calls for

10 speculation and expert opinion.

11        MR. JEEP DARNELL:  Same objections.

12   Q.   (By Mr. Gage)  Go ahead.

13   A.   Given the circumstances of what Mr. Saenz was

14 doing, I would have to say yes.

15   Q.   Mr. Saenz, when you took him into the jail,

16 was not wearing a shirt.  Is that a correct statement?

17   A.   That is correct.

18   Q.   So you had the opportunity to view his upper

19 body, his torso, and everything like that.  Correct?

20   A.   That is correct.

21   Q.   When he entered the jail, as you guys were

22 dragging him, he did not have any of the markings that

23 you see on his stomach, his waist area, his shoulder or

24 his face.  Correct?

25   A.   What markings, sir?

252

1   Q.   Any of the red markings.

2        MR. GAGE:  What we'll do is -- let's have

3 my client go out because this is going to -- and I

4 don't want her to be seeing this.

5        (Roswitha Saenz exits the deposition.)

6   Q.   (By Mr. Gage)  All right.  I'm going to show

7 the photograph on the screen and have you kind of look

8 at it and point out things.  So you may need to stand

9 up and we'll try to focus on it for you.  Okay?  If

10 you'll come around to your lawyer and do it.

11        Speak loudly if that doesn't work.

12        All right.  So we're looking at Exhibit

13 10.  In Exhibit 10 there's a bullet hole in the left

14 shoulder.  Correct?

15   A.   That's correct.

16   Q.   Around it in a -- kind of a circle region are

17 a number of red marks.  Do you see that?

18   A.   Are you talking about the dried blood?

19   Q.   The blood, yes.

20   A.   Okay.

21   Q.   You see that.  Correct?

22   A.   I see it, sir.

23   Q.   Did Daniel have any of those red marks before

24 he entered the jail with you and Flores that you could

25 see since his shirt was off?

253

1   A.   Not that I recall.

2   Q.   There are red marks on the shoulder going to

3 the neck region.  Did you see any such red marks

4 anywhere on Daniel's body before he entered the jail?

5   A.   If we're talking about the dried blood, no,

6 sir.

7   Q.   In the stomach and hip region, there are a

8 number of red marks on Daniel's body.  Do you see

9 those?

10   A.   Are you talking about these right here?

11   Q.   Correct.

12   A.   That is correct.

13   Q.   Did you see any of those red marks before

14 Daniel entered the jail?

15   A.   Not that I recall.

16   Q.   With respect to all of these red marks, all of

17 them had to occur between the time when he was in the

18 custody of you and Flores entering the jail until he

19 was shot and killed.  Correct?

20        MR. ORTEGA:  Objection, calls for

21 speculation and --

22        MR. JEEP DARNELL:  Same objection.

23        MR. ORTEGA:  -- and mischaracterizes his

24 testimony.

25   Q.   (By Mr. Gage)  Go ahead.

254

1    A.   I was going to say that I'm not too sure when
2 those red marks appeared, sir.
3    Q.   (By Mr. Gage)  But you do know that they were
4 not there before Daniel was taken in the jail and they
5 were there after he was shot and killed.  Correct?
6    A.   Well, I don't know if they were there after
7 they were shot and killed [sic].
8    Q.   Well, you see them in the picture, don't you?
9    A.   Yes, sir, now I see them here, but not at that
10 moment, sir.
11   Q.   All right.  Because at that moment after the
12 shooting took place, you were kind of in shock, you
13 weren't examining the body of Daniel.  Right?
14   A.   That is correct.
15   Q.   After he was shot, you were in the vicinity
16 for quite sometime until Daniel was taken away by
17 emergency medical services.  Correct?
18   A.   I was not in close proximity to him, no.
19   Q.   How far away were you?
20   A.   Well, after medical services showed up and
21 they took over the CPR, the holding his head, I walked
22 up the ramp and -- to the right side of the ramp and
23 after that I had no direct sign -- line of sight with
24 Mr -- with Mr. Saenz.
25   Q.   You certainly don't -- you never saw anybody

255

1 starting to mutilate Daniel's body after he was shot,
2 did you?
3           MR. ORTEGA:  Objection, assumes facts not
4 in evidence.
5    A.   No.
6    Q.   (By Mr. Gage)  And you don't believe that any
7 of the medical personnel caused any of the injuries
8 that we see in Exhibit 10 anywhere, do you?
9           MR. ORTEGA:  Objection, assumes facts not
10 in evidence, calls for speculation and calls for an
11 expert opinion.
12   A.   I'm not sure, sir.
13           MR. JEEP DARNELL:  Same objections.
14   Q.   (By Mr. Gage)  Okay.  You didn't --
15        Did you see anybody inflicting any wounds
16 on Daniel after he had been shot?
17   A.   No, sir.
18   Q.   There are a couple of other pictures.  You can
19 have a seat.  The other photos are --
20           MR. GAGE:  Just so we have a good record,
21 I'd like to mark as the next in order the statement of
22 May 5th, 2014.
23           (Exhibit marked, No. 41.)
24   Q.   (By Mr. Gage)  Is that a fair and accurate
25 representation of the statement that you provided to

256

1 internal affairs?
2    A.   I'm not sure, sir.  Can I read it?
3    Q.   Sure.  You can just look at the second page
4 and see if that's your signature.
5    A.   The third page?
6    Q.   Third page.
7    A.   Yes, that's my signature.
8    Q.   All right.
9    A.   And my badge number at the time.
10           MR. GAGE:  What are you laughing at?
11           MR. JEEP DARNELL:  I was hoping he was
12 going to have a better response to the signature on the
13 second page.  He has much greater character than I do.
14           MR. GAGE:  All right.
15   Q.   (By Mr. Gage)  Did you see any of the clothing
16 Daniel had that day in his bags or with him?
17   A.   In his -- in his bag?
18   Q.   Yes.
19   A.   No, I did not go through his duffel bag, sir.
20   Q.   Did any of his clothes look to be dirty or
21 disheveled at all?
22   A.   Once again, I did not look through his bag,
23 sir, so I would not know.
24   Q.   Let me show you a photograph.  I don't know if
25 we have a copy of it.  I just want to know --

257

1           MR. GAGE:  We'll mark this 42.
2           (Exhibit marked, No. 42.)
3    Q.   (By Mr. Gage)  It's cross-referenced Flores
4 00852.
5        My question only is do you know what that
6 is?
7    A.   Do I know if --
8    Q.   Do you know what that photo depicts or is
9 from?
10   A.   What I see in the picture is a -- patch from
11 the El Paso Police Department Crime Scene Unit and a
12 Call Card.
13   Q.   The next exhibit is really four pages.
14           MR. GAGE:  Maybe we'll just do them in
15 order.  43, 44, 45 and 46.  We'll get these scanned and
16 e-mailed because I don't even have them anymore.
17           (Exhibits marked, No. 43, No. 44, No. 45
18           and No. 46.)
19   Q.   (By Mr. Gage)  Looking at those in order,
20 first 43, are any of those photographs of any clothing
21 that you were aware that Daniel had with him on the day
22 he was shot and killed?
23           MR. ORTEGA:  Objection, lack of
24 foundation.
25           MR. JEEP DARNELL:  Same objection.

258

1    Q.   (By Mr. Gage)  If you don't know, you can tell
2  us that.
3    A.   Your question was do I know if --
4    Q.   Yeah.  Did you see --
5    A.   -- any of these items that I see in these
6  pictures --
7    Q.   Yes.
8    A.   -- if I know he had them?
9              No, sir, I do not.
10    Q.   All right.
11              MR. GAGE:  I'm done.
12              MR. JEEP DARNELL:  Real quick, can I see
13  what's what on the exhibits just so I don't mismark
14  mine.
15              MR. GAGE:  Sure.
16              THE WITNESS:  The UTEP shirt with a red
17  sweater, I believe, is Exhibit 43.
18              MR. JEEP DARNELL:  Okay.
19              THE WITNESS:   The red and white and
20  red -- I'm sorry -- red, white and black is Exhibit 44.
21              MR. GAGE:  Can you give the Flores Bates
22  stamp number as you're saying it, please.
23              MR. JEEP DARNELL:  I can't even read it
24  on mine so that won't help.
25              MR. GAGE:  I can read it.  It's -- 43 is

259

1  Flores 00870.  44 is Flores 00874.  I'll -- let me go
2  through it, it'll be simpler.
3              MR. JEEP DARNELL:  That's fine, yeah.
4              MR. GAGE:  45 is Flores 00900, it has --
5  it looks like socks and pants.  And 46 is for
6  cross-reference Flores 00 -- maybe 890.  It has a white
7  shirt, something Caballero Azteca, and a red glove.
8              MR. JEEP DARNELL:  Objection, terrible
9  Spanish.
10              MR. GAGE:  Yes.  All right.  Are we done,
11  guys, or do you have any questions?
12              MR. JEEP DARNELL:  I've got maybe two
13  questions.
14              MR. GAGE:  That could lead to 20 minutes
15  but go for it.
16                    EXAMINATION
17  BY MR. JEEP DARNELL:
18    Q.   Good afternoon.
19    A.   Good afternoon, sir.
20    Q.   Late in the afternoon this afternoon, Mr. Gage
21  was pointing you back and forth between the differences
22  where you said one thing earlier and a different thing
23  later.  Do you remember that line of questions as well?
24    A.   Yes, sir.
25    Q.   And at one point he said that your -- that the

260

1  difference between one statement to the next you were
2  not accurate in the first statement because you had
3  seen the video and you were more accurate.  It had
4  something to do with you thought he kicked you.  Do you
5  remember that?
6    A.   Yes.
7              MR. GAGE:  Objection, vague, ambiguous,
8  misleading, mischaracterization.
9              But you can answer.
10    Q.   (By Mr. Jeep Darnell)  He -- he pointed you to
11  Exhibit 39, page 8, where you had told the officers --
12  or the shooting review board that:  It felt like -- it
13  felt like a kick to my chest.
14              And he said that after you reviewed the
15  video, you found that to be not accurate.  Correct?
16    A.   That is correct, sir.
17    Q.   He pointed out a lot of differences between
18  what you told officers on March 8th, 2013, and
19  seemingly different statements made at a later time and
20  your testimony today.  Is that a correct summarization
21  of some of the testimony you've given?
22    A.   That is correct, sir.
23    Q.   Would you -- using Mr. Gage's words -- agree
24  that after reviewing the evidence, more specifically
25  the videos, that your prior statements specifically on

261

1  March 8th, 2013, were not incorrect and you were not
2  lying, they're more accurate after viewing the video?
3              MR. GAGE:  Objection, leading, compound,
4  misleading, mischaracterization, misstatement of the
5  testimony, and overbroad.  You can answer.
6              MR. JEEP DARNELL:  I'll retract the
7  question because it was leading.
8    Q.   (By Mr. Jeep Darnell)  Do you believe -- are
9  your questions -- your answers here today more accurate
10  than they were previously?
11              MR. GAGE:  Overbroad, compound and vague.
12    Q.   (By Mr. Jeep Darnell)  Are your answers to
13  Mr. Gage's questions comparing your testimony today to
14  other times more accurate?
15              MR. GAGE:  Overbroad, compound, vague.
16    A.   Like I told Mr. Gage, this happened over a
17  long period of time and -- I mean a long time ago and
18  my memory has faded since then.  I don't recall all the
19  events of that day and all the little details.  I --
20  I -- I can say with certainty that I was giving my best
21  and accurate statement at all -- at each point of
22  these -- these interviews.
23    Q.   (By Mr. Jeep Darnell)  Did the period of time
24  from when you showed up at the jail on March 8, 2013,
25  until the shooting, at that time did it seem like it

262

1  lasted forever?

2            MR. GAGE:  Objection, leading, vague,

3  ambiguous.

4       A.   I had lost track of time, sir.  It just -- it

5  was a very stressful situation.

6       Q.   (By Mr. Jeep Darnell)  Do you believe that

7  viewing the video has helped you to give more accurate

8  answers as to some of the actions that occurred that

9  day?

10           MR. GAGE:  Objection, overbroad, vague,

11  ambiguous, incomplete hypothetical, misleading,

12  mischaracterization, compound and overbroad.

13           You can answer, though.

14      A.   Yes, sir, after viewing the video, it does

15  help to refresh my memory, sir.

16           MR. JEEP DARNELL:  No further questions.

17           MR. GAGE:  Now I'll have some.

18           MR. JEEP DARNELL:  I believe Francisco --

19           MR. ORTEGA:  No, no, he goes next.

20           MR. GAGE:  Well, you --

21           MR. ORTEGA:  No, no, no.  You go next.

22                FURTHER EXAMINATION

23  BY MR. GAGE:

24      Q.   When you gave your testimony to the shooting

25  review board on April 29th, 2016, before you gave that

263

1  testimony, you had reviewed your video -- the

2  videotape.  Correct?

3       A.   If I remember correctly, it was at the IA

4  office and social media.

5       Q.   And you reviewed your -- the video before you

6  gave that testimony.  Correct?

7       A.   Not minutes or seconds prior to that

8  interview, but I had reviewed it within months of --

9  months -- the time span of months, sir.

10      Q.   Did you review the two statements you gave

11  before your testimony on April 20th, 2016, found in

12  Exhibit 40?

13      A.   Did I review this statement prior to --

14      Q.   Before you gave that statement in Exhibit 40,

15  you reviewed the other two statements just before

16  giving that testimony.  Right?

17      A.   I don't recall, sir.

18      Q.   Check out page 2 of Exhibit 40, line 16.

19           Do you see it says:  You provided two

20  statements in this investigation, one to the criminal

21  side and one to the administrative side.  Is that

22  correct?

23           You go, "That's correct, ma'am."

24           Do you see that?

25           Do you see that testimony, sir?

264

1       A.   I see it, sir.

2       Q.   So what happens is is before you gave your

3  statement on April 29th, 2016, you reviewed your prior

4  statements and the videos.  Correct?

5       A.   Like I said, sir, it was -- yes, it was at the

6  IA office and social media.

7       Q.   You also reviewed the videos before you gave

8  your IA interview on May 5th, 2014.  Correct?

9       A.   That is correct, sir, and actually during the

10  interview.

11      Q.   You had the opportunity to view the video that

12  day before you gave your testimony that day.  True?

13      A.   On -- on May 5th?

14      Q.   Yes.

15      A.   That is correct.

16      Q.   And then you had the opportunity to review the

17  video multiple times thereafter.  True?

18      A.   That is correct, sir.

19      Q.   Did you know when you were out on the driveway

20  that you were being videotaped?

21      A.   Did I know that I was being videotaped while

22  at the driveway at the county jail?

23      Q.   Yes.  Did you know there were videos there?

24      A.   Yes, I did.

25      Q.   And you also looked at the video on the day of

265

1  your interview on April 29th, 2016, didn't you?

2           MR. JEEP DARNELL:  Objection, asked and

3  answered.

4       A.   Are you asking me about 4-29-2016?

5       Q.   (By Mr. Gage)  Correct.

6           MR. ORTEGA:  Which exhibit are you

7  looking at?

8           MR. GAGE:  This is Exhibit 40.

9           MR. JEEP DARNELL:  40.

10      A.   On 4-29-2016 I did not do the shooting review

11  board, it was --

12      Q.   (By Mr. Gage)  Well, go to page 8.

13           At the top the question is:  Let me ask

14  you when he received the cut on the top of his head --

15  we saw the video.  In your mind was it an intentional

16  intent --

17           Blah blah blah.

18           Do you see that?

19      A.   I see it.

20      Q.   So they're talking about the fact that we,

21  meaning all of you, saw the video at that time.

22  Correct?

23           MR. ORTEGA:  Objection, calls for

24  speculation.

25           MR. JEEP DARNELL:  Same objection.

266

1          MR. ORTEGA:  Assumes facts not in
2   evidence.
3     **A.   I'm sorry.  These dates are all confusing,**
4   **sir.**
5     Q.   (By Mr. Gage)  I'm just saying when you look
6   at this, page 8 there talking about the fact, "We saw
7   the video" -- do you see that at line 4?
8     **A.   I see it, sir.**
9     Q.   Again, you're discussing about, "We saw on the
10  video," at line 9.  Correct?
11    **A.   That's correct, sir.**
12         MR. JEEP DARNELL:  Objection,
13  mischaracterization of the evidence.
14         MR. ORTEGA:  Same objection.
15    Q.   (By Mr. Gage)  Then you asked, when they're
16  talking about the videos, at lines 12 to 13, "At what
17  point in the video, sir?"
18         Do you see that?
19    **A.   That's the question I asked, sir, yes, I see**
20  **it.**
21    Q.   Right.  So what happened is is you were
22  reviewing the video with the board as part of your
23  testimony April 29th.  Correct?
24    **A.   This is where I'm getting confused.**
25  **April 29th, I was not at the shooting review board,**

267

1   **sir.**
2     Q.   In the statement that you gave?
3          MR. ORTEGA:  Mr. Gage, just so we're
4   clear, the Exhibit 40, which is the shooting review
5   board transcript, says that the date is May 16, 2014,
6   at 13:18 hours.
7          MR. GAGE:  That's not what mine shows.
8          MR. JEEP DARNELL:  Page 2.  Look at the
9   top of page 2, lines 1 and 2.
10         MR. GAGE:  That's interesting.  It says
11  on the top of every page 4-29-2016.
12         MR. JEEP DARNELL:  I agree.  I agree.  I
13  think that was when it was transcribed --
14         MR. GAGE:  Oh.  That's even more
15  interesting.
16         MR. JEEP DARNELL:  -- by the same company
17  transcribing today.
18         MR. GAGE:  Then you guys can explain that
19  to me later but --
20    Q.   (By Mr. Gage)  Now I'm understanding your
21  confusion.  You gave testimony to the shooting review
22  board on May 16th, 2014.  Is that correct?
23    **A.   That is correct.**
24    Q.   And you had seen the videos with that board at
25  that time.  Correct?

268

1          MR. ORTEGA:  Objection, misstates his
2   testimony and assumes facts not in evidence.
3          MR. JEEP DARNELL:  Same objection.
4     **A.   I don't remember seeing the video with the**
5   **shooting review board.**
6     Q.   (By Mr. Gage)  How many days before your
7   testimony of May 16, 2014, had you last seen the video?
8     **A.   On May 5th.**
9     Q.   May 5th.  All right.  So at a minimum you saw
10  that video 11 -- no -- nine days in advance.  Correct?
11    **A.   That's correct.**
12         MR. GAGE:  I have nothing else.
13         MR. JEEP DARNELL:  I've got a few more
14  questions.
15              FURTHER EXAMINATION
16  BY MR. JEEP DARNELL:
17    Q.   Mr. Romero -- Officer Romero, have you seen
18  the jail surveillance videos that are being referenced
19  by all the attorneys here, have you seen those broken
20  down frame by frame, where instead of one continuous
21  video, it's choppy and slowed down?
22    **A.   I think it was only slowed down once that I**
23  **recall, sir, and that was, I think, during the IA -- or**
24  **at the IA questioning.**
25    Q.   Did you review videos broken down and slowed

269

1   down, framed -- done by frame in preparation for your
2   testimony today?  Don't tell me anything you told your
3   attorney or that you guys discussed.  I'm just asking
4   if you reviewed those.
5     **A.   Not that I recall, sir, no.**
6     Q.   Okay.
7          MR. JEEP DARNELL:  No further questions.
8          MR. GAGE:  Do you have any?
9          MR. ORTEGA:  Just a few.
10              EXAMINATION
11  BY MR. ORTEGA:
12    Q.   Mr. Romero, were you familiar generally with
13  the G4S policies on March 8, 2013?
14    **A.   Yes, sir, I had familiarization with them.**
15    Q.   My understanding is you were asked earlier
16  today if your alleged failure to notify the El Paso
17  police dispatch or any emergency medical personnel
18  while you were at the jail constituted a violation of a
19  G4S policy.  Do you recall that?
20    **A.   Yes, sir, I recall that.**
21    Q.   And my understanding was that your testimony
22  was that you felt that that was, indeed, a violation of
23  G4S policy.  Is that what you testified to earlier
24  today?
25    **A.   That is correct, sir.**

270

1    Q.   Was that a misstatement on your part?
2              MR. GAGE:  Objection, leading,
3    suggestive.
4    A.   We're talking about at the jail, not in
5    transport?
6    Q.   (By Mr. Ortega)  That's correct, sir.
7    A.   Yes, sir, that was an incorrect statement.
8    Q.   Would you like to clarify that statement
9    today?
10   A.   When I was asked about the jail, it was -- it
11   was -- I was referencing the -- about the
12   transporting -- during the transporting, that's when we
13   have an obligation to notify either G4S supervisors or
14   the police officer of a medical emergency that might or
15   should arise while in transport, not at the county
16   jail.
17   Q.   What do you mean by "while on transport"?
18   A.   While we're driving in the van and there's
19   detainees in the van with us.
20   Q.   Other than that, based on your review and
21   understanding of the G4S policies as they were
22   implemented on March 8, 2013, were you under any
23   impression that you had an obligation, duty or
24   requirement to notify El Paso police dispatch or any
25   emergency medical personnel as it related to

271

1    Daniel Saenz in the jail?
2              MR. GAGE:  Objection, foundation,
3    speculation, leading, overbroad, incomplete
4    hypothetical, compound.
5    A.   This is at the county jail?
6    Q.   (By Mr. Ortega)  Yes, sir.
7    A.   No, sir, since we were already -- there was
8    already a police officer there with us.
9    Q.   You were asked earlier this afternoon about
10   what was your concern at the time that you were outside
11   the sally port with Daniel Saenz by yourself.  Do you
12   recall those lines of questions?
13   A.   I do, sir.
14   Q.   You testified, based on certain testimony that
15   you provided to the shooting review board on May 16,
16   2014, that a concern that you had was you losing your
17   job at G4S if you couldn't control Daniel Saenz.  Is
18   that accurate?
19   A.   Yes, it is.
20             MR. GAGE:  Objection, leading, misstates
21   prior testimony.
22   Q.   (By Mr. Ortega)  What other concern, if any,
23   did you have while you were outside the sally port by
24   yourself with Daniel Saenz?
25             MR. GAGE:  Objection, vague, overbroad,

272

1    incomplete.
2    A.   There was -- I was concern -- I was feeling
3    concern for -- for myself, my job, obviously, and the
4    fact of what were we going to do with Mr. Saenz as far
5    as if we were going to transport or get FMS -- EMS
6    personnel were going to arrive there and take care of
7    him.
8    Q.   (By Mr. Ortega)  Let's turn to Exhibit 40.
9    Let me direct your attention to page 34, line 17.
10   A.   You said page what?  I'm sorry.
11   Q.   Page 34, line 17.
12        Are you there?
13   A.   Yes, sir.
14   Q.   You were asked at the time:  What was going
15   through your head?
16        Did I read that accurately?
17             MR. GAGE:  Objection.  In this case it
18   becomes hearsay because it's not a prior consistent
19   statement.
20        But you can answer.
21   A.   Do you want me to answer what I said there?
22   Q.   (By Mr. Ortega)  No, sir.  I'm asking you if
23   you could tell me if I read the question accurately.
24   A.   Yes, sir, you did.
25   Q.   Okay.

273

1              MR. ORTEGA:  Same objection.
2    Q.   (By Mr. Ortega)  Now let's go to the same
3    page, line 24.
4         Can you read what your answer was to
5    that question, please, out loud.
6    A.   (Reading) I was just thinking --
7              MR. GAGE:  Wait.  Let me just make my
8    objection, then you can read it.
9         My objections are the following:  One,
10   that it's not in sequence so it's misleading,
11   mischaracterization.  Two, it would constitute hearsay
12   in this instance.  And, three, the document speaks for
13   itself for best evidence rule.
14        But you can answer.
15   Q.   (By Mr. Ortega)  Okay.  Well, let's -- let's
16   do this instead.  Read page 34, line 17 all the way
17   through page 35, line 10, so we can have a complete
18   question and answer session.
19             MR. GAGE:  All right.  I have most of
20   those same objections, so I'll state them and then you
21   can read it.
22        Hearsay, not subject to an exception.
23   Best evidence rule.  And it's not even a question, it's
24   just having him do an act of reading.
25        But you can do it.

274

1     Q.   (By Mr. Ortega)  All right.  I'll ask the
2  question:  What was going through your head?
3               What was your answer?
4     A.   (Reading) I was thinking, okay, if -- I
5  thought he was just going to go -- I just -- he was
6  just going to go in and out, but --
7     Q.   Question:  Minutes turn to -- I mean seconds
8  to minutes.  What were you thinking?
9               What was your answer at the time, sir?
10     A.   (Reading) I was just thinking that this guy --
11  I hope Saenz doesn't get up.  I just need to keep him
12  down because if -- if he does, then it's just going to
13  be -- going to be me and him and he's probably either
14  going to run away or engage me.  So that's -- that's
15  basically what's -- what's going through my mind and --
16  and I was concerned that -- that he would get up.  That
17  was my concern.  I didn't want him to get up.  That's
18  why I kept looking at him to see if he was kind of --
19  kind of like still like this because I was thinking
20  if he looks like he's even -- he's even going to get
21  up, then I don't know what I'm going to do.
22     Q.   So besides the concern about you losing your
23  job if you were unable to restrain Daniel Saenz, when
24  you were by yourself at the sally port, did you have
25  any other concerns based on what you just read?

275

1               MR. GAGE:  Objection, vague, ambiguous,
2  leading, incomplete and mischaracterization.
3     A.   My other concerns, other than Mr. Saenz, what
4  his actions would be, and -- how would I go about
5  it, and my job, was to get Mr. Saenz to some medical
6  attention, sir.
7     Q.   (By Mr. Ortega)  Now, lastly, you were shown
8  earlier this afternoon Exhibit 10, which contains a --
9  a photo of -- of Daniel Saenz which was previously
10  shown on the video.  Do you recall that?
11     A.   I do, sir.
12     Q.   And you were asked several questions about
13  certain red markings that are throughout Daniel Saenz's
14  upper body.  Correct?
15     A.   That's correct, sir.
16     Q.   Looking at Exhibit 10, are you able to
17  determine if any of those markings are bruises,
18  contusions or dry blood?
19               MR. GAGE:  Overbroad, compound.
20     A.   I'm not able to distinguish, no, sir.
21               MR. ORTEGA:  Pass the witness.
22               MR. GAGE:  I have a couple of others.
23                    FURTHER EXAMINATION
24  BY MR. GAGE:
25     Q.   Let's start with the end first.  You went

276

1  through with your lawyer from Exhibit 40 at pages 34 to
2  35 and you were asked if there were other concerns and
3  you said that dealt with getting medical attention was
4  the only other concern.  Correct.
5     A.   You said page 34?
6     Q.   34, 35.  What you read with your lawyer.
7     A.   Okay.  And your question was, sir?  I'm sorry.
8     Q.   And then you said other than what you read
9  with him, your only concern dealt with getting medical
10  attention for Daniel Saenz at that point.  Correct?
11               MR. ORTEGA:  I'm sorry.  Just so I'm
12  clear, you're asking aside from what he read, did he --
13  the additional concern was Daniel Saenz receiving
14  medical attention.  Correct?
15               MR. GAGE:  Right.
16               MR. ORTEGA:  Sorry.
17     Q.   (By Mr. Gage)  Do you understand that?
18     A.   Yes, I do.
19     Q.   All right.  I -- I'm happy to have your lawyer
20  ask the question so that you're understanding it, but I
21  just -- and he's accurate.  I just -- so why don't we
22  let your lawyer say his statement again or read it back
23  for you so you know that is the question pending.
24               MR. GAGE:  Okay.  We'll have it read
25  back.

277

1               So here's what I want for the record so
2  you'll know.  We'll have the question from defense
3  counsel put in here and then his client can answer that
4  so we'll have it all.
5               (The Court Reporter read back:  MR.
6               ORTEGA:  I'm sorry.  Just so I'm clear,
7               you're asking aside from what he read,
8               did he -- the additional concern was
9               Daniel Saenz receiving medical attention.
10               Correct?)
11     A.   Yes, sir.
12     Q.   (By Mr. Gage)  And that was the only other
13  item.  So there was the statements of your concerns in
14  Exhibit 40 at pages 34 to 35 and the only other item
15  not covered there, your testimony was, medical
16  attention for Daniel.  Correct?
17     A.   That is correct, sir.
18     Q.   Yet when you were asked those questions, you
19  did not say that your concern was getting him medical
20  attention, did you?
21     A.   That is correct, sir.
22     Q.   Instead what you testified to was your concern
23  was, "There goes my job."  Correct?
24     A.   That is correct, sir.
25               MR. JEEP DARNELL:  Objection,

278

1  mischaracterization of the evidence.

2          MR. ORTEGA:  Same objection.

3      Q.  (By Mr. Gage)  This statement of yours about

4  your concern involved getting medical attention is

5  something that you've testified to after you had a

6  chance to take a break and meet with your lawyer.

7  Correct?

8      A.  This statement here?

9      Q.  The statement you've testified to, the

10 questions from your own counsel, he asked you questions

11 after the two of you were able to meet at the last

12 break.  Correct?

13     A.  These questions that he asked me?

14     Q.  Let me try it a different way.

15     A.  Yes, please.

16     Q.  A short while ago we took a break.  Correct?

17     A.  That's correct.

18     Q.  I don't want to have you testify to what your

19 discussions were with your attorney, but you met with

20 your attorney for a period of time, several minutes at

21 least.  Correct?

22     A.  That's correct.

23     Q.  It was after that meeting between you and your

24 attorney that he has now asked you these questions on

25 the record.  Right?

279

1      A.  That's correct.

2      Q.  And as part -- after that meeting with your

3  attorney where you were asked questions, that's the

4  first time today that you testified that your concern

5  was about medical attention at this time.  Correct?

6      A.  That is correct.

7      Q.  And you had not testified on three prior

8  occasions when you were questioned under oath about

9  this concern of yours for medical attention.  True?

10     A.  That's correct, I had not put it on my

11 statements.  I had not said it in my statements, those

12 prior statements.

13     Q.  And you had all the time you needed that you

14 felt you needed in order to make your first statement

15 in March 2013.  Correct?

16     A.  I don't -- I don't feel like that -- that's an

17 accurate statement that I had all the time.

18     Q.  Did anybody pressure you?

19     A.  No, sir.

20     Q.  Similarly, your discussion about policy and

21 changing your answers under oath today, you did that

22 only after you had a chance to meet with your attorney

23 during the last break.  Correct?

24          MR. JEEP DARNELL:  Objection, vague.

25     Q.  (By Mr. Gage)  Go ahead.

280

1      A.  No, sir, I don't feel like that's correct.

2      Q.  You changed your testimony.  This morning you

3  testified you had violated policies of G4S.  Remember

4  that.  Correct?

5      A.  That's correct.

6      Q.  You took a break this afternoon where you met

7  with your attorney.  Right?

8      A.  That's correct.

9      Q.  After that break you then changed your

10 testimony from this morning about violating policies.

11 Right?

12     A.  With regards to -- no, I don't feel like I

13 violated -- or violated the -- the G4S policy.  What I

14 meant was it was -- there's a difference between the

15 transporting and being at the county jail, sir.

16          MR. GAGE:  Move to strike, nonresponsive.

17     Q.  (By Mr. Gage)  My question is simply is a

18 timing sequence.  Before your meeting with the attorney

19 today during a break, you testified under oath to

20 violating a policy.  True?

21     A.  Which policy is that, sir?

22     Q.  The one that you have told us you violated,

23 the transportation policy of G4S?

24     A.  Which is what, sir?

25     Q.  You don't know what -- did you answer

281

1  questions about a policy violation by your attorney two

2  minutes ago?

3      A.  I did, sir.

4      Q.  That's what we're referring to.

5      A.  Okay.

6      Q.  This morning your testimony was different

7  under oath than your testimony was when you were

8  questioned by your own counsel.  Correct?

9      A.  That's correct.

10     Q.  In the time between you gave your testimony

11 this morning and the questions of your attorney, you

12 had a chance to meet with him over a lunch break for

13 over an hour.  True?

14     A.  That's correct.

15     Q.  And you met with him for anywhere from five to

16 twenty minutes on at least two other occasions today

17 during this deposition.  Correct?

18     A.  That's correct.

19          MR. JEEP DARNELL:  Let me object to that

20 line of questioning on commenting on the

21 attorney-client privilege.

22     Q.  (By Mr. Gage)  You can go back to Exhibit 39,

23 please.

24          You said you didn't have sufficient time

25 to review this statement, I believe.  Is that correct?

282

1    A.   I'm sorry.
2    Q.   Did you have sufficient time to review your
3  statement to make sure it was true and correct?
4    A.   Prior to when, sir?
5    Q.   To when you signed it.
6    A.   That I recall, I don't know how much time I
7  sat there reading the statement, but I -- I know I read
8  through the statement, sir.
9    Q.   Did you read the statement and find it to be
10 true and correct?
11   A.   That's correct.
12   Q.   Did you then have a chance in May of 2014 to
13 review that statement that you had given in March of
14 2013?
15   A.   Not that I recall, sir.
16   Q.   Go to exhibit -- is it 41?  The May 5th?
17        MR. JEEP DARNELL:  Yeah, 41.
18        MR. GAGE:  41, thanks.
19   Q.   (By Mr. Gage)  The very first question asked
20 of you:  Do you still stand by the statement you
21 provided to CAP on 3-8-13?
22        Answer:  Yes.
23        Do you see that?
24   A.   I see it, sir.
25   Q.   CAP, what does that stand for?

283

1    A.   Crimes against persons.
2    Q.   And the statement that's being referred to is
3  your statement from March 8th, 2013, which is marked as
4  Exhibit 39.  Right?
5    A.   That's correct.
6    Q.   So you obviously reviewed your statement of
7  March 8, 2013, in order to answer the first question on
8  May 5th, 2014.  Agreed?
9    A.   That's correct.
10   Q.   You also had the opportunity to review the
11 videotapes.  Correct?
12   A.   Only -- only on March -- I mean May 5th did I
13 have a chance to review the video, not my statement.
14   Q.   Is it your claim that on May 5th, 2014, you
15 only read [sic] the video, you did not read the
16 statement of March --
17   A.   To the best of my knowledge, yes, sir, I only
18 saw the video.
19   Q.   So when you say in response, "Do you still
20 stand by the statement you provided to CAP on 3-8-13?"
21 and you said, "Yes," that was just based on your
22 recollection because you had not read that statement?
23   A.   Well, I had read it 3-18 -- I mean 3-8-13,
24 sir.
25   Q.   And that's the only time.  Correct?

284

1    A.   That's correct.
2    Q.   When you did your second statement, which is
3  Exhibit 41, did you have a chance to review the
4  statement and make any changes or corrections to it?
5    A.   In my second statement?
6    Q.   Yes.
7    A.   Yes, I did have a chance.  You're talking
8  about the IA statement?
9    Q.   The IA statement of May 5.
10   A.   Yes.
11   Q.   You were given the opportunity to review your
12 statement and make a change or correction if you wanted
13 to.  Right?
14   A.   That is correct.
15   Q.   And you said you did not want to do that.
16 Right?
17   A.   That is correct.
18        MR. JEEP DARNELL:  Which one is the IA
19 statement?
20        MR. GAGE:  41.
21        MR. JEEP DARNELL:  I'm going to object to
22 the characterization as a statement.
23   Q.   (By Mr. Gage)  At page 3 of Exhibit 41, near
24 the bottom, it says:  I have read the above statement
25 and find it to be true and correct to the best of my

285

1  knowledge.  Detective J. Poust gave me the opportunity
2  to review this statement and I do not wish to add or
3  change anything.
4        Do you see that sentence?
5    A.   I see it, sir.
6    Q.   There's a signature below it.  Is that your
7  signature?
8    A.   That is correct.
9    Q.   And you signed it and then it was sworn as a
10 true affidavit in front of a notary public.  Is that
11 correct?
12   A.   That's correct.
13   Q.   Were you also advised that if you thought of
14 any additional information that you had left out that
15 you had the opportunity to change or correct your
16 statement?
17   A.   I don't remember them saying that, no, sir.
18   Q.   Were you advised that if you had new
19 information and you failed to provide it, that you
20 could be disciplined for it?
21        Without looking, just do you know?
22        MR. ORTEGA:  You can take look at the
23 document.  That's fine.  You can take a look at the
24 document.
25   Q.   (By Mr. Gage)  Okay.

286

1     A.   I don't recall them saying that, if I withheld
2  information, sir.
3     Q.   So now I'm going to point you to something in
4  the document.
5          Look at page 3 of Exhibit 41, second
6  paragraph:  Should you remember any relevant
7  information, you are ordered to immediately notify the
8  Internal Affairs Division and provide them with the
9  information.  If it is after hours, then no later than
10 the next working day to an IAD supervisor.  Failure to
11 comply with any of the directives above can result in
12 discipline.
13          That's what you were told.  True?
14    A.   That's correct.
15    Q.   You did not make any changes to your
16 statements, plural, after being advised that you were
17 ordered to provide any information that you had left
18 out, did you?
19    A.   That's correct.
20          MR. GAGE:  I'm done.
21          MR. JEEP DARNELL:  I'm done.
22          MR. ORTEGA:  I'll reserve my -- all my
23 questions at the time of trial.
24          MR. JEEP DARNELL:  I'll reserve.
25          MR. GAGE:  Do I have to say I reserve,

287

1  too?
2          THE VIDEOGRAPHER:  This concludes the
3  deposition.  The time is 6:19 p.m.  We're off the
4  record.
5          MR. GAGE:  Well, before we go off the
6  record, if it's Texas law I have to reserve, then I'm
7  reserving.
8          THE VIDEOGRAPHER:  Off the record at
9  6:19.
10          (The deposition concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

288

1            CHANGES AND SIGNATURE
2  PAGE  LINE   CHANGE                    REASON FOR CHANGE
3
4
5
6
7
8
9
10
11
12
13
14
15    I, ALEJANDRO ROMERO, have read the foregoing
16 deposition and hereby affix my signature that same is
17 true and correct, except as noted herein.
18
19          _____
             ALEJANDRO ROMERO
20
     SUBSCRIBED AND SWORN TO before me this the
21 _____ day of _____, 2017.
22
                    SEAL:
23
   _____
24 NOTARY PUBLIC
   EXPIRES:_____
25

289

1            CERTIFICATION
2
3     I, the officer before whom the foregoing
4  deposition was taken, do hereby certify that I
5  personally recorded the testimony of the witness whose
6  testimony appears in the foregoing deposition; that
7  said deposition is a true record of the testimony given
8  by said witness; that I am neither attorney for,
9  related to, nor employed by any of the parties to the
10 action in which this deposition is taken, and that I am
11 not a relative or employee of any attorney employed by
12 the parties hereto, or financially interested in the
13 action.
14
15
16
                    Teri C. Finnegan
17                  Certificate No. 2911
                    Expires: 12-31-2017
18                  Firm No. 1
19
20
21
22
23
24
25

| 0 |
| --- |

**00** 259:6

**000264** 3:15

**000275** 3:16

**00512** 3:19

**00514** 3:20

**00852** 257:4

**00870** 259:1

**00874** 259:1

**00900** 259:4

| 1 |
| --- |

**1** 229:6 247:19
  248:17 249:9 267:9
  289:18

**1,000** 204:9,12

**1:44** 160:6

**10** 158:12,13 159:9
  162:10,11,15,24
  163:14 183:7,11
  189:18,20 199:1
  204:3,5,12 205:11
  212:1 230:17 250:16
  252:13 255:8 273:17
  275:8,16

**100** 245:16,17,18

**109** 1:17 2:7

**10th** 40:14

**11** 205:22 231:20
  268:10

**11:43** 87:11

**1100** 2:11

**12** 192:18 194:9,11
  266:16

**12:02** 87:14

**12:41** 115:19

**12:46** 115:22

**12-31-2017** 289:17

**12th** 2:7

**13** 194:10 196:4
  231:21 266:16

**13:18** 267:6

**14** 196:5 205:12

**14-CV-244PRM** 1:8

**15** 158:12
  162:10,11,15,24
  198:25 199:1 200:25
  201:5 202:6

**15:00** 104:4

**15-minute** 158:13
  159:10 163:14

**16** 4:3 181:10 201:11
  202:6 230:17 263:18
  267:5 268:7 271:15

**160** 3:15

**167** 3:17

**16th** 267:22

**17** 168:9 202:13
  272:9,11 273:16

**18:00** 147:6

**185** 45:23

**190** 45:23

| 2 |
| --- |

**2** 4:2 181:23 192:20
  249:15 263:18
  267:8,9

**20** 115:13 122:22
  194:9,12 259:14

**20/20** 209:17,23
  210:14 213:15

**201** 2:11

**2012** 18:4,5,12 19:19
  40:4 73:10,12

**2013** 19:23 20:1,3,7
  24:17,21
  40:5,6,8,13 42:15
  48:8 52:2,16 63:5,9
  71:12 72:7 88:5
  92:16,20 93:5 95:22

96:1 99:25 100:3,10
  101:24 102:9 103:23
  104:3 139:23 151:11
  153:23 154:12 158:3
  160:17 179:4
  203:12,19,21
  204:6,20,23 205:4
  219:10 231:3 233:14
  260:18 261:1,24
  269:13 270:22
  279:15 282:14
  283:3,7

**2014** 40:14,24,25
  42:15 255:22 264:8
  267:5,22 268:7
  271:16 282:12
  283:8,14

**2015** 42:8 60:25

**2016** 60:25 168:4
  199:10 206:21
  262:25 263:11 264:3
  265:1

**2017** 1:17 5:2 143:18
  288:21

**2018** 92:13,15

**20th** 263:11

**21** 201:2,5

**210** 4:3

**212** 2:15

**22** 168:9 184:8,12
  228:16,20

**23** 228:17,20

**23002** 2:4

**24** 181:10 228:17,20
  229:6 230:17 273:3

**25** 168:9 181:22

**254** 3:18

**256** 3:21,22,23,24,25

**258** 3:5

**26** 15:20 231:20

**261** 3:6

**267** 3:7

**268** 3:8

**27** 15:20,21

**274** 3:9

**287** 3:11

**288** 3:12

**2911** 289:17

**29th** 168:4 262:25
264:3 265:1
266:23,25

---
**3**

**3** 32:8 37:13,24
163:2 169:18 201:12
202:13 284:23 286:5

**3:00** 104:6 105:10

**3:07** 160:9

**30** 122:22

**310** 2:15

**3-18** 283:23

**34** 205:11 272:9,11
273:16 276:1,5,6
277:14

**35** 273:17 276:2,6
277:14

**36** 208:6

**3-8-13** 282:21
283:20,23

**39** 160:15,16 163:3
164:10 169:17
175:14 233:14 235:4
237:12,24 239:2
242:11 260:11
281:22 283:4

**39A** 3:15 160:13

---
**4**

**4** 175:14 181:10
201:13 266:7

**4:00** 105:18

**4:30** 105:11

**40** 3:17 108:15,16
110:25 111:4,7
168:1,2,4 180:22
183:6 184:10 189:19
192:19 194:10
196:3,4 198:25
205:11 208:6 228:16
230:17 231:20
263:12,14,18
265:8,9 267:4 272:8
276:1 277:14

**41** 3:18 255:23
282:16,17,18
284:3,20,23 286:5

**42** 3:21 257:1,2

**4-29-2016** 265:4,10
267:11

**43** 3:22 257:15,17,20
258:17,25

**44** 3:23 257:15,17
258:20 259:1

**45** 3:24 257:15,17
259:4

**46** 3:25 257:15,18
259:5

---
**5**

**5** 3:4 181:22
183:6,11 194:10
233:13,15 284:9

**5:00** 105:12,15

**5:05** 243:22

**5:15** 105:15

**5:21** 243:25

**5:30** 105:18 107:16

**50,000** 219:22 221:12

**51** 4:2

**551** 41:23

**5th** 255:22 264:8,13
268:8,9 282:16
283:8,12,14

---
**6**

**6** 183:6,11 184:7,11
228:17,20 237:24

**6:00** 147:6

**6:10** 159:23

**6:15** 159:23

**6:19** 1:17 287:3,9

**6:30** 105:19 147:7

---
**7**

**7** 201:12 229:6
249:20 250:11

**700** 1:18

**72** 62:14,16 215:13

**79901** 1:18 2:7,12,16

---
**8**

**8** 24:17 63:5,9 88:4
99:25 100:3,10
101:23 102:9 143:18
153:23 164:6 166:8
179:4 231:3 233:14
239:1,15 249:5
260:11 261:24
265:12 266:6 269:13
270:22 283:7

**890** 259:6

**8th** 24:21 48:8 49:9
52:1,16 61:21 62:4
64:1 65:12 72:13
93:5 104:3 112:8,11
125:18 139:22 158:2
160:17 182:12
219:10 220:19
236:23 260:18 261:1
283:3

---
**9**

**9** 1:17 5:2 167:2
241:14 266:10

**9:56** 1:17 5:2

**91367** 2:4

---

**A**

---

**a.m** 1:17 5:2 87:11

**abilities** 39:6,24
75:22 76:9

**ability** 16:9,14
75:15 90:25 91:21
198:16,23

**able** 74:17 79:6,9,12
92:9 95:25 97:12
131:23 138:23 165:4
178:25 191:2 196:19
238:16 245:15
249:10 275:16,20
278:11

**absolutely** 75:21
212:20

**academy** 20:1
40:7,9,10,12,16
42:13 144:25

**accept** 148:4 182:24
183:15 184:4,21
185:2 236:13 237:2

**accepted** 183:2,4

**accepting** 183:19

**accommodate** 149:22

**accompany** 106:21

**accompanying** 107:4

**according** 48:3
157:23 182:16
183:21 184:19
185:3,4 199:13
203:9

**accurate** 64:17,18
99:15 116:23 148:13
156:23 160:20
163:20,22 164:5,11
168:7 176:7 225:14
239:24 242:10
249:16 255:24
260:2,3,15
261:2,9,14,21 262:7
271:18 276:21
279:17

**accurately** 272:16,23

**accuse** 212:13,15

**accusing** 212:18,21

**across** 23:18 24:1

**act** 83:25 149:19,22
150:6 165:22 186:18
187:2 273:24

**acted** 180:7,15

**acting** 123:19

**action** 27:24 211:2
226:12 230:25
289:10,13

**actions** 47:23 179:10
191:18 262:8 275:4

**activate** 165:19

**active** 192:25

**activity** 247:14

**acts** 14:19 15:23
16:3 88:25

**actual** 112:2

**actually** 68:25
125:12 137:4 138:7
161:16 194:22
201:13 226:18
231:12 233:25
242:18 264:9

**add** 285:2

**additional** 227:2
276:13 277:8 285:14

**Additionally** 20:13

**administrative** 3:19
263:21

**advance** 171:2,17
268:10

**advantage** 68:25 69:7
90:8

**advise** 30:23 94:9

**advised** 33:3 237:1
285:13,18 286:16

**affairs** 41:14

**accurately** (col3)

62:2,11 64:9 240:1
256:1 286:8

**affect** 7:8 16:14
196:8

**affected** 220:9

**affidavit** 285:10

**affirmed** 141:4

**affirming** 68:9

**affix** 288:16

**afforded** 215:23

**afraid** 66:19,25
67:10,14 68:12
96:19 161:4 199:2
208:19

**afternoon**
259:18,19,20 271:9
275:8 280:6

**afterwards** 24:12

**against** 25:23
26:10,16,24 32:24
35:13 41:15,17
54:3,14 55:10,11,17
56:6 57:24 59:10
60:16,17 112:18
120:16,18 121:1
122:2,20 123:18,21
127:8,10,15,18
129:3 150:17 158:17
162:20,21 163:6
178:14 190:10,17
192:21 225:20
235:2,7 239:3 283:1

**agencies** 36:9,12,21
37:6 42:20

**agency** 33:19 41:18
145:6

**agitated** 11:19

**ago** 9:23 20:22 47:1
52:5,6 53:6 85:5,9
199:15 210:2 261:17
278:16 281:2

**agreed** 14:20 85:12
114:21 176:24

---

244:14 245:2 246:8
248:10 283:8

**agreement** 189:1

**Aguirre** 249:25
250:2,4

**ahead** 8:2 15:14,15
26:3 33:16 58:23
67:20 69:6 76:1,13
80:2 86:19 101:5
120:25 124:23
126:19 140:12
142:10 155:5 156:1
166:18 173:22 174:8
197:3 202:2 203:17
207:2 228:10 230:19
232:25 244:24
245:7,23 251:12
253:25 279:25

**ahold** 46:22 80:7
117:24 118:6,18
119:2 124:12 175:23
176:4

**aid** 97:20,24 98:2
110:1

**al** 5:4,5

**alcohol** 6:24

**Alejandro** 1:10,14
2:9 3:3,17 5:3,18
6:1 288:15,19

**alive** 78:8,14 240:21

**allegation** 42:1,3

**alleged** 247:14
269:16

**allow** 212:6

**allowed** 22:10 48:1
84:13 89:13,15

**alone** 60:1,4,14
66:3,19,23
67:1,14,17,24,25
68:3,12 90:18 109:3
137:10,23 200:5
207:7,13 209:1

**already** 97:14 98:1,9

101:22 132:25 133:4
160:1 171:21,23
193:22 247:12
271:7,8

**altered** 242:15

**am** 151:17 175:25
200:9 212:21 243:17
289:8,10

**ambiguous** 260:7
262:3,11 275:1

**ambulance** 78:4
148:21

**Amendments** 28:14
35:15

**Americans** 149:19,21
150:6

**ammo** 232:22 233:18

**ammunition** 124:11
125:1,22

**amount** 20:10 38:1
48:17 67:21 121:22
226:5,6,14

**Ana** 17:23 19:20
20:4,11,15,23 22:7
46:18 69:17 73:14
221:2 229:3

**A-N-A** 18:1

**angry** 7:24
8:3,5,11,18,25
9:4,10,17,22,25
10:5,8,11,16,20,24,
25 11:4 12:4,21
14:9,18 15:7,22
16:2,4,18 17:5

**ankles** 76:8 89:1
150:23

**answer** 6:17 17:9
25:6 27:14 30:7
31:17 47:15
50:23,25 51:1,4,22
57:12 81:3,10 92:1
99:2 119:7,11 120:9
134:10 137:13
152:22 157:6

168:11,25 169:12
171:13,21,22,23
172:1,19 177:12
182:2 183:8,11
184:7,13 192:24
194:17 196:14 199:4
201:19 203:2 204:16
208:12,19 209:9,19
212:7,10 216:1,10
228:18,25 230:14
231:1,22 233:5
238:17 260:9 261:5
262:13 272:20,21
273:4,14,18 274:3,9
277:3 280:25 282:22
283:7

**answered** 29:25 30:6
31:22 33:14
58:16,22 84:3,16
124:21 157:13
164:23 173:21 174:7
204:14 206:3 210:13
227:5 232:24 233:10
236:18 238:15
240:24 265:3

**answering** 31:9 32:10
51:21 171:12

**answers** 29:23 201:1
261:9,12 262:8
279:21

**anybody** 19:23 37:9
44:25 47:8 60:8
91:10 101:7,8 103:7
107:3 141:16 143:22
182:14 200:16
254:25 255:15
279:18

**anymore** 257:16

**anyone** 94:9 97:5
133:21 134:13,17
137:3 138:6,10
141:11,18 146:10,15
180:13 219:21 220:4
227:3 241:10

**anything** 6:24 20:18
32:11 33:11 37:5

50:1 53:9 54:22,24
55:2 56:23 59:24
61:23 63:6,10
64:6,11 68:4 79:19
80:11,15 81:3
82:3,7,24 86:24
87:2,3 96:1 110:13
124:19 139:11
143:21 152:3,4
154:14 170:15
172:6,7 174:16,24
187:6,14,15,19,21
188:9,19 189:5
190:24 218:24 229:9
232:17,19 242:25
243:8 247:4 269:2
285:3

**anywhere** 17:14 36:2
37:16 145:6 202:5
214:15 246:22 247:5
253:4 255:8 281:15

**apart** 69:8

**appear** 8:5 54:16
111:18 161:12
190:6,10,13 192:10

**appeared** 59:14 78:7
127:23 174:25 254:2

**appears** 289:6

**applied** 47:12
58:12,18

**apply** 47:16

**appropriate** 85:21
223:13 226:6

**approximate** 105:12
111:2 121:22 162:8

**approximately** 18:7
45:23 104:4
105:10,17,23 108:17
113:19 121:16
123:13,17 147:6
158:12 159:25 168:4

**April** 168:4 199:9
262:25 263:11 264:3
265:1 266:23,25

**arbitration**

61:4,5,6,7

**area** 21:16,17,18
22:21 23:16,19
24:2,3,5 80:10
83:13,19 84:25
104:16 126:25
129:21,22 132:17
137:18 159:4 163:11
205:17 233:16 234:6
241:6 251:23

**areas** 68:21,22 99:11

**argued**
212:10,11,12,15

**argument** 212:16
213:10

**argumentative** 66:10
164:7 176:17

**arise** 12:23,25 13:13
270:15

**arm** 21:14,15
22:15,17,20
23:11,13,16,17,18,1
9 24:1 58:8 77:3
130:1,3 131:12,17
180:11 245:8,16,18
246:1

**armed** 99:12

**armpit** 21:16,17
22:21 23:17 24:2
129:22 130:25
131:10,13,17

**armpits** 131:3

**arms** 70:15,16,19
71:15 76:20 77:1
111:12 112:18,25
117:24 118:19 119:2
125:11 131:2,9
133:25 135:4,22
136:3,9,20,24 137:4
138:7,13 152:9
164:18 175:24 176:5
202:14 223:14
244:12,13,19,23
245:19 246:6

**arose** 155:17

**arrest** 45:7 220:4

**arrested** 185:10

**Arrestee** 118:16,18
163:5 175:24
176:2,4,9
177:2,3,17,18
233:22 234:20
235:6,21 238:1
239:3,15
240:14,15,16

**arrestees** 32:22

**arrival** 94:3

**arrive** 94:3 96:22
97:1 105:16 128:18
272:6

**arrived** 78:2
94:3,4,25 104:11,13
105:24 107:15,18
159:5 185:23 187:9

**arriving** 116:4

**aside** 276:12 277:7

**asleep** 192:11,13,14
193:2,6

**assaulted** 185:13

**assaultive** 150:17
243:4

**assess** 19:3

**assign** 91:19

**assignment** 104:8,9

**assist** 77:20 93:6
97:17 98:7,9
99:7,9,12 109:8,12
126:1 129:5 131:23
150:7

**assistance** 16:20
17:4 92:14,17 95:16
96:9,10
97:6,11,19,20,25
98:3 100:8
109:3,14,25 126:3
146:11,16,19,23
147:3 167:22 168:21

193:12 227:2

**assisted** 93:10
109:16 110:21

**assisting** 125:21
151:19 234:4

**associated** 8:18

**assume** 16:13 39:1
59:17 78:22 124:2
148:2 229:18 247:24
248:14

**assumes** 9:13 47:13
169:10 202:22
206:23 255:3,9
266:1 268:2

**assuming** 217:4

**Atkins** 183:13

**attach** 89:5

**attached** 89:18

**attainable** 91:12

**attempt** 44:14 59:11
130:18 172:22
173:10

**attempted** 25:2,3,10
120:10 125:15
129:2,20 131:3
134:18 152:9 239:4

**attempting** 64:25
111:8 128:13,16,21
131:21 138:25 143:5
163:22 175:2 176:20
191:20 195:9

**attempts** 60:16

**attention** 147:23
148:6,8,12,19,23
152:18 155:9 167:2
184:23 243:14
248:15,24 272:9
275:6 276:3,10,14
277:9,16,20 278:4
279:5,9

**attorney** 27:22 269:3
278:19,20,24
279:3,22 280:7,18

281:1,11 289:8,11

**attorney-client**
281:21

**attorneys** 268:19

**Audio** 3:17

**August** 1:16 5:2
40:25 143:18

**authorized** 109:20,21

**available** 22:10
70:7,11 73:19 150:7

**avoid** 87:17 98:20
178:24

**aware** 15:6 45:16
70:1 72:7 82:12
87:16,20
92:13,16,19,20
99:22 106:4
171:1,15 183:14
196:22 247:1 257:21

**awareness** 179:17,20
186:7

**away** 44:5,6 46:11,23
47:4,6 77:1
90:10,13,20,22
105:1 108:13 129:6
133:12 135:19 148:9
159:10 187:8 190:23
195:20,24
196:9,16,24
197:7,11,13,22
245:16,17,18
254:16,19 274:14

**Azteca** 259:7

━━━━━━━
B
━━━━━━━
**backs** 13:8 198:11

**backup** 66:23 67:11

**bad** 96:17,23 147:12

**badge** 256:9

**bag** 256:17,19,22

**bags** 256:16

**balance** 77:12 218:10

**balanced** 54:7 55:20
128:12 158:20

**bang** 77:14 114:11
208:2 247:8 249:17

**banged** 246:25

**banging** 196:10 239:3

**bangs** 173:9,19

**barricaded** 96:18

**baseball** 50:12

**based** 9:4 16:1 32:24
39:4 79:21 82:23
178:25 200:17
216:4,10,11 223:11
247:25 270:20
271:14 274:25
283:21

**bash** 64:25

**bashing** 77:2 180:10
194:2

**basic** 191:12

**basically** 53:3
148:21 150:20
154:17 202:15
221:11 274:15

**basis** 230:5

**bat** 50:12

**Bates** 3:15,19 258:21

**baton** 145:19 229:2

**Beat** 232:19

**became** 40:23 154:9

**become** 37:18,19
94:11 165:21

**becomes** 272:18

**begins** 173:11 233:17

**behalf** 1:5 5:10,12
186:19

**behavior** 150:17
178:25 179:4,12,13
181:15

**behind** 22:15,17,25

23:6 70:19 71:5,16
77:13,15 88:21
89:17 106:11 113:18
114:1,8 124:18
130:5 131:16
135:5,22
136:3,9,14,20,24
137:4 138:7,13
165:3 179:24,25
180:4,9 186:6
198:11 233:22 244:4
247:10

**believe** 7:1 28:23
40:4 44:4,17 60:20
64:12 78:14 81:4
82:24 86:24 87:4
96:10 100:25 101:23
102:9 103:1,3
117:13 124:14
125:13,23 127:7
129:2 137:8 139:7,8
141:4 142:2,11
146:5,25 147:1,9
152:17 154:24
160:22,24 161:2
166:15 180:16
182:23 185:12
186:20 191:11
195:11 196:7,8
198:1,8 228:4 233:3
249:17 251:5 255:6
258:17 261:8
262:6,18 281:25

**believed** 47:3 81:22
156:21 157:20

**believing** 224:1

**belly** 71:21,23,24,25
72:6,19,24
73:6,9,15,16,18,22
87:25 88:2,10,14

**belt** 80:9
83:6,8,9,19,21
151:1
162:3,7,9,16,22
163:9 208:4 216:24

**belts** 150:21

**bench** 129:14,15

**benefit** 70:18 95:24
217:21 218:19

**benefits** 93:12

**bent** 215:3

**besides** 72:13 74:2
139:6 170:21 274:22

**best** 6:23 7:2,6,14
63:17 69:14 78:23
105:9 140:14,16,20
146:4,24 154:13
168:8 175:23 177:10
191:20 207:1 219:8
226:13 241:17
261:20 273:13,23
283:17 284:25

**Betancourt** 2:19

**better** 204:11 220:23
225:21 243:17
256:12

**bgage@goldbergandgag
e.com** 2:5

**bicep** 129:21 130:2

**bicep/tricep** 21:18
22:20

**biceps/triceps** 23:19

**billy** 71:22

**bit** 57:6 58:7,14
86:23 240:6

**biting** 65:3 225:13

**black** 258:20

**blah** 233:11,12
265:17

**blank** 53:3,8

**blast** 220:5

**bleed** 122:8

**bleeding** 120:22
121:3,5 122:13
152:10,24 248:13

**blocked** 110:6

**blocking** 110:14

**blood** 77:22 121:9,13
123:5,15,16 152:13
184:3,15 247:22
248:5 252:18,19
253:5 275:18

**blows** 11:18

**board** 3:17 168:3
182:14 209:23
213:14,19,23 260:12
262:25 265:11
266:22,25
267:5,22,24 268:5
271:15

**bodily** 103:7,10
132:11,13

**body** 23:18 24:1,6
135:6 162:19,20
194:8 221:16 246:23
247:6 251:19
253:4,8 254:13
255:1 275:14

**booking** 106:22
107:5,23 184:14

**Border** 41:21 145:15
146:2

**born** 20:2

**bottom** 150:21 169:19
200:25 241:14
284:24

**Boulevard** 2:4

**Brad** 79:3 85:15
186:11 188:25
227:20

**Bradley** 2:3 5:9

**break** 79:4
85:2,10,12 87:10
115:13 151:16
243:21 278:6,12,16
279:23 280:6,9,19
281:12

**breath** 54:8,10

**breathing** 54:11

78:15,16,20 79:7,9
225:17 240:16

**bring** 46:11 70:16
213:2,7

**bringing** 46:24
161:18 248:3

**broad** 133:23

**broke** 41:22 42:1

**broken** 42:9,10
132:18 268:19,25

**brought** 91:11

**bruises** 275:17

**buddy** 56:15

**building** 110:16

**bullet** 250:20,24
251:6 252:13

**burning** 193:24

**business** 229:16,19
230:20

**buttocks** 239:18

**button** 116:3 165:17
166:4,9

----

**C**

**Caballero** 259:7

**California** 2:4

**calisthenics** 46:4

**calm** 56:16,20,21
57:1,2

**calves** 75:21

**Campbell** 107:19

**cane** 228:3,4,5

**CAP** 61:19 282:21,25
283:20

**capable** 7:20

**capacity** 72:14

**car** 106:11 110:16
170:3

**card** 41:23,25 42:9

257:12

**care** 85:8 141:13
142:5 153:17 154:15
179:7,14,19
180:6,14 210:5
249:14 272:6

**career** 18:19 28:1
34:2 98:4 153:20

**carefully** 6:15 63:14
111:15

**carried** 119:18
175:11 202:10,11

**carries** 6:10

**carry** 91:16 92:25
119:19 120:10
128:16,21 130:19,24
131:4,6,9 132:3
151:5 152:9 176:20
202:21 203:8

**carrying** 128:20
129:17,23
130:5,17,20 131:24
176:14,24 178:10

**case** 50:18 51:7 99:5
210:17 272:17

**catch** 54:8 77:14,16
115:1 243:14

**catching** 54:10

**cause** 12:5 86:6,16
132:14 166:1 195:25
199:21 200:21
201:17 250:25

**caused** 9:9,16
86:15,24 87:4 167:5
255:7

**causes** 11:22

**causing** 167:13

**caution** 50:22
180:6,15,19 182:1

**CBP** 99:9

**cell** 21:2 44:18
104:16 137:11,18
146:13 147:14,18

151:23 152:11,15

**center** 10:8 17:24
18:2,8,13 19:15,21
20:4,11,15,24 73:14
88:3,9 104:25 105:7
133:3 149:5
161:16,25 221:3
246:21

**certain** 8:13 32:19
174:12 245:13 246:4
251:2 271:14 275:13

**certainly** 212:21
254:25

**certainty** 261:20

**Certificate** 3:12
289:17

**CERTIFICATION** 289:1

**Certified** 6:2

**certify** 289:4

**cetera** 233:18

**chain** 71:25 72:2
73:6 120:19 121:2
122:3,9,20 126:22
132:2

**chains**
71:21,22,23,24,25
72:7,19,24
73:9,15,16,19,22
87:25 88:2,10,14

**chair**
150:13,14,15,19,20
151:11,13

**chance** 242:9 278:6
279:22 281:12
282:12 283:13
284:3,7

**change** 24:14 115:18
133:13 169:2 242:17
284:12 285:3,15
288:2

**changed** 130:23 242:5
244:8,11 280:2,9

**changes** 3:11 284:4

286:15 288:1

**changing** 244:18,22
279:21

**character** 256:13

**characteristics** 8:13

**characterization**
284:22

**characterized** 238:9

**check** 134:21 165:6
263:18

**chest** 56:6 77:22,24
225:18 239:17
260:13

**chief** 42:25 43:2

**choppy** 268:21

**chose** 232:5

**Christine** 249:23,24

**circle** 252:16

**circumstance** 26:20
224:24,25 249:5

**circumstances** 13:17
14:5 223:22 251:13

**city** 3:19,20 227:20

**civil** 1:16 29:1
34:21 35:1,7
103:14,24

**civilian** 107:7

**claim** 25:23
26:10,16,24
103:14,24 283:14

**claimed** 178:9

**clamps** 165:20

**clarify** 270:8

**class** 38:13

**classes** 37:23 38:1

**clear** 30:21 51:25
52:13 80:14 81:2,3
211:13 267:4 276:12
277:6

**clearly** 16:10 17:5

30:1

**client** 252:3 277:3

**close** 22:3 147:6
185:7 193:8 195:1
203:10 206:8 229:15
254:18

**closed** 192:17 205:14

**clothes** 256:20

**clothing** 256:15
257:20

**clue** 132:24

**coach** 210:22 211:20
212:24 213:4,9

**coaching** 157:5,7
212:12,23 213:6

**college** 31:8,20 32:8
38:5,13,19,24
39:1,15 144:21

**colleges** 37:24

**Color**
3:21,22,23,24,25

**combative** 21:7 25:12
65:21,25 66:3,8,15
69:21 76:20 116:14
123:21 150:16
167:13 190:22
207:14 219:6
224:6,17,21
228:7,24 239:16

**combination** 216:12

**combined** 179:5

**comes** 24:1 150:25
193:11 200:5

**comfortably** 134:22
135:1

**coming** 101:6 113:14

**Command** 104:25 105:7
133:3 161:15,25

**commander** 196:6

**commence** 206:16

**commenting** 281:20

**common** 26:11,14
73:18 101:7 103:6

**communicate** 92:7,9
93:18,19 94:22

**communicating** 56:4,8
218:12

**communication**
64:13,14 65:13

**communications** 39:23

**community** 31:8,20
32:8 38:4,19,24
39:15

**company** 32:7 205:5
227:3 229:8 267:16

**comparing** 261:13

**compartment** 108:7
162:21 163:7 179:25
247:9

**complaint** 41:17

**complaints** 41:14

**complete** 49:10
142:25 225:1 273:17

**completely** 72:5
76:18 118:19 119:3
176:5 200:24

**comply** 150:5 157:25
243:17 286:11

**compound** 217:8 244:6
261:3,11,15 262:12
271:4 275:19

**comprehensive** 71:11

**compressions** 77:24

**concern** 8:24 9:9,17
10:24 11:1,23 12:5
107:9 179:17 184:23
197:25 206:19,20
207:3,5 208:14,24
271:10,16,22
272:2,3 274:17,22
276:4,9,13
277:8,19,22 278:4
279:4,9

**concerned** 9:3 11:2
54:19 60:14
190:19,20 197:10,21
205:16,24 206:15
208:15,18,19 274:16

**concerns** 197:20
229:4,7 274:25
275:3 276:2 277:13

**concluded** 287:10

**concludes** 287:2

**conclusion** 26:1,18
27:1,8,20 28:16
29:4,20 30:4 31:1
33:7,14 34:11 35:17
46:12 79:24 80:19
81:7,25 83:2 84:5
100:23 101:15 102:2
142:8,22 149:25
150:10 153:5,14
155:2,14 174:22
223:18

**confer** 210:23 212:5

**conference** 44:7

**confirm** 38:25 181:13

**confused** 266:24

**confusing** 266:3

**confusion** 267:21

**connection** 212:22

**conscious** 54:19

**consequence** 33:11

**consequences** 34:1,3

**consider** 90:21

**considerably** 37:19

**considered** 31:4,14
32:2 89:11,22,25
107:6

**consisted** 39:24

**consistent** 167:16
226:7 227:22 272:18

**constantly** 244:8

**constitute** 273:11

**constituted** 269:18

**Constitution** 28:13

**Constitutional** 25:23
26:10,16,23 27:17
28:3,24 29:1,8,11
30:15 35:14

**contact** 57:17
58:12,17 86:12,21
107:1 116:3 129:7
158:19

**contains** 275:8

**contents** 63:20

**continue** 172:22
174:13 178:4 197:24

**continued** 136:3

**continues** 177:1,16

**continuous** 268:20

**continuum** 20:21,24
32:13,16,25 226:2,4

**contract**
197:12,18,23
227:9,18 229:8,10

**control** 46:25 69:14
70:1,7 76:21 77:5
97:14 98:1,8 101:13
111:11 118:11
125:5,9,15 133:5,11
142:5,11,16,18
143:2,5,8,11,13,15,
19,21,23
144:1,6,9,13,17,19,
21 145:1,20,25
146:7 153:17 169:8
175:2
191:2,6,12,13,15,16
,18,22,23 194:1,5,8
208:2 219:6 223:13
224:6 225:21 271:17

**contusions** 275:18

**conversation** 147:14
180:18 182:6,19
188:8,13,22

**conversations** 187:24

232:13

**cool** 11:18

**cooperate** 56:16,21
192:5

**cooperating** 59:18

**cooperative** 130:19

**copy**
3:21,22,23,24,25
61:9 256:25

**corner** 222:22

**correct** 7:15
10:3,21,22 11:6
13:2,15,25 14:13
16:20 17:2,18
18:19,24 19:5,22
20:8,12,19 23:20,21
24:7,8,18,19
26:16,22 28:1,10
34:9 35:25 36:10,11
37:20 38:5
40:1,17,18 42:15
43:7,17,18 45:18
47:10,12,24
48:10,12,15,18,19,2
1,22,25 49:4,7,8,10
50:17 52:4,19,25
53:1,18,19 54:25
55:1,8,11 57:3,16
59:6,19,25 60:2,3
61:8,23,24
62:6,17,18 63:19,23
64:1 65:9 66:1,21
68:21 69:24 70:2,7
71:13 73:1 76:10
78:8,24,25
79:8,10,11,13
82:4,9,10,15,18,22
87:25 88:1,10,19
90:11 91:7 93:22
95:6,9 97:20 98:22
100:19,20 102:21
103:12,14,20,24
104:7 105:23
106:1,2 108:12
110:2 111:5,17
112:6,9,23,24

113:1,5 114:9
117:5,17 119:23
120:17 121:9,25
122:17,25 123:16,25
124:7,8,11,12,16
125:18,19 127:20,24
129:12,25 130:13
131:10,11,25
133:2,19,20
135:12,16,17,19,20
136:7,11 137:6
138:17,24,25
139:4,20,23 140:19
143:12 144:2,8
145:8,11 146:3
147:8 151:8,9,11
152:16 153:22 154:3
156:11 157:22 158:5
160:4,18,19,25
162:25 163:1
164:13,20 167:17,18
169:2,5,14
170:8,24,25
171:5,20
172:11,12,15
173:9,15 174:5
175:12 176:7,15
177:7,24
179:7,16,23
180:4,19,24 181:21
182:15,16 183:20
184:18,21 185:6
186:10 187:11 188:9
189:16,17 191:8,14
193:7,12,13,15,16
194:24,25 196:21,24
197:8,9,14 198:19
199:13,16
200:11,15,23
201:9,23 202:21
203:8 205:20 207:24
209:1,2 213:18,25
214:1 215:9
218:20,24 220:7,12
221:25 222:2,11,24
224:2 225:3,4,9,24
226:8,9,12,16
227:11,12,15
229:10,11 230:25

232:3,7 233:4,11
234:2 235:12 236:22
237:10,11,13
238:8,13
239:13,14,19,20,23
240:2,8,19,20,22,25
241:3,4,7,8,10,11,1
7,20 242:15 244:5
246:3 247:2,3,15,16
248:19 249:19
250:18,22,23
251:8,16,17,19,20,2
4 252:14,15,21
253:11,12,19
254:5,14,17
260:15,16,20,22
263:2,6,22,23
264:4,8,9,15,18
265:5,22
266:10,11,23
267:22,23,25
268:10,11 269:25
270:6 275:14,15
276:4,10,14
277:10,16,17,21,23,
24
278:7,12,16,17,21,2
2
279:1,5,6,10,15,23
280:1,4,5,8
281:8,9,14,17,18,25
282:3,10,11
283:5,9,11,25
284:1,14,17,25
285:8,11,12,15
286:14,19 288:17
**correction** 284:12
**corrections** 284:4
**correctly** 38:14
39:20 56:11 60:12
166:2,3 263:3
**counsel** 5:6 50:24
277:3 278:10 281:8
**count** 175:20
**country** 226:18
**county** 17:23 18:1

19:14,21
20:4,11,15,23 22:7
46:18 72:25
73:7,14,24
105:14,16 107:18
113:11 115:7 116:4
119:17 136:19
138:16 148:3,4
151:10 161:25 162:2
175:16 176:10
177:2,4,18,19
180:11 187:9 204:22
205:2 221:2 229:3
236:12,15 237:2
244:9 264:22 270:15
271:5 280:15
**couple** 9:23 78:21
79:13,14 108:4
222:3 246:19 255:18
275:22
**course** 12:12 36:17
50:9 91:25 247:8
250:12,15
**court** 1:1 3:12 5:7
6:2,11 13:11 26:7
31:13,18 32:1 51:6
52:12 102:8 134:12
137:21,25 138:3
156:3 157:17 171:14
177:15 203:5 206:14
210:23 213:13 277:5
**courtesy** 211:9
**courts** 28:19
**covered** 277:15
**covering** 68:21,22
**CPR** 218:4,6,7,18
254:21
**cramp** 134:2
**create** 12:25 13:13
29:18 33:4 171:10
**created** 174:24,25
**crevice** 166:14
**Crime** 257:11

**Crimes** 283:1

**criminal** 263:20

**crossed** 90:19 225:10

**crossing** 117:12

**cross-reference**
259:6

**cross-referenced**
257:3

**crotch** 80:10 84:25
85:22 214:21 215:1

**cruel** 101:12,18,24
102:10 132:4

**crying** 78:18

**crystal** 211:13

**CSR** 1:25

**cues** 43:20

**cuff** 132:2,14 133:8
135:1

**cuffed** 131:16,18
132:25 133:4,21
134:13 198:2,9,18
199:4,11,12 240:15

**cuffs** 89:4,16
131:18,23
132:1,3,10
133:14,16,17
134:18,23 166:23
167:20 168:19 199:6

**curb** 77:11

**curious** 220:22

**current** 41:19

**custody** 70:19 90:13
101:19,25 102:11,21
103:2 125:6
142:6,12,24,25
150:5 154:20,24
155:7 169:8 253:18

**Customs** 41:21 145:15
146:2,8

**cut** 246:7 265:14

**cuts** 132:17

---

### D

**daily** 230:5

**danger** 48:6 190:18

**dangerous** 12:25
13:14 19:5 69:21
98:21 99:12

**Daniel** 1:6 7:25
10:12,19 24:20,25
47:3,12,18 49:11,15
50:12,18,20 51:7,9
53:14 54:1,24 55:2
56:21 59:5,14,18
60:2,5 65:25
66:2,7,15,19
67:1,17 68:16
74:7,12 78:7,14,20
79:10,12,20 80:15
81:4,23 82:25
84:23,24 86:7,25
90:12,21
100:11,13,18 101:1
104:20 105:25
108:18 109:4,12,15
111:18,22 112:14
113:4,11 114:7
121:13,18 122:8
123:18 124:10
125:21
126:7,13,23,24
127:6,24 128:8
129:13,17 130:12
131:15,24 132:19,23
133:8,16 134:18
135:1,4,19
136:8,14,20,24
137:4,10,23
138:6,11,13
139:1,3,10,17
140:1,6
141:12,21,24
142:2,17 143:2
146:11,16 147:4
148:11,18 151:19,22
152:10 153:25
158:2,11
159:4,10,17,21
164:18 169:7 170:16

171:4,18 172:13
173:17 174:3,17
175:7 178:21
179:5,12 180:3,7,14
181:15 182:22 184:4
185:10,17 186:8,16
187:6 188:14 189:9
190:6,13,16 191:5
192:1,10 193:12
195:2 197:11,21
199:17,20
200:5,6,20 201:21
202:10 205:19,25
206:16 207:6,13,19
208:9,25
214:3,4,6,11,14,21
215:3 216:18,22
219:10,12 222:11,23
223:1,8,14
225:12,20 226:24
232:8,17 237:16
238:6,22 241:1
242:23
243:2,7,14,17
244:3,25 245:8
246:20,25 247:4,19
249:17 250:17 251:6
252:23 253:14
254:4,13,16 255:16
256:16 257:21
271:1,11,17,24
274:23 275:9,13
276:10,13 277:9,16

**Daniel's** 68:20 69:2
122:8 123:4,14
130:2 131:13 166:1
170:11,17,24 186:20
189:25 200:11 220:4
244:12 246:6 247:20
248:2,17 253:4,8
255:1

**Darnell** 2:14,15
3:5,7 5:13,19,20
9:12,18 11:9 13:5
14:3 15:12 16:23
17:8 19:1,11 25:5
26:2 27:2,10,21
28:17 29:5,21 30:5

33:8,17 35:9,18
36:14 38:11 39:7
64:4 69:5 72:8
78:12 79:1,3,25
80:21 81:9 83:4
84:2,15
85:1,4,8,14,18
86:10,18 87:1,5
88:11 94:19 97:23
98:5 100:24 101:4
102:3,25 107:13
110:12 116:24
117:8,18 118:8
119:9 120:6 124:20
126:12,18 128:2
133:9 140:9
142:9,21 149:9
150:1,11 152:21
153:6,15 155:1,15
157:1 159:7,12
164:23 167:8 171:8
172:16 173:3,23
174:19 176:18 177:8
179:9 186:11
188:5,10,17,25
189:1,4,12 193:17
195:7 197:2,15
198:6,22 199:18
201:4 202:1,24
203:14,22,25
204:4,15,24
206:4,22 207:1,23
209:3,15,20
210:1,5,10,13,18,25
211:4,7,11
212:9,20,24 213:4,8
214:7,19,22 215:5
217:3,10 219:18,24
220:1 223:19
226:19,23
227:4,19,24 228:9
229:12 230:10
232:23 236:17
238:14,18 240:23
241:12 242:17 244:7
245:20 246:11
248:20 250:5,9
251:11 253:22
255:13 256:11

257:25 258:12,18,23
259:3,8,12,17
260:10
261:6,8,12,23
262:6,16,18
265:2,9,25 266:12
267:8,12,16
268:3,13,16 269:7
277:25 279:24
281:19 282:17
284:18,21 286:21,24

**date** 5:1 40:13 60:24
83:16 88:9 250:14
267:5

**dates** 60:22 266:3

**day** 20:2 38:7,12
51:20 53:4,9,11
60:13 63:7 64:20
100:5 104:5,10,18
139:25 160:17
161:21 179:14
185:11 220:4 247:25
256:16 257:21
261:19 262:9
264:12,25 286:10
288:21

**days** 5:14 62:17
63:2,8 64:9 180:24
268:6,10

**deadly** 48:2
49:11,15,21 50:2,16
51:16 52:3,18 79:21
80:16 81:4,22
82:8,20,25 219:7

**deadweight** 130:20

**deal** 21:7 196:12
230:5

**dealing** 32:21
228:7,23 230:2,12

**dealt** 276:3,9

**Deceased** 1:6

**decide** 27:23,24
28:19,21 101:21
159:10

**decided** 200:13

201:23

**decides** 193:11 200:6

**decision** 156:18

**decorum** 211:15

**deem** 211:17

**de-escalate** 19:9

**de-escalation** 18:22
20:16 32:19

**Def** 3:19,20

**Defendant** 2:13

**Defendants** 1:11 2:9
5:17

**defense** 277:2

**Define** 208:18

**delay** 5:22,23

**demanded** 106:20

**demonstrate** 21:11
38:18

**demonstrated** 81:22
129:24

**demonstration** 22:5

**Demonstrations** 22:10

**department** 3:15,18
19:15,16,25 20:6
41:6,9 42:13,18,22
46:14,18 61:20
93:17,20 94:6 106:6
125:6 144:25 145:9
155:25 197:12
203:12,19
204:6,18,20 215:22
221:6 227:3 257:11

**departments** 226:17

**department's** 155:7

**depend** 15:2 26:19
27:3 84:6 167:10
245:4

**depending** 226:5

**depends** 12:15 14:4
16:14 17:10

27:11,13,15 43:10
44:12 114:24 167:11
198:15,23 223:20,21
224:24 245:4,13

**depicted** 249:9

**depicts** 257:8

**deposition** 1:14 5:3
6:6,9 61:15 211:15
252:5 281:17
287:3,10 288:16
289:4,6,7,10

**describe** 23:14
129:18 150:19

**describing** 22:19

**description** 3:14
222:16

**detail** 53:12,24

**details** 261:19

**detained** 45:7 83:13

**Detainee** 108:21,23
113:14

**detainees** 32:21
128:18 144:16
270:19

**detection** 19:21
144:11

**detective** 61:19
118:22 164:2 178:19
236:20,21 242:2,15
285:1

**detectives** 176:22

**detention** 17:23
18:1,8,13 19:14
20:4,11,15,24
73:11,14 122:3
123:22 124:9 125:20
141:7 149:5 221:3
229:3 234:4,9,15

**determine** 275:17

**determined** 42:14
239:24

**device** 150:7,12

**devices** 69:25

**DHS** 19:16 41:4,5

**difference** 147:22
260:1 280:14

**differences** 13:21
259:21 260:17

**different** 13:17 23:8
24:13 27:12 28:2
37:23 43:25 69:25
73:24 80:24,25 81:1
86:23 130:23
131:19,22 139:24
143:22 163:5 175:6
176:14,23 198:23
212:1 216:6 223:22
224:22,23 235:11
259:22 260:19
278:14 281:6

**differently** 213:22

**difficult** 75:5,9
185:18 186:1,4
216:1

**difficulties** 149:13
150:8 228:1

**direct** 179:25 254:23
272:9

**directed** 154:18

**directive** 156:14

**directives** 154:21
286:11

**directly** 93:16
179:24 180:9 186:5
247:10

**dirty** 256:20

**disabilities**
149:19,22,23 150:6

**disability** 148:25

**discipline** 286:12

**disciplined** 285:20

**discussed** 269:3

**discussing** 266:9

**discussion** 14:6
87:23 180:13 279:20

**discussions** 278:19

**disengage** 77:8 80:5

**disengaged** 222:20

**disheveled** 256:21

**disoriented** 77:21

**dispatch** 95:3
147:1,11
158:21,24,25 269:17
270:24

**display** 43:25

**distance** 113:24
245:1,10,18
246:4,12,13

**distinction** 84:10

**distinguish** 216:8
275:20

**distinguishing**
220:21

**DISTRICT** 1:1,2

**Division** 1:3 286:8

**dock** 222:7,9,10

**document** 124:6
273:12 285:23,24
286:4

**documents** 61:14 62:7

**Dona** 17:23 19:20
20:4,11,15,23 22:7
46:18 69:17 73:14
221:2 229:3

**D-O-N-A** 18:1

**done** 101:9 127:12
138:23 207:18 209:7
213:21 243:21
248:25 258:11
259:10 269:1
286:20,21

**door** 108:13 109:9
110:16 111:21,25
112:12,19,21

115:5,24,25
116:2,8,11,12,17,22
117:12,15 118:15
119:17,20,21,22
120:1,20 121:12,15
122:15 123:14,19
126:14,21,25 146:14
172:10,23
173:10,13,17
174:2,14,15,17,18,1
9 175:4,22 176:10
177:2,4,18,20 178:5
182:22,23 183:14
202:16 205:14 208:2
235:16 249:18

**door/fence** 234:6

**doorjamb** 170:24
171:5,20 174:5
186:17

**doors** 44:8 108:7
120:16,19 128:14
175:17 178:15
235:14,22

**doors/fence** 234:21

**double** 109:6 133:21
134:1,13
165:7,9,13,25
166:5,10,21,22
167:16 190:12
198:1,9,18 199:4,11
205:14

**downhill** 111:16

**downstairs** 131:7,8
141:3,5
147:16,18,20 148:17
158:9

**drag** 24:20 119:16,18
120:10,12,13
126:7,10,13,20
132:9 152:5,7
175:11 202:11,15,20
203:7 234:5,16,20
235:15,21 236:2,7
237:20 238:1

**dragged** 130:13 175:7
176:9 177:2,6,17,23

178:13,17 188:22
202:10 205:13
237:16

**dragging** 7:24 120:1
128:20,22 131:24
132:14 176:13,23
178:5,10 205:19
235:17 244:2,25
251:22

**drawing** 243:10

**dress** 104:14

**dried** 252:18 253:5

**drinking** 115:11

**drive** 105:14

**driveway** 146:14
159:21 222:15,18
232:16 264:19,22

**driving** 106:5 270:18

**drop** 116:15 117:25
118:19 119:3 176:5

**dropped** 112:19
116:15 117:2,9
118:4,5,17,24,25
119:15 126:15,23,24
129:2 172:14,20
173:6,17,24 174:11
176:3 234:7,21

**dropping** 116:19
117:4 140:3

**drops** 172:25

**Drugs** 6:24

**dry** 275:18

**duffel** 256:19

**during** 38:8 40:11
65:20 66:12 67:5
72:18 80:13 111:6
135:21 138:10 142:3
144:24 145:24
158:13 161:8,24
162:13,15 177:25
178:2 182:13 211:15
215:20,21 218:17
247:8 250:12,14

264:9 268:23 270:12
279:23 280:19
281:17

**duties** 109:22 153:11

**duty** 104:2 153:16
270:23

―――――――――
E
**earlier** 76:12 129:24
178:9 220:4 233:1
238:20 259:22
269:15,23 271:9
275:8

**easier** 44:6,17
198:2,8,10,18
199:5,10

**easily** 74:17 90:10
91:11 167:20 168:19

**East** 2:11

**effect** 170:13 219:14
243:18

**effective** 219:11

**eight** 38:14,15 105:2
123:12

**Eighth** 28:14 35:15

**either** 10:17 25:18
28:13 35:21 48:4
51:15 80:9 89:23
94:2 97:14 119:15
129:21 130:8 148:22
166:15 172:9 174:18
190:22 192:10
204:12 225:19
228:24 230:22
236:11 237:1,9
270:13 274:13

**El** 1:3,18 2:7,12,16
3:15,18 19:15,25
20:5,9
40:10,12,16,19,22
42:13,18 43:2 46:17
61:2,19 62:5,11
72:6,12 73:24
93:16,20 94:5
106:6,11,15 118:21

125:6 142:12 144:25
145:4,9 151:10
154:19 155:25
197:12 203:12,19
204:6,18,19 215:22
221:5,20 257:11
269:16 270:24

**elbow** 23:18 129:21

**electricity** 219:23
221:12

**elevate** 163:8

**elevated** 179:6,13

**elevator** 125:24,25
127:2,4,5,9,16
128:8,14 146:12,13
158:10
235:1,6,7,8,14,16,2
2 237:17,21

**elevators** 123:6,11
126:8,14,21 152:6
158:9 234:6,16,21
238:2

**else** 47:12 61:25
75:8 161:21,22,23
197:5 227:3 243:18
247:5 268:12

**else's** 48:5

**elsewhere** 215:18

**E-Mail** 2:5,8,12,16

**e-mailed** 257:16

**emergency** 148:7
155:17,23
156:5,9,10,15
254:17 269:17
270:14,25

**emotion** 44:1

**emphasize** 229:6

**employed** 289:9,11

**employee** 289:11

**employees** 203:11,18

**employer** 34:8 35:14

**employment** 250:12

**EMS** 78:3 148:21
272:5

**en** 97:16 169:19

**enable** 165:2

**encourage** 192:4

**encouragement** 192:5

**enforcement** 11:21
12:6 16:17 17:14,21
18:19 19:4 20:10
28:1 33:19 36:9
41:18 42:12 69:1,8
82:13,17 91:22
94:10 95:17 97:7
98:20 143:17 144:1
145:5,14 153:20
154:5 155:19
156:16,20 157:19
158:1

**engage** 14:18 16:3
48:2 274:14

**engaged** 15:22 30:23
33:12 80:4 243:4

**engagement** 84:7

**engaging** 50:20 51:9
226:11

**ensues** 193:14 200:6

**enter** 108:14 113:4
122:15 172:11

**entered** 104:1 135:14
136:13 138:11
141:22,25 146:12
251:21 252:24
253:4,14

**entering** 120:21
121:4 246:25 253:18

**entire** 20:3,9,12
25:1 38:5 65:23
66:8,15,17 135:13
140:18 180:2 227:20

**entirely** 7:3 223:6
245:3 251:2

**entity** 34:7,19 35:22

**entrance** 10:13 110:8

177:4,20

**equipment** 56:4 68:2
122:6 125:4 136:5
208:3

**escalation** 18:22
32:18

**escape** 46:21 47:4,19
90:9 196:9 229:24
230:7,23

**escaping** 90:9

**escort** 21:7 24:15,25
25:10,17,22 26:8
87:21 108:8
111:8,13 144:4,16
145:21 146:9 172:22
173:10,18 174:4,13
228:12

**escorted** 123:1,2
173:8

**escorting** 24:13
25:19 43:19 44:19
106:9 108:20,21
132:8 155:18 162:1
172:25 180:3 219:10

**escorts** 21:2,5

**especially** 83:19
100:18 101:9 211:20

**essentially** 226:12

**established** 203:1

**ESTATE** 1:6

**estimate** 105:9
140:15,16 203:24
204:11 205:9

**et** 5:4,5 233:18

**event** 7:9 53:12
64:20,22 94:16
112:2,4 163:25
165:21 181:3

**events** 9:4,8,15 10:1
53:11,25 63:16
79:19 112:7 213:25
216:4,10 217:21
222:6 238:6 240:6

247:25 261:19

**everybody** 75:8

**everyone** 47:11

**everything** 6:20
42:21 52:7 139:25
160:1 211:9 242:10
251:19

**Everything's** 192:3

**evidence** 9:13 47:14
159:13 169:11
172:17 173:4
177:9,11 193:18
202:23 206:23 207:1
209:4 211:14 217:4
255:4,10 260:24
266:2,13 268:2
273:13,23 278:1

**exact** 52:6 105:8
241:16,21 242:4

**exactly** 159:1 163:23
190:3 250:14

**exaggeration** 66:9,11

**Examination**
3:4,5,6,7,8,9 6:4
259:16 262:22
268:15 269:10
275:23

**examining** 254:13

**example** 28:9 50:11
69:25 244:24

**except** 288:17

**exception** 273:22

**excessive** 29:14,17
30:1,24 33:12
34:9,20 35:2 102:21
103:2,9,16,23

**excruciating**
221:17,23

**excuse** 81:18 93:24
116:7 225:16

**exert** 55:19
57:5,9,13

**exerting** 55:13,23

**exhausted** 8:4
16:9,18 17:5 54:9

**exhaustive** 18:21
38:8

**exhibit** 3:14
160:13,15,16 163:3
164:10 166:8 167:2
168:1,2 169:17
175:14 180:22 183:6
184:9,10 189:19
192:19 194:10 196:3
198:25 205:11 208:6
228:16 230:17
231:20 233:14 235:4
237:12,24 239:2
242:11 247:19
248:17 249:9,15,20
250:11,16 252:12,13
255:8,23 257:2,13
258:17,20 260:11
263:12,14,18
265:6,8 267:4 272:8
275:8,16 276:1
277:14 281:22
282:16 283:4
284:3,23 286:5

**exhibited** 8:17

**exhibits** 257:17
258:13

**exit** 53:17

**exited** 158:10 247:12

**exits** 252:5

**expect** 211:10

**expectation** 230:23

**expecting** 196:23

**experience** 15:6,9,21
16:2 20:3 43:1
75:19 76:10 93:5
97:18

**experienced** 14:8,12
81:12

**experiencing** 60:13

**expert** 80:1,19
81:7,25 83:2 100:22
101:14 102:2,23
152:20 167:8 223:17
248:12 249:12
251:10 255:11

**Expires** 288:24
289:17

**explain** 34:20 74:8
95:3,11 107:3 212:2
216:2 267:18

**explained** 22:5 33:20
79:18 95:5

**explaining** 163:13

**explanation** 114:18

**express** 214:13

**expressed** 60:18,20
180:17 214:23,24

**extending** 162:19,20

**extent** 37:11 218:12

**extra** 88:16 89:4

**extractions** 21:2

**extreme** 179:13

**eye** 222:22

**eyes** 192:17

---

**F**

**face** 77:17 121:8,10
123:4,15,16
126:15,23,24 130:21
131:15 152:14 201:7
234:7,22 236:1,7
239:16 247:20,22
248:2,5,9,17 251:24

**facilitate** 165:2

**facilities** 151:14

**facility** 149:14
185:14 187:10,12

**facing** 24:3

**fact** 12:13 15:6
52:2,17 55:6

57:5,15 68:20 71:14
83:5 140:1 190:21
208:15 229:7 234:19
236:19 239:11
265:20 266:6 272:4

**facts** 9:13 47:14
51:14 164:1 169:10
193:18 199:19
201:25 202:22
206:23 217:4
255:3,9 266:1 268:2

**faded** 261:18

**failed** 285:19

**failure** 167:16
269:16 286:10

**fair** 249:15 255:24

**fairly** 73:18

**fall** 46:9 54:14,20
59:12 77:14,16
117:25 127:17,23
193:15 200:7

**falling** 57:7 59:6
127:20

**familiar** 132:13
269:12

**familiarization**
269:14

**family** 14:17

**fashion** 26:23

**fast** 46:23 188:25
196:17 208:13

**fear** 60:4,8,19 90:12

**feasible** 157:24

**February** 18:5,11
40:14,24,25 42:15

**Federal** 1:16

**feel** 60:4 68:16
179:12 190:18 191:5
192:14 193:6 199:21
205:13 220:14
221:14,23 223:7
243:4 279:16

280:1,12

**feeling** 193:21,23
194:15,21,22 213:24
272:2

**feelings** 195:3

**feels** 221:10,12

**feet** 77:11 121:16,24
135:19 150:21
244:24
245:1,7,16,17,18

**fell** 77:15 118:5,17
119:1,17 172:14
176:3 239:18

**felt** 64:15 77:8
90:17 102:20 112:18
130:20 176:19 179:4
190:19 193:1 202:14
209:14,24
213:17,19,22 221:15
223:4,5 225:15,17
239:17 260:12,13
269:22 279:14

**female** 94:2

**fence** 120:19 121:2
122:3,9,20,24
123:1,10,18,20
126:14,22,25

**fight** 230:7

**fighting** 59:23 74:12
87:18 139:13 209:10

**figures** 245:24

**finally** 146:7 162:17

**financially** 289:12

**fine** 40:1 97:2
115:16 144:20
157:12 189:7 259:3
285:23

**finger** 129:10

**fingers** 65:3 132:16
215:3 225:13

**finish** 15:14,16
81:20 85:6,16
127:13 137:13

211:6,8

**Finnegan** 1:25 289:16

**fire** 86:6

**firearms** 145:18

**fired** 18:11,15 78:1
99:6 197:13,19

**fireman's** 131:4,5,9

**Firm** 289:18

**first** 23:9,14 46:15
60:18 103:16 104:20
116:18 123:7,8,15
128:18 138:11 147:3
149:13 154:4
161:12,14,19 163:4
185:22,23 216:3,15
221:1,2,7,8 231:21
249:24 250:10
257:20 260:2 275:25
279:4,14 282:19
283:7

**fitness** 179:5,13
181:15

**five** 62:22 63:1
85:4,9 111:2,4,6
113:21 115:2,5,6
121:16,24 123:12
140:14,16,23 175:21
245:7 281:15

**five-eight** 45:21

**five-seven** 45:21

**flailing** 112:18,25

**flee** 43:6,11,13,21
44:18,19 47:9,19

**fleeing** 87:18

**flexibility** 133:25

**flight** 45:1

**flipped** 77:21

**floor** 2:7 152:4
174:11

**Flores** 1:10 2:13
3:15 5:20 8:5,8,16
9:4,10,17,22,25

10:5,7,11,15,20,23
11:10 25:12
49:11,15,17,21
50:3,13,18 51:7
52:3,17,24
56:3,8,11,14,20
58:4,5 59:4,15,19
60:2,6 61:7
64:13,23
65:4,6,11,14
66:3,5,19,22,25
67:4,10,13,16,23
68:11,15 74:7
77:8,19,24
80:4,8,11,25 83:9
84:23,24
86:1,6,12,15,21,25
87:4,7 90:18 99:5
107:20,24 108:3,20
109:4,8,12,16 110:7
114:6,7 115:25
116:7 118:6,16,18
119:2 122:5 123:21
124:10,14 125:3
126:7,13 128:10
131:12 133:13
134:25 139:2
140:18,25
141:15,18,21,23
142:6 146:17
147:3,11,14,19
148:10,16 151:18
158:20 159:3,15,16
161:17 170:10
171:2,3,9,16,18
172:2,11 174:3,4,19
175:1,22 176:4
178:20 180:17
182:6,19 183:22
187:19,24
188:14,15,19,23
189:8,15,24 193:11
194:3 197:5
200:5,19,22 202:3,6
205:14,24 206:15
207:13 208:3,13
214:3,4,10,14,20,23
,24 215:2 216:19,22
217:1,16,24

218:6,16
222:7,19,23
223:8,23 225:3
232:14,21 233:17
234:5,20 235:15,21
236:11,15 237:1,8
238:21 239:8
241:6,9
243:5,8,10,13,16
244:4,25 245:7,8,17
246:5,13 250:21
251:7 252:24 253:18
257:3 258:21
259:1,4,6

**fly** 13:25

**FMS** 272:5

**focus** 30:20 53:13
206:8 252:9

**focusing** 30:21

**folks** 99:20

**force** 18:23
19:3,9,17,18
20:16,20,24,25
29:15,18 30:2,24
31:4,15
32:3,12,13,15,24
33:4,12,21 34:9,20
35:2 46:20 48:2,18
49:2,6,11,15,21
50:2,16 51:16
52:3,18 79:21 80:16
81:5,22 82:9,21,25
102:21
103:2,10,17,24
116:17 174:20 219:7
223:13 225:20
226:2,4,5,7,13,14

**foregoing** 288:15
289:3,6

**forehead** 54:12
121:11,13 152:14

**foresee** 230:4

**forever** 262:1

**forget** 189:5 217:12

**forgot** 15:17 249:22

**form** 8:1 9:12 25:24
26:17 172:16 177:8

**fort@scotthulse.com**
2:12

**forth** 112:17 113:2
117:10,11 173:12
175:4 259:21

**forwarded** 39:1

**foundation** 11:25
16:12,22 17:7 25:25
27:8 28:6 29:4
33:23 35:17 50:6
69:4 106:17 167:7
203:15 204:24
206:22 219:24
230:1,9 238:19
250:9 257:24 271:2

**Fourteenth** 28:14
35:15

**fourth** 28:14 35:15
170:2 240:13

**frame** 53:13 111:25
112:21 116:17
117:15 119:21
123:14 126:21
138:11 162:13,14
163:14 173:13
174:15,18,19 175:4
201:3 268:20 269:1

**framed** 119:7,11
269:1

**Francisco** 2:10 5:17
262:18

**free** 45:12 212:16

**freely** 51:1

**frequently** 16:3
73:23

**friends** 14:17

**front** 51:13 70:20
71:5,16 88:22
89:3,7,17,23 112:17
124:18 130:4 135:6

136:15,16,21,25
137:5 138:8,14
164:19 165:3 167:21
168:20 198:3,11
199:3,6,11 209:22
210:17 212:14
213:2,7,14 240:10
244:4 247:2 285:10

**full** 121:8 123:5,16
248:5

**fully** 74:18

**fuse** 11:19 12:4
13:22,23,24

───────────

G

**G4** 183:14

**G4S** 1:9 2:9 5:4,17
18:17 20:13
30:15,19,20,23
31:3,13 32:1,11,23
34:13 36:4,6
38:4,17,20,23
39:2,5,10,13,16,24
40:3 42:12,20
46:18,20 48:1 69:19
71:12 72:14,21
91:17
93:11,15,16,21
95:5,12,20 100:3
103:19,23 106:12
107:10 144:12,20
154:14 155:12
156:6,8,20 157:18
197:12 205:4,8
209:1 227:3,7,9,14
228:7,11,23 229:16
230:24 231:7,11,15
250:12 269:13,19,23
270:13,21 271:17
280:3,13,23

**Gage** 2:3 3:4,6,9
5:9,10,15,21 6:5
8:2,10 9:8,15,21
11:12 12:3,13
13:7,20 14:7,13,24
15:4,14
16:1,8,16,25 17:13

19:2,8,13 21:22,25
22:8,13 23:5,7
24:10,12,24
25:7,13,14
26:3,13,21
27:5,13,25 28:8,21
29:7,23 30:7,11
31:3,9,11,21 32:6
33:3,10,16,19,25
34:13,25 35:6,11,21
36:20 37:23 38:12
39:3,4,12 43:12
44:3,16,23 45:6
47:15,21 50:1,9
51:2,4,14,24
52:9,21 53:19,21
57:11,12 58:19,23
59:14 61:7 64:7
66:14 67:20 68:20
69:6 70:6,12,25
72:11,23 74:1,4,22
75:14 76:1,6,13
78:13 79:5,6 80:2
81:2,10,20 82:3,16
83:8,17,22,24 84:8
85:3,6,11,16,20
86:14,19
87:3,9,16,24
88:8,14 89:12
90:2,15 91:13
92:3,20 93:3,11
94:17 95:9,12,21
96:16 97:2,9
98:2,12,16,24
99:2,13 100:1,4,25
101:5,17,23
102:6,13 103:1
107:15 109:20
110:15 113:9
115:2,8,12,17,24
116:21 117:4,16,23
118:13 119:7,11,16
120:9 124:3,23
126:13,19 127:13
128:7 130:7 132:7
133:13 134:9,17
136:2 137:19,24
138:2,10 139:22
140:12 142:10,15,16

143:1,6,12,16
144:6,17 145:4
146:3 149:11,18
150:4,14 151:17,18
152:22 153:10,19,24
154:2,4 155:5,22
156:1,8,19
157:4,8,12,15,25
159:9,16
160:5,11,14 161:5,6
164:3,4,10,24
167:15 168:2 169:12
171:11,22,24
172:3,19 173:8,22
174:2,8,16 176:23
177:12 178:1 179:11
184:10,12,24 185:1
186:14,16
188:3,7,12,21
189:3,7,8,15 193:19
195:8,17 197:3,21
198:8,17,24 199:20
200:4 201:5,6 202:2
203:2,4,10,17,24
204:2,7,21 205:3
206:6,13,20 207:2
208:5 209:6,18,22
210:3,8,12,16,20
211:2,6,8,12
212:18,21
213:1,6,11,18
214:10,20 215:2,6
217:7,12,14 219:21
220:3 223:7
224:1,14 225:1
226:21,24
227:7,21,25 228:10
229:14 230:6,13
232:25 233:9,13
236:19 238:20
241:1,13 242:21,23
243:20 244:2,11,20
245:15,23 246:15
248:16,25 249:15
250:7,10 251:12
252:2,6 253:25
254:3
255:6,14,20,24
256:10,14,15

257:1,3,14,19
258:1,11,15,21,25
259:4,10,14,20
260:7
261:3,11,15,16
262:2,10,17,20,23
265:5,8,12 266:5,15
267:3,7,10,14,18,20
268:6,12 269:8
270:2 271:2,20,25
272:17 273:7,19
275:1,19,22,24
276:15,17,24 277:12
278:3 279:25
280:16,17 281:22
282:18,19 284:20,23
285:25 286:20,25
287:5

**Gage's** 260:23 261:13

**gain** 125:5,9,15
175:2 194:8 208:1
221:9

**gained** 194:4

**gaining** 224:6

**Gary** 250:1

**gauge** 249:14

**gee** 42:19 68:11
209:23 213:15 225:5

**general** 14:16 22:13
149:23

**generally** 269:12

**George** 183:13

**gets** 11:19 207:4
208:13

**getting** 30:18 76:21
84:18 142:13 148:12
162:3,4,22 193:25
266:24 276:3,9
277:19 278:4

**given** 29:23 36:9
98:2 134:4 245:24
251:13 260:21
282:13 284:11 289:7

**giving** 7:2 37:1

154:21 261:20
263:16

**glove** 225:13 259:7

**Goldberg** 2:3 5:9

**gone** 67:22 125:14
133:6 143:25 188:15

**gotten** 207:6,19
208:1

**grab** 118:6 245:16

**grabbed** 83:10 118:18
119:2 125:11 176:4
214:21,25

**grabbing** 214:15

**graduated** 40:21

**graduation** 40:13

**grand** 60:9,10 61:9

**grapplings** 46:21

**great** 116:16

**greater** 179:6,19
180:6,14,18 181:16
182:1,7,15,19
256:13

**grip** 194:19

**groaning** 187:18

**ground** 64:24,25
76:23 77:2 117:25
118:5,17,19 119:1,3
125:13 126:15,25
129:16 131:16
145:19 172:14,21
173:18,25 174:3
176:3,6 180:11
189:10 193:10,15,19
194:2,14 196:11,13
200:7,11,12,21
209:10 225:21
232:16 234:7,22
251:3

**group** 133:7

**grunting** 123:22,23
124:6 187:17

**guard** 32:9

37:13,16,18,25
73:8,9

**guards** 107:8

**guess** 77:16 90:8
111:2 123:22
126:4,6 134:1 196:5
225:11

**gun** 80:9 86:1 96:20
99:8
120:12,14,15,18
121:14,15 122:1,5
135:15,22 146:20
158:16 159:4,11
178:13 216:19,22,24
217:2,6,16,24
218:17 222:8,19
233:18 243:11,14,17

**gunmen** 96:23

**guns** 121:19 124:11
125:1,22 188:16
232:21 233:18

**gunshot** 77:22 78:6
225:2 240:10

**gurneys** 149:12

**guy** 67:11,14 201:16
274:10

**guys** 96:18 114:13,15
196:9 199:24 251:21
259:11 267:18 269:3

---

H

**half** 63:13 85:15

**hand** 21:18 24:3
65:1,7 166:1 194:4
200:13,22
201:7,18,23 202:4,7
239:12

**handcuff** 71:18,19
72:2 89:1 133:22
134:15,18 165:18
167:5,11

**handcuffed** 22:25
23:1,3 100:18
101:2,9 132:21,23

134:1,22 135:1,5,23
136:4,9 138:14
142:17 166:21

**handcuffing** 21:2

**handcuffs** 71:5,17
72:3 83:12 88:16,21
89:3,5,6,17 101:13
132:19 133:22
134:3,14 136:14,21
150:24 164:14,17,25
165:3,5,6,9,13,14,2
0,23,24 166:5,10
167:14,17 198:9,19
244:12 245:2,17,19
246:8,14

**handle** 13:25 26:22
27:16 28:12,25

**handling** 13:1,15

**handouts** 36:25
37:2,3

**hands** 22:25
23:6,12,25 54:6
55:21,23 57:7,19
58:8 59:11 77:13
89:24 128:7,10
131:16 158:20
198:3,11 199:3,5,11
238:21 239:4 240:14

**happen** 33:20 42:5,6
117:17 135:10 212:8
223:5 234:14 236:3

**happened** 14:16 20:21
36:17 41:1,20 42:3
52:1,5,6,15,23
53:3,6,9,25 55:5
56:2 76:24 77:10,18
116:10 117:23
122:21 128:14,25
139:25 140:21,22,23
147:7,10 158:13
159:8 215:19 218:11
240:3 247:25 261:16
266:21

**happens** 27:23 264:2

**happy** 200:4 276:19

**hard** 54:10 112:21
225:17

**harm** 195:11,25
196:8,23

**haul** 111:14

**haven't** 11:13

**having** 54:10 59:12
60:15 69:1 70:15
74:15 90:6,8
91:2,23 92:6,21
93:12 111:9,11,12
142:24 150:17
162:22 164:17,25
165:16 180:6 191:16
193:25 202:15
217:21 219:7 273:24

**head** 44:13 50:13
56:25 64:25
65:1,2,8 77:2,3,23
111:22,25
112:15,16,20,25
116:3,16,22
117:5,10,13,14
119:6,20 120:21,22
121:5,18 122:8,16
123:14 126:21
128:4,6 129:8
140:3,8 152:10
170:11,12,17,19,21,
24 171:3,4,17,19
172:24
173:1,9,13,19
174:4,14,19 175:3
177:5,7,21,24
180:10,12 182:22,23
183:13,18 186:17
190:6,14 194:2,4,16
196:10 199:22
200:11,14,20
201:15,22 202:4,7
238:21,22,24,25
239:1,3,4,5,12
241:2 243:3 246:25
247:2,9 248:1
249:16,17 254:21
265:14 272:15 274:2

**health** 96:11,15

148:1

**hear** 78:16
79:9,12,16,17
137:20 141:7,15,23
146:10,15,18,21
157:4 187:19,24
188:9 189:24
210:3,4,6 240:17
242:22,24 243:8,16

**heard** 11:12 77:14
79:20 98:18 135:9
147:2,10 148:10
149:3,18 225:2

**hearsay** 188:5 189:12
214:7,19,22 217:3
220:2 241:12 272:18
273:11,22

**heavily** 54:11 76:21
78:15,20 79:7,9

**heavy** 194:6 240:16

**heightened** 179:17,20
186:7

**held** 77:23 109:9
112:20 122:4,9
127:16

**help** 43:20 45:17
62:7 69:22 87:17
88:20 94:12,13
95:16,25
96:7,11,14,22
97:6,12 98:3,13,19
99:14,18,23 142:13
149:12,22 150:5
155:12 159:5 181:12
219:5 223:13 224:15
249:1,3,6,10 258:24
262:15

**helped** 93:1 97:15
98:20 224:13 262:7

**helping** 74:12

**hereby** 288:16 289:4

**herein** 288:17

**here's** 277:1

**hereto** 289:12

**he's** 22:5 27:22 30:8
51:21,22 54:3,19
65:19 100:2 115:1
127:11 147:25 148:1
188:4 194:14 201:17
209:16 242:2
274:13,20 276:21

**Hey** 56:15

**hill** 114:6

**Hills** 2:4 10:9
91:19,20
104:13,23,24
105:7,11,14
136:19,23 137:17
161:24 167:20
168:19 179:11,15,21
185:9,18,20,24
186:9 231:12 249:23
250:13

**hindsight** 207:24
209:17,24 210:14
213:16

**hip** 253:7

**hit** 100:13 101:8
112:21 117:5 119:21
120:2,21 121:5,18
123:14 172:23
174:14,18 178:6
182:22,23 183:13
186:17

**hits** 172:25 173:12
174:5

**hitting** 100:17 101:1
200:11,12

**hogtie** 70:13,14,16
71:1,2 89:11,23,25

**hogties** 70:6,10

**hold** 21:6,9 22:6,14
23:8,17,19 127:11
143:2,11,14,15,19,2
1 144:1,6,9,19,21
145:1,22,25 146:7
192:25

**holding** 116:12
127:19,22
128:17,19,24
129:1,13,17
139:1,2,5 140:2,6
141:23,25 146:13
147:13,18 151:23
152:5,11,14 192:20
236:2,7
237:16,17,21 238:1
244:12 248:3 254:21

**holds** 87:21 143:23
144:4,13,18 228:12

**hole** 252:13

**holster** 216:23

**Homeland** 19:16 41:6
46:14

**honest** 163:24

**hook** 72:1 130:25
131:12 228:14

**hooked** 131:17

**hope** 208:12 274:11

**hoping** 256:11

**hospital** 147:25

**hothead**
11:13,15,16,22
12:4,14,21

**hotheads** 12:25 13:13

**hour** 63:12 85:11,15
105:21 215:16
281:13

**hours** 38:7,12,15
62:14,16,22 63:1
104:4 147:6 215:13
267:6 286:9

**Hulse** 2:11

**humane** 190:1

**Hummer** 170:3

**hurt** 133:24 197:4
214:5,10,11

**hurting** 193:23

201:22

**hypothetical** 44:4
96:16 248:21 262:11
271:4

---

I

**IA** 215:21 263:3
264:6,8 268:23,24
284:8,9,18

**IAD** 286:10

**I'd** 51:12 52:7 63:3
167:2 241:23 242:6
255:21

**idea** 195:17

**I'll** 30:13 31:12
32:5 50:22 52:11
96:16 137:13 160:14
168:10 183:7 186:14
200:4 203:4 206:7
210:22 211:9 228:17
230:13 231:21
242:22 259:1 261:6
262:17 273:20 274:1
286:22,24

**illegal** 28:9

**I'm** 7:3,6 8:8 11:10
12:1,3,17,18,19
14:4 15:4,5,18,20
17:3 28:21,22
30:20,21 35:4,23
40:10 44:3,13,22
45:14,21 51:19
54:6,8 60:25 61:5
62:16,24 63:12
66:25 67:10,14,25
68:10,11 70:17
71:21 72:10 73:25
74:14,23 77:5
81:2,11,13,16
82:2,5,6 84:8
85:1,6,16 86:17,20
87:2 89:21 90:4
93:9 97:24 99:11
101:22 102:4 105:18
110:18 113:19
115:8,10,13 118:23

122:22 125:8 128:3
134:6,10 143:6,15
144:6 151:12 156:2
157:7 158:25 161:2
164:24,25 166:7
167:1,10 168:14
169:22 174:12
177:13 181:11
183:10 186:12 187:4
189:21,23 192:12
193:17 194:6,11
195:8,9,15 196:1,3
199:18 200:25
201:3,4 203:3
206:5,6 209:15
210:6,20,21
211:2,12 212:4,6,18
214:8 215:25
216:2,13
217:6,7,8,20
222:3,9 223:6,20
224:15 228:19
229:12 230:16,23
231:19 232:18 233:7
241:23 242:6,7
245:3,13 246:18
247:17 249:13 251:2
252:6 254:1 255:12
256:2 258:11,20
266:3,5,24 267:20
269:3 272:10,22
274:21 275:20
276:7,11,19 277:6
282:1 284:21
286:3,20,21 287:6

**immediate** 248:9

**immediately** 16:19
116:10 248:18 286:7

**immune** 219:22

**impact** 75:15,21 76:9

**impacted** 76:15

**impacts** 16:9

**impeachment**
209:16,21 210:7,9
211:24 212:3

**impermissible** 11:6

**impervious** 220:5,9

**implemented** 270:22

**important** 6:14 7:5,9
48:13,16 63:20
82:12 92:21
112:4,7,23 113:3,7
123:24 124:5 125:17
139:19

**impossible** 245:25

**impression** 270:23

**improper** 29:14 51:2
57:11 100:19
101:2,10,17 103:2,4
209:16,20
210:7,8,15 211:24
212:3 250:5

**Inc** 1:10 2:9 5:5

**incapacitate** 221:18

**incapacitated** 222:1

**incident** 12:24 13:12
62:3 164:9

**include** 48:13,17,23
49:1,5

**including** 42:12
100:5 144:20 178:17

**incomplete** 248:21
262:11 271:3 272:1
275:2

**incorrect** 239:22
261:1 270:7

**increase** 43:6 164:17

**indeed** 60:1 269:22

**independent** 218:9

**indicate** 48:20 240:9

**indicated** 170:18
181:17 235:1

**indicates** 234:19

**indicating** 21:16
80:5 129:8,9 170:16

**indication** 47:23

**Individually** 1:5

**individuals** 66:18

**inevitably** 230:21

**inflict** 101:12,18
103:7 132:11

**inflicted** 251:6

**inflicting** 103:9
255:5

**inflicts** 219:23

**information** 19:8
39:2 48:14 50:19
51:8 52:22,24
64:22,23 82:20
112:22,23 123:24
185:10 219:9
285:14,19
286:2,7,9,17

**initially** 104:1

**injure** 186:21

**injured** 122:16
126:21 186:25 190:6

**injuries** 48:20,24
132:13 246:22
247:14 249:8,14
255:7

**injuring** 238:22
239:5

**injury** 65:2 77:4
103:7,10 132:11
166:1 167:3,4,16
170:11 171:10
174:24 180:12
183:15,18 199:21
200:21 201:17
247:1,5 248:8
249:16 251:5

**inmates** 148:25

**inner** 56:7

**inside** 10:16 43:7
44:17 60:6 127:5
165:4 166:13
177:3,19 235:5

**insist** 115:13

**instance** 17:10 26:19
82:6 273:12

**instances** 27:17

**instead** 202:21 203:8
268:20 273:16
277:22

**instructed** 65:7,11
159:2,3,15

**instruction** 51:3

**instructors** 221:8,11

**intent** 48:13
195:3,24
196:7,8,20,22
265:16

**intentional**
186:17,20 187:1
265:15

**interaction** 188:18

**interest** 94:6

**interested** 242:22
289:12

**interesting** 241:13
267:10,15

**internal** 41:14
62:2,11 64:9 240:1
256:1 286:8

**interrupt** 25:5

**interview** 182:10,11
263:8 264:8,10
265:1

**interviews** 261:22

**introduce** 5:6

**investigation**
45:10,18 263:20

**investigations** 41:15

**involuntary** 41:11

**involved** 180:13
223:25 278:4

**irons** 70:2 71:20,21
231:4,6,9,12,14,17,

24

**irritated** 11:20

**isn't** 50:21 51:10,16
58:1 140:1 167:12

**issue** 76:5,7 212:14
233:12

**issued** 37:15

**issues** 162:22

**item** 82:12 277:13,14

**items** 4:1 49:20,25
68:2 199:1 258:5

**it'll** 259:2

**it's** 6:14 7:5 20:21
22:18 26:4 27:20
28:19 31:21
32:17,18 34:16,24
36:16 37:14 41:25
42:16 44:5,17 46:9
51:25 52:13 53:8,14
60:17 63:24 80:14
88:25 91:25 97:18
101:10,21
102:15,17,18,20
111:13 118:3
132:6,8 150:20,25
151:6 153:16 155:10
166:13,14,15,17,19,
20,21,22 184:10
198:2,8,17,18
199:5,10 200:22
208:8 209:20
210:6,23
211:2,13,20,24
212:3,7 216:6,11,12
223:5 230:15 233:11
246:6 249:22 257:3
258:25 268:21
272:18 273:10,23
274:12 287:6

**I've** 19:14,15 74:6
98:7 115:10 144:4
150:2 215:19 220:25
259:12 268:13

——————————
———— J ————
——————————

**jail** 7:25
10:12,13,16 11:4
24:20 25:1,8,11,15
43:6,7 44:18 53:18
60:6 65:20 68:1
72:6,12,16,20,25
73:6,7,22,24 104:1
105:14,16,21,24
106:10 107:15,18
108:11,14,19 109:15
110:8 111:1,19
113:5,11 114:6
115:7 116:4 119:17
121:5 129:18
130:5,7,12,14,24
131:2 135:14
136:8,13,19 138:16
141:22 143:3 146:12
148:3,4 151:10,13
159:17,21 160:3
161:25 162:2 170:9
172:11 175:16
176:10
177:2,4,18,20
180:11 182:24
183:15,19 184:4,20
185:1 188:2,3
204:22 205:2 219:10
226:25 232:17
236:12,15 237:2
243:3 244:10 246:22
247:1,13 249:10
251:15,21 252:24
253:4,14,18 254:4
261:24 264:22
268:18 269:18
270:4,10,16 271:1,5
280:15

**jails** 73:18,24
74:2,5 106:22 107:5
148:24 244:3

**January** 18:4,5 73:12

**jdarnell@jdarnell**
2:16

**jedarnell@jdarnell.c
om** 2:17

**Jeep** 2:15 3:5,7

5:19,22 79:3
85:1,4,8,14,18
186:12
188:5,10,17,25
189:1,4,12 193:17
195:7 197:2,15
198:6,22 199:18
201:4 202:1,24
203:14,22,25
204:4,15,24
206:4,22 207:1,23
209:3,15,20
210:1,5,10,13,18,25
211:4,7,11
212:9,20,24 213:4,8
214:7,19,22 215:5
217:3,10 219:18,24
220:1 223:19
226:19,23
227:4,19,24 228:9
229:12 230:10
232:23 236:17
238:14,18 240:23
241:12 242:17 244:7
245:20 246:11
248:20 250:5,9
251:11 253:22
255:13 256:11
257:25 258:12,18,23
259:3,8,12,17
260:10
261:6,8,12,23
262:6,16,18
265:2,9,25 266:12
267:8,12,16
268:3,13,16 269:7
277:25 279:24
281:19 282:17
284:18,21 286:21,24

**jeopardize** 229:9

**Jim** 2:14 5:13,19
9:12,18 11:9 13:5
14:3 15:12 16:23
17:8 19:1,11 25:5
26:2 27:2,10,21
28:17 29:5,21 30:5
33:8,17 35:9,18
36:14 38:11 39:7

64:4 69:5 72:8
78:12 79:1,25 80:21
81:9 83:4 84:2,15
86:10,18 87:1,5
88:11 94:19 97:23
98:5 100:24 101:4
102:3,25 107:13
110:12 116:24
117:8,18 118:8
119:9 120:6 124:20
126:12,18 128:2
133:9 140:9
142:9,21 149:9
150:1,11 152:21
153:6,15 155:1,15
157:1 159:7,12
164:23 167:8 171:8
172:16 173:3,23
174:9 176:18 177:8
179:9 186:11

**jitter** 208:17

**job** 19:25 34:2
40:17,19 41:4,19
144:12 190:20,21
197:20 206:1,10,18
207:5 208:21 209:1
229:20,21 271:17
272:3 274:23 275:5
277:23

**Johnson** 108:21,23
109:3 113:15 139:7
228:1 233:22

**join** 142:23

**Jose** 1:10 2:13 5:20

**judge** 157:6 210:17
212:2,14 213:2,7
226:23

**July** 20:1,2,7
40:5,6,8,13 42:15
154:12

**jumping** 111:10

**jury** 60:9,10 61:9

**justification** 37:10
49:2,5,10,14 83:14

**justified** 49:18,20

79:21 82:24 103:11
174:18

**justifies** 84:1

**justify** 50:2,20
51:10,15 52:3,17

**justifying** 50:16

---

### K

**keel** 127:20

**key** 165:18

**kick** 77:9,10 100:13
101:8 225:16 226:10
239:17 260:13

**kicked** 64:16 260:4

**kicking** 100:17 101:1
150:16

**kill** 84:13 85:21
232:19

**killed** 50:21 51:10
253:19 254:5,7
257:22

**killing** 83:14 84:1

**kinds** 14:15 43:13
102:16 132:13 228:6

**knees** 54:4,14
55:5,7,9,10,11,14,1
7,21
57:6,10,13,15,20
58:8,12,13,18
59:1,10 112:19
116:15,16,19
117:2,5,9,16,21,25
118:4,6,12,17,24
119:1,15,17 123:20
124:6 125:14 129:2
158:18,19 172:14,25
173:7 176:3

**knelt** 56:5,6

**knew** 26:14 28:11
43:5 68:3 73:22
100:2,17 103:19
171:9 183:18 197:7
199:10 200:17 204:8

224:15 229:22 230:2

**knocked** 243:7

**knowledge** 38:18
39:5,6 47:17 48:23
82:19 103:15 134:20
140:20 144:7
146:4,24 151:21
154:13 155:6 164:19
167:5 168:8 214:12
215:7 216:20
217:18,19 219:8
221:9 226:13 231:11
236:12 241:17 245:5
283:17 285:1

**known** 13:22

––––––––––––– L –––––––––––––

**lack** 6:24,25 11:24
16:12,21 17:6 25:25
27:7 28:5 29:3
33:22 35:16 50:5
69:3 167:6 230:8
238:18 257:23

**lacks** 106:17 203:15

**lady** 41:22

**lane** 99:12

**lap** 162:22

**lapse** 159:10

**large** 175:15

**last** 61:12 62:14
63:4 64:9 115:13
169:19,23,25 178:4
199:19 215:13
246:19 249:22 250:2
268:7 278:11 279:23

**lasted** 38:5 40:24
163:21 262:1

**lastly** 275:7

**lasts** 215:16

**latch** 165:17
166:13,14,20

**late** 40:4 104:4
137:12,15 259:20

**later** 60:9,21 211:25
259:23 260:19
267:19 286:9

**laughing** 256:10

**law** 6:11 11:21 12:5
16:17 17:14,21
18:18 19:4 20:10
27:25 28:4,24
29:9,11 30:2,15
33:19 36:9 41:18
42:12 69:1,8
82:12,17 91:22
94:10 95:17 97:6
98:20 143:17,25
145:5,14 153:20
154:5 155:19
156:16,20 157:19
158:1 242:18 287:6

**lawful** 41:25

**laws** 36:13

**lawsuit** 35:13

**lawyer** 252:10
276:1,6,19,22 278:6

**laying** 77:17

**lead** 30:9,24 259:14

**leading** 261:3,7
262:2 270:2
271:3,20 275:2

**leaned** 192:21

**leaning** 190:17

**learn** 18:22 72:19
93:19 101:11,17
103:16 109:7 135:4
145:24 154:4,10
159:2 185:15

**learned** 20:14 36:21
37:5 109:2 148:24
170:11 220:3

**least** 26:13 35:13
57:6,22 58:7 97:19
103:22 108:15 165:2
174:3 240:7 278:21
281:16

**leave** 40:6 45:12
66:22 67:14,23,25
105:13

**leaves** 207:13

**leaving** 45:2 74:11
109:8,11 146:14
151:23 179:15 188:2
232:17 237:15

**leg** 70:1,2 71:20,21
231:4,6,9,12,14,17,
24

**legal** 25:25 26:18
27:1,8,20 28:16
29:4,20
30:4,9,10,25
33:7,14 34:11 35:17
79:24 80:19 81:7,25
83:2 84:4 100:22
101:15 102:2,24
142:7,21 149:24
150:9 153:4,14
155:2,13 174:22
211:16,23 223:17

**Legate** 2:6

**legitimate** 211:22

**legs** 69:2,23
70:7,15,16 74:11,16
75:3,6,10,15
88:18,22,24
89:1,6,25 190:17
193:24 228:13

**lend** 91:19,21

**length** 168:5 246:4

**Leo** 2:19

**less** 19:4 37:19
62:22,25 63:3
163:17,21 204:9,12
215:17

**let's** 22:22 51:24
52:12 53:13 94:17
95:21 104:2 134:9
137:20 147:20
160:5,23 168:2,9
169:16 180:21

181:10 183:6 184:7
189:18 192:18 194:9
196:3 198:24 200:25
202:13 208:5 210:16
222:13,14 230:13
237:24 243:20
245:15 252:2 272:8
273:2,15 275:25

**level** 32:8 37:13,24
179:14 181:17 186:7
225:20

**liability** 29:18
30:24 33:5

**liable** 35:23

**license** 37:13,14,25

**licensing** 32:9

**life** 14:7,12 16:17
20:12 48:4,5 71:3
72:12,24 75:2
220:22,24

**life's** 15:5,21

**life-threatening**
98:21

**lifetime** 15:9

**lift** 45:24

**lifted** 131:17

**lifting** 131:24

**likely** 13:25

**Lincoln** 170:3

**line** 4:2,3 85:7
110:18 163:5 170:2
179:25 181:22
183:11 184:8,12
192:6,20
194:9,10,11,12
196:5 201:2,5,12,13
202:13 205:22
228:17,20 232:14
254:23 259:23
263:18 266:7,10
272:9,11
273:3,16,17 281:20
288:2

**lines** 168:9 175:21
181:10 183:6 199:1
205:11 229:6 230:17
231:20 266:16 267:9
271:12

**link** 120:19 121:2
122:3,9,20 126:22

**liquid** 240:17

**listen** 6:14 232:9

**litigations** 29:13

**little** 53:12 57:6,22
58:7,19 86:23
165:17 166:14
193:14 200:6 240:6
244:4 261:19

**loaded** 242:23

**loading** 222:6,9,10

**locate** 166:11

**located** 94:7 107:22
241:7

**location** 22:13 44:7
45:2,8 92:10
94:4,24 95:1,3,6,13
96:5

**lock** 167:16

**locked** 44:7,8,18
45:1,17 165:7,25
166:6,21,22

**locker** 121:15 124:11
135:16,22 159:4,11

**lockers**
120:12,14,15,18
121:14,19 122:1,5
123:19 146:20
158:16 178:14
233:18

**locking** 165:9,13
166:10

**logical** 46:12 114:18

**long** 13:22 20:22
28:1 52:5,6 53:6
105:3 108:3 110:25
113:3,24 114:24

115:14 122:7 123:9
140:6 158:10 261:17

**longer** 90:6

**loop** 150:23

**loops** 71:19

**loose** 164:14,16,17
165:1 167:12

**lose** 206:1,10,17

**losing** 77:5 271:16
274:22

**lost** 15:17 77:12
218:10 262:4

**lot** 115:11 139:24
260:17

**loud** 77:14 273:5

**loudly** 252:11

**Lozano** 61:19
236:20,21 242:2

**LPR** 41:23

**lunch** 85:12 151:16
160:5 175:5 178:9
202:9 233:1
234:3,13,25
235:12,18,25 236:4
237:15 281:12

**lying** 54:2 240:14
261:2

———————————
M
———————————
**ma'am** 232:1 263:23

**main** 2:11 206:20
208:14 229:4,7

**male** 94:2

**man** 68:12 184:15
225:6

**maneuvers** 228:13

**manners** 48:11

**March** 24:17,21 48:8
49:9 52:1,15 61:21
62:4 63:5,9 64:1
65:12 71:12 72:13

88:4 92:13,15,16,20
93:5 95:21 96:1
99:25 100:3,10
101:23 102:9 103:23
104:3 112:8,11
125:18 139:22
153:23 158:2 160:17
164:6 179:4 182:12
204:22 205:4 219:10
220:19 231:3 233:14
236:23 249:5 260:18
261:1,24 269:13
270:22 279:15
282:13
283:3,7,12,16

**mark** 51:3 168:2
210:16 255:21 257:1

**marked** 160:13 168:1
255:23 257:2,17
283:3

**markings** 250:25
251:1,22,25 252:1
275:13,17

**marks** 252:17,23
253:2,3,8,13,16
254:2

**mask** 151:1

**matter** 5:3 22:8
122:21

**matters** 14:17

**Matthews** 105:25
108:21,23,25
109:2,7,11,16
110:7,20 113:12,23
114:2,8,20 124:13
127:3 133:6
137:8,9,10,12,16,22
,23 138:9 139:8
154:23 155:9 167:25
232:8,12,22 233:22

**may** 60:20 119:9
216:1,7 252:8
255:22 264:8,13
267:5,22 268:7,8,9
271:15 282:12,16

283:8,12,14 284:9

**maybe** 21:25 46:2
67:11 97:25 98:9
232:25 257:14
259:6,12

**mean** 28:19 71:21
73:23 80:24 90:4
97:16 101:7 105:18
114:25 130:16 134:2
144:9 152:23 165:1
166:21 191:15,18,19
222:12 224:21,22
227:22 261:17
270:17 274:7
283:12,23

**meaning** 265:21

**means** 98:24 165:10
166:20 191:17 250:8

**meant** 280:14

**media** 215:20 263:4
264:6

**mediation** 60:21,23
61:1,3

**medical** 56:13
141:1,24 142:2
146:11,15,18
147:21,22,23,24
148:4,6,7,8,11,12,1
7,18,19,21,22,23
152:17 155:9,16,23
156:5,9,15,21
157:21 158:2 184:23
185:14 189:10
248:9,15,18,24
254:17,20 255:7
269:17 270:14,25
275:5 276:3,9,14
277:9,15,19 278:4
279:5,9

**medically** 147:4
151:19

**medication** 6:24

**meet** 107:21 210:23
212:5 278:6,11
279:22 281:12

**meeting** 278:23 279:2
280:18

**memory** 216:10 222:4
237:12 261:18
262:15

**Mendez** 2:6 5:11

**mentally** 12:22

**mention** 239:8

**mentioned** 29:12
34:12 53:5 167:25
200:19 202:3

**Mesa** 2:15

**met** 226:13,14 278:19
280:6 281:15

**metal** 120:16,19
150:20 178:14

**method** 24:18
224:6,17

**methods** 25:18 37:1

**middle** 175:16,21
235:5

**miles** 105:2

**mind** 12:11,14,20
21:20 47:2,7 53:3,7
79:20 90:19
126:4,5,6 147:23
172:2 186:16 189:19
223:10 225:10
265:15 274:15

**mindful** 13:18,21

**mine** 11:1 57:24
258:14,24 267:7

**minimum** 268:9

**minor** 249:9

**minute** 79:5
163:17,21 210:2

**minutes** 9:23 60:2,5
78:21 79:13,14
85:3,5,9 108:4
111:3,4,7 113:22
115:3,5,6,13,15
121:23,24 123:12,13

140:14,17,23 158:12
162:10,11,15,24
259:14 263:7
274:7,8 278:20
281:2,16

**mischaracterization**
97:22 117:1,19
260:8 261:4 262:12
266:13 273:11 275:2
278:1

**mischaracterize**
120:4

**mischaracterizes**
57:8 64:2 75:24
76:11 116:20 117:6
120:4 253:23

**misconduct** 212:22

**misleading** 189:22
260:8 261:4 262:11
273:10

**mismark** 258:13

**misread** 189:21,22

**Mission** 31:7,19 32:8
38:4 104:24 105:6
133:3,12 161:15

**misstatement** 86:18
88:11 98:6 116:24
118:9 126:12 140:9
149:10 159:12
172:17 173:3 177:9
206:24 209:4 261:4
270:1

**misstates** 9:13
126:16 156:12,24
173:20 174:6 201:24
217:5 229:13 268:1
271:20

**misstating** 157:10
199:19

**moaning** 78:18

**moment** 55:6 76:19
96:4 155:21 185:7
186:12 190:22
191:24 206:8 207:11

229:15 246:18
254:10,11

**moments** 47:1

**month** 18:6,7,21
19:20 20:3,11,14
46:2 73:9

**months** 144:24
263:8,9

**month's** 18:18

**morning** 5:16 176:15
226:1 280:2,10
281:6,11

**mouth** 240:18

**move** 25:13 31:11
39:3 52:9 83:22
134:10 137:4,13,19
138:7 142:15 150:25
164:3,18
165:4,15,18 184:24
280:16

**moved** 138:13

**movement** 72:4,5
243:4

**movements** 173:11

**moving** 76:7 129:10
135:5 165:2 167:13
170:21 194:21

**multiple** 72:17,18
217:22 264:17

**muscles** 221:16

**mutilate** 255:1

**myself** 34:2 77:5
108:2 184:15,17
186:1 272:3

---
N
---

**nature** 21:3 34:5
36:19 87:22 98:10
208:4 245:6

**necessarily** 16:24,25
224:21

**necessary** 81:5,23

**neck** 253:3

**negative** 109:6
190:12

**neither** 289:8

**Nevertheless** 63:24

**nice** 211:25

**night** 147:2 236:23
242:12

**nine** 123:13 268:10

**NM** 1:25

**nobody** 134:8,16
181:24

**noises** 123:23 124:6
187:17,18

**nonresponsive** 25:13
39:3 52:10 83:23
93:3 134:11 137:19
142:15 164:3 184:25
280:16

**noodles** 202:15
223:14

**nor** 289:9

**normally** 14:19

**notary** 285:10 288:24

**note** 113:3,7,9

**noted** 125:17 288:17

**nothing** 81:14,21
110:6 140:7 268:12

**notice** 123:4

**noticed** 121:2 122:13
123:6,8,15

**notified** 156:17

**notify** 155:18,23
156:4,10,20 157:19
158:1 269:16
270:13,24 286:7

**nurse** 151:19 184:14
236:12 237:2,8,9
249:10

**nurses** 129:5

141:7,11,16,19
142:14 148:4 184:23
236:14 249:7,13

---

O

**oath** 6:9 168:22
181:4,5 194:24
199:15 202:20
203:1,7 235:12
237:22 279:8,21
280:19 281:7

**object** 19:1 22:4
36:14 38:10,11 39:7
72:8 86:18 87:1,5
88:11 116:24 117:18
118:8 124:20 126:12
133:9 149:9 155:1
159:7,12 172:16
177:8 188:5 193:17
199:18 209:16
229:12 281:19
284:21

**objecting** 22:9

**objection** 8:1,6
9:7,12,18 11:7,9,24
12:7 13:3,5,9
14:1,3,11,21,25
15:10,12,24
16:5,11,21,23
17:6,8 19:6 24:23
25:24 26:2,17,25
27:2,7,10,19,21
28:5,15,17
29:3,5,19,21
30:3,5,25 31:6
33:1,6,8,13,17,22
34:10,23
35:3,8,9,16,18
36:15 37:21 39:9
43:8,22 44:10,20
45:4 47:13 49:23
50:5 57:8,11
58:15,21 59:7
64:2,4 66:10 68:18
69:3,5 70:4,8,22
73:20 74:19
75:12,24 76:11
78:10,12 79:2,23,25

80:18,21 81:6,9,24
82:14 83:1,4
84:2,15,17 86:8,10
87:6 89:8,19
91:8,24 92:18,23
93:8 94:14,18,19
95:7,10,18 96:12,24
97:21,23 98:5
100:21,24 101:14
102:1,3,23,25
106:17 107:11,13
109:17 110:10,12
113:6 114:22
116:20,25
117:6,8,20 118:10
119:8 120:3,6 124:1
126:16,18 127:25
128:2 132:5 133:10
135:25 139:21
140:11
142:7,9,20,23 143:4
144:3,15 145:2
146:1 149:15,24
150:1,9,11
152:19,21
153:4,6,13,15
155:3,13,15,24
156:12,24
157:1,6,13 159:14
164:7,21 167:6
169:10 171:6,8
172:18 173:2,20,23
174:6,9,21
176:17,18 177:10
179:8,9 188:10,17
189:5,12 195:4,7,13
196:25 197:2,15,17
198:4,6,13,20,22
200:1 201:24
202:1,22,24
203:14,15,22,25
204:4,13,15,24,25
206:2,4,22,23
207:20,23 209:3,5
210:6 211:16,17,24
212:11 213:10
214:7,19,22 215:5
217:3,4,5,8
219:16,18,24 220:1

223:2,16,19
224:8,20 226:19,22
227:4 228:8,9
229:25 230:8,10
232:23 236:17
238:14 240:23
241:12 244:6,7,15
245:11,20,21
246:9,11 248:11,20
249:11 250:5 251:9
253:20,22 255:3,9
257:23,25 259:8
260:7 261:3
262:2,10
265:2,23,25
266:12,14 268:1,3
270:2 271:2,20,25
272:17 273:1,8
275:1 277:25 278:2
279:24

**objections** 22:12
101:3,20 102:7
189:2 206:13,25
210:22 248:22
251:11 255:13
273:9,20

**obligation** 6:10 7:13
49:22 154:10
156:10,19 157:18
181:7 270:13,23

**obligations** 153:20
155:11

**observation** 116:1,2
240:22

**observations** 157:16
200:18

**obviously** 12:8 45:11
77:12 91:5 92:7
96:2 99:5,9 221:15
272:3 283:6

**OC** 145:19

**occasionally** 140:2

**occasions** 279:8
281:16

**occur** 253:17

**occurred** 48:24 119:4
160:3 262:8

**off-duty** 185:13

**office** 215:22 263:4
264:6

**officer** 1:10 2:13
3:17 8:16 11:21
12:9,16 19:4 25:12
37:20 40:17,20,23
48:5 49:11,15 56:3
62:3 64:13
69:1,9,22 73:11
82:13,17 83:14
84:1,9,23 93:10,21
95:17,20 97:7,12
98:3,14 99:5,8
104:9
106:5,11,15,21
107:4,20,24 108:20
109:23 115:25 116:3
118:6,15,18 119:2
122:5 131:12 137:16
142:6 143:17
144:1,11 151:18
153:17 154:5,9
155:18,20
156:15,16,21 157:19
158:1,20,25
159:15,16 161:16,17
168:11 170:10
171:2,3,15,18
172:2,11 175:22
176:4 178:20 181:8
182:6,19 183:12,22
185:13 187:24
188:14 189:8,15
194:3 197:5
200:19,22 202:3,6
205:14 208:13 214:3
216:19 217:1,16,24
218:16 219:6
222:7,19,23 228:22
229:3 233:17
234:5,9,15,20
235:15,21 237:8
238:21 241:6,9
243:5,10 249:22
251:7 268:17 270:14

271:8 289:3

**officers** 12:15 78:2
96:22 97:18 98:18
99:7 107:6 109:24
122:3 123:22 124:9
125:20 137:17,18
141:8 154:17,18,19
176:22 203:20
204:5,17,19
227:10,12,13,14
234:4 260:11,18

**officer's** 83:21 84:7
93:6

**official** 155:19

**officially** 40:23

**oh** 8:23 64:16 99:11
103:5 166:19 168:23
201:16 250:4 267:14

**okay** 10:15 17:19,23
22:22 30:21 51:24
54:5 61:25 68:7,8,9
84:20 101:24 102:9
135:10 141:25 145:15
147:17,25 163:19
166:16 168:11
169:16,24 170:6
192:3 195:23 203:10
216:8,15 217:13
222:13,18 227:24
228:18,21 231:22
242:21 252:9,20
255:14 258:18 269:6
272:25 273:15 274:4
276:7,24 281:5
285:25

**old** 15:19

**omendez@scherrlegate
.com** 2:8

**one-hour** 5:22

**one-month** 19:12
149:6

**ones** 133:8 154:20

**one-week** 38:8

**onto** 119:17

**open** 112:20 116:2,13
118:16 175:23

**opened** 108:6 115:25
116:7,10,12 118:15
128:14 172:10
173:17 174:2 175:22
235:15

**opening** 116:8

**opens** 173:10

**opinion** 11:17 12:22
30:9 32:17 80:1
81:8 82:1 83:3
100:22 101:15
102:2,24 147:24
148:6 167:9 196:19
248:12 249:12
251:10 255:11

**opportunity** 67:3,7
88:20 164:18 215:23
251:18 264:11,16
283:10 284:11
285:1,15

**opposed** 45:2 130:13
148:12 176:13 222:4
239:12

**order** 37:16 255:21
257:15,19 279:14
283:7

**ordered** 286:7,17

**Oregon** 1:17 2:7

**orient** 201:2

**Ortega** 2:10 3:8
5:16,17 8:1,6 9:7
11:7,24 12:7 13:3
14:1,11,21,25
15:10,24 16:5,11,21
17:6 19:6 21:23
22:4,11 24:23 25:24
26:17,25 27:7,19,22
28:5,15 29:3,19
30:3,6,8,25
31:6,17,23
33:1,6,13,22
34:10,23 35:3,8,16
36:15 37:21 38:10

39:9 43:8,22
44:10,20 45:4
47:13,20 49:23
50:5,22 51:21 53:17
57:8 58:15,21 59:7
61:3 64:2 66:10
67:18 68:18 69:3
70:4,8,22 72:21
73:20 74:3,19
75:12,24 76:2,11
78:10 79:2,23 80:18
81:6,18,24 82:14
83:1,16 84:4,17
86:8 87:6 88:4
89:8,19 90:14
91:8,24 92:1,18,23
93:8 94:14,18
95:7,10,18 96:12,24
97:8,21 98:15,22,25
99:25 100:2,21
101:3,14,20
102:1,23 106:17
107:11 109:17
110:10 113:6 114:22
115:8 116:20,25
117:6,20 118:10
119:5,8,13 120:3
124:1,22 126:16
127:11,25 130:6
132:5 133:10 135:25
139:21 140:11
142:7,20,23
143:4,10,13
144:3,15 145:2
146:1 149:15,24
150:9 151:16 152:19
153:4,7,13,23,25
155:3,13,24
156:12,24
157:2,7,10 159:14
161:5 164:7,21
167:6 169:10
171:6,21,23,25
172:18 173:2,5,20
174:6,21 176:17
177:10 179:8 184:9
188:1 195:4,13
196:25 197:17
198:4,13,20 200:1

201:24 202:22,25
203:15 204:13
206:2,25 207:20
209:5 219:16
223:2,16 224:8,20
228:8 229:25 230:8
244:6,15 245:11,21
246:9 248:11,22
249:11 251:9
253:20,23 255:3,9
257:23 262:19,21
265:6,23 266:1,14
267:3 268:1
269:9,11 270:6
271:6,22 272:8,22
273:1,2,15 274:1
275:7,21 276:11,16
277:6 278:2 285:22
286:22

**Oscar** 2:6 5:11

**others** 12:1 49:6
155:23,25 156:5
275:22

**otherwise** 7:18 16:18
26:15 45:12 77:9

**outside** 43:5 44:8,15
53:2,14 54:1
90:16,23 108:24
146:14 158:11
159:5,10,17,21
160:2 180:11 187:23
188:4,14,16,23
190:16 191:7
192:2,9 193:5
205:15 214:2
271:10,23

**overbroad** 36:14
261:5,11,15
262:10,12 271:3,25
275:19

———————
P
———————
**P.C** 2:11

**p.m** 1:17 87:14 104:6
107:16 115:19,22
147:7 160:6,9

243:22,25 287:3

**page** 3:2,11,14 4:2,3
160:23 163:2 168:9
169:18 175:14
181:10,22
183:6,10,11
184:7,10 189:18,20
192:18 194:9,10,11
196:3,4 198:25
200:25 201:4,5,11
202:13 205:11 208:6
228:16,17,19,20
229:6 230:16,17
231:20 233:13,15
237:24 239:1,15
241:14 256:3,5,6,13
260:11 263:18
265:12 266:6
267:8,9,11
272:9,10,11
273:3,16,17 276:5
284:23 286:5 288:2

**pages** 168:4 202:5
257:13 276:1 277:14

**pain** 169:9,13,15
170:4 221:17,23
225:11,17

**pair** 74:16

**pamphlets** 36:25
37:2,3

**pant** 71:19

**pants** 56:18 65:17
68:16,17 69:1
74:8,11,16,17
76:16,19 189:25
259:5

**paperwork** 148:2

**paragraph** 163:4
169:19,22 175:15,17
178:5,13 233:17
235:5 237:25
239:2,15 240:13
286:6

**paranoid** 111:20

**Pardon** 124:3

**parked** 107:18 108:13

**partially** 93:3

**parties** 189:1,6
  289:9,12

**partner** 11:3 12:9,14
  13:22,24 109:24
  113:12 233:22

**partway** 174:4

**Paso** 1:3,18
  2:7,12,16 3:15,18
  19:15,25 20:5,9
  40:10,12,16,19,22
  42:13,18 43:2 46:17
  61:2,19 62:5,11
  72:6,12 73:24
  93:16,20 94:5
  106:6,11,15 118:21
  125:6 142:12 144:25
  145:4,9 151:10
  154:19 155:25
  197:12 203:12,19
  204:6,18,19 215:22
  221:5,20 257:11
  269:16 270:24

**Pass** 275:21

**passed** 119:22 120:17
  121:17,20
  122:1,11,19 162:6

**passenger** 180:9

**passenger's** 186:6

**past** 36:22 42:11,20
  62:15,17 63:1,8
  120:1,12,13
  178:5,13 180:24

**patch** 257:10

**path** 189:23

**patting** 192:2
  217:2,6,16 218:17

**pavement** 199:17,21
  201:8,14 239:4

**pay** 167:2

**PD** 40:22 62:5,11
  94:22 145:4 221:21

**peace** 106:21 107:4,6

**Pebble** 10:9 88:2
  91:18,20
  104:13,23,24
  105:7,11,14 133:1
  136:19,23 137:17
  161:24 167:20
  168:19 179:11,15,21
  185:9,18,20,24
  186:9 231:12 249:23
  250:13

**Pebbles** 246:20

**pedestrians**
  99:10,14,19

**penalty** 7:10 63:25

**pending** 276:23

**people** 14:8,18 15:6
  92:10 98:10 99:10
  133:7 139:5 149:23
  185:14 204:21
  205:1,3,7 227:9
  228:14 242:19

**people's** 198:23

**per** 38:7,12
  227:10,16,17,19

**perceived** 84:7,10

**perform** 218:4

**performed** 218:6

**period** 78:7 114:20
  149:6 158:14 240:21
  261:17,23 278:20

**peripheral** 77:7 80:6

**Peripherals** 113:17

**perjury** 7:10 63:25

**permanent** 41:25

**person** 7:19 8:10,25
  11:4,16 12:4,21
  15:22 16:2,4,8,15
  43:13 44:5,12,17
  45:10,17,19 46:23
  47:2,5 69:21 70:18
  71:15 72:16
  83:12,25 85:22

88:21 90:6 98:19
  101:18,25 102:11,21
  103:2 133:7 150:17
  152:24 198:1,3,9
  199:5,10 219:23
  238:12 245:4
  248:13,24 250:3

**personal** 14:17 39:4
  217:14 240:22

**personality** 12:10

**personally** 39:13
  112:11 142:17 143:7
  289:5

**personnel** 78:3 255:7
  269:17 270:25 272:6

**persons** 283:1

**person's** 43:24 44:1
  45:7 70:1,7 89:24
  198:16

**perspective** 80:25
  81:1

**pertains** 177:11

**phone** 146:25
  158:21,22

**photo** 257:8 275:9

**photograph**
  3:21,22,23,24,25
  252:7 256:24

**photographs** 247:18
  257:20

**photos** 166:7 246:18
  255:19

**physical** 145:18
  179:5,13

**physically** 89:16
  111:13 130:18
  178:24

**pick** 125:12

**picture** 247:19
  249:21 250:17 254:8
  257:10

**pictures** 255:18

258:6

**pit** 129:21

**placed** 179:24 239:12

**places** 28:1,2

**plaintiff** 1:7,15 2:2
5:10,12

**plaintiff's** 50:24

**plan** 207:12

**Planas** 161:17

**plate** 150:20

**pleasant** 221:15

**please** 5:6 9:20 13:6
15:16 23:9 25:5
26:5 31:25 51:4,5
81:10 102:5 115:18
119:12 127:13
129:19 156:2 166:12
171:13 177:14 200:3
210:16 213:12
233:13 258:22 273:5
278:15 281:23

**plexiglass** 247:9

**PLLC** 2:6

**plural** 286:16

**plus** 20:5 94:19

**point** 9:1 10:18
47:20,21 56:3,5,22
66:4 68:11 71:7
76:22
77:2,7,8,14,23
81:15 90:14,22,23
91:6 94:4 95:19
97:8 98:15,22
100:4,9 109:10
117:12,24 119:20
120:24 121:1,9
122:4,16 123:4,19
124:13 125:10,14
127:23 128:11
130:6,7 131:20
138:17 148:8 153:19
154:25 158:16
159:18 161:5,6,8

166:11 175:7 179:1
182:5,8 185:19,21
188:22 190:18,24
191:6 192:21 193:21
194:16 195:12 196:6
199:23 200:10
214:16 218:24,25
219:20 220:15,16,20
224:5,10 225:5,7,15
229:22 232:22
233:25 239:17 246:5
252:8 259:25 261:21
266:17 276:10 286:3

**pointed** 260:10,17

**pointing** 218:13
259:21

**points** 25:11 87:21
108:24 130:24 139:8
161:10 175:6

**police** 3:15,18
19:15,25 20:5 37:19
40:7,9,10,12,16,17,
19,23 41:9
42:13,18,22,25 43:2
46:18 61:20 62:3
69:22 78:2 83:14
84:1 92:9 93:16,20
94:6 99:7
106:5,6,9,11,15
118:22 125:6 133:17
137:17 142:12
144:25 145:9
154:9,18,19
155:7,25 156:15
181:8 197:12
203:12,19,20
204:6,18,19 215:22
219:6 221:5 226:17
227:3 257:11 269:17
270:14,24 271:8

**policies** 17:12,14
48:3 73:25 106:3
150:3 156:8,20
157:18 269:13
270:21 280:3,10

**policy** 156:6,7
157:23,25 269:19,23

279:20
280:13,20,21,23
281:1

**port** 50:2 52:23
53:14 55:4 60:1,5
67:19 78:4 91:14
109:15 113:4 187:23
188:15 190:16
191:3,7 192:2,9
199:25 200:5
222:12,13 271:11,23
274:24

**portion** 84:23 169:21
184:8 198:24 201:19

**position** 24:25

**positions**
244:8,11,18,22

**possibility** 34:24
35:1 87:17

**possible** 34:16 96:5
208:13 216:5 246:1

**possibly** 11:17

**potentially** 50:16
69:21 98:21 201:22
229:9

**Poust** 285:1

**PowerPoints** 36:24
37:1,2

**precaution** 179:20
181:17 182:7,15

**precautions** 179:6
182:20 186:3

**predicate** 250:6

**preparation** 269:1

**prepare** 61:14 104:11

**prepared** 12:22 242:1

**presence** 49:6 126:6

**present** 2:19 148:1

**presented** 32:13

**presents** 12:10

**preserved** 13:9 102:7

157:16 206:13

**press** 165:25

**pressed** 116:3

**pressure**
55:13,17,19,24
57:6,10,13,18,21,22
,25
58:2,7,10,12,18,20
59:1 87:21 158:18
244:13,18,19,22
245:1,9,19 246:6,14
279:18

**pretty** 54:9 111:14
112:21 163:24

**prevent** 7:1 65:2
71:4 74:12,16 77:3
88:20 89:2 90:6,22
180:5,12 238:22
239:5

**prevented** 74:25

**prevents** 70:20 90:10
165:19

**previous** 46:17

**previously** 194:24
202:20 203:6 227:23
261:10 275:9

**prior** 75:25 210:7,10
217:5 220:18 260:25
263:7,13 264:3
271:21 272:18
279:7,12 282:4

**prison** 73:8

**prisoner** 11:3
13:2,15
21:2,4,6,7,8,9
22:24 24:2,13,15
25:19,22 26:9,15,22
27:16 28:12,25
33:21 43:5,6,14,19
48:21 49:3,6 73:5
99:23 101:9
103:8,10 104:20
105:25 106:10,16
109:8,11,25 132:15
149:12 151:6

153:11,21 154:11,25
155:9,12,17 156:22
157:21 178:25
182:25 183:15
227:25 228:7,24

**prisoners** 22:6 32:21
72:11 94:1
104:12,18 106:5
107:25 116:5 150:7
153:2 154:16,23
155:8 229:17,23
230:3,4,12 248:16

**private** 68:21,22

**privilege** 281:21

**probably** 203:13
209:9 239:22 274:13

**probation** 41:7,10

**problem** 233:10

**Procedure** 1:16

**procedures** 17:14
73:25

**proceed** 7:7,19
107:22 108:10

**proceeded** 108:7
128:16 172:22
174:13 234:5,20
235:15,21 236:1,7
238:1

**proceeding** 161:19

**process** 32:18 177:25
178:2

**processing** 137:17
154:17 161:17
227:13

**proficiencies** 38:18

**profusely** 152:10

**prohibited** 90:1

**pronunciation** 163:6

**proper** 14:10 21:1
25:19 31:4,15
32:3,12
102:14,15,17,18,20

103:3 107:10
132:6,8,9 204:16
211:17

**properly** 25:21
26:8,15 28:12,25
165:15

**propped** 77:10 122:20

**propping** 122:2 127:9

**protect** 69:22
96:11,23 98:13
153:11,21 154:6,11
155:12 200:14

**protected** 96:7,8

**protecting** 153:2

**Protection** 41:21
145:15 146:2

**provide** 38:20,23
39:12 48:7 64:21
285:19 286:8,17

**provided** 36:12
38:3,19 39:14 61:18
64:20,23 98:13
178:18 255:25
263:19 271:15
282:21 283:20

**proximity** 254:18

**public** 285:10 288:24

**pull** 56:18 68:16,17
74:8 76:16 166:15
189:25

**pulled** 49:21
222:7,19 223:23

**pulling** 76:20 216:23
218:1 243:13,17

**pulsating** 152:13

**punch** 100:13 226:10

**punching** 100:17
101:1

**punishment** 101:18,25
102:10

**punisment** 101:12

**purpose** 42:2 44:25
45:13,16 74:8
90:3,4,5 92:6,8
93:7 94:5 96:6
211:22

**purposes** 91:22

**pursuant** 1:15

**push** 100:15 101:8
151:7 171:4,18

**pushed** 77:11 166:4,5

**pushing** 100:18 101:1
123:20 162:20 163:6

**putting** 45:1 58:7
71:5 77:13 90:21
124:14 135:15 140:8
174:19 180:4,8,9,11

---
Q
---

**qualifications** 38:25

**quarter** 105:12

**question** 6:16 8:22
9:19,20 13:6
25:3,4,7,14 26:6
29:25 31:10,22,23
32:10 35:4 38:21
44:4 51:1,4,5,20,22
52:11 58:3 64:15
81:3,19,20 83:24
86:23 91:3 93:4
101:16 102:4
119:7,11 121:4
134:9 137:20 143:10
147:12 156:2
157:13,14 164:4
168:10,18,24 171:12
177:13 181:12,14,24
182:9,13 183:7,9,12
192:7,23 194:14,23
196:5,6,12,19
199:2,19 200:3
201:3 203:2,3
204:16
206:6,7,8,9,11
208:18 209:7,18
211:21 213:12 217:9
220:17 227:20

228:17,22 230:14,20
231:21,24 234:9
257:5 258:3 261:7
265:13 266:19
272:23 273:5,18,23
274:2,7 276:7,20,23
277:2 280:17 282:19
283:7

**questioned** 205:12
279:8 281:8

**questioning** 45:11,19
62:1 268:24 281:20

**questions** 6:15 30:21
64:8,10,12 175:6,9
186:15 189:2 201:1
215:25 216:1,8
222:3 246:19 247:18
259:11,13,23
261:9,13 262:16
268:14 269:7 271:12
275:12 277:18
278:10,13,24 279:3
281:1,11 286:23

**quick** 258:12

**quickly** 11:20

**quite** 73:23 76:21
163:24 254:16

---
R
---

**radio** 77:25
91:6,13,16,19,21,23
92:6,9,14,17,21
93:6,12,15,20
95:13,16,25
96:6,20,21 97:5
98:13,19
99:6,13,18,23
100:6,7 147:1
148:10,14,15,17

**raising** 225:20

**ramp** 78:5
111:13,14,16
113:12,14,22 222:12
241:6 254:22

**ran** 206:9

**rash** 14:10

**rather** 133:22
134:14,23 135:2
189:10 195:24
198:2,10

**re** 111:11

**reach** 83:5 114:19

**reached** 80:11

**reaches** 83:13 84:13

**reaching** 80:9
83:8,25 84:22

**reading** 53:2
62:19,23 63:1 163:8
184:2 196:15 201:16
229:1 273:6,24
274:4,10 282:7

**ready** 7:22 56:19
65:17 74:9 85:1
104:16,17 230:18

**real** 188:25 258:12

**really** 14:10 16:9
85:9 143:16 184:20
193:24 208:15
220:21 223:9 224:14
257:13

**reason** 5:21 6:14,22
7:17 9:3 10:23
49:13 95:2,5 99:17
106:14 107:14
127:22 169:9 170:4
221:22 223:9 224:4
227:7 238:12 288:2

**reasonable** 32:24
33:4 152:24

**reasons** 11:2 94:9
212:1

**recall**
10:6,10,14,17,18
20:17,18,20
29:6,7,10,11,22,24
30:17,18 31:2 33:9
34:15,16 35:10
36:5,6,8,16,19,20,2
4 37:11 42:8

43:3,15,16 50:23,25
51:12,14,23 52:20
53:9,11,12,25
54:23,24 58:24,25
59:1,3 60:24 63:6
64:7,11 73:2,3,7
76:17 83:11 84:18
86:3,4,11 88:6,12
103:18 105:4,5,8
113:25 119:13,14
124:17,25 131:14,22
133:15 140:13
158:21 159:6 165:8
166:2 169:4,5 172:7
179:3
187:16,20,21,22
188:11,12,13,18
190:5,11,25 200:24
207:11,16 216:25
218:8,21,23
220:6,7,11 224:1,11
227:6 228:15
231:5,8 232:8,20
233:2 234:8
236:15,20,21 237:7
238:23 246:24 248:7
250:14 253:1,15
261:18 263:17
268:23 269:5,19,20
271:12 275:10
282:6,15 286:1

**recalled** 63:16

**recalling** 164:9

**receive** 97:19 145:7
178:23 179:2
228:6,23

**received** 19:20 28:11
46:5,8,15,20 48:21
69:11,16 71:12
97:24 223:12 265:14

**receiving** 226:15
276:13 277:9

**recent** 215:11

**recently** 63:4 146:8

**recess** 87:13 115:21
160:8 243:24

**recognize** 247:20,21
250:18

**recollect** 210:14

**recollection** 21:13
37:14,22 38:6,22
52:1,15 53:16 62:8
78:23 94:21 118:15
127:1,14,21 146:24
178:22 185:4,12
216:3,16,21
217:15,21 218:9
228:11 240:4,6
283:22

**record** 14:6 23:15
50:23 87:12,15,23
112:4 115:17,20,23
160:7,10,12,16
242:22 243:21,23
244:1 255:20 277:1
278:25 287:4,6,8
289:7

**recorded** 112:7 289:5

**records** 39:11

**red** 252:1,17,23
253:2,3,8,13,16
254:2 258:16,19,20
259:7 275:13

**referenced** 268:18

**referencing** 270:11

**referred** 283:2

**referring** 50:25
170:6 220:15 281:4

**reframe** 217:8

**refresh** 62:7 237:12
262:15

**regain** 111:11

**regard** 240:7

**regarding** 20:15,24
21:4 32:12 35:1
36:13 43:1 62:3
64:22

**regards** 280:12

**region** 252:16

253:3,7

**regional** 10:8 88:3,9
104:25 105:7 133:3
161:15,25 246:21

**regulations** 106:3

**reholstering** 216:19
217:24

**related** 270:25 289:9

**relative** 289:11

**relax** 56:16,21 58:6
59:5,15

**relaxed** 57:3,5 58:6
59:5,9,14,17

**relaxing** 55:16

**release** 56:13 141:1
147:21,23,24
148:5,11,18,22

**relevant** 184:8
198:24 199:1 286:6

**remain** 125:20 139:2

**remained** 234:4

**remaining** 136:9

**remember** 9:22 10:20
37:4,5 38:1,14
39:20,22 47:9 52:7
53:21 54:10
56:11,24 59:10
60:12 61:22 62:21
63:10,25 64:5 66:20
75:13,17,18
76:3,14,22 77:1,5
78:19 86:11
88:6,9,12,16 91:15
92:25 103:18 104:19
105:20 106:18
114:17 121:10 130:3
139:12,25
141:10,17,20 146:22
148:14,16,20 149:17
150:12 151:20
159:22,24 163:23,25
164:1 166:2 170:14
175:5,7,9 176:21
178:10,12 181:5

185:16 187:13
192:1,6 193:23
194:6 202:11,12
218:11,13,14 229:1
232:12 234:12,17,18
235:2,3,17,19 236:3
237:6,17,21,23
239:17 242:4 259:23
260:5 263:3 268:4
280:3 285:17 286:6

**remove** 65:3

**render** 110:1

**repeat** 9:11 13:6
26:5 51:5 102:4
156:2 177:13

**rephrase** 9:20 35:4
101:16 200:3

**report** 49:22 50:15
112:22,25

**Reported** 1:24

**reporter** 3:12 5:7
6:2 13:11 26:7
31:13,18 32:1 51:6
52:12 102:8 134:12
137:21,25 138:3
156:3 157:17 171:14
177:15 203:5 206:14
213:13 277:5

**representation**
249:16 255:25

**representative** 167:4

**request** 1:15

**Requested** 4:1

**requesting** 148:20,22

**required** 26:14
106:4,6

**requirement** 45:9
270:24

**requires** 81:7

**reserve** 286:22,24,25
287:6

**reserving** 287:7

**resident** 41:25

**resign** 18:16 41:3

**resignation** 41:11

**resigned** 18:15
41:2,8,15

**resist** 229:23 230:22

**resistant** 228:7,24

**resisting** 100:19
101:2 239:16

**respect** 19:2 59:4
193:9 197:11 227:7
253:16

**respond** 152:2 183:16
211:21 238:13

**responded** 212:16
213:10

**responding** 238:6

**response** 31:21
256:12 283:19

**responsibilities**
154:15

**responsibility** 153:2
154:5

**rest** 194:5

**resting** 55:10

**restrain** 69:23 71:15
274:23

**restrains** 72:4,5

**restraint**
150:13,14,15,19
151:10,13

**restroom** 115:9

**result** 25:22
26:9,16,23 27:16
35:13 103:13,24
183:19 247:5 286:11

**results** 39:13,17

**retract** 261:6

**retrieve** 188:15

**retrieving** 56:4

**return** 105:6

**returned** 136:2

**review** 3:17,19 38:24
60:21 61:14,25
168:3 182:14 213:23
242:9 260:12 262:25
263:10,13 264:16
265:10 266:25
267:4,21 268:5,25
270:20 271:15
281:25 282:2,13
283:10,13 284:3,11
285:2

**reviewed** 62:1 64:9
260:14 263:1,5,8,15
264:3,7 269:4 283:6

**reviewing** 260:24
266:22

**ride** 234:25

**ridiculous** 204:4
245:20

**rights** 29:1 34:22
35:2,7 103:14,24

**risk** 43:6 45:1

**risks** 35:11

**rolled** 78:5

**Romero** 1:10,14 2:9
3:3,17 5:3,18 6:1
50:22 115:9 143:7
168:11 183:12
228:22 268:17
269:12 288:15,19

**room** 44:7

**Roswitha** 1:5 2:19
5:4 252:5

**roughly** 121:22

**route** 97:16 169:20

**RPR** 1:25

**rule** 157:6 177:11
273:13,23

**ruler** 167:3

**rules** 1:16 106:3

211:14,15

**run** 44:5,6,14 46:4
47:3 74:17
75:3,6,10,15,22
76:9 90:13,20
190:23 229:22
230:21 274:14

**running** 59:23 74:12
90:10,22 194:16

**rushed** 46:10

_____

S

**Saenz** 1:5,6 2:19 5:4
7:25 10:12,19
24:20,25
25:10,15,17 47:3,18
49:11,15
50:12,18,20 51:7,9
52:3,18,24 53:14
54:1,13,16
56:5,14,15,21
58:5,6 64:17,24
65:25 66:2,7,15
76:19,25
77:10,17,19 78:7
80:4,7,15 83:5
86:25 87:4 104:20
106:1 107:22
108:1,7,8,18,21
109:4,12 111:9
116:13,14,18 117:9
118:7,11,16,25
119:6,16,19
120:12,13,15,18,20
121:3 122:2,4 123:1
124:12 125:5
133:3,6,14 137:18
141:6,9,14 143:8
147:20 154:1
158:2,16 160:24
163:5 167:12,19
170:7,18 171:9
172:13,20
174:10,13,17,23
175:7 176:3,9,20
177:2,3,17,18
179:10 183:13,19,23
184:15 185:25

187:25 188:14,19,21
190:9,21 194:1
195:9 196:1,23
202:15 207:9 208:2
214:25 218:5
219:20,22 220:8
224:19 230:22
231:10,14 232:3,5
234:4,6,20
235:6,16,22
236:1,6,13 237:3
238:1 239:3,16
240:14,15,16 244:10
249:6 250:17
251:13,15 252:5
254:24
271:1,11,17,24
272:4 274:11,23
275:3,5,9 276:10,13
277:9

**Saenz's** 77:23 117:24
118:18 127:14
175:24 176:5 235:1
246:14 275:13

**safe** 96:18

**safer** 19:10

**safety** 92:22
93:2,6,10 96:11,15
98:13 99:19
153:2,12,22
154:6,11

**sally** 50:2 52:23
53:14 55:4 60:1,5
67:19 78:4 91:14
109:14 113:4 187:23
188:15 190:16
191:2,7 192:2,9
199:25 200:5
222:12,13 271:11,23
274:24

**sat** 59:22 125:14
127:15 129:4,14
152:14 235:6 282:7

**satisfied** 242:13

**saw** 9:16 14:8
50:2,8,11,12,19

51:9 73:5
77:16,21,22 79:20
80:3,4,8 81:14,21
82:7 83:5,7 84:9
87:7 88:10 111:24
112:2
116:9,14,18,21
117:17,25 120:23
121:2,4,13
122:3,7,16 129:7
135:10 136:9
137:4,7 138:1,6
150:13 161:14,19
170:15
177:4,7,20,24
181:15 182:4
184:3,15 185:17
186:8 199:17,20
200:10,20
201:8,13,21 208:16
213:21 216:4,5
217:2 222:5
240:10,13,15 241:2
243:3 246:22
248:2,13 254:25
265:15,21 266:6,9
268:9 283:18

**scanned** 257:15

**scared** 111:18,20
160:24
161:3,6,12,21

**scaring** 161:11

**scene** 114:5 216:21
257:11

**Scherr** 2:6

**Scott** 2:11

**screaming** 59:23

**screen** 252:7

**SEAL** 288:22

**search** 36:13 37:6

**searches** 28:9 35:24
36:7,10

**seat** 162:3,7,9,16
163:9 180:9 186:6

255:19

**seated** 158:17

**second** 23:22,24
50:13 116:21 160:23
163:5 169:18,23,25
171:13 210:12
221:4,5,20,23 222:1
237:25 239:2
256:3,13 284:2,5
286:5

**seconds** 114:25
122:21,22
135:15,18,21 136:3
232:10 263:7 274:7

**secure** 1:9 2:9
5:4,17 165:15

**secured** 45:8 125:1
232:21 233:17

**securing** 125:22

**security** 19:16 32:9
37:13,16,18,24 41:6
46:14 93:21 95:20
144:12 209:1

**seeing** 88:12 101:22
152:24 206:5 216:16
252:4 268:4

**seem** 261:25

**seemed** 111:20 116:15
117:2,9,22 118:4
172:20,21 173:6
174:10 186:23
195:22

**seemingly** 260:19

**seen** 8:10,17 14:15
15:22 49:20 72:24
88:8 151:13 166:3
215:8 260:3 267:24
268:7,17,19

**seizure** 36:13 37:6

**seizures** 28:9 35:24
36:7,10

**self-defense** 21:1
46:6,19

**sense** 26:11,14 101:7
103:6

**sent** 31:7,18 32:7,9
228:11

**sentence** 176:2 178:4
237:25 239:2 285:4

**September** 40:4 60:25
73:12

**sequence** 53:25
138:12 173:1,9,15
174:2 273:10 280:18

**series** 85:17,19
175:5 216:7

**served** 73:9,11

**services** 189:10
254:17,20

**session** 38:9 273:18

**sessions** 36:18 38:8

**sets** 198:9

**seven** 105:2 113:20
175:21

**several** 36:22 275:12
278:20

**severed** 132:16 246:2

**shackles** 88:17,18,20
89:5,18 90:3,5,21
91:1,2,6,12

**shake** 119:20 129:8

**shaked** 177:7,24

**shaking** 177:5,21
243:3

**shell** 218:14

**sheriff** 106:19,24
107:1,3

**shift** 227:16,17

**shirt** 251:16 252:25
258:16 259:7

**shock** 221:16 225:1
254:12

**shoot** 85:21

86:15,16,25 87:4
225:6,8 242:25

**shooting** 3:17,18
50:16 60:21 96:18
105:19,22 147:7,11
160:3,18 168:3
182:13 213:23
215:8,15 217:15,23
222:16 227:1 240:9
241:5,10 254:12
260:12 261:25
262:24 265:10
266:25 267:4,21
268:5 271:15

**short** 11:19 12:4
13:23,24 113:24
114:6 246:12 278:16

**shortly** 78:3

**shorts** 75:17,20
76:4,8

**shot** 50:14 52:4,18
65:24 79:7,10,13,20
80:16 81:4,23 82:25
84:24 86:2,7 100:11
133:18 135:14 137:3
138:5,12 158:3,4
178:21 188:23 214:4
216:18,22 222:11
240:22 241:1 250:21
253:19 254:5,7,15
255:1,16 257:22

**shots** 78:1 99:6

**shoulder** 240:11
247:11 250:20,24
251:23 252:14 253:2

**shoulders** 54:7 58:9
59:11 133:23,25
151:3

**showed** 23:7 254:20
261:24

**showing** 23:24

**shown** 275:7,10

**shows** 77:9 248:9
267:7

**sic** 54:11 88:3
  160:15 164:9 174:17
  246:21 254:7 283:15

**sidebar** 19:1
  38:10,11

**sides** 186:14

**sight** 109:1 110:18
  179:25 254:23

**sign** 254:23

**signature** 3:11
  241:18,19
  256:4,7,12 285:6,7
  288:1,16

**signed** 242:11 282:5
  285:9

**significant** 114:19

**signs** 8:17 43:13,20
  93:25

**silent** 140:2

**similar** 232:13
  242:25 243:8

**Similarly** 279:20

**simple** 25:14 83:24
  164:4

**simpler** 259:2

**simply** 6:17 84:12
  93:4 280:17

**single** 36:20 63:25
  198:2,18 199:12

**sir** 6:8,13,19,21,25
  7:8,12,16,21,23
  8:3,4,9,12,15,19,23
  9:2,6,19,24
  10:3,6,10,14,17,22
  11:1,11,20 12:2
  14:4,14,23
  15:2,13,15 16:7
  17:3,9,15
  18:10,15,17,20,24
  19:7,18,24 20:17
  21:3 24:16 25:2
  26:20 27:3,11,24
  28:2,7

29:6,16,22,24 30:17
31:2,8,20 32:14,19
33:9,24
34:12,15,18,24
35:5,10
36:1,3,5,8,16,19
37:4,12 38:16,22
39:14 40:2,21
41:4,13,16,19 42:8
43:3,10,15 44:1,22
45:5,21 46:7,14
49:18,25 51:12
52:5,20 53:5,12
54:21,23
58:10,17,24 59:3
60:7 61:11,16
62:9,21
63:7,12,15,19
64:5,20 65:6,22
66:1,4,13,24
67:2,12 68:5,19
69:13,17 70:3,11,24
71:7,10,20 72:17
73:2,16,25 74:14,21
75:7 76:3,14 78:19
79:15,17 80:3,22
81:13 82:2,10
83:7,11 84:25 85:25
86:3,11 87:19
88:6,23 91:15 92:15
93:9,14 95:19 96:15
100:9,12,14,16,20
102:12
103:15,18,21,25
104:5,19 105:4,20
106:13 107:2,14
110:13,23 111:23
112:13 113:25
115:10,16 117:2
118:2,12 119:15,18
120:8,9,13,17
124:2,17,24,25
126:11,20 127:1,21
128:9,21,23 130:3
132:20,24 133:15
134:8 137:8
140:13,22 141:20
144:10 145:3 146:22
147:9 149:2,17

150:12 151:20 152:7
154:13 156:6 157:14
159:8,22 160:22
161:1 162:12,14
163:12,15 164:16
166:25 167:10
168:8,23 169:4
170:22 172:5 173:7
175:19
176:1,8,12,16
177:25 178:19 179:3
180:5 181:6,9
182:2,4,8,16,21
183:1,17,21,25
184:19,22 185:3,16
186:6,10,19,22
187:3,20 188:11,24
189:13 190:25
191:4,15 192:12
194:13
195:10,16,19,22
196:1 198:15
199:8,16
200:12,19,24 201:20
202:3,8,12,18
203:9,23 204:1,8,10
205:1,8,10,16,18,21
,23 206:5,19
207:11,17 208:23
209:11,13,25
213:17,20 214:18,23
215:10 216:14,20,25
217:18,19,25
218:3,6
219:4,8,19,25
220:6,11,13,25
221:19,22,25
222:21,24 223:9,20
224:3 225:10
226:3,9 227:6 228:2
229:1,11,19,21
230:11,12,19
231:2,5,8,13,16,19,
23 232:4,15
233:7,20,24
234:12,18,24
235:3,10,13,24
236:5,25
237:6,10,14

238:4,8,17,24
239:7,10 240:25
241:20,23
242:2,6,16
243:1,6,9,12,15,19
244:17 245:3,6,13
246:3,14,17,24
247:3,7,11,16,21
248:1,5,7 249:14
250:13,19 251:2,25
252:22 253:6
254:2,9,10
255:12,17
256:2,19,23 258:9
259:19,24 260:16,22
262:4,14,15
263:9,17,25
264:1,5,9,18
266:4,8,11,17,19
267:1 268:23
269:5,14,20,25
270:6,7 271:6,7,13
272:13,22,24 274:9
275:6,11,15,20
276:7
277:11,17,21,24
279:19
280:1,15,21,24
281:3 282:4,8,15,24
283:17,24 285:5,17
286:2

**sit** 139:17,18 162:18

**Site** 2:15

**sits** 72:4 165:21

**sitting** 51:15 54:2,3
59:20 65:15 90:23
127:8 186:5 190:17
191:1

**situation** 12:23
13:1,14,16 15:3,5,7
16:17 19:3,4,9
27:4,14,15 43:10
46:24 57:25 94:11
96:3,17 97:13,14
98:21 99:4,24
153:8,9,10 167:11
178:24 186:8 220:19

223:13 224:18 240:4
245:14 262:5

**situations** 13:17
14:8,15,17 27:12,15
31:5,16 32:4,19,20
48:4 150:5 223:21

**six** 123:13 140:16,23
144:24 175:21

**size** 134:4

**skills** 39:6,24

**sleep** 6:24,25

**slight** 57:22 58:2

**slip** 199:3

**slipped** 167:19
168:19

**slipping** 89:2

**slouching** 56:1
139:18

**slow** 230:14

**slowed** 268:21,22,25

**snap** 163:9

**social** 215:20 263:4
264:6

**socks** 259:5

**Solutions** 1:9 2:9
5:5,17

**somebody** 45:1 197:5
230:21

**somehow** 46:22 196:17
219:22 220:5 242:15
245:15 246:25

**someone** 11:17 12:20
13:23 40:15 44:4
48:5 85:21 89:2
91:7 101:12 103:17
132:9,14 147:25
148:7 152:24 154:6
156:10 161:11
182:23 226:5,11
230:7

**someone's** 43:21

**sometime** 42:8 254:16

**Somewhat** 62:9

**sore** 193:23,24

**sorry** 12:18 15:18,20
35:4 40:10 45:14
60:25 61:5 62:16,24
70:17 71:21 74:23
81:16 87:2 90:4
99:11 102:4 105:18
113:20 115:8,10
125:8 134:6 137:13
156:2 164:24 168:14
169:22 177:13
183:10 187:4 194:11
195:8 196:3 201:4
203:3 214:8,9 217:6
222:9 228:19 230:16
258:20 266:3 272:10
276:7,11,16 277:6
282:1

**sort** 26:9 59:22,24
124:7 175:15 196:9
226:7 230:25 245:19

**span** 38:2 263:9

**Spanish** 259:9

**speak** 12:15 67:3,7
236:12,14 241:10
252:11

**speaking** 141:15,18
210:21 236:20,21

**speaks** 273:12

**special** 186:3

**specific** 15:4 30:13
227:18

**specifically** 153:25
260:24,25

**speculation** 8:7
11:8,25 13:4
14:2,22 15:1,11
16:6,12,22 17:7
25:25 26:18
27:1,9,20 28:16
29:3 30:4 33:7 39:8
43:9,23 44:11,21

49:24 59:8 69:4
70:5,9,23 72:9
73:21 74:20 78:11
79:1,24 80:19
81:6,25 83:2 84:5
86:9 87:1,5 89:9,20
91:9 94:15 96:13,25
100:22 102:24
107:12 109:18
110:11 114:23
124:22 128:1 133:9
136:1 149:16 150:10
152:20 153:7,14
155:4 159:7 164:22
167:7 169:11 171:7
174:22 195:5,14
197:1,16
198:5,14,21 200:2
203:16 204:25
207:21 219:17
223:3,17 224:9
230:1,9 244:16
245:12,22 246:10
248:12,21 249:12
251:10 253:21
255:10 265:24 271:3

**speculative** 31:1
33:15

**speech** 211:19

**Spell** 17:25

**spend** 38:13
62:19,22,25 215:14

**spent** 63:8

**spit** 151:1

**spitting** 150:16

**spoke** 87:24
158:22,24 182:14

**squirming** 192:25

**stabilized** 77:23

**stamp** 258:22

**stand** 22:2,14 56:18
65:16 74:7
120:16,18 123:10
151:22 162:18
178:14 189:11

193:11 200:6 252:8
282:20,25 283:20

**standing** 22:23 24:25
54:2,6 118:12
119:15

**stands** 58:3

**start** 20:7,9 94:17
95:21 104:11,17
113:22 122:8 173:18
175:17 211:19 212:6
275:25

**started** 19:24 40:7
59:22 65:3,23 76:19
77:2,24 119:19
131:9 177:4,21
192:25 194:1 209:10
239:3

**starting** 5:22 85:18
166:8 184:8
201:2,11 255:1

**state** 37:15,16 243:8
273:20

**stated** 163:16

**statement** 3:15,19
6:9 36:23 47:4
48:7,10,14,17 49:9
50:4,7,21,24
51:11,13,17,19,23
52:7,25 53:2
61:18,21 62:20,23
63:1,5,9,21
64:1,6,16,18,19
65:10,12
66:5,7,14,16 75:23
80:17 95:9 97:20
98:4 110:9
112:8,10,13
118:14,20,21,23,25
119:4,10 123:25
125:17 135:11
136:10 139:20,22
160:17,21 163:2,16
164:6,11 168:3,6
169:16,18 170:2,5
173:14,16 175:13
177:1,16 178:16,18

180:21,23,25 181:3
182:17 183:21
184:19 185:3 188:16
192:18 194:9
199:9,13,14,15
202:19 203:1,6,9
211:6 227:22 233:14
234:19 235:11,20
236:6 237:22
239:11,19,21,24
241:14,15,21,24,25
242:1,7,10,19
251:16 255:21,25
260:1,2 261:21
263:13,14 264:3
267:2 270:7,8
272:19 276:22
278:3,8,9 279:14,17
281:25
282:3,7,8,9,13,20
283:2,3,6,13,16,20,
22
284:2,4,5,8,9,12,19
,22,24 285:2,16

**statements** 62:2,10
64:8 242:14 243:16
260:19,25
263:10,15,20 264:4
277:13 279:11,12
286:16

**STATES** 1:1

**station** 10:8 104:13
133:1,17 136:23
141:12,16,19 142:14
161:18 167:20
168:19 179:21
227:11,20 231:12
250:13

**stay** 22:13,23 55:20
108:23

**stayed** 125:23 129:6
146:12

**staying** 140:2

**steep** 111:14

**stenographic** 14:6
87:23

**step** 108:9

**steps** 32:18

**stipulate** 13:8

**stomach** 251:23 253:7

**stood** 76:18 199:24
214:3

**stop** 37:9 89:16,21
111:9,10 113:22
114:1,7,8,9,10
186:13 194:21

**stopped**
114:1,19,20,24,25
115:2,6 219:20

**stopping** 111:10
114:13,16 219:12,14

**strain** 167:14

**street** 37:9 44:9,19
107:19

**streets** 45:2

**stressful** 262:5

**stretch** 245:5

**stretchers** 149:11

**stride** 90:7

**strike** 25:13 31:11
39:3 52:9 83:22
112:15 134:10
137:14,19 142:15
164:3 171:4,19
184:24 190:7,8,13
226:11 280:16

**striking** 111:22
112:11 116:22
170:24 225:22

**strongest** 194:19

**struck** 111:25 116:16
117:13,14 119:6,24

**struggle** 193:14,20
194:15 200:6 201:7
214:2 222:20

**struggled** 60:15

**struggling** 76:25

77:4 109:24 116:13
195:2 251:4,7

**stuff** 36:25 124:15
186:12 242:20

**subject** 46:10,21
71:20 72:3 77:25
99:6,8 146:9 150:16
153:18 165:14,21
221:10
224:6,18,21,23
273:22

**subject's** 70:15,16
72:1,5 83:20

**SUBSCRIBED** 288:20

**successfully**
136:16,22 138:19,20

**sudden** 67:16

**sued** 29:1
34:6,7,9,20,21
35:1,7,12

**suffered** 250:21

**suffering** 148:7

**sufficient** 281:24
282:2

**suggest** 212:7,9

**suggestive** 270:3

**Suite** 1:18 2:11

**summarization** 260:20

**summarize** 181:11

**summarized** 181:20

**summary** 181:13

**superior** 159:3

**supervisor** 146:25
189:9 286:10

**supervisors** 17:11
270:13

**Suppose** 96:17 97:4

**supposed** 50:3 110:1

**sure** 7:3 8:8 9:21
11:10 12:1 14:4

21:12 44:22,23
47:24,25 51:13,24
52:13 63:12,16
67:13 72:10 73:25
74:14 81:13
82:2,3,5,6 89:21
93:9 97:24 110:19
122:23 127:19 128:3
143:15 151:12
158:25 164:25
165:24 167:10
192:12 195:9,15
196:1 206:5 222:14
223:6,20 230:14,24
231:19 233:7 241:23
242:6,10 245:3
249:13 254:1 255:12
256:2,3 258:15
282:3

**surprise** 170:23
225:2

**surprised** 67:16,21

**surveillance** 268:18

**sus** 46:10

**suspect** 69:14 71:4
84:12 87:17 143:19
145:20,22 219:6

**suspension** 34:4

**sustain** 226:21

**swear** 5:7,24

**sweat** 54:12

**sweater** 258:17

**swinging** 50:13
112:16 117:10 175:3

**switch** 186:14

**sworn** 6:2 203:20
204:19 285:9 288:20

**swung** 112:20

**system** 11:4 151:1

---
T
---

**tactical** 68:25 69:7

tactically 46:9

tactics 69:11,13,14
  145:19

taking 10:12 11:3
  43:5 71:4 98:9
  107:25 109:15
  111:19 113:11,21,23
  129:18 130:12,21
  135:4 141:12,13
  147:24 189:1 218:7
  243:2

talk 42:25 111:12
  141:11 217:1 218:8
  232:11

talked 43:3 202:9
  226:1

talking 12:24 13:12
  49:25 51:18 56:9
  67:18 145:13 153:8
  192:1 201:6 208:7
  218:16 227:19
  252:18 253:5,10
  265:20 266:6,16
  270:4 284:7

tall 45:20

tank 128:17,19,24
  129:1,13
  139:1,2,6,9,10,14
  140:2,6 141:23,25
  152:5 236:2,8
  237:16,17,21 238:1
  248:4

tape 115:18

tase 223:24

tased
  220:12,18,22,23,25
  221:7,10,20,21

taser 80:9 145:19
  216:23 217:2,17
  218:2,17
  219:1,5,11,13,19,23
  220:5 221:11
  223:1,12,23 224:16

tasing 223:8,25

224:2,4

taught 11:5 18:25
  19:9 20:23,25 21:9
  22:6 23:8,13 24:12
  25:18
  28:3,8,18,22,23
  29:8,10
  30:1,11,12,15 32:23
  33:2 34:3,6,8 35:24
  37:7 43:16 46:13
  69:20 70:25
  71:1,2,3,8,14 82:11
  83:12,25 84:12
  85:20,23 91:22
  92:3,5 93:11
  94:5,22 95:2,4
  103:9,13 144:16
  153:19 219:5 224:17
  226:5,10

teach 21:4 31:3,14
  32:2,6,11 44:25
  93:15 144:13,17,21
  145:1

teaching 84:9

teachings 28:11,18

Team 3:19

techniques 21:1
  87:17,20 132:8

ten 111:3,4,6
  113:19,20,21
  115:3,5,6 140:14

tend 15:7

tensing 221:16

Teri 1:25 289:16

term 11:12 144:7
  202:20 203:7 205:19

termination 33:18
  34:4

terms 222:14

terrible 259:8

test 38:17 39:13,16

testicles 214:21

testified 6:2 63:5

176:14 206:21
208:24 209:16 210:1
227:23 232:2 238:20
269:23 271:14
277:22 278:5,9
279:4,7 280:3,19

testify 52:22 196:14
  212:17 278:18

testifying 6:11 7:10
  63:21 209:24 213:16
  226:20

testimony 6:23
  7:2,6,14 9:14,23
  43:14 47:9,11 51:25
  52:14 57:9 58:20
  60:10 61:10 62:8
  63:17,24 64:3 66:20
  75:25 76:12 80:20
  97:22 117:1,7,19
  118:9 120:5 126:17
  140:10 143:20
  144:2,14 152:20
  154:12 156:13,25
  157:9,11 167:17
  168:22 169:2 173:21
  174:7 176:13 178:11
  181:19 184:18
  189:19 194:23
  195:18 198:25 199:7
  201:11 202:5 209:22
  210:4,7,10 213:14
  217:5 223:17 227:22
  229:5 233:21
  235:2,11,17 236:3
  253:24 260:20,21
  261:5,13 262:24
  263:1,6,11,16,25
  264:12 266:23
  267:21 268:2,7
  269:2,21 271:14,21
  277:15 280:2,10
  281:6,7,10
  289:5,6,7

testing 38:19,20
  39:5

tests 38:23

Texas 1:2,18

2:7,12,16 37:15,17
287:6

**Thank** 24:10 115:17
226:23

**thanks** 282:18

**that'll** 207:4

**that's** 7:1 11:20,22
19:22 20:8 23:21
24:8,19 26:20 27:14
31:9 32:9,10 34:12
37:15 39:22
40:16,18 43:18
45:13,16 47:10
48:12,22,25 49:4,8
50:17 51:2 53:1
55:1 57:11 58:25
59:25 61:8,21,24
62:6,18 63:19,23
65:9 66:1,21
71:13,20 72:2 73:17
74:5 78:1,23,25
79:8,11 80:8
82:10,11,18 83:6
88:19 90:11 92:1
93:3 97:2 98:24,25
99:25 100:20
101:6,21 102:22
103:12 104:7 105:12
106:2 109:10 110:2
111:5,17 112:4,6,9
113:17 115:16 116:8
117:13 118:2,21
121:2 124:8,12
125:16,19 128:18
129:12,25 131:11,21
133:2,20
135:12,17,20 136:7
137:6 138:25
139:4,19 140:5
141:3 144:1,7,13,20
147:12 148:1,3,7
150:16 151:9
157:5,12 160:4
161:19 162:21
163:1,13 164:13
165:1 166:13 167:18
170:5 171:11
172:21,23

173:1,9,11,12,25
174:14 175:4,17
176:7,13,19,20,21
180:2 181:21 182:16
185:6 193:7,16
194:1 195:23 196:18
197:9 199:16 200:23
202:4 206:20
209:2,14,15,18
210:25 211:4 213:22
214:1 216:5,8
217:12 218:14
221:10 222:13
223:23 224:12
225:15 226:9,16
228:15 229:11
233:10,16 237:11
238:8 239:14,19,21
240:2,8,25 245:25
246:3 247:16 250:20
252:15 256:4,7
259:3 263:23
266:11,19
267:7,10,14 268:11
270:6,12 274:14,17
275:15 278:17,22
279:1,3,10,16
280:1,5,8
281:4,9,14,18
282:11 283:2,5,9,25
284:1 285:12,23
286:13,14,19

**theirs** 21:14

**themself** 12:10

**themselves** 164:14

**thereafter** 264:17

**therefore** 42:20

**there's** 7:17
13:16,17 15:13
57:25 70:6 72:1
81:14,21 94:11
99:10 110:17 149:22
150:23 165:17
190:12 211:22
218:13,14 241:18
242:17 246:4 252:13
270:18 280:14 285:6

**they'd** 246:7

**they're** 11:4
13:1,14,24 21:14
22:24 23:1,2 40:16
43:11,14
44:6,13,17,18 45:11
46:22 47:8 90:7,9
96:19 167:12 184:16
188:1 199:11 208:7
261:2 265:20 266:15

**thigh** 56:7 80:12,13
83:6,13,19,25
84:13,22,25

**thighs** 75:20 80:10

**third** 239:15 256:5,6

**thoughts** 207:7

**threat** 210:24,25
211:4

**threaten** 212:14

**threatening** 210:18
213:9 232:18

**threshold** 117:12
119:24 172:24 173:1
177:3,19

**throat** 240:18

**throughout** 130:14,23
244:8,9 275:13

**throw** 228:14

**tie** 70:14,17

**tied** 74:15

**tight** 164:15 165:16

**tighten** 165:22

**tighter** 165:21

**tilting** 151:7

**tiny** 58:14,19

**tip** 54:8

**tipping** 54:21 55:25
59:22

**tired** 7:24 8:3
16:9,18 17:5 194:22

223:14

**today** 5:18 6:23
7:2,6,14 51:15
52:22 61:15 62:8
63:6,11,18,22 82:16
129:24 143:18 144:7
210:7,11 212:1
239:22 260:20
261:9,13 267:17
269:2,16,24 270:9
279:4,21 280:19
281:16

**Today's** 5:1

**tolerate** 212:5

**tools** 224:23

**top** 194:20 208:7,10
233:16 239:2 241:6
247:2 248:1
265:13,14 267:9,11

**topics** 242:4

**topside** 117:14

**torso** 129:3 251:19

**total** 62:23,25
227:14

**touch** 85:22 86:1

**touching** 57:15,20
84:23

**toward** 235:6

**towards** 24:3 80:9,12
108:10 112:21 115:5
138:15 173:18 174:3
226:12 243:5

**track** 124:10 262:4

**trade** 130:9

**traditionally** 73:18

**traffic** 99:11

**train** 15:17 93:23

**trained** 16:16 17:13
35:19 82:8,23
93:17,24 95:15,22
110:3 143:24 144:4
219:1 226:2

**training** 17:16,17,20
18:3,18,21
19:12,15,16,17,20,2
3
20:1,3,6,10,13,19,2
1 24:14 30:14,18
31:7,19 34:13 35:12
36:4,6,10,18
37:18,19 38:3,8
42:11,14,16,19,23,2
4 43:1 46:5,16,19
69:11,16,19,20
71:11 79:22 82:19
84:19 93:5 103:5
107:10 143:17,25
145:5,7,12,13,14,16
,18,19,24 146:7
178:23 179:2 223:11
224:10 228:6,12,23
229:2

**trainings** 46:17

**transcribed** 267:13

**transcribing** 267:17

**transcript** 206:24
213:2 229:13 267:5

**Transcription** 3:17

**transfer** 162:18
185:25

**transport** 26:15
56:19 65:18,24
74:10 104:9,16
107:7,16 109:22,24
137:16 154:18,22
161:16,24 180:14
185:18,21 186:2,4
227:10,13 230:20
231:3,17,25
270:5,15,17 272:5

**transportation** 66:13
104:12 280:23

**transported** 104:21
158:6,8 246:21

**transporters** 107:7

**transporting** 10:19
65:20 104:18 106:16

153:3,11,21
154:7,16 155:8,17
156:22 157:3,22
180:3,8 229:17
247:7 270:12 280:15

**traumatic** 163:24

**treatment** 141:21
142:3 152:18 154:15
156:22 157:21 158:2
248:10,19

**tree** 110:16

**trees** 110:17

**trial** 286:23

**tricep** 24:5,6

**tried** 75:3 76:21
77:13 121:18 138:21
190:13 208:1

**trigger** 49:21

**trouble** 193:25

**troubles** 162:3

**true** 9:1,5 10:2,25
16:4 19:21 20:4
26:24 27:6 28:9,14
29:2 34:14 36:7,23
47:4,19
49:3,10,16,22
50:4,21 51:11,16
53:4,7 57:7,23 58:9
59:16 63:18,22
66:16 69:23 70:21
71:12 72:22 74:13
75:22 80:17 81:21
82:13 87:18 88:22
89:18 90:18 98:4
99:24 102:22 110:8
118:1,2,3,13,14,20,
23,25 119:4 135:11
136:4,10 144:14
160:3 161:4 170:7
173:1 188:16 193:6
195:25 199:12
200:18 206:1,18,21
209:14,25 224:7
232:6 234:1 238:10
239:22 241:17

264:12,17 279:9
280:20 281:13
282:3,10 284:25
285:10 286:13
288:17 289:7

**truth** 6:10 7:13
181:7

**truthful** 48:10
160:20 163:20
164:5,8,11 168:7
176:7 242:14

**try** 46:23 47:4,8,19
90:13 194:19 212:6
213:1 229:23 230:23
243:14 249:2 252:9
278:14

**trying** 54:8,13 59:6
70:18 77:1 80:4,7
81:2 83:20 90:9
98:25 117:24 130:24
139:16 142:13
162:16,18 163:25
164:8 175:23
190:7,8 191:20
192:4 195:11,15,20
196:15,24 197:4,6,7
210:22 211:20 230:7
249:6

**turn** 168:9 184:1
208:5 272:8 274:7

**turning** 241:2

**twenty** 281:16

**twice** 84:16 220:25

**TX** 1:25

**tying** 89:23,24

**type** 12:9 13:18
43:25 72:6 97:25
103:7 165:22 171:10
208:3 228:22 229:18
230:12

**typed** 242:3,8

**types** 224:23

**typically** 40:15

131:4

------------------------

U

**U.S** 41:21 145:15
146:2,8

**Uh-huh** 168:12

**unable** 17:5 94:12
274:23

**unclear** 27:14

**uncomfortable** 134:3

**unconscious** 54:17
127:24 128:3
192:11,13,15
238:13,17

**unconstitutional**
103:11,17

**uncooperative** 25:11
65:21,25 66:2,8,15
69:15 139:15 238:9

**underneath** 21:15,16
22:21 23:16 24:2
65:1 77:3 131:3
180:12 194:4 201:18
202:4

**understand**
6:12,17,18 7:11,14
9:19 13:20 22:11
45:9 53:7 73:17
84:10 94:20 133:5
149:21 153:1 155:22
156:4 206:12
216:13,17 220:17
230:6 276:17

**understandable**
230:15

**understanding**
11:15,16,20
32:15,17 33:18
37:20 47:18
70:12,14 90:2,5
92:8 103:21,22
143:19 146:6 150:4
153:16 155:6,11
165:12 205:4 267:20
269:15,21 270:21

276:20

**understood** 6:20 27:6
50:3 109:23

**underwear** 68:20,22

**unethical**
212:13,15,19

**unfolded** 114:5 222:6

**unfounded** 42:4

**uniform** 91:16,18
104:14,15

**unit** 106:9 257:11

**UNITED** 1:1

**units** 78:1

**universal** 226:17

**unknown** 233:2

**unlawful** 11:6

**unless** 51:22

**unlocked** 45:3

**unresponsive** 171:24

**unruly**
99:10,14,18,20,22

**unusual** 101:12,18,24
102:10

**upper** 251:18 275:14

**upright** 55:20,22
56:7 57:19 59:12
128:13 129:4
130:13,14 139:16
191:21

**upset** 8:5 14:9,18

**upstairs** 141:12,23
147:13,17 183:23
184:13 248:3

**urgent** 68:17,19

**USA** 1:9 2:9

**usable** 212:4

**useful** 224:17

**usually** 151:1

UTEP 258:16

---

V

vague 8:1 9:7
    11:7,25 12:7 13:3
    14:1,11,21,25
    15:10,24 16:5,11,22
    17:6 19:6 24:23
    26:17,25 27:7,20
    28:15 29:4,19 30:3
    31:6 33:1,6,14,22
    34:10,23 35:3,8,16
    37:21 39:9 43:8,22
    44:10 45:4 47:13
    49:24 50:6 68:18
    69:4 70:4,8 73:20
    75:12 76:2 79:24
    81:7,24 82:14 83:1
    91:24 92:18,23 93:8
    94:14 95:7,18 96:12
    100:21 101:20 102:1
    103:21,22 107:11
    109:17 113:6 119:8
    124:1 132:5 139:21
    142:20 143:4
    144:3,15 145:2
    146:1 153:13 167:6
    179:8 224:8,20
    228:8 244:7 260:7
    261:11,15 262:2,10
    271:25 275:1 279:24

Valley 31:8,19 32:8
    38:4 104:25 105:7
    133:3,12 161:15

van 10:13 78:4 88:15
    105:25 106:5,7,8,11
    107:16,20,21,23,25
    108:8,9,13 110:8,15
    111:1 136:13,18
    137:2
    138:4,11,15,16
    154:22 155:8,10
    157:3 161:19
    162:1,4,18,21
    180:10 185:24 187:7
    226:25 231:3,17
    242:24 247:8,13
    270:18,19

vans 231:25

various 25:10 27:25
    31:4,15 32:3 66:18
    139:7

verbally 22:6 56:9

versa 188:20

versus 5:4 44:15
    198:18

vice 188:20

vicinity 254:15

Victory 2:4

video 64:19 77:9
    166:9,12 177:11
    215:12,16,20,23
    216:5,6,11,12,16
    217:22,23
    218:9,15,19 222:5
    240:5 260:3,15
    261:2 262:7,14
    263:1,5
    264:11,17,25
    265:15,21
    266:7,10,17,22
    268:4,7,10,21
    275:10 283:13,15,18

videographer 2:19
    5:1 21:25 23:5,12
    87:11,14 115:19,22
    129:24 160:6,9
    243:22,25 287:2,8

videos 260:25
    264:4,7,23 266:16
    267:24 268:18,25

videotape 215:8
    239:25 263:2

videotaped 1:14 5:3
    264:20,21

videotapes 215:15
    283:11

view 110:6,14 191:19
    215:18 251:18
    264:11

viewed 215:19

viewing 64:19
    216:4,11 261:2
    262:7,14

violate 37:8

violated 280:3,13,22

violating 280:10,20

violation 26:23
    27:17 28:13 30:2,10
    34:22 35:7 103:14
    269:18,22 281:1

violations 29:1,2
    35:2,14

violence 14:19 15:23
    16:3

violent 15:7

visible
    166:20,22,23,24
    247:14

visually 22:5

volts 219:22 221:12

voluntary 41:11,13

volunteer 22:1

---

W

waist 72:1 75:20
    151:2 163:8,10
    251:23

wait 56:12 107:24
    108:3 210:12 273:7

waited 85:11

waiting 107:20 129:5
    189:10

waive 42:22

walk 25:8,14
    75:3,5,9,15,22 76:9
    108:10 110:25
    111:4,15 113:4,22
    115:5 139:8 149:1

walked 68:1 108:18
    110:7 111:7 122:24
    187:7,12 241:5
    254:21

**walking** 10:12 73:5
76:7 90:7 114:6
115:1 123:2 130:16
149:13 150:8 162:1
170:9,16 226:24
228:1

**wall** 110:16,17
127:9,10,15,16,18
162:21 163:7 192:22
235:2,7

**walls** 247:9

**wasn't** 11:1 26:11
47:25 56:23,25
57:18 59:23 69:2,8
91:18 95:4 113:8
130:19 131:20
163:25 186:23
200:20 220:21
224:14 234:15

**watch** 65:18
170:12,17,19
171:3,17 172:6
178:20 243:8

**watched** 217:22

**watching** 78:23
126:2,3 172:6

**water** 115:11

**ways** 23:8 35:6 71:8
149:12

**weapon** 86:13,21
208:8

**weapons** 83:20 187:8

**wearing** 251:16

**we'd** 155:17

**Wednesday** 1:16

**week** 38:2,5

**weigh** 45:22,23

**weight** 45:24 117:22
174:11 194:7,20

**welcome** 213:2

**we'll** 7:3,18 13:7
51:3 102:6 157:15

166:9 171:12 222:5
252:2,9 257:1,14,15
276:24 277:2,4

**well-being** 153:12
154:11

**we're** 22:22 42:22
51:24 52:13 56:17
98:25 115:20,23
140:25 141:2 147:19
160:10 175:15 201:8
242:21 244:1 252:12
253:5 267:3
270:4,18 281:4
287:3

**WESTERN** 1:2

**We've** 5:14 85:14

**whatever** 53:10 64:11
250:2

**wheelbarrow** 151:7

**wheelchairs** 148:25
149:6

**wheels** 151:4,5,6

**wheezing** 78:16,20
79:12,16,17 240:17

**whenever** 98:8 106:21
107:4

**whereabouts** 94:10

**whether** 8:16 9:17
10:24 22:8 23:1
30:9 52:2,16 75:19
86:15 118:11,24
134:17,21 148:16,18
175:6 181:16 182:14
197:4,18 202:9
216:9 219:11 224:15
237:16

**white** 258:19,20
259:6

**whoever's** 133:16

**whole** 65:20 128:8
130:14 161:8 164:9
194:20 196:12 205:5
241:24,25

**whom** 289:3

**who's** 5:18 12:20
69:15 98:3

**whose** 61:7 186:19
289:5

**wife** 85:13

**Wiles** 106:19,24
107:1,3

**winded** 193:22,25
194:22 223:15

**windy** 194:22

**wiping** 54:12

**wish** 285:2

**withdraw** 58:4 66:6
69:10 97:4 126:23
147:12 193:10

**withheld** 286:1

**witness** 3:2,15 5:8
9:14 21:20 26:5
31:25 48:7 50:4
57:9 61:5 64:3
115:10,16 123:25
210:22 211:20
212:7,10,12,16,23,2
5 213:5,7,9
258:16,19 275:21
289:5,8

**Witness/Sworn** 3:19

**woman** 250:11

**Woodland** 2:4

**work** 37:16 40:22
42:21 46:1 73:13
151:15 229:3 252:11

**worked** 27:25 36:22
40:3 91:17 103:19
106:12 149:5,13
155:12
203:11,12,18,21
204:6,22 205:1

**working** 11:22
12:5,20 13:21,23,24
18:8 20:4 40:17,19
82:16 93:13 99:7,9

100:3 103:23 107:10
144:12 145:4 197:24
204:17,19 205:3,7
229:7 231:6,9
250:13 286:10

**world** 145:6

**worried** 161:3 197:23

**wound** 78:6 142:4
170:24 240:10
250:20,24 251:6

**wounds** 255:15

**wrapped** 75:3,10,14

**wrist** 132:17,18
167:3

**wrists** 89:5 150:22
165:1,4,16 167:14
244:13,19,23 245:2

**write** 49:22 170:3
242:19

**written** 52:25

**wrong** 103:4

**wrote** 53:10 164:5
170:6 178:16

———————————————
Y
———————————————
**yards** 108:15,16
110:25 111:4,7
113:20 114:8

**yell** 169:8 208:3

**yelling** 59:23 123:23
141:8,10 170:4

**yesterday** 63:7

**yet** 127:12 220:23
224:14 236:6 277:18

**you'll** 168:15 206:12
252:10 277:2

**yours** 8:25 10:24
11:3 63:10,21 199:7
211:21 236:6 237:22
278:3 279:9

**yourself** 52:23 96:20
181:11 201:2 205:15

224:18 225:12
242:13 243:5 246:5
271:11,24 274:24

**yourselves** 5:7

**YouTube** 215:18,20

**you've** 8:13,17
11:5,12 16:16 23:7
27:25 28:22 29:23
36:21,22 42:19
52:25 56:15,20
63:10 70:25 74:2
82:11 88:8 98:2
99:13 143:17,24,25
149:3 157:5,12
160:1 176:14 202:25
215:8 220:12,21
230:24 260:21
278:5,9