# EXHIBIT S

1              IN THE UNITED STATES DISTRICT COURT

2                   WESTERN DISTRICT OF TEXAS

3                        EL PASO DIVISION

4

5  ROSWITHA M. SAENZ,
   Individually and on behalf of
6  THE ESTATE OF DANIEL SAENZ,
   Deceased,
7
             Plaintiff,
8
   v.                              14-CV-244PRM
9
   G4S SECURE SOLUTIONS (USA)
10 INC., OFFICER JOSE FLORES AND
   ALEJANDRO ROMERO,
11
             Defendants.
12

13

14      The Videotaped Deposition of JAMES MATTHEWS, taken

15 at the request of the Plaintiff, pursuant to Federal

16 Rules of Civil Procedure, on Monday, October 9, 2017,

17 from 1:46 p.m. to 5:11 p.m., at 109 N. Oregon, Suite

18 700, El Paso, Texas 79901.

19

20

21

22

23

24 Reported by:

25 Teri C. Finnegan, TX & NM CSR, RPR

2

1          A P P E A R A N C E S
2 For the Plaintiff:
3     Bradley C. Gage
      Goldberg & Gage
4     23002 Victory Boulevard
      Woodland Hills, California 91367
5     E-Mail: bgage@goldbergandgage.com
           and
6     Oscar Mendez
      Scher & Legate, PLLC
7     109 N. Oregon, 12th Floor
      El Paso, Texas 79901
8     E-Mail: omendez@scherrlegate.com
9 For Defendants G4S Secure Solutions (USA) Inc. and
  Alejandro Romero:
10
      Francisco J. Ortega
11    Scott Hulse, P.C.
      201 East Main, Suite 1100
12    El Paso, Texas 79901
      E-Mail: fort@scotthulse.com
13
  For Defendant Officer Jose Flores:
14
      Jim Darnell
15    Jeep Darnell
      310 N. Mesa, Site 212
16    El Paso, Texas 79901
      E-Mail: jdarnell@jdarnell.com
17            jedarnell@jdarnell.com
18
  Also present:  Noe Aleman (Videographer)
19
20
21
22
23
24
25

3

1          I N D E X
2 WITNESS:                              PAGE:
3 JAMES MATTHEWS
4     Examination by Mr. Gage              4
5     Examination by Mr. Ortega          108
6     Further Examination by Mr. Gage    111
7
8 CHANGES AND SIGNATURE PAGE            115
9 CERTIFICATE OF COURT REPORTER        116
10
11 EXHIBIT          DESCRIPTION         PAGE:
12 No. 68  Supplemental Report of James Wesley   107
             Matthews Dated March 8, 2013,
13           Bates Def City 00812 - Def City 814
14
15
16 Requested Information:
17 Page 22, Line 9
18 Page 23, Line 13
19
20
21
22
23
24
25

4

1          THE VIDEOGRAPHER:  Good afternoon.
2 Today's date is Monday, October the 9th, 2017.  The
3 time is 1:46 p.m.  This is the video deposition of
4 James Wesley Matthews.
5          Would the court reporter please swear in
6 the witness.
7          JAMES MATTHEWS,
8 sworn by the Certified Court Reporter, testified as
9 follows:
10          EXAMINATION
11 BY MR. GAGE:
12    Q.   Good morning -- or good afternoon.  Have you
13 ever had your deposition taken before?
14    **A.   I did, sir, about 30-something years ago,**
15 **maybe 35 years ago.**
16    Q.   What did that involve?
17    **A.   It was a motor vehicle accident I was involved**
18 **in.**
19    Q.   Any other depos since then?
20    **A.   No, sir.**
21    Q.   All right.  A deposition is a statement under
22 oath.  It carries with it the same obligation to tell
23 the truth as if you were testifying in a court of law.
24 Do you understand that?
25    **A.   Understood, sir.**

5

1    Q.   Today you're being audiotaped, videotaped and
2 everything is taken down by a court reporter to your
3 left.  At the end of the deposition, you'll get a
4 transcript that reads kind of like a play, question,
5 answer, you'll get a chance to read and review your
6 transcript, you can make a change or correction if you
7 want to.  However, if you do make a change or
8 correction, I or any other attorney can comment on it
9 at time of trial.  Do you understand that?
10    **A.   Yes, sir.**
11    Q.   For that reason it's important that you listen
12 closely to all questions asked of you today.  If at any
13 time anyone asks you a question that you don't
14 understand, don't answer, simply tell us that you don't
15 understand.  Will you do that for us?
16    **A.   Yes, sir.**
17    Q.   Have you understood everything so far?
18    **A.   Yes, sir.**
19    Q.   Is there any reason why you cannot give us
20 your best testimony here today?
21    **A.   No reason, sir.**
22    Q.   And reasons can be anything from drugs,
23 alcohol, medication, lack of sleep, health issues,
24 puppy got stuck in the sink in the morning and you
25 spent the day trying to get it out.  Anything like

6

1  that?

2  **A.   I am well and healthy, I'm not a drug user or**

3  **alcoholic and I feel okay today.**

4          (Discussion off the stenographic record.)

5  Q.   (By Mr. Gage)  All right.  From time to time,

6  you'll hear lawyers making objections.  Just let them

7  make the objection.  Unless your attorney, Francisco,

8  instructs you not to answer, then you have to answer

9  the question.

10  **A.   Okay.**

11  Q.   It's just we make the objections to preserve

12  them.

13          And you're testifying under penalty of

14  perjury just like in a court of law.  You understand

15  that?

16  **A.   Yes, sir.**

17  Q.   Did you speak with anyone before your

18  deposition even over the lunch break to help you

19  prepare for today's deposition?

20  **A.   Yes, sir, I did.**

21  Q.   And who was that?

22  **A.   I spoke with Francisco.**

23  Q.   And is he representing you as your attorney?

24  **A.   I do not know if he's representing me as my**

25  **attorney.**

7

1  Q.   All right.  What did the two of you discuss

2  then?

3  **A.   Just how -- what is involved in a deposition**

4  **and we went over some of the -- some of the highlights**

5  **of this -- this case with Daniel Saenz.**

6  Q.   What kind of highlights did you go through?

7  **A.   More of just a general -- a general thing**

8  **about -- about the incident.**

9  Q.   What did he tell you?

10  **A.   What did he tell me?**

11  Q.   Yes.

12          MR. GAGE:  Off record.

13          THE VIDEOGRAPHER:  We're off the record,

14  1:49 p.m.

15          (A recess was had.)

16          THE VIDEOGRAPHER:  We are back on the

17  record, 1:52 p.m.

18  Q.   (By Mr. Gage)  What did Francisco tell you

19  about the case today?

20  **A.   He didn't tell me anything.**

21  Q.   Okay.  I thought you went over some of the

22  highlights with him.

23  **A.   I -- I went over -- I told him some of the**

24  **highlights that I had -- that I had remembered about**

25  **what -- the occurrence.**

8

1  Q.   Okay.  What did you say?

2  **A.   I told him how I remembered how Daniel Saenz**

3  **had been arrested probably two or three months before**

4  **this incident and how cooperative he was with me**

5  **because I talked to him and he told me that --**

6  Q.   "He" being Daniel or Francisco?

7  **A.   Daniel.**

8  Q.   Okay.

9  **A.   Daniel told me that -- well, he didn't tell**

10  **me.  Let me back up.**

11          **I asked him because I always ask people**

12  **whenever they'd be brought into the cells if they**

13  **were -- if they were intoxicated, under the influence**

14  **of any drugs, so that I kind of know what to expect out**

15  **of -- out of their -- their -- whether they be**

16  **cooperative, combative, friendly, unfriendly.**

17          **And I asked Daniel if he was a --**

18  **intoxicated or a drug user, he said yes, that he was a**

19  **cocaine user and -- and he assured me -- he said,**

20  **"Mr. Matthews," he says, "I will" -- he says -- I say,**

21  **"Are you okay?"  He says, "Yes," he says, "I'm fine."**

22  **He said, "Don't worry, Mr. Matthews, I will not give**

23  **you any problems, I'll cooperate with you 100 percent."**

24  **And I says, "Good."  I says, "If you need something,**

25  **Daniel," I says, "just let me know.  If you need to go**

9

1  to the restroom, you want water" -- that's about all we

2  could do there in the cell is tend to some of their --

3  their easy needs.

4  Q.   And was he cooperative with you when he was

5  with you --

6  **A.   Yes.**

7  Q.   -- when he was under your care?

8  **A.   Yes, he was -- he was very cooperative.**

9  Q.   Was Daniel ever combative with you when he was

10  under your care?

11  **A.   Not that particular day, no, sir.**

12  Q.   What else, if anything, did you and Mr. Ortega

13  discuss at lunch?

14  **A.   He kind of gave me the -- the layout as to how**

15  **a deposition goes and then I asked him what the --**

16  **obviously, it's a lawsuit and -- and what the**

17  **allegations of the lawsuit was --**

18  Q.   What did he --

19  **A.   -- and he told me that.**

20  Q.   What did he tell you the allegations were?

21  **A.   Civil rights and something about not -- that**

22  **Daniel Saenz had not been treated fairly.**

23  Q.   Did you provide any information about those

24  theories?

25  **A.   No, sir.**

10

1    Q.    Anything else that the two of you discussed at
2  lunch today?
3    A.    No, sir.
4    Q.    Was anyone else present besides the two of
5  you?
6    A.    Henry.
7    Q.    Who's Henry?
8    A.    P-A-O-L-I.
9    Q.    Who's Henry Paoli?
10   A.    Paoli.
11   Q.    Who is that?
12   A.    He's an attorney, I -- I guess.  Isn't he the
13  attorney for the firm?
14   Q.    Okay.  Did Henry provide you with any
15  information during your lunch?
16   A.    No, sir, nothing more than -- than what
17  Francisco had -- had told me and what we had discussed
18  about depositions.
19   Q.    Did you review any documents to prepare for
20  your deposition here today?
21   A.    No, sir.
22   Q.    Did you spend about an hour, hour and a half,
23  talking with the lawyers?
24   A.    I don't know, sir, I didn't look at a clock.
25   Q.    You must have had lunch pretty close to here,

11

1  then.  Correct?
2    A.    No, I didn't eat lunch.
3    Q.    Oh, they ate lunch and you just spoke to them?
4    A.    I ate this morning about -- about 10:30 while
5  I was drinking some coffee at McDonald's.
6    Q.    So they took you to lunch and they didn't even
7  feed you is what you're telling us.  Huh?
8    A.    No, they did not take me to lunch.
9    Q.    All right.  Have you spoken with anyone else
10  about this case other than the two attorneys today at
11  lunch?
12   A.    No, sir.
13   Q.    When did you join G4S?  Which the complete
14  name is G4S Secure Solutions (USA) Incorporated, but
15  we'll call them G4S today.  Okay?
16   A.    Yes, sir.
17   Q.    Or the security company.
18         When did you join G4S?
19   A.    In September of 2008.
20   Q.    What made you join them at that time?
21   A.    They were hiring -- they had a contract with
22  Border Patrol transporting detainees from -- from
23  Border Patrol and Immigration and I knew some other
24  retired policemen and -- that was working there and
25  they said, you know, "You should come to work over

12

1  here," so I applied and I did.
2    Q.    Before G4S you worked at El Paso PD?
3    A.    No, before G4S I worked at El Paso Independent
4  School District Police Department as a school resource
5  officer.  Did that for about three and a half years.
6    Q.    During what years?
7    A.    March 2005 or '4, I'm not -- I don't actually
8  remember 100 percent.
9    Q.    Until September 2008, approximately?
10   A.    Yes, sir.
11   Q.    Why did you leave the school district?
12   A.    To go to work for G4S.
13   Q.    Do you still work for G4S now?
14   A.    No, sir, I do not.
15   Q.    When did you stop working with G4S?
16   A.    In May of 2015.
17   Q.    Why did you stop then?
18   A.    I started working.  I had worked -- I looked
19  at it like this.  Okay, I'm 64 and a half years old and
20  I can continue to work for another year and a half, did
21  the math, how much would I make if I kept working
22  versus how much would I make right now, and I said,
23  "Well, I can live without a couple of hundred dollars a
24  month more," and so I started drawing Social Security
25  and quit.

13

1    Q.    Before working for the school district, where
2  did you work?
3    A.    I was a Texas state trooper from January 1981
4  until July 2002.
5    Q.    What rank did you reach as a Texas state
6  trooper?
7    A.    Senior trooper.
8    Q.    How does that -- what's the lowest rank at the
9  Texas state troopers?
10   A.    Well, trooper is -- is -- is the lowest rank,
11  then you have your sergeants, lieutenants, right up the
12  chain of command, but being a trooper was a pretty good
13  job.
14   Q.    So when did you go from being a trooper to a
15  senior trooper?
16   A.    I don't -- I don't remember the exact how it
17  goes for -- for years of service.  It's based on years
18  of service and I think it's after you get 15 years of
19  service, then you're -- you're a step up to a senior
20  trooper and then there was a little bit more pay.  Now
21  I understand there's a significant amount of pay, but
22  then it was -- it was a little bit more pay.
23   Q.    In 2002, when you left the Texas state
24  troopers, where did you go, if anywhere?
25   A.    I started substitute teaching at El Paso

14

1  School District.
2     Q.   Why did you leave the troopers?
3     A.   I didn't want to work anymore there.
4     Q.   Why not?
5     A.   No particular reason.  I just -- I know that
6  there's other things that -- that I could do and I
7  wanted different challenges, I wanted to experience
8  different things in the work field, and so I just says,
9  "I'm going to -- I just want to go do something else."
10    Q.   So you were a substitute teacher from 2002
11 until when?
12    A.   I only did that for about two years.
13    Q.   Till about 2004?
14    A.   Somewhere along there, maybe 2005.  I was
15 probably substituting still whenever -- whenever I went
16 to work for the school district police department
17 because I was already in the school district system.
18    Q.   All right.  So did you ever work for the
19 El Paso PD?
20    A.   I did, yes.
21    Q.   When did you do that?
22    A.   I don't remember the exact month, but 1975
23 until December -- December 1980 or I probably stayed on
24 their -- their books until January 1981.
25    Q.   Why did you leave?

15

1     A.   I always wanted to go to work for the state, I
2  wanted to be a state trooper.
3     Q.   What was your rank when you left El Paso PD?
4     A.   Corporal.  I -- I had two chevrons, so I
5  guess -- I guess that would -- because I got those
6  after five years.
7     Q.   Were you a training officer at El Paso PD?
8     A.   No, sir.
9     Q.   Is a corporal a supervisor there?
10    A.   No, it just means that you have -- then -- I
11 don't know what it is now -- it just means that you had
12 been there five years.
13    Q.   What's different between working for the state
14 and the city?
15    A.   Oh, a world of difference.
16    Q.   What were a couple of the main things?
17    A.   Main thing is that your job as -- as highway
18 patrolman is rural traffic enforcement.  You've got to
19 remember the speed limit was 55 back in those days so
20 nobody liked you, you know, because your job was to go
21 out and write tickets.  And that's what -- that's what
22 we did.  Accident investigations.  You stop a motorist,
23 you develop some probable cause and if -- you might
24 find a stolen vehicle or, you know, something like
25 that, some criminal activity.

16

1     Q.   Would you pull people over for driving under
2  the influence?
3     A.   Yes.
4     Q.   Were you a drug recognition expert?
5     A.   Expert, no, sir.
6     Q.   When you would pull someone over for driving
7  under the influence, would you give them like a breath
8  test, a GCI or whatever they call them?
9     A.   They didn't have that back in those days.
10    Q.   How would you develop if they were under the
11 influence?  Field sobriety test?
12    A.   Do -- do a field sobriety, you know, the
13 one-legged stand and see if you can walk a fairly
14 decent straight line, bloodshot eyes, odor about you,
15 little simple things.
16    Q.   What was the blood alcohol limit back then?
17    A.   0.10.
18    Q.   Would they -- how would they determine the
19 blood level of alcohol on a person when you were
20 pulling people over for DUI?
21    A.   There was an intoxilyzer available for us to
22 use.
23    Q.   In the field or at the station?
24    A.   At the station.
25    Q.   So people would blow into it at the station

17

1  and that would give you the alcohol level.  Correct?
2     A.   Yes, sir.
3     Q.   When Daniel Saenz was in your custody in March
4  of 2013, did you check him to see what his blood
5  alcohol level was or what his level, if any, of drugs
6  was in his system?
7     A.   No, sir.  That was not my job.
8     Q.   Did you learn of anybody doing that at the
9  time to see if he was under the influence of anything?
10         MR. JIM DARNELL:  Object, hearsay.
11    Q.   (By Mr. Gage)  Go ahead.
12    A.   To the -- no, to the best of my knowledge, I
13 do not know.
14    Q.   Did you conduct any field sobriety tests on
15 Daniel at all when he was under your custody in March
16 of 2013 to see if he was under the influence of any
17 drugs or alcohol?
18         MR. ORTEGA:  Objection, form.
19    A.   No, sir.
20    Q.   (By Mr. Gage)  Go ahead.
21    A.   No, sir, that was not my job.
22    Q.   Did you just happen to observe anything about
23 Daniel with respect to his eyes, his walking, any
24 alcoholic odors to see if he was under the influence of
25 any drugs or alcohol from your personal observation?

Matthews, James  10-09-2017

18

1    A.    I did not smell any alcohol on him.  I know
2    that I asked him if -- if -- I said, "Danny, do you
3    remember me from when you were here a few months ago?"
4    and he never would actually acknowledge or respond to
5    me.  Wanting him to -- because I had such a good
6    rapport with him before.
7              Sorry.
8    Q.    Something about this is emotional it sounds
9    like.
10   A.    Well, I thought -- I didn't think he was a
11   terribly bad person.  My first -- you know, in -- in
12   talking with him because he was so polite and cordial
13   and cooperative, "Anything you want, Mr. Matthews," and
14   I believed him, I really did.  Just, you know, this
15   time he was -- it was like he wasn't a human, you know.
16   His -- his demeanor and his -- he was just -- I had
17   never seen anybody under -- under the influence of
18   something -- what it -- what it was I do not know, but
19   I said, "This -- this guy's not" -- you know, "he's not
20   all there."
21   Q.    Were his eyes bloodshot?
22   A.    I don't remember.  I really don't remember.
23   Q.    When you have a patient that -- or a prisoner
24   that doesn't seem to be all there psychologically, are
25   there things that you were taught you should do, like

19

1    to get them medical treatment at that point?
2              MR. ORTEGA:  Objection, form.
3    Q.    (By Mr. Gage)  Go ahead.
4    A.    Well, now, you know, common sense is going to
5    tell you and -- and -- because -- that -- that -- that
6    if someone needs -- needs medical attention, you're
7    going to seek it.  But our job was -- was not in that.
8    He was not in my care and custody right there.  My job
9    was not to -- to seek medical for him.  That was the --
10   that was the police department's job to -- to tend to
11   him because they had -- whenever they -- and I think
12   they arrested him at a hospital for an assault on a
13   peace officer, so they -- they should have recognized
14   or knew if he needed any -- any type of medical
15   attention.
16   Q.    When you say "they" should have recognized if
17   he needed medical attention, you're talking about the
18   employees and officers from the El Paso PD.  Correct?
19   A.    Yes, sir.
20   Q.    When you worked for G4S security, if you saw a
21   patient or prisoner that appeared to need medical
22   attention, were you allowed to call for aid for them?
23   A.    Yes.
24             MR. ORTEGA:  Objection, form.
25   Q.    (By Mr. Gage)  Did you receive any kind of

20

1    training from G4S regarding the care for prisoners?
2              MR. ORTEGA:  Objection, form.
3    A.    Answer?
4    Q.    (By Mr. Gage)  Yes.
5    A.    Just your -- your standard CPR, you know, and
6    that's about the only thing that really comes to my
7    mind real quick, you know.
8    Q.    When you joined G4S, did they give you any
9    kind of training?
10   A.    Yes, sir.
11   Q.    What did they tell you?
12   A.    Well, that -- can you narrow it down to
13   something in particular?
14   Q.    Sure.  Yeah, that really wasn't the best of
15   questions.  I'll withdraw it.
16             What areas did they train you in when you
17   joined G4S?  I'm talking categories, use of force, for
18   example, or medical attention for a prisoner, whatever
19   those categories were?
20   A.    You know, sir, I cannot -- I cannot tell
21   you -- give you anything in particular that -- that --
22   that -- that we went through that training.  I do
23   not -- I -- I can't think of anything in -- in -- just
24   in particular about it.
25   Q.    Was there a course that G4S provided to you to

21

1    make sure that you received training as a security
2    guard?
3    A.    Yes, sir.
4    Q.    What was that course called?
5    A.    I don't remember.
6    Q.    How many hours long was that course?
7    A.    Hours?  It might have been four or five
8    weeks -- or maybe it was only three weeks.  I think
9    maybe it was only three weeks.
10   Q.    Where did you have that course?
11   A.    Here in El Paso.
12   Q.    Was it at the facility of G4S, like their
13   headquarters, or where was it?
14   A.    No, it was at a -- at a hotel along Interstate
15   10 westbound, just a little bit west of Bassett Center,
16   but I do not remember the name of the -- of the -- they
17   rented a room and set tables up and, you know, we
18   were -- we were sitting around some tables in a room.
19   Q.    How many people were there for the training?
20   A.    15 to 17 sticks in my mind.
21   Q.    Who was doing the training?
22   A.    There was a gentleman, he was a captain with
23   G4S.  I do not remember his name.
24   Q.    Did you receive any kind of written materials
25   with the training?

22

1    A.    Yes, sir.

2    Q.    Do you still have them?

3    A.    Probably not.

4    Q.    Do you recall what they were called, those

5 written materials?

6    A.    Not right offhand I don't -- I don't remember.

7 I remember we -- we got a bunch of different type of

8 handout material.

9    Q.    When this deposition is over, I'm going to

10 have a blank put in the transcript here and what I'd

11 like you to do is if you go home and you happen to get

12 any training, you can just say "I still have the

13 documents" or "I do not have the documents."  If you

14 have them, I want to preserve them because I'll

15 probably ask you to produce them.

16    A.    All right.

17    Q.    So in the beginning of the transcript, I like

18 a thing to say Information Requested or Items Marked,

19 either way, and we'll just have this page and line

20 reference.  So when you see your transcript, you'll

21 know where that is because the front page will indicate

22 it.

23    A.    Okay.

24    Q.    And there may be other times I'll ask to mark

25 that for some reason.

23

1    A.    Sure.

2    Q.    It will probably just involve other documents

3 I might want you to look for so you'll know what that

4 is.

5         Did you receive any kind of a guard card

6 or license as a result of your training?

7    A.    Well, our -- I know I had a -- a card that

8 allowed me to carry a firearm in Texas and one for

9 New Mexico and I know I had a card that -- from G4S

10 that probably said I was an employee of G4S.

11    Q.    Do you still have any of those cards?

12    A.    I do not know, but probably not.

13    Q.    All right.  Same thing, we'll have that

14 marked.  If you have any of those cards, preserve them,

15 and you can just -- we'll leave a space and you can

16 say, "I have the following cards as listed."

17    A.    Yes.

18    Q.    And we'll deal with getting it from you.

19    A.    Yes, sir.

20    Q.    At the end of the deposition, I would like

21 your home address to be provided off the record to the

22 court reporter so she'll have that and --

23         MR. GAGE:  Let's go off the record a

24 second.

25         THE VIDEOGRAPHER:  We're off the record,

24

1 2:17 p.m.

2         (A recess was had.)

3         THE VIDEOGRAPHER:  We're back on the

4 record, 2:24 p.m.

5    Q.    (By Mr. Gage)  When you worked for G4S, did

6 that company provide you with any kind of insurance in

7 case there was a lawsuit against the company that

8 you're aware of?

9    A.    No, sir.

10    Q.    Did the company have insurance?

11    A.    I do not know.

12    Q.    Do you know what kind of training Mr. Romero

13 had when he worked for G4S?

14    A.    No, sir, I do not know.

15    Q.    Did he ever tell you about his training at

16 all?

17    A.    No, sir.

18    Q.    I think earlier you had mentioned that there

19 was some kind of a contract between G4S and the El Paso

20 Police Department that you were aware of.  Is that

21 accurate?

22    A.    Yes, sir.

23    Q.    How did you know about that contract?

24    A.    The -- the Border Patrol contract was -- we

25 were not moving -- we were not moving enough people --

25

1 enough of Border Patrol's detainees because they were

2 not apprehending them along the border, so as the

3 numbers were falling off, then -- we had at one time 85

4 employees, transportation officers, and I was one of

5 the sergeants in the office running -- and -- and so

6 there was some -- some of the -- the -- the latest new

7 hires got laid off and then five of us sergeants lost

8 our jobs, but they kept me on as a trans- -- as a

9 transportation officer.  And then I also knew -- I knew

10 eventually that I was going to be out of -- out of a

11 job with this contract, which -- which I knew that, so

12 when I hired on, I knew some day it's going to just

13 kind of dwindle way.

14    Q.    That's the Border Patrol contract?

15    A.    Yes.  The Border Patrol contract, yes, sir.

16    Q.    Okay.  And then what happened?

17    A.    And then -- but I also knew that -- that --

18 that they were -- that they were going to start up a

19 contract with the El Paso Police Department maintaining

20 their cell area, watching over the prisoners in the

21 cell area, and transporting the people that the -- the

22 detainees from the police department.

23    Q.    With respect to watching the prisoners in the

24 cell for El Paso PD, what specific job duties were you

25 told you had?

26

1    A.    The main thing that was -- to answer your
2    question, what I was told -- I don't -- I don't
3    remember anything in particular that I was told that
4    this is what your -- your duties are, even though we
5    probably were told, but I just -- I just don't remember
6    what they were, but it amounted to -- to -- if they
7    needed water, they needed to go to the restroom,
8    then -- then you escorted them to the water fountain or
9    to the restroom.
10   Q.    What --
11   A.    And we fingerprinted them -- excuse me --
12   on -- what they had is a -- they had a scanning machine
13   that we -- that we would take fingerprints and palm
14   prints.
15   Q.    What were you supposed to do if the prisoners
16   tried to resist once you were taking them to get water
17   or to the restroom?
18         MR. ORTEGA:  Objection, form.
19   A.    I never had any of them try to resist, so I
20   never -- I never ran into that.
21   Q.    (By Mr. Gage)  Were you given any instructions
22   of what you should do if you were with a prisoner that
23   tried to resist while working for G4S?
24   A.    Yes.  You would call one of the policemen.
25   Q.    Were you ever, while working for G4S, told

27

1    what you should do when a prisoner is resisting until a
2    police officer arrived?
3    A.    No, sir.
4    Q.    Once a police officer arrived, if you had a
5    resisting prisoner while working at G4S, were you told
6    what you should do to help the police officer in
7    restraining that prisoner that was resisting?
8         MR. ORTEGA:  Objection, form, assumes
9    facts not in evidence.
10   Q.    (By Mr. Gage)  Go ahead.
11   A.    Repeat your question, please.
12   Q.    Sure.  Were you told what you should do if
13   there was a prisoner who was resisting -- a police
14   officer comes to help you -- what were you supposed to
15   do as a G4S security employee?
16         MR. ORTEGA:  Same objections.
17   A.    I can't -- I can't honestly say that I was
18   told, "This is what you will do if -- if -- if an
19   officer needs help."  Okay?
20   Q.    (By Mr. Gage)  All right.  So if I'm
21   understanding you correctly, you're not aware of G4S
22   providing any of its employees with training or
23   instructions on what to do if you're with a police
24   officer and there's a prisoner who is resisting and the
25   officer needs help.  Is that a true statement?

28

1         MR. ORTEGA:  Objection, form.
2    A.    Well, I'm just telling you that I cannot
3    remember what, if anything in particular, that -- that
4    we were told to do.  Okay?
5    Q.    (By Mr. Gage)  Are you aware of anybody at G4S
6    being told by the company what the G4S employees should
7    do if they're with a police officer and a prisoner is
8    resisting?
9         MR. ORTEGA:  Objection, form, calls for
10   speculation and hearsay.
11   A.    I do not have a remembrance, a recollection,
12   of anything in particular there.
13   Q.    (By Mr. Gage)  Were there any written
14   documents that you ever received while working for G4S
15   advising you what you should do if you were with a
16   police officer and a prisoner was resisting?
17         MR. ORTEGA:  Objection, form.
18   A.    It -- it -- it sounds like you're asking me
19   the same question again, if there's anything in
20   particular, and I -- and I can't tell you -- all I can
21   tell you is that I don't have an independent
22   recollection of anything in particular that -- that I
23   should do.
24   Q.    (By Mr. Gage)  It is quite similar.  One I was
25   asking if you were given information orally, the other

29

1    I was asking if you received information in writing.  I
2    take it your answer is you don't recall receiving
3    information orally or in writing about what to do in a
4    situation of a prisoner resisting and being with an
5    officer?
6    A.    That is correct, yes, sir.  Just leave it at
7    that.
8    Q.    In your career in law enforcement, have you
9    seen or become aware of the fact that sometimes
10   prisoners would resist when they were in custody with
11   an officer?
12         MR. ORTEGA:  Objection, form.
13   A.    Have I seen prisoners -- yes.
14   Q.    (By Mr. Gage)  In other agencies that you
15   worked in, because of the fact that it was foreseeable
16   that a prisoner might resist, did you receive training
17   on what to do in connection with the resisting
18   prisoner?
19   A.    I cannot tell you that, yes, I did receive
20   training because I don't remember if I received any
21   particular training.
22   Q.    Specifically I want to ask you about when you
23   worked for El Paso Police Department.  Is it true that
24   when you worked for the El Paso Police Department, you
25   do not recall receiving any training as to what you

30

1 should do in connection with a resisting prisoner under

2 your care and custody?

3    **A.   Well, going back to 1975, I remember vaguely**

4 **that they would say use necessary force.**

5    Q.   Did they explain to you at the El Paso PD what

6 necessary force consisted of?

7    **A.   Well, if you're asking me for an independent**

8 **recollection, sir, I do not have an independent**

9 **recollection of what necessary force is.  But, yet,**

10 **I -- I -- I feel like I know what necessary force is.**

11    Q.   What is -- what do you know necessary force to

12 be, then?

13    **A.   Use just enough force to make and affect the**

14 **arrest.**

15    Q.   It sort of sounds like you're talking about a

16 use of force continuum.  So if you have a person who is

17 saying, "Get away, I don't want to be arrested," then

18 you would use that force of command presence, a stern

19 voice, "Turn around, listen to me now, put your hands

20 behind your back," essentially.  Correct?

21          MR. ORTEGA:  Objection, form, lacks

22 foundation.

23          MR. JIM DARNELL:  Same objection.

24    **A.   Yes, sir.**

25    Q.   (By Mr. Gage)  On the other hand, if you're

31

1 with a suspect who was struggling a bit, possibly

2 trying to hit you or kick you or grab you, then you

3 could use an amount of force that would counter that,

4 you could punch them, you could grab them, you could

5 put them in a wrist lock, you could tackle them, some

6 way to gain control using an amount of force

7 appropriate based on the force they're using.

8         Is that accurate?

9          MR. ORTEGA:  Objection, form, foundation,

10 calls for speculation.

11          MR. JIM DARNELL:  Same objection.

12    **A.   Well, you used -- you used "punch."  I know**

13 **I've never punched -- I've never had to punch anybody.**

14 **Okay?**

15    Q.   (By Mr. Gage)  So even if -- have you in your

16 life ever had a suspect that was resisting you where

17 they were using their hands or feet sort of to fight

18 with you or try to punch you or kick you, things of

19 that sort?

20    **A.   In my career?**

21    Q.   Yes.

22    **A.   In the 35 years, I'm sure that I have.  I'm**

23 **sure I have.**

24    Q.   And you were able to diffuse that situation

25 without even having to resort to a punch.  Correct?

32

1    **A.   Yes, sir.  Yes, sir.**

2    Q.   It sounds like in your 35 years of experience,

3 you developed a way to deal with people and diffuse

4 potentially violent situations just with your

5 personality, your words and your presence.  Is that

6 accurate?

7          MR. ORTEGA:  Objection, form.

8    **A.   Yes.**

9    Q.   (By Mr. Gage)  As an example, Daniel Saenz,

10 two times he was in custody that you were at least

11 around him.  One time you were the person who basically

12 had control over him.

13    **A.   Uh-huh.**

14    Q.   You spoke to him, he cooperated with you, you

15 didn't have to use any violence or force at him at all.

16 Accurate?

17    **A.   Yes.**

18    Q.   Second time, at a time when Daniel Saenz was

19 not with you, you weren't even there, all of a sudden,

20 the individuals that were with him, he ends up getting

21 shot and killed.  Right?

22          MR. JIM DARNELL:  Object, facts not in

23 evidence.

24          MR. ORTEGA:  Same objection.

25    Q.   (By Mr. Gage)  Go ahead.

33

1    **A.   No, sir.  No, sir, that's not -- I don't**

2 **believe that's accurate what -- what you stated.**

3    Q.   What's not accurate about the fact that he was

4 shot and killed when you weren't present?

5    **A.   Well, that -- of course we know that's a true**

6 **statement.**

7    Q.   Right.

8    **A.   You know.  But I -- I can't say that I**

9 **wholeheartedly agree with your -- your question.**

10    Q.   Well, when you were with Daniel that day of

11 March 8th, 2013, you thought he was a different

12 person --

13    **A.   Yes.**

14    Q.   -- he was a little combative.  Right?

15    **A.   Yes.**

16    Q.   Did you have to punch him at all?

17    **A.   No, sir.**

18    Q.   Did you have to strike him at all?

19    **A.   No.  No, sir.**

20    Q.   Did you ever think you should pull out a gun

21 and shoot him?

22    **A.   No, sir.**

23    Q.   All right.  So when he was under your custody

24 on March 8th, 2013, even though he was unruly, you were

25 able to control him without causing him any physical

34

1 violence.  Correct?

2             MR. ORTEGA:  Objection, form.

3     **A.    I was not getting the cooperation from him**

4 **wholeheartedly that I felt like that he could gave me,**

5 **that he gave me the last time he was arrested.**

6     Q.    (By Mr. Gage)  And even though he didn't give

7 you the same cooperation as before, did you use any

8 physical violence on him?

9     **A.    No, sir.**

10     Q.    That's what I was getting at, basically.

11     **A.    Okay.**

12     Q.    One of the things that you've noticed, I bet,

13 in the 35 years that you've been involved in law

14 enforcement is different officers would treat a person

15 in custody differently.  Correct?

16     **A.    Yes, sir.**

17     Q.    The way that they would treat that person in

18 custody frequently influenced whether the person in

19 custody was a little bit resistant or extremely

20 combative.  Agreed?

21             MR. ORTEGA:  Objection, form.

22     **A.    I cannot agree with you on that, no, sir.**

23     Q.    (By Mr. Gage)  Okay.  It sounds to me like

24 you're the kind of an officer who in 35 years had many

25 people that you came in contact with, engaged in

35

1 potential criminal acts.  Is that correct?

2     **A.    Yes, sir.**

3     Q.    You've had to arrest people, put them in

4 custody, probably so many times you can't count in your

5 35-year career.  Right?

6     **A.    Yes, sir.**

7     Q.    Yet because of the demeanor that you had, the

8 way that you would treat those people in custody, even

9 people with lots of arrests or bad people, somehow you

10 were able to keep them under enough control that you

11 never needed sort to strike them, hit him them, shoot them,

12 things of that sort.  Right?

13             MR. ORTEGA:  Objection, form.

14     **A.    Yes, sir.**

15     Q.    (By Mr. Gage)  And that's my point is that you

16 personally found a way to deal with potentially

17 combative suspects, calm them down, keep them under

18 control, so you could do your job without having to

19 shoot them, kill them or beat them.  Right?

20             MR. ORTEGA:  Objection, form.

21     **A.    Yes.  But let me also say that when I -- when**

22 **I was out there working, you didn't have these hardcore**

23 **drugs out there like you do now.**

24     Q.    (By Mr. Gage)  Right.

25     **A.    And, my goodness, it was -- it -- it was till**

36

1     **I was a -- on the PD that I arrested somebody for**

2 **possession of a usable quantity of marijuana.**

3             **When I was with the highway patrol, I**

4 **never -- never put anybody in jail for under the**

5 **influence of any drugs, it was always alcohol.  I did**

6 **not know -- until I got to work with the -- with the El**

7 **Paso Police Department, I did not know the ugly effects**

8 **that -- that some of these drugs had on human beings.**

9     Q.    I understand.

10             MR. GAGE:  I move to strike as

11 nonresponsive, but I understand.

12     Q.    (By Mr. Gage)  Even in the '70s, though, there

13 was the drug called PCP --

14     **A.    Uh-huh.**

15     Q.    -- or angel's dust or elephant tranquilizer,

16 something like that.  Right?

17     **A.    I can remember PCP.  I remember the -- the**

18 **letters.**

19     Q.    All right.  And I know many police officers,

20 even in the '70s, encountered people on PCP and having

21 all kinds of terrible altercations.  Did you experience

22 that ever when you were in law enforcement?

23     **A.    No, sir.**

24     Q.    All right.  Did you ever see any toxicology

25 reports indicating that Daniel Saenz was under the

37

1 influence of any drugs at any time in his life?

2     **A.    No, sir.**

3     Q.    When he got arrested a few months earlier, do

4 you know what that arrest was for?

5     **A.    No, sir, I -- I can't remember exactly.**

6     Q.    Do you know if he was convicted after that

7 arrest or not?

8     **A.    No, sir, I do not know.**

9     Q.    How were you assigned to transport Daniel

10 Saenz on March 8th, 2013.

11     **A.    It was -- it was my job to -- to transport --**

12 **do the transporting of prisoners.**

13     Q.    Were there any other prisoners that you were

14 also transporting at that time?

15     **A.    There was another gentleman that we**

16 **transported.**

17     Q.    Do you recall his name?

18     **A.    I do not remember.**

19     Q.    Do you recall what he looked like at all?

20     **A.    White male, maybe a little bit on the heavyset**

21 **side, maybe early 60s.**

22     Q.    Do you remember what he was arrested for?

23     **A.    No, sir, I do not.**

24     Q.    Where did you get that other prisoner?  Was it

25 from the Pebble Regional --

38

1    A.    Hills.
2    Q.    -- Pebble Hills regional center or was it
3 somewhere else?
4    A.    I do not remember if we loaded him at Pebble
5 Hills or down at the -- at the substation at Mission
6 Valley.
7    Q.    When you loaded prisoners from Mission Valley
8 and transported them, would you have any El Paso police
9 officers with you?
10    A.    Yes, sir.
11    Q.    When you had this prisoner, was there an
12 El Paso police officer with you, assuming he came from
13 Mission Valley?
14    A.    I do not recall.
15    Q.    If there had been a police officer from
16 El Paso PD with you, would you have put that into any
17 kind of statement as to who was present with you at
18 that point?
19    A.    No, sir.
20         MR. ORTEGA:  Objection, calls for
21 speculation.
22    Q.    (By Mr. Gage)  And why not?
23    A.    No need for it.
24    Q.    Okay.  Did you ever transport any prisoners
25 for the El Paso Police Department without having an

39

1 El Paso officer with you?
2    A.    Explain your -- what you mean by having an
3 El Paso policeman with us.
4    Q.    First, you would transport prisoners in a van
5 or car of some kind.  Is that correct?
6    A.    A van.
7    Q.    A van.  Can you describe the inside of the
8 van.
9    A.    Just a van that had steel walls and benches,
10 steel benches on both sides, a divider in the middle,
11 seat belts, air conditioner, window that they could see
12 out the -- out the back.
13    Q.    Was there a way to secure a prisoner to those
14 benches by handcuffs or other means?
15    A.    Seat belt.  There was a smaller compartment on
16 the right-hand side behind the -- driver -- behind
17 the passenger of -- in the cab.  Because these were one
18 ton -- one-ton vans.  And there was a smaller
19 compartment there that you could put -- put one or two
20 people in.
21    Q.    Could they be secured more securely in that
22 location?
23    A.    They -- everybody was secured the same with
24 seat belts.
25    Q.    If a passenger started to struggle at all,

40

1 what would you do to control them or secure them in
2 that respect?
3         MR. ORTEGA:  Objection, form.
4    A.    Well, I -- that's hard for me to answer your
5 question because I -- I don't know that I understand
6 and -- and -- what would be wrong with the prisoner
7 that I would need to -- to stop?  I don't know that I
8 would stop unless they were -- were injuring
9 themselves.
10    Q.    (By Mr. Gage)  Were you trained at all by G4S
11 as to what you should do if you were transporting a
12 prisoner who appeared to be injuring themselves?
13    A.    Was I trained?  I cannot answer that.  I don't
14 remember.
15    Q.    You don't remember receiving any training on
16 that subject, do you?
17    A.    Yeah, that is correct, I don't remember what
18 kind of training we received.
19    Q.    When you were transporting Daniel Saenz to
20 jail from the Pebble Hills regional center, did he at
21 any time appear to you to be trying to injure himself
22 in the van?
23    A.    I can't remember a -- anything in particular.
24 I know I -- I was driving and I cannot tell you that he
25 did or did not try to injure himself.

41

1    Q.    If Daniel was trying to injure himself in the
2 van at all by banging his head against the walls or
3 anything, what would you have done?
4         MR. ORTEGA:  Objection, calls for
5 speculation.
6         MR. JIM DARNELL:  Same objection.
7    Q.    (By Mr. Gage)  Go ahead.
8    A.    I would have tak- -- I would have taken the
9 necessary action to keep him from being injured.
10    Q.    What would that consist of?
11    A.    Whatever was necessary.
12    Q.    So would you stop the van and try to
13 reposition himself in some way?
14    A.    Would I have?  Yes.
15    Q.    Why would you do that?
16    A.    To keep him from getting injured.
17    Q.    Is that part of one of your duties of your job
18 as you understood it was to try to make sure the
19 prisoners under your custody did not get injured?
20    A.    Well, again, all I can tell you is -- is what
21 I know what -- what I would have done in -- in good
22 conscious of taking care of somebody in my custody.  I
23 would not want somebody to get injured.
24    Q.    Because that's just part of being a decent
25 human being?

42

1           MR. ORTEGA:  Objection, form.

2           MR. JIM DARNELL:  Same objection.

3      **A.    I think that that's a fair statement.**

4      Q.    (By Mr. Gage)  When you've worked in law

5  enforcement at any time, were you also taught that in

6  law enforcement, if you have a prisoner in your

7  custody, that you have an obligation to take care of

8  their medical needs?

9           MR. ORTEGA:  Objection, form.

10     **A.    Your question was I trained for that?**

11     Q.    (By Mr. Gage)  Correct.

12     **A.    Well, I can tell you that I don't have an**

13  **independent recollection of it.**

14     Q.    Is that something you generally knew?

15  Regardless of if you had an independent recollection or

16  not, you knew in general that as a law enforcement

17  officer, you had an obligation to protect --

18     **A.    Common -- common sense would tell you that you**

19  **needed to take care of that.**

20     Q.    So -- because we kind of start talking over

21  one another, we need to --

22     **A.    Okay.**

23     Q.    -- slow down.

24           Common sense told you that when you had a

25  prisoner in your custody, you had an obligation to take

---

43

1  care of their medical needs.  Correct?

2      **A.    Yes, sir.**

3      Q.    And did you ever observe Daniel banging his

4  head on the wall in the van at all as you were

5  transporting him?

6      **A.    A good -- a good -- a good memory of that, no,**

7  **I don't have an absolute perfect memory of it, but it**

8  **seems like that -- that -- that he might have been --**

9  **been -- might have hit his head a time or two.  But I**

10  **remember him more of talking -- talking to people that**

11  **weren't there.**

12     Q.    With respect to him hitting his head a time or

13  two, what do you recall Daniel was hitting his head on?

14     **A.    I don't know.  It could have been the wall or**

15  **it could have been the -- the fiberglass window that**

16  **was -- would be to -- to -- him sitting here -- to his**

17  **left.**

18     Q.    Did you stop and take any precautions to

19  protect Daniel from continuing to bang his head on the

20  wall of the van while you were transporting him?

21     **A.    No, sir.**

22     Q.    Why not?

23     **A.    Because it did not -- what I could hear and**

24  **see, it didn't seem like that it was of anything**

25  **that -- anything serious, you know, just -- that --**

---

44

1  where he could have injured himself.

2      Q.    When you picked up Daniel at the Pebble Hills

3  Regional Command Center and put him into the van, you

4  had a chance to observe his head, his face.  Correct?

5      **A.    Yes, sir.**

6      Q.    Was he bleeding at all at that point when he

7  got taken into the van?

8      **A.    No, sir.**

9      Q.    Did he have any cuts or marks that you saw on

10  his face or head at all?

11     **A.    Not that I knew of.**

12     Q.    Is it a true statement that you did not see

13  any injuries to Daniel's head or face at the time that

14  you put him into the van to take him from regional

15  hills -- or rather -- withdraw.

16           Is it a true statement that did you not

17  see any injury to Daniel anywhere on his body when you

18  picked him up from the Pebble Hills Regional Command

19  Center to take him to jail?

20     **A.    That is correct.**

21     Q.    After stopping the van at the jail, Daniel was

22  taken into the jail through the front door.  Correct?

23     **A.    Front door, no, sir.**

24     Q.    Where was he taken into, through what

25  facility?

---

45

1      **A.    There is a ramp that -- that goes into the**

2  **basement -- excuse me -- into the sally port area.**

3      Q.    So that's the place where he ended up getting

4  shot and killed is where he also entered.  Is that

5  correct?

6      **A.    Yes, sir.**

7      Q.    At the time that -- as Daniel was taken into

8  jail, that first door after entering the sally port, by

9  the time you saw him right there entering jail, did he

10  have some injuries to his head or face that you

11  observed?

12     **A.    I -- I know that he -- that he -- somewhere he**

13  **received a laceration on his -- on his head and when**

14  **he -- when we got there, he did not have it.**

15           **I did not walk -- I took the other**

16  **prisoner and -- with -- and walked with the other**

17  **prisoner and Officer Flores and Romero took -- took**

18  **Daniel down in through the -- through the people --**

19  **people door, where the people go in and out of, not the**

20  **vehicles.  And -- and whenever I got inside -- or got**

21  **down to the -- to the -- to that door, then I could --**

22  **no.  It was whenever we got into the elevator that I**

23  **saw that he had a laceration.**

24     Q.    Was Daniel bleeding by that point?

25     **A.    Yes, he was.**

---

46

1    Q.   Heavy bleeding?
2    A.   Not heavy heavy, but, yes, he -- there was --
3  there was a substantial amount of blood.
4    Q.   Do you know how he got that injury?
5    A.   No, sir.
6    Q.   The injury to his head where he had the
7  laceration, was that in the same area as you observed
8  Daniel banging his head on the wall of the van while
9  transporting him?
10        MR. JIM DARNELL:  Objection, speculation.
11        MR. ORTEGA:  Same objection.
12   A.   I cannot say that.
13        MR. JIM DARNELL:  Can we take a short
14 break?
15        MR. GAGE:  In a moment, yeah.
16   Q.   (By Mr. Gage)  When you were entering the
17 jail, where were you in relation to Daniel, Officers
18 Flores and Romero?
19   A.   I was behind them bringing down the other --
20 the other prisoner and I walked -- they got to the
21 door -- gee, I don't know how much -- I mean I don't
22 know -- I don't know how long it took me to get this
23 other gentleman down there walking down the ramp, but
24 they just -- I just got there behind them is all.
25   Q.   About how far away were they from you when you

47

1  saw them at the door first?
2    A.   12, 15 paces.
3    Q.   Was there anything that blocked your vision?
4    A.   No, sir.
5    Q.   Was the lighting good at that point?
6    A.   Yes, sir.
7    Q.   Did you see anything that Daniel did going
8  into the door that would have caused him to be injured
9  at all?
10   A.   I believe that -- that he slung his head -- I
11 couldn't tell you if it was to the right or to the
12 left -- that when he slung his head, that that's
13 probably where he -- where he got the injury.
14   Q.   So you actually saw him slinging his head?
15   A.   Let me -- I -- I can't say that I saw it like
16 I'm sitting here seeing you type, I'm seeing that, but
17 whenever -- whenever -- as they were -- as they were
18 going in with him, I can remember him -- him, what I'm
19 pretty sure is slinging his head.
20   Q.   Is that something that would be important to
21 document in a witness statement if you wrote one about
22 the events?
23   A.   If I -- if I recalled it, yeah.
24   Q.   And why would that be important to put into a
25 witness statement?

48

1    A.   Well, because it's -- it would show that we --
2  or the transporting officer didn't -- didn't -- didn't
3  cause the damage.
4    Q.   There has been some testimony in this case
5  indicating that either Officers Romero or Flores or
6  perhaps both of them had pushed Daniel shortly before
7  his head banged into the doorway.  Did you ever see any
8  of that?
9         MR. ORTEGA:  Objection, assumes facts not
10 in evidence.
11        MR. JIM DARNELL:  Same objection.
12   A.   No, sir, I did not see him pushed.
13   Q.   (By Mr. Gage)  When Daniel's head went into
14 the door, the way that it went in, would it be
15 consistent with a person pushing him from the back, to
16 your understanding?
17        MR. ORTEGA:  Objection, calls for
18 speculation.
19        MR. JIM DARNELL:  Same objection.
20   A.   I do not know, sir.
21   Q.   (By Mr. Gage)  Did you see Daniel go on the
22 floor or on the ground at the entrance to the jail?
23   A.   Can you rephrase that or ask it again.
24   Q.   Sure.  When you -- you were able to watch
25 Romero and Flores walk Daniel to the jail entrance door

49

1  at the bottom of the sally port.  Correct?
2    A.   Yes, sir.
3    Q.   Did you see Daniel go onto the floor at any
4  point in that location?
5    A.   Well, what do you mean "go on"?
6    Q.   Did you ever see him on the ground?
7    A.   I'm trying to think.  Him laying on -- on the
8  floor?  I don't think so.
9    Q.   Okay.  Did you notice Daniel on the floor at
10 all?
11        MR. ORTEGA:  Objection, asked and
12 answered.
13   A.   I can't recall, sir.
14   Q.   (By Mr. Gage)  Did you see how he would have
15 ended up on the ground, if he was there?
16   A.   No, sir.
17   Q.   At any point did you open the door for the
18 officers and Daniel to enter the jail?
19   A.   Which door, sir?
20   Q.   The first -- the first door.  Did you open the
21 door?
22   A.   No, sir.
23   Q.   Did you open any other door in the jail for
24 them?
25   A.   I -- not that I can remember.  Could I have?

50

1  Possibly.  Do I recall?  No.

2      Q.   When Daniel was going towards the door of the

3  jail, was he resisting in any way that you saw?

4      A.   I do not think so.

5      Q.   Was Daniel screaming at all when he was by the

6  door to the jail?

7      A.   Not that I can recall.

8      Q.   Did any other jailers come to assist with

9  Daniel near the jail door that you saw?

10     A.   Not that I can remember.

11     Q.   Was there anything that Daniel was doing that

12  you personally saw from the time he left the van after

13  parking at the jail until he got to the elevator of the

14  jail?

15     A.   Was there --

16     Q.   Was there anything that Daniel was doing from

17  the time that he got out of the van at the jail until

18  he was at the elevator of the jail that you believed

19  would justify any use of force against him?

20          MR. ORTEGA:  Objection, calls for legal

21  conclusion, vague and form.

22          MR. JIM DARNELL:  And it calls for

23  speculation.

24     A.   Not that I can recall, sir.

25     Q.   (By Mr. Gage)  Did you see Daniel on the

51

1  elevator at the jail?

2      A.   Yes, as we were going up.

3      Q.   Did you notice any bleeding from his head at

4  that point?

5      A.   Yes, sir.

6      Q.   What did you see?

7      A.   He was just -- he was bleeding from his --

8  from his head.

9      Q.   Did he appear to be losing consciousness at

10  that point?

11     A.   No, sir.

12          MR. ORTEGA:  Objection, calls for

13  speculation.

14     Q.   (By Mr. Gage)  Was he standing, sitting or

15  laying down when you saw him on the elevator going

16  upstairs?

17     A.   He was probably -- gee, let me think.  I know

18  he wasn't standing.  He was probably on the floor on

19  his -- on his left side, but I am not 100 percent sure.

20     Q.   So laying down on his left side?

21     A.   Yeah.

22     Q.   Is that correct?

23     A.   Yes, sir.

24     Q.   Did he -- were his eyes open or closed?

25     A.   I do not know.

52

1      Q.   Was he moving sort of laying still?

2      A.   More laying still.

3      Q.   Did you determine at that point when you were

4  on the elevator if Daniel was conscious or not?

5      A.   Well, I do not know if he was conscious or

6  not.  But -- because I -- I -- I couldn't tell you that

7  I -- that I, you know, was right there to -- to -- to

8  see exactly everything that he was doing.

9      Q.   Did you see any -- withdraw.

10          Did you see Daniel getting dragged at all

11  by Romero or Flores?

12     A.   They had him by the shoulders because -- and

13  because he wouldn't cooperate to -- to walk and -- and

14  they drug him through the -- through the -- through

15  the -- where booking is -- where that little room is

16  that's kind of a little holding area and then through

17  that door and then over to the elevators, which would

18  be to the left of there probably five feet -- no, more

19  than that to the elevators -- maybe 10 or 12 feet to

20  the elevators.

21          And -- and I remember seeing them because

22  I stayed in the booking and they drug him through that

23  little room, the little holding cell area, and over to

24  the double doors and then they went out the double

25  doors.

53

1      Q.   How far is booking from those double doors?

2      A.   Two ways to go, through the cell area or

3  through -- through the other double doors.  And you're

4  just going to ask me to make a guess because that's all

5  I could do for you would be guess.

6      Q.   There is a difference between a guess and an

7  estimate.  Sometimes they're given at the beginning of

8  the deposition, I'm going to explain now.

9          The common definition is if you look at

10  this table here that you're in front of, you can

11  observe how long it is and you can give us an estimate

12  of the distance.  If I was to ask you for the length of

13  the table in my home, you've never been to my home,

14  you've never seen it, it would be a sheer guess.

15          Do you understand that distinction?

16     A.   I do.

17     Q.   And the same thing applies with respect to the

18  distance from the booking area to the double doors.  If

19  I asked you what was the difference from -- or the

20  distance between the booking area at the Lost Hills

21  sheriff's station to the double doors, you've never

22  been there, you would be making a sheer guess, but here

23  you had an observation so you can give us an estimate.

24          So it can be a range.  You can say 10 to

25  12 feet, you could say 50 to 60 feet, whatever is the

Matthews, James  10-09-2017

54

1 best estimate.
2    **A.    So --**
3          MR. ORTEGA:  I'm going to object to your
4 narrative and instruction and that your question calls
5 for speculation.
6          MR. GAGE:  I haven't even finished my
7 question.  That is very clairvoyant.
8    Q.    (By Mr. Gage)  My question for you is what's
9 your best estimate of the distance from that booking
10 area that you were in to the double doors you talked
11 about?
12          MR. ORTEGA:  Object to the narrative and
13 calls for speculation.
14          MR. JIM DARNELL:  Same objection.
15    **A.    It would be an estimate because I have been**
16 **there.**
17    Q.    (By Mr. Gage)  Right.
18    **A.    Okay.**
19    Q.    And what's that distance?
20    **A.    And -- okay.  From inside the -- the -- from**
21 **the door of that little cell area to the other hallway,**
22 **I would estimate 15 to 17 feet.**
23    Q.    What -- go ahead.  Sorry.
24    **A.    Through the double doors to the elevator, I**
25 **would estimate eight to eleven feet.**

55

1    Q.    Did anything obscure your vision from booking
2 to the double doors?
3    **A.    Yes.**
4    Q.    And what was that?
5    **A.    It would be the location of where the double**
6 **doors are at.**
7    Q.    Okay.  But at least between booking and double
8 doors, you had a clear line of sight.  Correct?
9    **A.    No, because there's that little cell area.**
10    Q.    The cell area is on the left, the right or
11 where is it?
12    **A.    It's right doggone in the middle.**
13    Q.    Okay.
14          MR. JIM DARNELL:  Let's take a break.
15          MR. GAGE:  Two more minutes.
16          MR. JIM DARNELL:  No, I've got to go to
17 the restroom.
18          MR. GAGE:  Okay.
19          MR. JIM DARNELL:  Thank you.
20          THE VIDEOGRAPHER:  We're off record,
21 3:13 p.m.
22          (A recess was had.)
23          THE VIDEOGRAPHER:  We're back on the
24 record, 3:28 p.m.
25    Q.    (By Mr. Gage)  Did you ever learn that jail

56

1 trustees were mopping up the blood from Daniel's head
2 that went on the floor?
3    **A.    Yes, sir, I did.**
4    Q.    How did you learn about that?
5    **A.    Because the prisoner that I -- I stayed behind**
6 **to -- to -- with, I passed him on to another city**
7 **officer, El Paso PD officer that was up there, and I --**
8 **I knew that they needed help --**
9    Q.    "They" being who?
10    **A.    Romero and Flores.  And I wanted to hurry and**
11 **get back downstairs to the -- to the basement, to the**
12 **sally port, and -- and give them some help.  There was**
13 **only one elevator -- one elevator they -- wasn't**
14 **working or they were using it upstairs transporting**
15 **whatever -- meals or whatever, so it was not -- not in**
16 **operation.  And the other elevator I kept pushing and**
17 **I -- and I looked at the -- the -- the gentleman**
18 **that -- the deputy or trustee -- whatever he was that**
19 **worked there at the control and I read his lips saying,**
20 **"It's too late."  And I read his lips saying, "It's too**
21 **late," and I -- my heart just sunk.  I didn't know what**
22 **happened.**
23    Q.    Why did your heart sink?
24    **A.    Oh, because I knew that -- I knew that those**
25 **guys needed help.**

57

1    Q.    How did you know that they needed help?
2    **A.    Well, because of -- Saenz was a handful.  If**
3 **he wasn't going to cooperate, then -- then, you know,**
4 **they -- they -- they just needed help.**
5    Q.    Did you hear them calling for assistance?
6    **A.    No, sir, I did not hear anything.**
7    Q.    Did you call for assistance to get someone to
8 help them since you knew they needed help?
9    **A.    No, sir, I did not have -- I do not have a**
10 **police radio.**
11    Q.    Did you ask anyone else there at the jail to
12 get some help since you saw they were in need of
13 assistance?
14    **A.    Well, can I kind of correct you on your**
15 **question there?  You said since -- since I saw that**
16 **they needed.  It's that -- that I sensed that -- that**
17 **they really -- that they needed some help, so, no, I**
18 **did not ask anybody else to -- to summons help for**
19 **them.  Flores had a police radio and he could get help,**
20 **I mean stop a patrol car driving down the street**
21 **because there's a lot of them right there and -- and**
22 **get help if you needed it.**
23          MR. JIM DARNELL:  Object to speculation.
24    Q.    (By Mr. Gage)  So did you have any kind of a
25 radio on you at all, whether it was a police radio or a

58

1  G4S radio?

2  **A.   No, sir.**

3  Q.   At some point I think you told us that you

4  knew Romero and Flores need help and at another point

5  you said you sensed that they needed help.

6  **A.   Uh-huh.**

7  Q.   What caused you to feel that way?

8  **A.   Because Saenz was -- was not cooperating.**

9  Q.   What was he doing that you observed that was

10 not cooperative in the jail?

11 **A.   He would -- he would not stand and -- and --**

12 **and walk on his own.**

13 Q.   Other than him not standing and walking on his

14 own, did you see Daniel doing anything else in the jail

15 that was not cooperative?

16 **A.   No, sir.**

17 Q.   In the jail did they have any kinds of gurneys

18 or wheelchairs or other devices that would allow a

19 prisoner to be transported if they weren't walking?

20 **A.   Not that I know of.**

21 Q.   Did anyone ever tell you what should be done

22 if you have a prisoner who can't walk in the jail?

23 **A.   No, sir.**

24       MR. JIM DARNELL:  Object, assumes facts

25 not in evidence.

59

1  Q.   (By Mr. Gage)  Have you been at any jails in

2  your 35-year career where there would be a prisoner

3  that needed assistance, he couldn't walk for some

4  reason?

5  **A.   No, sir.**

6  Q.   Are you aware of any jails that have

7  wheelchairs for disabled prisoners?

8  **A.   No, sir.**

9  Q.   You had contact with Daniel Saenz before March

10 of 2013, I believe.  Correct?

11 **A.   Yes, sir.**

12 Q.   When you were around him before, what kind of

13 a guy was he?

14 **A.   Nice guy.**

15 Q.   And why did you feel he was a nice guy?

16 **A.   Because he -- he was -- he was polite,**

17 **cordial, told me that he -- was on -- on coke.  And**

18 **I asked him if he was okay and he says yeah, he was**

19 **fine.  And then he voluntarily said, "Don't worry,**

20 **Mr. Matthews," he says, "I won't give you any**

21 **problems."  And he didn't.**

22 Q.   Did you ever see Daniel at any other times

23 before March of 2013 other than that one time he got

24 arrested?

25 **A.   No, sir.**

60

1  Q.   Did you have any knowledge of Daniel

2  volunteering at the YMCA helping children and adults

3  with physical fitness at all?

4  **A.   No, sir.**

5  Q.   Did you know anything about any of his weight

6  lifting efforts in the past or bodybuilding, anything

7  like that?

8  **A.   No, sir.**

9  Q.   When Daniel was, for whatever reason, unable

10 to walk, did you observe Flores and Romero pulling him

11 by his arms, dragging him on the floor?

12 **A.   Pulling him by his arms, no, sir.**

13 Q.   How were they getting him through the jail if

14 Daniel was not walking?

15 **A.   I don't -- I cannot actually visualize the --**

16 **what -- what -- how they were moving him, but probably**

17 **something sticks in my mind that -- that they would**

18 **grab him under each armpit and -- and moved him in --**

19 **moved him in that fashion.**

20 Q.   Do you know if he was single or double cuffed

21 at that point?

22 **A.   He was double cuffed.**

23 Q.   Do you know who cuffed him?

24 **A.   No, sir, I do not know.**

25 Q.   Did you ever see anyone try to single cuff

61

1  Daniel?

2  **A.   No, sir.**

3  Q.   When you had him under your custody about

4  three months earlier, do you recall if he was single

5  cuffed or double cuffed?

6  **A.   He probably was double cuffed, because I know**

7  **that -- that -- I knew he was -- he was a -- you could**

8  **tell he lifted weights, you know, he didn't get the --**

9  **get those biceps and shoulders from, you know, from**

10 **lifting -- lifting 12 ounces.  And I know that --**

11 **that -- I don't know whether I did, but I would put two**

12 **handcuffs on him so that -- so that his shoulders would**

13 **not be -- be pinching -- you know, pinching together**

14 **and he would be hurting and uncomfortable.**

15 Q.   Okay.

16       MR. GAGE:  Move to strike, nonresponsive.

17 Q.   (By Mr. Gage)  Do you happen to recall

18 specifically if three months previously Daniel was

19 single cuffed or double cuffed?

20 **A.   I'm almost 100 percent sure he was -- he was**

21 **double cuffed.**

22 Q.   Is that -- and what causes you to be almost

23 100 percent sure?

24 **A.   Well, I -- because I -- I can't -- you know,**

25 **time has passed and I can't say that -- that I remember**

62

1  seeing him, you know, just as vivid as you're sitting
2  there, I can't tell you that.  But -- but there's
3  something that's in -- you know, in my mind that says
4  yeah.
5      Q.   Did you know that Daniel had been accused of
6  punching a female officer that morning of March 8th,
7  2013?
8      A.   I did.
9      Q.   How did you learn about that?
10     A.   Hearing officers talk there in the -- in the
11  cell area or in the office.
12     Q.   This was before you took him to the jail.
13  Correct?
14     A.   Yes, sir.
15     Q.   Do you know if Flores was around at the time
16  of this conversation?
17     A.   I do not know.
18     Q.   Did -- was Romero there at the time that these
19  officers had mentioned that Daniel was accused of
20  punching a female officer in the face?
21     A.   He probably was, but, again, I can't tell you,
22  "Yeah, I remember him sitting there," you know, "We
23  were standing there talking together," or anything.
24     Q.   One of the reasons you feel that Romero was
25  probably present during this conversation is because

63

1  you guys were partners that day?
2      A.   Yes, that is correct.
3      Q.   So he would have been where you were at least
4  at the Pebble Hills regional center.  Correct?
5      A.   Yes, sir.
6          MR. ORTEGA:  Objection, calls for
7  speculation.
8          MR. JIM DARNELL:  Same objection.
9      Q.   (By Mr. Gage)  And you have a recollection of
10  being together with Romero at the Pebble Hills regional
11  center.  Correct?
12     A.   Yes, sir.
13     Q.   What do you recall, in as much detail as
14  possible, the officers saying regarding the allegation
15  that Daniel had punched a female officer in the face
16  earlier that day?
17     A.   Nothing.  That's all I can recall.
18     Q.   Did you ever learn that Flores volunteered to
19  transport Daniel from the Pebble Hills regional center
20  to jail?
21         MR. JIM DARNELL:  Object, assumes facts
22  not in evidence.
23     Q.   (By Mr. Gage)  Go ahead.
24     A.   No, sir, I did not know.
25     Q.   Did you speak with Flores at all regarding why

64

1  Daniel was arrested or being transported to jail?
2      A.   Not that I can recall.
3      Q.   Did Flores tell you anything about why Daniel
4  was arrested and taken to jail?
5      A.   Not that I can recall.
6      Q.   Do you recall the names of any of the officers
7  that you heard talking about Daniel being accused of
8  punching a female officer in the face while you were at
9  the regional -- Pebble Hills Regional Command Center?
10     A.   No, sir.
11     Q.   Did you go up the elevator with Daniel to the
12  second floor of the jail?
13     A.   Yes, sir.
14     Q.   When he was at the second floor, did you
15  observe Romero and Flores continue to drag Daniel to
16  the processing area?
17     A.   Well, I wish I -- again, I -- I wish I could
18  say that I -- that I could have a real independent
19  recollection, but chances are, yes, you know, that's
20  how they were moving him around.
21     Q.   Was he continuing to bleed from his head and
22  face area when he was getting dragged on the second
23  floor?
24     A.   Yes, sir.
25     Q.   Did you observe or learn that any trustees

65

1  mopped up the floor from the blood of Daniel's head and
2  face on the second floor as well?
3      A.   I don't remember, sir.
4      Q.   Did you see blood on the floor?
5      A.   I probably did, but I -- I can't -- I can't
6  tell you that, "Yeah, I remember seeing blood on the
7  floor."
8      Q.   Were you present when a female nurse was
9  speaking to Flores and Romero about the medical
10  condition of Daniel?
11     A.   I was present because I -- I -- I know I was
12  there, but I cannot tell you exactly what she said
13  other than -- than -- I remember they, the nurse -- if
14  there was one or two, I don't remember -- probably
15  said -- because they left with him -- that, you know,
16  "We can't accept him because -- because he's bleeding."
17     Q.   Did the nurse yell to get him out of there?
18     A.   Gee, I don't -- I can't remember that.
19     Q.   You don't remember that happening?
20     A.   I don't remember that.  No, sir.
21     Q.   What time did you arrive at the jail that day
22  with Daniel, approximately?
23     A.   I do not remember.
24     Q.   How much time passed, approximately, from the
25  time you arrived until you learned he had been shot?

66

1    A.   I could only estimate --

2    Q.   That's fine.

3    A.   -- because I don't -- I don't remember, you

4  know -- goodness.

5    Q.   Two hours?

6    A.   Oh, heavens no.  Maybe 25, you know, to 40 --

7  40 minutes maybe, 45 possibly.  I don't think it was

8  that long but...

9    Q.   When Daniel was taken to the nurse, did the

10 nurse do anything to provide medical treatment to

11 Daniel that you saw?

12   A.   Not that I saw, no, sir.

13   Q.   When the nurse refused to allow Daniel to be

14 booked that was because of the serious head injury he

15 had as you understood it.  Correct?

16   A.   Yes, sir.

17   Q.   What happened -- once that happened, what is

18 the next thing that you saw or heard happening?

19   A.   They were -- before they left there was a -- a

20 gentleman that worked at the jail.  He was -- he's an

21 African-American man, maybe late 50s there, tall,

22 slender.  I don't remember his name, whether Wilson,

23 Parks -- I just -- I didn't -- don't -- I don't

24 remember exactly what his name was, but as -- he walked

25 in there and his statement was, "Stay away from that

67

1  man, he's dangerous, he'll hurt you."  And he says,

2  "You-all stay away from him," and he left.

3    Q.   He laughed?

4    A.   He left.  He got out of the room.  And that

5  is -- that is the way that he did it.  And I'm going,

6  like, "Whoa, he -- he knows something that we don't

7  know."

8    Q.   Did you ask this man, "What do you mean by

9  that?"

10   A.   No, sir, he was -- if he would have come back

11 in there -- well, I didn't have time, but I certainly

12 would have liked to have asked him.

13   Q.   At any time did you hear the people in the

14 jail joking about Daniel being unconscious at all?

15   A.   No, sir.  No, sir.

16   Q.   Would that have concerned you if they were

17 making such statements?

18        MR. ORTEGA:  Objection, calls for

19 speculation.

20        MR. JIM DARNELL:  Same objection.

21   Q.   (By Mr. Gage)  Go ahead.

22   A.   Yes, if -- if -- if I would have thought that

23 he was -- he was unconscious, then, yeah, something

24 needed -- needed to be done real quick.

25   Q.   Why would that have concerned you?

68

1    A.   Well, because if somebody's unconscious, then

2  it must be something that's physically wrong.

3    Q.   The black male that you spoke of, was he

4  wearing glasses?

5    A.   I wish I could remember, but I do not

6  remember.

7    Q.   Do you remember anybody at the jail joking

8  about steroids not helping Daniel that day or words to

9  that effect?

10   A.   No, sir, I don't.

11   Q.   Did you learn of anyone giggling -- law

12 enforcement giggling about the fact that Daniel was

13 being dragged and -- or appeared to be unconscious?

14   A.   No, sir.

15   Q.   Would that concern you if law enforcement was

16 doing that?

17        MR. ORTEGA:  Objection, calls for

18 speculation.

19   A.   Well, it would have been unprofessional, of

20 course.

21   Q.   (By Mr. Gage)  I think one of the statements

22 was that there was a black male with glasses, a deputy,

23 who had recognized Daniel, he mentioned that Daniel was

24 using steroids and joked about steroids not helping him

25 that day.  That there were officers, including Trooper

69

1  Melvin Anthony Allick, who giggled about that.

2        Did you ever hear anything about that?

3    A.   No, sir.

4    Q.   What were you told you were supposed to do if

5  you were in a situation where you needed help or backup

6  since you didn't have a radio to call for help?

7        MR. ORTEGA:  Objection, form, lack of

8  foundation.

9        MR. GAGE:  I'm actually going to sustain

10 that objection and reask it.

11   Q.   (By Mr. Gage)  At G4S were you trained what

12 you should do in a situation if you needed assistance

13 and to call for backup not having a radio?

14        MR. ORTEGA:  Objection, form.

15   Q.   (By Mr. Gage)  Go ahead.

16   A.   Well, again, when you say trained, I cannot --

17 I can't remember everything that we were trained about.

18   Q.   Do you recall any training that you received

19 from G4S security as to what you were supposed to do if

20 you needed backup?

21        MR. ORTEGA:  Objection, form.

22   A.   Well, I cannot tell you that -- that --

23 that, "Yeah, I remember what this training manual said

24 that you're going to do this, you should do this."

25        Sir, as far as the training, I just -- I

70

1    can't come up with something that's -- that's
2    independent that I can remember.
3        Q.   (By Mr. Gage)  Did you receive any training on
4    how to handle an unruly or combative suspect when
5    worked for G4S security?
6                MR. ORTEGA:  Objection, form.
7        A.   I cannot tell you any specific training that
8    we received on handling prisoners because I don't
9    remember.
10       Q.   (By Mr. Gage)  Did Romero ever tell you that
11   he was aware of any training on how to handle combative
12   suspects?
13       A.   Not that I know of.
14       Q.   Were you ever taught by G4S security that if
15   you have a combative suspect, you should have some kind
16   of an action plan with your partner as to how to deal
17   with that situation if the suspect gets more unruly?
18                MR. ORTEGA:  Objection, form.
19       A.   I have no recollection of anything like that.
20       Q.   (By Mr. Gage)  When you worked for other law
21   enforcement agencies, were there times where you would
22   have a plan of attack, what to do in case things
23   started to go bad in a law enforcement setting?
24                MR. ORTEGA:  Objection, form.
25       A.   Again, I -- one particular training or -- or

71

1    memo or policy on what you did for something, I just --
2    I can't tell you, I just don't remember.
3        Q.   (By Mr. Gage)  Did you have briefings or roll
4    call when you worked for police agencies?
5        A.   At the PD we did.
6        Q.   As part of that roll call, were there times
7    where they would tell you, "This is a person that we're
8    concerned about," kind of like a -- a something-10
9    memo?  Well, withdraw.
10                Were you ever told, "Gee, we have this
11   person that's a suspect.  If you come into contact with
12   him, here's the plan of attack, here's what you should
13   do"?
14                MR. ORTEGA:  Objection, form.
15       A.   Not that I can remember, no, sir.
16       Q.   (By Mr. Gage)  Were you taught how you could
17   summon aid as a G4S security officer by anyone, if you
18   needed it?
19       A.   Well -- were we taught how to summons aid --
20       A.   Yes.
21       A.   -- if we needed -- if we needed -- if we
22   needed help?
23       Q.   Yeah.
24       A.   Well, you know, we -- you know, we did have a
25   police radio in the van, so if -- if we needed help,

72

1    then we would go through their communications center
2    and -- and tell them what we were up against, what we
3    needed.
4        Q.   So you had a police radio that would go
5    directly to the police department, then, as opposed to
6    G4S security if you needed backup.  Correct?
7        A.   Correct, yes, sir.
8        Q.   Was there any way for you to obtain backup
9    from G4S security if you needed it?
10       A.   No, sir.
11       Q.   Have you ever heard of situations before March
12   of 2013 where security guards escorting prisoners to
13   transport them to jail would need backup?
14       A.   No, sir, I have not.
15       Q.   What were you told were your duties when
16   transporting a prisoner for the El Paso Police
17   Department?
18       A.   Was to take them from the Pebble Hills
19   Regional Command Center to the El Paso County detention
20   facility.
21       Q.   How far away are those two facilities?
22       A.   Well, I would estimate that they're about 10
23   miles.
24       Q.   How long did it take you to drive on the day
25   of March 8th, 2013, from Pebble Hills to the jail?

73

1        A.   Well, on that day I couldn't tell you exactly
2    how long it took us to drive.
3        Q.   How about your best estimate.
4        A.   If traffic is flowing, 30 minutes, and if it's
5    at a standstill, it could be 45 minutes or longer.
6        Q.   So your best estimate, then, is that on
7    March 8th, 2013, it took you approximately 30 to 45
8    minutes to drive Mr. Saenz from the Pebble Hills to the
9    El Paso jail.  Correct?
10       A.   Yes, sir.
11       Q.   Did you have any knowledge as to why G4S would
12   work only at the Mission Valley Regional Command Center
13   and Pebble Hills Regional Command Centers for El Paso
14   PD?
15       A.   My understanding was it was a brand-new
16   contract, they were going to try it for a year, and if
17   it was a successful program, then it would -- they
18   would -- would hire more people and we would station
19   G4S people at the other three substations.
20       Q.   Did that happen, to your knowledge?
21       A.   Yes, it did.
22       Q.   So after this incident G4S continued to have a
23   contract with El Paso PD.  Correct?
24       A.   Yes, sir.
25       Q.   And then El Paso PD actually expanded so that

74

1 G4S now was at all five substations rather than just
2 two of them.  Is that correct?
3    **A.   That is correct, yes, sir.**
4        MR. JEEP DARNELL:  Just for the record,
5 I'm Jeep Darnell taking over for Jim Darnell by
6 agreement.
7        MR. GAGE:  Right.
8    Q.   (By Mr. Gage)  Did you get interviewed by
9 anyone after Daniel was shot and killed?
10    **A.   Yes, sir.**
11    Q.   Who interviewed you?
12    **A.   It was a detective downtown, police detective.**
13    Q.   Were you truthful and honest when you were
14 giving your testimony to that detective?
15    **A.   To the best of my knowledge, yes, sir.**
16    Q.   You wanted to make sure that you had all of
17 the information that was pertinent set forth in your
18 statement.  Correct?
19    **A.   Yes, sir.**
20    Q.   Were you tape recorded?
21    **A.   I don't think so.**
22    Q.   Was your statement typed out for you in some
23 fashion afterwards?
24    **A.   Yes, sir, I believe it was.**
25    Q.   Did you have a chance to read it and review it

75

1 for accuracy?
2    **A.   Yes, sir, I did.**
3    Q.   And you read it to make sure it was complete
4 as well.  True?
5    **A.   Yes, sir.**
6    Q.   Did you then sign it?
7    **A.   I probably did, yes, sir.**
8    Q.   And when you signed it, you affirmed that
9 everything you said in that statement was true and
10 accurate.  Right?
11    **A.   Yes, sir.**
12    Q.   In -- how many different statements did you
13 give to the police department to the best of your
14 recollection?
15    **A.   Only one.**
16    Q.   Did anyone from G4S interview you in addition
17 to the police department?
18    **A.   No, sir.**
19    Q.   Before you were interviewed on tape or at
20 least a formal interview, did you have discussions with
21 anyone from the police department about the incident?
22    **A.   Okay, now, say that again, please.**
23    Q.   I'll ask it a different way.  Was there any
24 information that you gave to the police department
25 orally that was not contained in your handwritten

76

1 statement that you signed that you can recall?
2    **A.   Not any information that -- that I am aware**
3 **of.**
4    Q.   Have you ever heard of the term Livescan?
5    **A.   Yes.**
6    Q.   What is that?
7    **A.   That is what -- what we do there in the cell**
8 **area is take the detainee's fingerprints.  You roll --**
9 **roll their fingers -- in the old days it was ink and**
10 **nowadays it's on a piece of glass and it leaves an**
11 **impression on some kind of a computer program that's in**
12 **the metal box, and then you roll their palm over --**
13 **over a wheel that's made of some hard substance and you**
14 **get a handprint.**
15    Q.   How did you man that Livescan system at the
16 jail?
17    **A.   By the two -- two of our people are assigned**
18 **to work in the cell area and two people were assigned**
19 **to work transport.  And then at -- at Mission Valley,**
20 **there's two people that work in the cell area also.**
21    Q.   Were those individuals that were working the
22 Livescan on March 8th, 2013, able to leave their post
23 and assist Flores and Romero in handling Mr. Saenz if
24 necessary?
25    **A.   No, sir.**

77

1    Q.   And why not?
2    **A.   Because they are -- they are assigned to work**
3 **in the cell area and take care of the prisoners in the**
4 **cell area.**
5    Q.   If there was some kind of emergency, are G4S
6 officers authorized to leave that post because of an
7 emergency situation?
8        MR. JEEP DARNELL:  Objection, calls for
9 speculation.
10        MR. ORTEGA:  Same objection.  And form.
11    **A.   I do not -- I do not think so.  Is it**
12 **possible, but is there something that -- that they can**
13 **do right now on it?  The answer would be no, that**
14 **they're assigned to do that.**
15    Q.   (By Mr. Gage)  Did you receive any training or
16 teaching as to what you should do as a G4S security
17 guard if you're working the prison or the jail, even
18 working Livescan, but there's some kind of an emergency
19 where your assistance could help to protect other law
20 enforcement officers?
21        MR. ORTEGA:  Objection, form.
22    **A.   A particular training, it's possible, sir.**
23 **But, again, on the -- on the training issues, I -- I**
24 **can't recall everything that we -- that we received**
25 **training on.**

78

1    Q.   (By Mr. Gage)  So is it a true statement that
2  as you sit here today, you cannot recall receiving any
3  training at any time from G4S security as to what to do
4  in the case of an emergency at the jail?
5    A.   No, that's not a true statement.
6    Q.   Okay.  What do you recall being told?
7    A.   The statement -- I -- the answer to your
8  question was I can't recall if we received any -- any
9  training, but it's -- it's likely that we -- we could
10  have received training, but I don't remember the
11  specific training that you're asking me to recall.
12    Q.   As you sit here today, you do not recall any
13  specific training that you received as to what to do in
14  an emergency from G4S security.  Is that correct?
15         MR. ORTEGA:  Objection, form.
16    A.   Okay.  Read it back again.
17    Q.   (By Mr. Gage)  Sure.
18         (The Court Reporter read back: As you
19          sit here today, you do not recall any
20          specific training you received as to what
21          to do --
22         THE COURT REPORTER:  I'm sorry.
23         THE WITNESS:  Patience, it's an
24  electronic device.
25         (Discussion off the stenographic record.)

79

1         (The Court Reporter read back:  As we
2          sit here today, you do not recall any
3          specific training you received as to what
4          to do in an emergency from G4S security.
5          Is that correct?)
6    A.   No.  Again, what you want me to say is that
7  we -- we did not receive any training.  And I'm telling
8  you we could have received training, it's possible, but
9  in your -- in what you're putting down there, you're
10  not -- you're not saying that, "It's possible that you
11  received the training, but you're not -- you don't
12  remember the training that you received.  Is that
13  right, Mr. Matthews?"
14         That's more correct.
15    Q.   (By Mr. Gage)  Anything is possible, but as
16  you sit here today, you don't know whether or not you
17  received training from G4S, at least you don't remember
18  any such training.
19    Q.   Now, there's a difference between I don't know
20  and I don't remember, don't you think?  It's kind of
21  like guessing and estimate.
22    Q.   Could be.
23    A.   Could be.
24    Q.   So you don't remember receiving any training
25  from G4S regarding what to do in the case of an

80

1  emergency at the jail.  Is that accurate?
2    A.   That's more correct, yes, sir.
3    Q.   All right.  What were your specific duties
4  regarding watching a prisoner, as you understood your
5  duties to be, when you worked for G4S?
6    A.   Making sure that -- that they were okay, that
7  they're sitting upright, that if -- if they needed
8  water, restroom break, then -- then we would take them
9  to the restroom, take them to the water fountain.  And
10  that was about -- about all, you know, all we could do.
11  That's all they needed back there in the cell area.
12    Q.   Were you given any instruction by G4S as far
13  as what your duties were if you were with a prisoner
14  who was struggling under your care?
15         MR. ORTEGA:  Objection, form.
16    A.   Well, struggling -- define struggling.
17    Q.   (By Mr. Gage)  Did they -- did G4S give you
18  any instructions on what to do if a prisoner was
19  resisting in any way when he or she was under your
20  care?
21         MR. ORTEGA:  Objection, form, vague.
22    A.   Again, probably in our training we -- we -- we
23  very likely could have received some training on what
24  to do with a prisoner that was -- that was being
25  difficult or unruly.  But do I remember exactly what we

81

1  were supposed to do?  No, sir, I cannot recall anything
2  in particular.  You've got to remember that's been, you
3  know, many -- what -- since '08.
4    Q.   (By Mr. Gage)  Did you receive any updates in
5  your training from G4S after 2008 on any topics that
6  you can recall?
7    A.   Not that I can recall.
8    Q.   When you've worked at other law enforcement
9  agencies, did you have a radio on your person, on your
10  body, that you could contact the dispatch or others on?
11    A.   We had access to one, but did I -- did I have
12  it on my -- on my person?  No, I did not.
13    Q.   So even when you worked for El Paso PD or as a
14  trooper?
15    A.   Well, El Paso PD, no.  This was -- when I
16  worked for El Paso PD, this is before walkie-talkies
17  were invented.
18    Q.   Or cell phones or computers.  Right?
19         I tell my children, "There once was a
20  time that cell phones and computers did not exist."
21         MR. JEEP DARNELL:  Objection, relevance.
22         MR. GAGE:  That probably won't get in
23  front of a jury, I imagine.
24    Q.   (By Mr. Gage)  As a trooper did you have a
25  radio with you?

82

1  **A.   I was assigned one, yes, sir.**

2  Q.   And the reason for having a radio at that

3  point was in part your safety --

4  **A.   Sure.**

5  Q.   -- if you needed assistance you could call for

6  help.  Right?

7  **A.   Uh-huh.**

8  Q.   Yes?

9  **A.   Yes, sir.  If they worked.**

10  Q.   And one of the reasons for having a police

11  radio on your body, also, you can call for a backup if

12  a prisoner was not cooperating.  True?

13  **A.   Yes, sir, correct.**

14  Q.   One of the reasons why --

15          MR. JEEP DARNELL:  Objection, form.

16  Q.   (By Mr. Gage)  -- you would want more backup

17  when you had a prisoner that was not cooperating was if

18  you had a number of officers, it would help you to

19  safely restrain an individual without needing to use,

20  say, deadly force.  Correct?

21          MR. ORTEGA:  Objection, form.

22          MR. JEEP DARNELL:  Objection, form.

23  **A.   Well, you're partly right there, but not --**

24  **not are you going to use deadly force on -- on somebody**

25  **that's just being disruptive.**

83

1  Q.   (By Mr. Gage)  Agreed.

2  **A.   Okay.**

3  Q.   But one of the reasons you want more backup is

4  actually having more officers present can help you to

5  gain control over a suspect who is resisting actually

6  easier and with less harm to that person than when just

7  one or two people are there.  Correct?

8          MR. JEEP DARNELL:  Objection, form.

9  **A.   Yes, that's possible.**

10  Q.   (By Mr. Gage)  And one of the reasons for that

11  is is if you only have one or two people, they can't

12  get the kind of control over the person the way a group

13  can.  Right?

14          MR. JEEP DARNELL:  Objection, form.

15          MR. ORTEGA:  Objection, form and calls

16  for speculation.

17  **A.   Yes, sir, you're -- you're -- you're partly**

18  **right there.**

19  Q.   (By Mr. Gage)  And what else would in your

20  mind help to avoid more serious injuries or force to a

21  suspect when there's a lot of officers there?

22          MR. ORTEGA:  Objection, form.

23  **A.   If -- with a lot of officers?  Well, I'm not**

24  **sure that I -- I understand the question.  I'll have to**

25  **ask you to repeat it.**

84

1  Q.   (By Mr. Gage)  Sure.  You've told us that

2  having more officers come for backup when there is a

3  suspect who's resisting can help for control of the

4  suspect in a safe manner.  Correct?

5  **A.   Hold it.  Now, I didn't tell you that.  That**

6  **was a question that you asked me.**

7  Q.   Right.

8  **A.   So now don't -- don't turn around and say that**

9  **I told you because you asked me the question --**

10  Q.   And you agreed with it.

11  **A.   -- and I answered it.  I didn't tell you.**

12  **Okay?**

13  Q.   So do more officers help you to gain control

14  of a suspect without needing to use deadly force based

15  on your experience?

16          MR. ORTEGA:  Objection -- excuse me,

17  sir -- objection, form, calls for speculation.

18          MR. JEEP DARNELL:  Same objections.

19  Q.   (By Mr. Gage)  Now you can answer.

20  **A.   Well, I -- I must agree with you somewhat, of**

21  **course.**

22  Q.   Okay.  Explain why you agree with me.

23  **A.   Well, because logic has it that -- that if you**

24  **have more -- more people to control somebody, then --**

25  **then it's going to be easier to control the person with**

85

1  **less likelihood of injury to the person, the subject**

2  **under arrest, or officers.**

3  Q.   Was it typical for you as a G4S officer to

4  report directly to the Pebble Hills regional center?

5  **A.   Yes, sir.**

6  Q.   On March 8th, 2013, did Daniel say that he was

7  using any drugs that day?

8  **A.   To the best of my recollection, no, he did not**

9  **say he was using drugs that day.**

10  Q.   Did Daniel say that he had used drugs the day

11  before on March 7th, 2013, when he spoke to you on

12  March 8th?

13  **A.   I don't think he made any statement to that**

14  **fact to me.**

15  Q.   Did you conduct any field sobriety tests on

16  Daniel on March 8th, 2013, to help form an opinion of

17  whether or not Daniel was under the influence of any

18  drugs that day?

19  **A.   No, sir, that is not my job.**

20  Q.   Did you observe anybody doing any field

21  sobriety tests on Daniel to see if he was under the

22  influence of drugs that day?

23  **A.   No, sir, I did not observe.**

24  Q.   Did you conduct any blood, breath or urine

25  tests on Daniel to see if he was under the influence of

86

1 drugs on March 8th, 2013?

2    **A.    No, sir, that was not my job.**

3    Q.    Did you see anyone else doing any blood,

4 breath or urine tests on Daniel that day to see if he

5 was under the influence?

6    **A.    I did not see anybody.**

7    Q.    Did anyone tell you that they had conducted

8 any blood, breath or urine tests on Daniel on that day?

9    **A.    Nobody volunteered the information nor did I**

10 **ask anybody.**

11    Q.    Has anyone ever told you that there were any

12 tests that showed that Daniel was under the influence

13 of drugs on March 8th, 2013?

14    **A.    No, sir.**

15    Q.    Have you ever seen someone with a crazy look

16 in their eyes?

17    **A.    Yes.**

18    Q.    What does a crazy look in one's eyes look like

19 to you?

20    **A.    Somebody who is obviously not in complete**

21 **control of their mental and physical faculties and**

22 **their eyes are -- are -- are big, wide open and glassy**

23 **looking and their language is obscene.**

24         **There was this other guy that was on**

25 **coke, he was -- he was scary.  He was scary.  I -- I --**

87

1 **I didn't want to even get up to the cell.  I never --**

2 **it was -- it was scary, that's all I can tell you.**

3    Q.    Who is that guy you're referring to?

4    **A.    I don't know.  Some guy they brought in.  I do**

5 **not know who he was.**

6    Q.    Obviously obscene language has nothing to do

7 with a crazy look in one's eyes because one's a look

8 and the other is a --

9    **A.    Well, yes, the language I guess is vocal.**

10    Q.    And then when people appear to have problems

11 with their mental or physical faculties, if they're

12 under your care as a law enforcement officer, were you

13 taught what you were supposed to do to help those

14 people?

15         MR. ORTEGA:  Objection, form.

16    Q.    (By Mr. Gage)  If anything.

17    **A.    I do not have an independent recollection of**

18 **any training that I received for that.**

19    Q.    Do you have an independent recollection of any

20 training G4S security ever gave to you for handling

21 individuals with any kind of mental or physical

22 capacity problems?

23    **A.    No, sir, I do not.**

24    Q.    Did you ever see Daniel urinate on himself in

25 the cell on March 8th, 2013, or actually at any time?

88

1    **A.    Not that I can remember.**

2    Q.    In the cell that Daniel was in, there was a

3 bench.  Correct?

4    **A.    Yes, sir.**

5    Q.    And that bench had a metal circular ring that

6 you could attach handcuffs to.  Correct?

7    **A.    I don't know if it's in the bench or if**

8 **it's -- if it's -- if it's on the wall.**

9    Q.    I'll show you some photographs we marked

10 previously.  This is Exhibit 61.

11         You'll see there's a -- it looks like a

12 bench, then there's a metal circle with handcuffs

13 attached to it.  Do you see that?

14    **A.    I do, sir.**

15    Q.    The cell that Daniel was in on March 8th,

16 2013, did it have that setup with the circle and

17 handcuffs?

18    **A.    You're saying it did not?**

19    Q.    Did it have that?

20    **A.    Oh.  I do not remember.**

21    Q.    All right.  Do you know if Daniel was

22 handcuffed to that metal circular object attached to

23 the bar?

24    **A.    I do not remember that.**

25    Q.    I'll show you photograph Exhibit 60.

89

1         Is that a fair and accurate

2 representation of the way the cells looked at the

3 Pebble Hills facility to your recollection?

4    **A.    Yes, sir, to the best of my recollection it**

5 **is.**

6    Q.    Exhibit 62.

7         Is this a fair and accurate recollection

8 [sic] of the way the bench looked at Pebble Hills in

9 March of 2013?

10    **A.    Well, I don't know because I don't remember if**

11 **they were all that -- that type of grated metal or**

12 **whether they were solid steel metal.  I don't remember.**

13    Q.    Exhibit 63.

14         Is this a fair and accurate

15 representation of the way the Pebble Hills Regional

16 Command Center looked in 2013?

17    **A.    Yes, sir, very likely.**

18    Q.    Okay.  If I may borrow that for a moment.

19         There is it looks like a video camera in

20 the left top corner of Exhibit 63 and there's also a

21 circular item on the ceiling.

22         First, do you know where that video

23 camera would take videos of?

24    **A.    No, sir, I do not know.**

25    Q.    Do you know if the circular object also would

90

1 be able to take video pictures of the regional command
2 center?
3    A.   I do not know, sir.
4    Q.   Do you know whether or not there are any video
5 cameras showing Daniel when he was in the cell at the
6 regional command center?
7    A.   I do not know that.
8    Q.   Looking at Exhibit 64, is this a fair and
9 accurate representation of those cells at the regional
10 command center, cell numbers 2, 3, 4, 5 and 6?
11    A.   I'm trying to remember what the -- exactly
12 what that cell area looked like.  But -- but, yes, it's
13 very likely that that -- that could be -- it could be
14 it or it could be similar to -- to what is there.
15    Q.   Okay.  Great.  I'll take all those back from
16 you, please.
17           Do you recall if Daniel was cuffed to
18 that circular item in his cell or not?
19    A.   No, sir, I do not recall.
20    Q.   Would it be possible for Daniel to lay on the
21 floor if he was cuffed to that circle in the
22 photographs?
23           MR. ORTEGA:  Objection, calls for
24 speculation.
25    A.   Gee, I -- possible?  Yes.  Possible, yes.

91

1    Q.   (By Mr. Gage) How would that happen?  How
2 could he do that with his arms behind his back?
3    A.   It all depends on -- on -- how -- how he can
4 move his muscles and his arms.  You know -- you know,
5 there's a lot of things that are possible.
6    Q.   Were you ever in fear for your life or safety
7 at any time that you were with Daniel Saenz on
8 March 8th, 2013?
9    A.   In fear?  No, sir.
10    Q.   At any time that you've been around
11 Daniel Saenz, were you ever in fear for your health or
12 safety or well-being from him?
13    A.   No, sir, but I knew that I would not turn my
14 back on him.
15    Q.   You would not turn your back on any prisoners,
16 would you?
17    A.   Well, there's -- you know -- you know what I
18 mean.  Do you know what I mean?  Well, I shouldn't have
19 said that, I guess.  Sorry.
20    Q.   I've learned long ago I don't speculate on
21 what a witness means.  But be that as it may, did you
22 ever observe Daniel doing anything on March 8th, 2013,
23 that in your opinion justified using deadly force on
24 him?
25           MR. ORTEGA:  Objection, calls for a legal

92

1 conclusion and speculation.
2           MR. JEEP DARNELL:  Same objections.
3    A.   Did I ever see anything that Daniel Saenz did.
4 No, sir, I did not.
5    Q.   (By Mr. Gage)  Did he ever do anything to the
6 pocket of your shirt?
7    A.   Daniel was standing to my left -- and I don't
8 remember if we were outside or inside.  I always carry
9 my gun on my right side, I'm right-handed, and you
10 always keep your weapon away from anybody that -- that
11 you're with.  And he came up and -- I don't remember if
12 he bit the -- my -- my collar or the -- the flap over
13 my -- my shirt pocket and that -- that kind of -- I
14 mean it didn't -- it didn't startle me because -- but
15 it kind of caught me by surprise and I thought to
16 myself, "Well, wait a minute, maybe -- maybe he's not
17 near as -- as incoherent and out of it as -- as I first
18 thought."
19           And I -- and I questioned -- I just
20 questioned to myself.  Okay?  That's all I can say
21 about that.
22    Q.   How did you get him away from your collar or
23 shirt pocket?
24    A.   He just let go of it.  I didn't need to push
25 him away or -- or anything.

93

1    Q.   How many people do you recall helping you to
2 bring Daniel to the van?  Was it just you yourself or
3 were others involved?
4    A.   I can remember Officer Flores.  I couldn't
5 tell you whether Romero was there or I couldn't tell
6 you if there was other -- other officers there.
7    Q.   If you felt that you needed backup in
8 transporting Daniel to the jail, were you told who you
9 could go to for that backup when you worked at G4S?
10    A.   No, sir.
11    Q.   Did you have an understanding of what you
12 should do or would do if you were transporting a
13 prisoner for G4S and you needed some kind of backup?
14    A.   Okay.  Did I have an understanding?
15    Q.   Yes.
16    A.   What do you mean by understanding?
17    Q.   Well, what would you do if you needed backup
18 for a prisoner when you were working with G4S?
19    A.   I would -- would have called on the -- on the
20 police radio where I was and that I needed assistance.
21    Q.   That would be to El Paso PD.  Correct?
22    A.   Yes, sir.
23    Q.   Would it be common for the El Paso police
24 officers to follow you in a marked black and white
25 vehi- -- car when you were transporting a prisoner to

94

1  the jail?

2     A.  Would it be usual?

3     Q.  Yes.

4     A.  Yes.

5     Q.  At first you transported a prisoner by the
6  name of Kevin Johnson from the other facility to
7  Pebble Hills.  Do you recall doing that?

8     A.  No, sir.

9     Q.  Was there any officer with you when you were
10  transporting the other prisoner to the Pebble Hills
11  facility?

12     A.  No, sir.

13           MR. GAGE:  Let's go off record, take
14  another break.

15           THE VIDEOGRAPHER:  We're off the record,
16  4:33 p.m.

17           (A recess was had.)

18           (Discussion on the stenographic record

19           only.)

20           MR. GAGE:  We had a conversation off the
21  record.  Jeep may be delayed tomorrow, but we all are
22  expecting the need to leave by 4:30 to catch an
23  airplane to Austin for depos there on Wednesday in this
24  case.  Because of the fact that Jeep might not be here
25  at 9:00 a.m. due to a court appearance, this is what we

95

1  agreed to do.  We will proceed with the deposition in
2  the morning without him.  His rights, however, to
3  object later to the form of the question are being
4  preserved until he arrives in the deposition.

5           Is that accurate?

6           MR. ORTEGA:  I have no problem with that.

7           MR. JEEP DARNELL:  I have no problem with
8  that.

9           MR. GAGE:  All right.  Now we'll go back
10  on to the audiotaped record and try to get done with
11  this within less than an hour.

12           THE VIDEOGRAPHER:  We're back on the
13  record, 4:43 p.m.

14     Q.  (By Mr. Gage)  Do you know a Corporal
15  Covington?

16     A.  No, sir, I do not.

17     Q.  Do you know a Nurse Rosales?

18     A.  No, sir, I do not.

19     Q.  Did you ever hear the nurse indicate that the
20  jail could not accept Daniel because he was bleeding
21  too profusely or words to that effect?

22     A.  I'm trying to think who -- I -- I don't
23  remember what nurse or nurses were there, I couldn't
24  tell you if there was one or two.  And -- and I can't
25  tell you that yes, I heard the nurse say -- say that,

96

1     "No, we're not going to -- to accept him."

2     Q.  Do you know a Nurse Magdaleno,
3  M-A-G-D-A-L-E-N-O?

4     A.  No, sir, I do not.

5     Q.  Did you hear any nurse yelling "We," meaning
6  the jail, "are not going to accept him, a prisoner like
7  that, call EMS," or words to that effect?

8     A.  An independent recollection of it, no, sir, I
9  do not have.

10     Q.  Do you know if anyone called EMS from upstairs
11  in the jail for emergency medical services to be
12  provided to Daniel when he was bleeding?

13     A.  No, sir, I do not.

14     Q.  Do you know why Flores and Romero took Daniel
15  back downstairs after he was rejected from the jail?
16  Did anyone ever tell you why?

17           MR. JEEP DARNELL:  Objection, form.

18     A.  Well, I -- I -- I can only tell you what I
19  suspect.

20     Q.  (By Mr. Gage)  All right.  You can tell us
21  what you suspect, then I'll ask you the basis of that
22  suspicion.  But tell us your suspicion first, I guess.

23           MR. ORTEGA:  Mr. Matthews, testify as to
24  what you have personal knowledge of.

25           THE WITNESS:  Oh.

97

1     Q.  (By Mr. Gage)  But I can ask you what you
2  suspect and then find out what's the basis of it.
3  That's appropriate.

4     A.  I do not have personal knowledge, sir.

5     Q.  Okay.  Do you have a personal suspicion?

6           MR. JEEP DARNELL:  Objection, calls for
7  speculation.

8           MR. ORTEGA:  Same objection.

9     A.  To call EMS.

10     Q.  (By Mr. Gage)  Yes.

11     A.  That's -- that's -- that's probably why they
12  took him down was to call EMS.

13     Q.  Could you call EMS from the jail itself?

14     A.  I do not know.

15     Q.  Did you help to escort Daniel in the jail at
16  all?

17     A.  No, sir, I do not think so.

18     Q.  Did Flores or Romero ask you for assistance at
19  the jail at all?

20     A.  No, sir, not that I can recollect.

21     Q.  Did you talk to Romero about the incident
22  after the shooting happened?

23     A.  I do not have an independent recollection of
24  us talking about it, so I can only say I don't recall.

25     Q.  Did you stay with Mr. Johnson at all points

98

1  that you were outside between the time the van came to
2  the jail until you entered the jail?
3     **A.   Did I stay with him?**
4     Q.   Yes.
5     **A.   Well, I probably stayed with -- close to him,**
6  **but it's very likely that -- because he was a slow**
7  **walker -- that I asked him to -- to walk on down the**
8  **sidewalk while I gathered up their personal belongings**
9  **that we -- that we carry.  Excuse me.  So was he right**
10 **beside me?  I do not know.**
11    Q.   Did you ever leave Mr. Johnson alone to give
12 any assistance to Flores or Romero at any time?
13    **A.   No, sir.**
14    Q.   And that is to give assistance with respect to
15 Mr. Daniel Saenz you understood --
16    **A.   Yeah.**
17    Q.   Let me reask the question.
18    **A.   Okay.**
19    Q.   Did you ever leave your prisoner, Mr. Johnson,
20 to give assistance to Romero or Flores with regards to
21 Daniel Saenz?
22    **A.   Not that I can remember.**
23    Q.   You don't remember doing that, in other words.
24    **A.   No, sir, I do not.**
25    Q.   If you saw that Flores and Romero needed

99

1  assistance in controlling Daniel Saenz, would you have
2  left your prisoner to aid them?
3     **A.   Yes, sir.**
4     Q.   Was there anything that blocked your view of
5  what was going on between Daniel, Romero and Flores
6  while they were outside at any time?
7     **A.   Well, it -- it could be that they got to the**
8  **ramp before I got over there with the -- with the**
9  **gentleman that I was escorting.**
10    Q.   But you were there 15 to 20 feet behind them
11 at all times going down the ramp to the jail.  Correct?
12    **A.   Well, but not -- yes, unless they made the**
13 **turn before we got to the -- to the corner to make the**
14 **turn to go down the ramp.**
15    Q.   I'm showing you what's been marked as
16 Exhibit 66.
17         Is that a fair and accurate
18 representation of the ramp going to the jail?
19    **A.   Yes, sir, except I do not see the -- the**
20 **pass-through door -- the people door, that's over on**
21 **the right.**
22    Q.   That would be to the right of the smaller --
23    **A.   The single --**
24    Q.   That would be to the right of the smaller
25 garage area.  Correct?

100

1     **A.   Yes, sir.**
2     Q.   The bigger one looks like it has a bus in it
3  and then there's a smaller one and to the right of that
4  is where the door is.  Correct?
5     **A.   Yes, sir.**
6     Q.   And where was your car parked -- the van
7  parked when you took them in to the jail?  Do you see
8  that in the picture?
9     **A.   No, sir, I do not see it in the picture.**
10    Q.   I'll show you Exhibit 65.  Do you see it in
11 that area where your car was parked?
12    **A.   No, sir.**
13    Q.   All right.  Can you describe for us where the
14 car was parked in relation to Exhibit 65.
15    **A.   This is -- this is Campbell Street right here.**
16 **Down this -- facing -- facing -- facing the -- this**
17 **jail, those doors facing it, to your right would be**
18 **south -- what I would call south and -- and the jail is**
19 **on a whole city block of -- of -- there within the city**
20 **of El Paso in El Paso County.**
21         **So the next street over is Overland**
22 **street and -- and it would be on -- on -- on Campbell**
23 **Street, but I couldn't tell you how far from Overland**
24 **street -- I do not remember how far from Overland**
25 **street towards -- towards this wall, because this is a**

101

1  **wall that goes down to the ramp.**
2     Q.   Okay.  The wall on the right side of
3  Exhibit 65, it looks like it has windows or something
4  near the top part of it.  Correct?
5     **A.   Well, it's -- that's just a decoration barrier**
6  **concrete that's -- that's up above -- up above this.**
7     Q.   How far away from the smaller garage door that
8  we see here in Exhibit 65 were you parked,
9  approximately?
10    **A.   How far away from it?**
11    Q.   Yes.
12    **A.   I don't even know.**
13    Q.   20 feet?  30 feet?
14    **A.   No, much more than that, because I -- I**
15 **couldn't even estimate how -- how many feet of this**
16 **ramp is to -- to Campbell Street or to the sidewalk, I**
17 **wouldn't even begun to even estimate that.**
18    Q.   If Daniel was extremely combative and violent,
19 did you have the opportunity to park the van all the
20 way down that ramp closer to the entrance of the jail
21 rather than having him walk for a long distance where
22 he might be able to escape and get into the community?
23    **A.   Prior to -- arriving at the jail then,**
24 **Daniel was cooperative.**
25    Q.   So there was no need for you to go closer

102

1  because Daniel was cooperative at all times until you
2  arrived at the jail.  Correct?
3      **A.   Yes, sir.**
4          MR. JEEP DARNELL:  Objection --
5      Q.  (By Mr. Gage)  If he had not been cooperative,
6  then you had the ability to park closer to the jail.
7  True?
8          MR. JEEP DARNELL:  Real quick, let me
9  finish my objection to the last one.
10  Assumes facts not in evidence.
11      Q.  (By Mr. Gage)  Go ahead.
12          MR. ORTEGA:  Do you recall the question?
13          THE WITNESS:  Yes.
14      **A.   Do I have the ability to park closer.**
15      Q.  (By Mr. Gage)  Right.
16      **A.   On that particular day, I don't remember how**
17  **far we were from -- parked.  But if there is -- if**
18  **there is -- my goodness -- if -- if -- if there is one**
19  **or two or three other vehicles parked ahead of you up**
20  **closer, then -- then you're not -- you're not going to**
21  **get any closer, you're not going to get close to -- to**
22  **the ramp down there.**
23      Q.  Did Daniel ever refuse to get into the van at
24  the -- before going to the jail when you were at the
25  regional center, Pebble Hills?

103

1      **A.   I don't think he refused to.**
2      Q.  Did you -- do you recall ever physically
3  removing Daniel to the seating area of the van with him
4  resisting that when you were at the regional center?
5      **A.   Now, say that again, sir.**
6      Q.  Was there a time that you can recall that you
7  had to physically move Daniel to a seating area in the
8  van that he was resisting before you ever left for the
9  jail that you can recall?
10      **A.   Again, I -- I do not have a real good**
11  **recollection of having to do that.**
12      Q.  Okay.  Did Daniel bang his head on the wall a
13  few times of the van as you were driving the car?
14      **A.   I do remember him banging his head.**
15      Q.  Did it seem hard to you?
16      **A.   No, not -- not hard hard.**
17      Q.  If Daniel had been banging his head hard, then
18  you would have wanted to stop to protect his
19  well-being.  Correct?
20      **A.   Yes, sir.**
21      Q.  When you arrived at the jail, did you park on
22  Campbell facing northbound?
23      **A.   Yes, sir.**
24      Q.  Where was Officer Flores parked?
25      **A.   I'm not real sure.**

104

1      Q.  When you got to the jail, who was removed
2  first from the van, was it Daniel or the other
3  prisoner.
4      **A.   I do not remember exactly who was removed**
5  **first.**
6      Q.  Did you then all five, that is Romero, Flores,
7  Daniel, the other prisoner, Mr. Johnson, and yourself
8  walk towards the ramp that leads to the jail?
9          MR. JEEP DARNELL:  Objection, form.
10      **A.   Yes, sir.**
11      Q.  (By Mr. Gage)  The -- Johnson, Romero and
12  Flores were in front of you about 15 feet ahead, is
13  that correct, during that walk?
14      **A.   Approximately, yes, sir.**
15      Q.  And you were looking in their direction the
16  entire time as you were walking down the ramp.
17  Correct?
18      **A.   Yes, sir.**
19      Q.  But you were unable to see how Daniel ended up
20  on the ground.  True?
21      **A.   That is correct.**
22      Q.  Did you then go ahead of Johnson and hold the
23  door open for Officer Flores?
24      **A.   I don't remember.**
25      Q.  At that point did you hear Daniel screaming at

105

1  all?
2      **A.   I don't remember.**
3      Q.  You don't remember him doing that?
4      **A.   I don't remember him screaming.**
5      Q.  Okay.  And you don't remember any jailers
6  coming to assist, do you?
7      **A.   No, sir.**
8      Q.  Did you see Flores and Romero having to
9  physically bring Daniel to his feet and take him inside
10  of the door of the jail that had bars?
11      **A.   Yes, sir.**
12      Q.  And that's because at that point Daniel had a
13  head injury and had fallen to the ground in some
14  fashion.  Is that correct?
15      **A.   No, sir, that's not correct.**
16      Q.  Okay.  Did you see if he had any injury at the
17  time that he was on the ground?
18      **A.   I did not see any injuries at that time.**
19      Q.  You don't have any knowledge that Daniel had
20  cocaine addiction, do you?
21      **A.   Yes, I do.**
22      Q.  Okay.  Did you ever see him taking cocaine?
23      **A.   No, sir.**
24      Q.  Did you -- do you know how he ingested it,
25  whether he would -- I don't even know how you take

106

1  cocaine, but snort it or shoot it or whatever they do?

2      A.   No, I do not know.

3      Q.   Do you know the quantity of any cocaine that

4  he used if he ever used it?

5      A.   He told me -- whenever he was a prisoner when

6  he was brought in two or three months before, he told

7  me that -- that he was a cocaine user.

8      Q.   Did he say if he used it once, 10 times or

9  more?

10     A.   Well, it seemed he -- he told me that he

11  usually does three lines a day.

12     Q.   Did he tell you how he would obtain that

13  cocaine?

14     A.   No, sir.

15     Q.   Do you know what three lines a day even means?

16     A.   No, I do not know.

17     Q.   All right.  Is three lines a day a lot or a

18  little?  Do you know?

19     A.   I do not know.

20     Q.   Do you know if three lines a day means you're

21  an addict as opposed to just some kind of a user of

22  cocaine?

23     A.   I do not know.

24     Q.   Do you know the purity of the cocaine, whether

25  it was a pure cocaine or laced or -- with baking soda?

107

1      A.   I do not know.

2           MR. GAGE:  What's our next number, 68?

3           (Exhibit marked, No. 68.).

4      Q.   (By Mr. Gage)  I'll show you a document we'll

5  mark as Exhibit 68.

6           Looking at the third page of this

7  document, is that your signature below the statement,

8  "I have read the above statement and find it to be true

9  and correct to the best of my knowledge"?

10     A.   Yes, sir, that is my -- my signature.

11     Q.   And is that a true statement that you read

12  this statement and found it to be true and correct to

13  the best of your knowledge when you read it and signed

14  it?

15     A.   Yes, sir.

16     Q.   And you signed it on March 9th, 2013?

17     A.   Yes, sir.

18     Q.   It was under penalty of perjury at that point

19  as you understood it.  Correct?

20     A.   I did.

21     Q.   You made sure everything in this was true,

22  accurate and complete before you read it.  Correct?

23     A.   To the best of my knowledge, yes.

24           MR. JEEP DARNELL:  68, right?

25           MR. GAGE:  I have no other questions at

108

1  this point.

2           Do you gentlemen have any?

3                    EXAMINATION

4  BY MR. ORTEGA:

5      Q.   Mr. Matthews, you were asked earlier by

6  Mr. Gage if you could have radioed police for backup.

7  Do you recall that question?

8      A.   I do, sir.

9      Q.   Do you recall what your testimony was in

10  answering that question?

11     A.   Not word for word, but probably something like

12  I -- I couldn't -- I couldn't call for backup.

13     Q.   Why is that?

14     A.   Well, now, the -- the -- the radio that we

15  had -- that we have in the van is a fixed -- fixed

16  radio, so it's -- it's installed in the -- in the van.

17     Q.   If you were inside the jail on March 8th,

18  2013, with Daniel Saenz and you needed to call for

19  backup to call police, would you have been able to do

20  so?

21     A.   Not -- not by radio.  I would have to have

22  used a telephone.

23           MR. GAGE:  Was there a phone there?

24           MR. ORTEGA:  I'm sorry.

25           MR. GAGE:  You're right.

109

1           MR. ORTEGA:  This is not your time to ask

2  questions.

3           MR. GAGE:  You're right.

4      Q.   (By Mr. Ortega)  You were also asked by

5  Mr. Gage if Daniel Saenz was uncooperative or resisted

6  as you were trying to get him inside the van at

7  Pebble Hills Regional Command Center.  Do you recall

8  that?

9      A.   Yes, sir.

10     Q.   Do you recall what your answer was in response

11  to that question?

12     A.   No, sir, I don't.

13     Q.   My understanding was that you testified that

14  Daniel Saenz did not resist as you were trying to load

15  him inside the van at the Pebble Hills Regional Command

16  Center.

17           MR. GAGE:  Objection.  The testimony is

18  the testimony and that's the best evidence.  Object to

19  the form of the question.

20           You can answer.  I don't think it's a

21  question yet, but go ahead.

22     Q.   (By Mr. Ortega)  Is that your recollection in

23  terms of what you testified?

24           MR. GAGE:  Same objection.

25     A.   I'm -- I'm sorry, I -- I don't -- you want --

110

1          MR. GAGE:  Also vague and ambiguous.

2     Q.  (By Mr. Ortega)  Let me -- let me rephrase.

3          Was Daniel Saenz resisting as you were

4 trying to load him inside the van at the Pebble Hills

5 Regional Command Center?

6     **A.  I do not think so.**

7     Q.  Now, let me show you what has been previously

8 marked as Exhibit 68.

9     **A.  Uh-huh.**

10    Q.  That is the statement that you provided to

11 Detective Flores on March 8th, 2013.  Is that correct?

12    **A.  Yes.**

13         **Yes, sir.**

14    Q.  Let me direct your attention, sir, to page 2

15 of that statement, the very first paragraph.

16         Are you there?

17    **A.  Page 2.**

18    Q.  Yes, sir.

19    **A.  First paragraph.**

20    Q.  The first full paragraph.

21    **A.  Okay.**

22    Q.  In the middle of that paragraph it states:

23 They were at the back of the van trying to get Daniel

24 to take a seat inside the van.  Daniel refused to get

25 into the van.

111

1          Did I read that correctly?

2     **A.  You did.**

3     Q.  You go on to say:  I escorted Daniel to this

4 area of the van and he willingly complied, but he still

5 refused to get in.  We physically moved Daniel to the

6 seating area of the van and he resisted.

7          Did I read that accurately?

8     **A.  You did.**

9     Q.  Does that help refresh your recollection?

10    **A.  Yes, sir.  If -- if I wrote it in this, then**

11 **that's what occurred.**

12         MR. ORTEGA:  Pass the witness.

13              FURTHER EXAMINATION

14 BY MR. GAGE:

15    Q.  You said if you wrote it in that, that's what

16 occurred, but you also testified today under penalty of

17 perjury, correct, as to what occurred?

18    **A.  Then you can perjure me, yes, sir.**

19    Q.  So how did he resist, do you recall?

20    **A.  No, sir.  Probably --**

21    Q.  If you don't recall, then I don't want you to

22 speculate.

23    **A.  Okay.  All right.  Then I don't recall.**

24         MR. GAGE:  I have nothing else.

25    Q.  (By Mr. Gage)  Oh, did you have a cell phone

112

1 with you that day?

2     **A.  Yes.**

3     Q.  So if you needed to call the -- for backup,

4 you could have called 911 or whatever from your cell

5 phone.  Correct?

6     **A.  Yes.**

7     Q.  And there was also a phone in the jail.

8 Correct?

9     **A.  Yes, sir.**

10    Q.  You could have also asked anybody in the jail

11 that had a radio to call for a backup.  Right?

12    **A.  Well, the -- the -- if there was another PD**

13 **officer in there, yes, sir.**

14    Q.  You could have called for backup from any law

15 enforcement officers that were in the jail, they could

16 still assist you.  True?

17    **A.  Probably.**

18         MR. JEEP DARNELL:  I'm going to object.

19 It calls for speculation because he was at the

20 sheriff's department.

21         MR. ORTEGA:  Same objection.

22    Q.  (By Mr. Gage)  There were other law

23 enforcement officers you saw in the jail, many of them.

24 Correct?

25    **A.  Well, the only one that I -- that I can**

113

1 **remember is the trooper that was up there.  And I don't**

2 **know when -- when he was there.  I don't remember if he**

3 **was there when we got there or arrived later.**

4     Q.  Certainly if you saw anybody else in the jail

5 that was a law enforcement, if you were in need of

6 assistance for some unruly prisoner, you would have

7 asked for assistance.  Correct?

8     **A.  Yes, sir.**

9         MR. ORTEGA:  Objection, form, vague,

10 calls for speculation.

11         MR. JEEP DARNELL:  Same objections.

12    Q.  (By Mr. Gage)  The jail also -- the jail also

13 has a number of prison guards that are stationed there

14 at all times to watch the different prisoners.

15 Correct?

16    **A.  Yes, sir.**

17    Q.  So you had the opportunity, if necessary -- if

18 it was some kind of a real emergency, you thought

19 someone's life was in danger, for example, you could

20 have gone to one of the guards and said, "Hey, there's

21 this emergency.  Call for help."  Right?

22         MR. JEEP DARNELL:  Objection, form.

23         MR. ORTEGA:  Objection, form, vague,

24 calls for speculation.

25         MR. JEEP DARNELL:  Same objections.



114

1   **A.   Yes, sir.**

2          MR. GAGE:  I have no other questions at

3   this point.

4          Thank you very much.  It was nice meeting

5   you.

6          MR. ORTEGA:  No further questions.

7          MR. JEEP DARNELL:  We'll reserve for

8   trial.

9          THE VIDEOGRAPHER:  This deposition is

10  concluded at 5:11 p.m.

11          (Deposition concluded.)

12
13
14
15
16
17
18
19
20
21
22
23
24
25

116

1                    CERTIFICATION

2

3      I, the officer before whom the foregoing

4   deposition was taken, do hereby certify that I

5   personally recorded the testimony of the witness whose

6   testimony appears in the foregoing deposition; that

7   said deposition is a true record of the testimony given

8   by said witness; that I am neither attorney for,

9   related to, nor employed by any of the parties to the

10  action in which this deposition is taken, and that I am

11  not a relative or employee of any attorney employed by

12  the parties hereto, or financially interested in the

13  action.

14
15
16
                        Teri C. Finnegan

17                      Certificate No. 2911

                        Expires: 12-31-2017

18                      Firm No. 1

19
20
21
22
23
24
25

115

1                CHANGES AND SIGNATURE

2   PAGE  LINE   CHANGE              REASON FOR CHANGE

3
4
5
6
7
8
9
10
11
12
13
14
15      I, JAMES MATTHEWS, have read the foregoing

16  deposition and hereby affix my signature that same is

17  true and correct, except as noted herein.

18
19          _____

                    JAMES MATTHEWS

20
        SUBSCRIBED AND SWORN TO before me this the

21  _____ day of _____, 2017.

22
                        SEAL:

23
    _____

24  NOTARY PUBLIC

    EXPIRES:_____

25

| 0 |
| --- |

**0.10** 16:17

**00812** 3:13

**08** 81:3

| 1 |
| --- |

**1** 116:18

**1:46** 1:17 4:3

**1:49** 7:14

**1:52** 7:17

**10** 21:15 52:19 53:24
  72:22 106:8

**10:30** 11:4

**100** 8:23 12:8 51:19
  61:20,23

**107** 3:12

**108** 3:5

**109** 1:17 2:7

**1100** 2:11

**111** 3:6

**115** 3:8

**116** 3:9

**12** 47:2 52:19 53:25
  61:10

**12-31-2017** 116:17

**12th** 2:7

**13** 3:18

**14-CV-244PRM** 1:8

**15** 13:18 21:20 47:2
  54:22 99:10 104:12

**17** 21:20 54:22

**1975** 14:22 30:3

**1980** 14:23

**1981** 13:3 14:24

| 2 |
| --- |

**2** 90:10 110:14,17

**2:17** 24:1

**2:24** 24:4

**20** 99:10 101:13

**2002** 13:4,23 14:10

**2004** 14:13

**2005** 12:7 14:14

**2008** 11:19 12:9 81:5

**201** 2:11

**2013** 3:12 17:4,16
  33:11,24 37:10
  59:10,23 62:7
  72:12,25 73:7 76:22
  85:6,11,16 86:1,13
  87:25 88:16 89:9,16
  91:8,22 107:16
  108:18 110:11

**2015** 12:16

**2017** 1:16 4:2 115:21

**212** 2:15

**22** 3:17

**23** 3:18

**23002** 2:4

**25** 66:6

**2911** 116:17

| 3 |
| --- |

**3** 90:10

**3:13** 55:21

**3:28** 55:24

**30** 73:4,7 101:13

**30-something** 4:14

**310** 2:15

**35** 4:15 31:22 32:2
  34:13,24

**35-year** 35:5 59:2

| 4 |
| --- |

**4** 3:4 12:7 90:10

**4:30** 94:22

**4:33** 94:16

**4:43** 95:13

**40** 66:6,7

**45** 66:7 73:5,7

| 5 |
| --- |

**5** 90:10

**5:11** 1:17 114:10

**50** 53:25

**50s** 66:21

**55** 15:19

| 6 |
| --- |

**6** 90:10

**60** 53:25 88:25

**60s** 37:21

**61** 88:10

**62** 89:6

**63** 89:13,20

**64** 12:19 90:8

**65** 100:10,14 101:3,8

**66** 99:16

**68** 3:12 107:2,3,5,24
  110:8

| 7 |
| --- |

**700** 1:18

**70s** 36:12,20

**79901** 1:18 2:7,12,16

**7th** 85:11

| 8 |
| --- |

**8** 3:12

**814** 3:13

**85** 25:3

**8th** 33:11,24 37:10
  62:6 72:25 73:7
  76:22 85:6,12,16
  86:1,13 87:25 88:15
  91:8,22 108:17

110:11

---
**9**

**9** 1:16 3:17

**9:00** 94:25

**911** 112:4

**91367** 2:4

**9th** 4:2 107:16

---
**A**

**a.m** 94:25

**ability** 102:6,14

**able** 31:24 33:25 35:10 48:24 76:22 90:1 101:22 108:19

**absolute** 43:7

**accept** 65:16 95:20 96:1,6

**access** 81:11

**accident** 4:17 15:22

**accuracy** 75:1

**accurate** 24:21 31:8 32:6,16 33:2,3 75:10 80:1 89:1,7,14 90:9 95:5 99:17 107:22

**accurately** 111:7

**accused** 62:5,19 64:7

**acknowledge** 18:4

**action** 41:9 70:16 116:10,13

**activity** 15:25

**acts** 35:1

**actually** 12:7 18:4 47:14 60:15 69:9 73:25 83:4,5 87:25

**addict** 106:21

**addiction** 105:20

**addition** 75:16

**address** 23:21

**adults** 60:2

**advising** 28:15

**affect** 30:13

**affirmed** 75:8

**affix** 115:16

**African-American** 66:21

**afternoon** 4:1,12

**afterwards** 74:23

**against** 24:7 41:2 50:19 72:2

**agencies** 29:14 70:21 71:4 81:9

**ago** 4:14,15 18:3 91:20

**agreed** 34:20 83:1 84:10 95:1

**agreement** 74:6

**ahead** 17:11,20 19:3 27:10 32:25 41:7 54:23 63:23 67:21 69:15 102:11,19 104:12,22 109:21

**aid** 19:22 71:17,19 99:2

**air** 39:11

**airplane** 94:23

**alcohol** 5:23 16:16,19 17:1,5,17,25 18:1 36:5

**alcoholic** 6:3 17:24

**Alejandro** 1:10 2:9

**Aleman** 2:18

**allegation** 63:14

**allegations** 9:17,20

**Allick** 69:1

**allow** 58:18 66:13

**allowed** 19:22 23:8

**alone** 98:11

**already** 14:17

**altercations** 36:21

**am** 6:2 51:19 76:2 116:8,10

**ambiguous** 110:1

**amount** 13:21 31:3,6 46:3

**amounted** 26:6

**angel's** 36:15

**answer** 5:5,14 6:8 20:3 26:1 29:2 40:4,13 77:13 78:7 84:19 109:10,20

**answered** 49:12 84:11

**answering** 108:10

**Anthony** 69:1

**anybody** 17:8 18:17 28:5 31:13 36:4 57:18 68:7 85:20 86:6,10 92:10 112:10 113:4

**anymore** 14:3

**anyone** 5:13 6:17 10:4 11:9 57:11 58:21 60:25 68:11 71:17 74:9 75:16,21 86:3,7,11 96:10,16

**anything** 5:22,25 7:20 9:12 10:1 17:9,22 18:13 20:21,23 26:3 28:3,12,19,22 40:23 41:3 43:24,25 47:3,7 50:11,16 55:1 57:6 58:14 60:5,6 62:23 64:3 66:10 69:2 70:19 79:15 81:1 87:16 91:22 92:3,5,25 99:4

**anywhere** 13:24 44:17

**appear** 40:21 51:9
 87:10

**appearance** 94:25

**appeared** 19:21 40:12
 68:13

**appears** 116:6

**applied** 12:1

**applies** 53:17

**apprehending** 25:2

**appropriate** 31:7
 97:3

**approximately** 12:9
 65:22,24 73:7 101:9
 104:14

**area** 25:20,21 45:2
 46:7 52:16,23
 53:2,18,20 54:10,21
 55:9,10 62:11
 64:16,22 76:8,18,20
 77:3,4 80:11 90:12
 99:25 100:11
 103:3,7 111:4,6

**areas** 20:16

**armpit** 60:18

**arms** 60:11,12 91:2,4

**arrest** 30:14 35:3
 37:4,7 85:2

**arrested** 8:3 19:12
 30:17 34:5 36:1
 37:3,22 59:24
 64:1,4

**arrests** 35:9

**arrive** 65:21

**arrived** 27:2,4 65:25
 102:2 103:21 113:3

**arrives** 95:4

**arriving** 101:23

**assault** 19:12

**assigned** 37:9
 76:17,18 77:2,14

82:1

**assist** 50:8 76:23
 105:6 112:16

**assistance** 57:5,7,13
 59:3 69:12 77:19
 82:5 93:20 97:18
 98:12,14,20 99:1
 113:6,7

**assumes** 27:8 48:9
 58:24 63:21 102:10

**assuming** 38:12

**assured** 8:19

**ate** 11:3,4

**attach** 88:6

**attached** 88:13,22

**attack** 70:22 71:12

**attention**
 19:6,15,17,22 20:18
 110:14

**attorney** 5:8
 6:7,23,25 10:12,13
 116:8,11

**attorneys** 11:10

**audiotaped** 5:1 95:10

**Austin** 94:23

**authorized** 77:6

**available** 16:21

**avoid** 83:20

**aware** 24:8,20 27:21
 28:5 29:9 59:6
 70:11 76:2

**away** 30:17 46:25
 66:25 67:2 72:21
 92:10,22,25
 101:7,10

---
B
---

**backup** 69:5,13,20
 72:6,8,13 82:11,16
 83:3 84:2
 93:7,9,13,17
 108:6,12,19

112:3,11,14

**bad** 18:11 35:9 70:23

**baking** 106:25

**bang** 43:19 103:12

**banged** 48:7

**banging** 41:2 43:3
 46:8 103:14,17

**bar** 88:23

**barrier** 101:5

**bars** 105:10

**based** 13:17 31:7
 84:14

**basement** 45:2 56:11

**basically** 32:11
 34:10

**basis** 96:21 97:2

**Bassett** 21:15

**Bates** 3:13

**beat** 35:19

**become** 29:9

**beginning** 22:17 53:7

**begun** 101:17

**behalf** 1:5

**behind** 30:20 39:16
 46:19,24 56:5 91:2
 99:10

**beings** 36:8

**believe** 33:2 47:10
 59:10 74:24

**believed** 18:14 50:18

**belongings** 98:8

**belt** 39:15

**belts** 39:11,24

**bench** 88:3,5,7,12
 89:8

**benches** 39:9,10,14

**beside** 98:10

besides 10:4

best 5:20 17:12
  20:14 54:1,9 73:3,6
  74:15 75:13 85:8
  89:4 107:9,13,23
  109:18

bet 34:12

bgage@goldbergandgag
  e.com 2:5

biceps 61:9

bigger 100:2

bit 13:20,22 21:15
  31:1 34:19 37:20
  92:12

black 68:3,22 93:24

blank 22:10

bleed 64:21

bleeding 44:6 45:24
  46:1 51:3,7 65:16
  95:20 96:12

block 100:19

blocked 47:3 99:4

blood 16:16,19 17:4
  46:3 56:1 65:1,4,6
  85:24 86:3,8

bloodshot 16:14
  18:21

blow 16:25

body 44:17 81:10
  82:11

bodybuilding 60:6

booked 66:14

booking 52:15,22
  53:1,18,20 54:9
  55:1,7

books 14:24

border 11:22,23
  24:24 25:1,2,14,15

borrow 89:18

bottom 49:1

Boulevard 2:4

box 76:12

Bradley 2:3

brand-new 73:15

break 6:18 46:14
  55:14 80:8 94:14

breath 16:7 85:24
  86:4,8

briefings 71:3

bring 93:2 105:9

bringing 46:19

brought 8:12 87:4
  106:6

bunch 22:7

bus 100:2

———————————
              C
———————————
cab 39:17

California 2:4

calm 35:17

camera 89:19,23

cameras 90:5

Campbell 100:15,22
  101:16 103:22

capacity 87:22

captain 21:22

car 39:5 57:20 93:25
  100:6,11,14 103:13

card 23:5,7,9

cards 23:11,14,16

care 9:7,10 19:8
  20:1 30:2 41:22
  42:7,19 43:1 77:3
  80:14,20 87:12

career 29:8 31:20
  35:5 59:2

carries 4:22

carry 23:8 92:8 98:9

case 7:5,19 11:10

24:7 48:4 70:22
  78:4 79:25 94:24

catch 94:22

categories 20:17,19

caught 92:15

cause 15:23 48:3

caused 47:8 58:7

causes 61:22

causing 33:25

ceiling 89:21

cell 9:2 25:20,21,24
  52:23 53:2 54:21
  55:9,10 62:11
  76:7,18,20 77:3,4
  80:11 81:18,20
  87:1,25 88:2,15
  90:5,10,12,18
  111:25 112:4

cells 8:12 89:2 90:9

center 21:15 38:2
  40:20 44:3,19
  63:4,11,19 64:9
  72:1,19 73:12 85:4
  89:16 90:2,6,10
  102:25 103:4
  109:7,16 110:5

Centers 73:13

certainly 67:11
  113:4

Certificate 3:9
  116:17

CERTIFICATION 116:1

Certified 4:8

certify 116:4

chain 13:12

challenges 14:7

chance 5:5 44:4
  74:25

chances 64:19

change 5:6,7 115:2

**CHANGES** 3:8 115:1

**check** 17:4

**chevrons** 15:4

**children** 60:2 81:19

**circle** 88:12,16
  90:21

**circular** 88:5,22
  89:21,25 90:18

**city** 3:13 15:14 56:6
  100:19

**Civil** 1:16 9:21

**clairvoyant** 54:7

**clear** 55:8

**clock** 10:24

**close** 10:25 98:5
  102:21

**closed** 51:24

**closely** 5:12

**closer** 101:20,25
  102:6,14,20,21

**cocaine** 8:19
  105:20,22
  106:1,3,7,13,22,24,
  25

**coffee** 11:5

**coke** 59:17 86:25

**collar** 92:12,22

**combative** 8:16 9:9
  33:14 34:20 35:17
  70:4,11,15 101:18

**comes** 20:6 27:14

**coming** 105:6

**command** 13:12 30:18
  44:3,18 64:9 72:19
  73:12,13 89:16
  90:1,6,10 109:7,15
  110:5

**comment** 5:8

**common** 19:4 42:18,24
  53:9 93:23

**communications** 72:1

**community** 101:22

**company** 11:17
  24:6,7,10 28:6

**compartment** 39:15,19

**complete** 11:13 75:3
  86:20 107:22

**complied** 111:4

**computer** 76:11

**computers** 81:18,20

**concern** 68:15

**concerned** 67:16,25
  71:8

**concluded** 114:10,11

**conclusion** 50:21
  92:1

**concrete** 101:6

**condition** 65:10

**conditioner** 39:11

**conduct** 17:14
  85:15,24

**conducted** 86:7

**connection** 29:17
  30:1

**conscious** 41:22
  52:4,5

**consciousness** 51:9

**consist** 41:10

**consisted** 30:6

**consistent** 48:15

**contact** 34:25 59:9
  71:11 81:10

**contained** 75:25

**continue** 12:20 64:15

**continued** 73:22

**continuing** 43:19
  64:21

**continuum** 30:16

**contract** 11:21
  24:19,23,24
  25:11,14,15,19
  73:16,23

**control** 31:6 32:12
  33:25 35:10,18 40:1
  56:19 83:5,12
  84:3,13,24,25 86:21

**controlling** 99:1

**conversation**
  62:16,25 94:20

**convicted** 37:6

**cooperate** 8:23 52:13
  57:3

**cooperated** 32:14

**cooperating** 58:8
  82:12,17

**cooperation** 34:3,7

**cooperative** 8:4,16
  9:4,8 18:13
  58:10,15 101:24
  102:1,5

**cordial** 18:12 59:17

**corner** 89:20 99:13

**corporal** 15:4,9
  95:14

**correct** 11:1 17:1
  19:18 29:6 30:20
  31:25 34:1,15 35:1
  39:5 40:17 42:11
  43:1 44:4,20,22
  45:5 49:1 51:22
  55:8 57:14 59:10
  62:13 63:2,4,11
  66:15 72:6,7
  73:9,23 74:2,3,18
  78:14 79:5,14 80:2
  82:13,20 83:7 84:4
  88:3,6 93:21
  99:11,25 100:4
  101:4 102:2 103:19
  104:13,17,21
  105:14,15
  107:9,12,19,22

110:11 111:17
112:5,8,24 113:7,15
115:17

**correction** 5:6,8

**correctly** 27:21
111:1

**count** 35:4

**counter** 31:3

**County** 72:19 100:20

**couple** 12:23 15:16

**course** 20:25
21:4,6,10 33:5
68:20 84:21

**court** 1:1 3:9
4:5,8,23 5:2 6:14
23:22 78:18,22 79:1
94:25

**Covington** 95:15

**CPR** 20:5

**crazy** 86:15,18 87:7

**criminal** 15:25 35:1

**CSR** 1:25

**cuff** 60:25

**cuffed** 60:20,22,23
61:5,6,19,21
90:17,21

**custody** 17:3,15 19:8
29:10 30:2 32:10
33:23 34:15,18,19
35:4,8 41:19,22
42:7,25 61:3

**cuts** 44:9

———————————
            D
———————————

**damage** 48:3

**danger** 113:19

**dangerous** 67:1

**Daniel** 1:6 7:5
8:2,6,7,9,17,25
9:9,22 17:3,15,23
32:9,18 33:10 36:25

37:9 40:19 41:1
43:3,13,19
44:2,17,21
45:7,18,24 46:8,17
47:7 48:6,21,25
49:3,9,18
50:2,5,9,11,16,25
52:4,10 58:14
59:9,22 60:1,9,14
61:1,18 62:5,19
63:15,19
64:1,3,7,11,15
65:10,22 66:9,11,13
67:14 68:8,12,23
74:9
85:6,10,16,17,21,25
86:4,8,12 87:24
88:2,15,21
90:5,17,20
91:7,11,22 92:3,7
93:2,8 95:20
96:12,14 97:15
98:15,21 99:1,5
101:18,24 102:1,23
103:3,7,12,17
104:2,7,19,25
105:9,12,19 108:18
109:5,14
110:3,23,24 111:3,5

**Daniel's** 44:13 48:13
56:1 65:1

**Danny** 18:2

**Darnell** 2:14,15
17:10 30:23 31:11
32:22 41:6 42:2
46:10,13 48:11,19
50:22 54:14
55:14,16,19 57:23
58:24 63:8,21 67:20
74:4,5 77:8 81:21
82:15,22 83:8,14
84:18 92:2 95:7
96:17 97:6 102:4,8
104:9 107:24 112:18
113:11,22,25 114:7

**date** 4:2

**Dated** 3:12

**day** 5:25 9:11 25:12
33:10 63:1,16 65:21
68:8,25 72:24 73:1
85:7,9,10,18,22
86:4,8 102:16
106:11,15,17,20
112:1 115:21

**days** 15:19 16:9 76:9

**deadly** 82:20,24
84:14 91:23

**deal** 23:18 32:3
35:16 70:16

**Deceased** 1:6

**December** 14:23

**decent** 16:14 41:24

**decoration** 101:5

**Def** 3:13

**Defendant** 2:13

**Defendants** 1:11 2:9

**define** 80:16

**definition** 53:9

**delayed** 94:21

**demeanor** 18:16 35:7

**department** 12:4
14:16 24:20
25:19,22 29:23,24
36:7 38:25 72:5,17
75:13,17,21,24
112:20

**department's** 19:10

**depends** 91:3

**depos** 4:19 94:23

**deposition** 1:14
4:3,13,21 5:3
6:18,19 7:3 9:15
10:20 22:9 23:20
53:8 95:1,4
114:9,11 115:16
116:4,6,7,10

**depositions** 10:18

**deputy** 56:18 68:22

**describe** 39:7 100:13

**DESCRIPTION** 3:11

**detail** 63:13

**detainees** 11:22
25:1,22

**detainee's** 76:8

**detective** 74:12,14
110:11

**detention** 72:19

**determine** 16:18 52:3

**develop** 15:23 16:10

**developed** 32:3

**device** 78:24

**devices** 58:18

**difference** 15:15
53:6,19 79:19

**different** 14:7,8
15:13 22:7 33:11
34:14 75:12,23
113:14

**differently** 34:15

**difficult** 80:25

**diffuse** 31:24 32:3

**direct** 110:14

**direction** 104:15

**directly** 72:5 85:4

**disabled** 59:7

**discuss** 7:1 9:13

**discussed** 10:1,17

**Discussion** 6:4 78:25
94:18

**discussions** 75:20

**dispatch** 81:10

**disruptive** 82:25

**distance** 53:12,18,20
54:9,19 101:21

**distinction** 53:15

**district** 1:1,2

12:4,11 13:1
14:1,16,17

**divider** 39:10

**DIVISION** 1:3

**document** 47:21
107:4,7

**documents** 10:19
22:13 23:2 28:14

**doggone** 55:12

**dollars** 12:23

**done** 41:3,21 58:21
67:24 95:10

**door** 44:22,23
45:8,19,21 46:21
47:1,8 48:14,25
49:17,19,20,21,23
50:2,6,9 52:17
54:21 99:20 100:4
101:7 104:23 105:10

**doors** 52:24,25
53:1,3,18,21
54:10,24 55:2,6,8
100:17

**doorway** 48:7

**double** 52:24
53:1,3,18,21
54:10,24 55:2,5,7
60:20,22
61:5,6,19,21

**downstairs** 56:11
96:15

**downtown** 74:12

**drag** 64:15

**dragged** 52:10 64:22
68:13

**dragging** 60:11

**drawing** 12:24

**drinking** 11:5

**drive** 72:24 73:2,8

**driver** 39:16

**driving** 16:1,6 40:24

57:20 103:13

**drug** 6:2 8:18 16:4
36:13 52:14,22

**drugs** 5:22 8:14
17:5,17,25 35:23
36:5,8 37:1
85:7,9,10,18,22
86:1,13

**due** 94:25

**DUI** 16:20

**during** 10:15 12:6
62:25 104:13

**dust** 36:15

**duties** 25:24 26:4
41:17 72:15
80:3,5,13

**dwindle** 25:13

---

### E

**earlier** 24:18 37:3
61:4 63:16 108:5

**early** 37:21

**easier** 83:6 84:25

**East** 2:11

**easy** 9:3

**eat** 11:2

**effect** 68:9 95:21
96:7

**effects** 36:7

**efforts** 60:6

**eight** 54:25

**either** 22:19 48:5

**El** 1:3,18 2:7,12,16
12:2,3 13:25 14:19
15:3,7 19:18 21:11
24:19 25:19,24
29:23,24 30:5 36:6
38:8,12,16,25
39:1,3 56:7
72:16,19
73:9,13,23,25
81:13,15,16

93:21,23 100:20

**electronic** 78:24

**elephant** 36:15

**elevator** 45:22
50:13,18 51:1,15
52:4 54:24 56:13,16
64:11

**elevators**
52:17,19,20

**eleven** 54:25

**else** 9:12 10:1,4
11:9 14:9 38:3
57:11,18 58:14
83:19 86:3 111:24
113:4

**E-Mail** 2:5,8,12,16

**emergency** 77:5,7,18
78:4,14 79:4 80:1
96:11 113:18,21

**emotional** 18:8

**employed** 116:9,11

**employee** 23:10 27:15
116:11

**employees** 19:18 25:4
27:22 28:6

**EMS** 96:7,10
97:9,12,13

**encountered** 36:20

**enforcement** 15:18
29:8 34:14 36:22
42:5,6,16 68:12,15
70:21,23 77:20 81:8
87:12 112:15,23
113:5

**engaged** 34:25

**enter** 49:18

**entered** 45:4 98:2

**entering** 45:8,9
46:16

**entire** 104:16

**entrance** 48:22,25

**101**:20

**escape** 101:22

**escort** 97:15

**escorted** 26:8 111:3

**escorting** 72:12 99:9

**essentially** 30:20

**ESTATE** 1:6

**estimate** 53:7,11,23
54:1,9,15,22,25
66:1 72:22 73:3,6
79:21 101:15,17

**events** 47:22

**eventually** 25:10

**everybody** 39:23

**everything** 5:2,17
52:8 69:17 75:9
77:24 107:21

**evidence** 27:9 32:23
48:10 58:25 63:22
102:10 109:18

**exact** 13:16 14:22

**exactly** 37:5 52:8
65:12 66:24 73:1
80:25 90:11 104:4

**Examination** 3:4,5,6
4:10 108:3 111:13

**example** 20:18 32:9
113:19

**except** 99:19 115:17

**excuse** 26:11 45:2
84:16 98:9

**Exhibit** 3:11
88:10,25 89:6,13,20
90:8 99:16
100:10,14 101:3,8
107:3,5 110:8

**exist** 81:20

**expanded** 73:25

**expect** 8:14

**expecting** 94:22

**experience** 14:7 32:2
36:21 84:15

**expert** 16:4,5

**Expires** 115:24
116:17

**explain** 30:5 39:2
53:8 84:22

**extremely** 34:19
101:18

**eyes** 16:14 17:23
18:21 51:24
86:16,18,22 87:7

---

F

**face** 44:4,10,13
45:10 62:20 63:15
64:8,22 65:2

**facilities** 72:21

**facility** 21:12 44:25
72:20 89:3 94:6,11

**facing** 100:16,17
103:22

**fact** 29:9,15 33:3
68:12 85:14 94:24

**facts** 27:9 32:22
48:9 58:24 63:21
102:10

**faculties** 86:21
87:11

**fair** 42:3 89:1,7,14
90:8 99:17

**fairly** 9:22 16:13

**fallen** 105:13

**falling** 25:3

**fashion** 60:19 74:23
105:14

**fear** 91:6,9,11

**Federal** 1:15

**feed** 11:7

**feel** 6:3 30:10 58:7
59:15 62:24

**feet** 31:17 52:18,19
  53:25 54:22,25
  99:10 101:13,15
  104:12 105:9

**felt** 34:4 93:7

**female** 62:6,20 63:15
  64:8 65:8

**fiberglass** 43:15

**field** 14:8
  16:11,12,23 17:14
  85:15,20

**fight** 31:17

**financially** 116:12

**fine** 8:21 59:19 66:2

**fingerprinted** 26:11

**fingerprints** 26:13
  76:8

**fingers** 76:9

**finish** 102:9

**finished** 54:6

**Finnegan** 1:25 116:16

**firearm** 23:8

**firm** 10:13 116:18

**first** 18:11 39:4
  45:8 47:1 49:20
  89:22 92:17 94:5
  96:22 104:2,5
  110:15,19,20

**fitness** 60:3

**five** 15:6,12 21:7
  25:7 52:18 74:1
  104:6

**fixed** 108:15

**flap** 92:12

**floor** 2:7 48:22
  49:3,8,9 51:18 56:2
  60:11 64:12,14,23
  65:1,2,4,7 90:21

**Flores** 1:10 2:13
  45:17 46:18 48:5,25
  52:11 56:10 57:19

58:4 60:10 62:15
  63:18,25 64:3,15
  65:9 76:23 93:4
  96:14 97:18
  98:12,20,25 99:5
  103:24 104:6,12,23
  105:8 110:11

**flowing** 73:4

**force** 20:17
  30:4,6,9,10,11,13,1
  6,18 31:3,6,7 32:15
  50:19 82:20,24
  83:20 84:14 91:23

**foregoing** 115:15
  116:3,6

**foreseeable** 29:15

**form** 17:18 19:2,24
  20:2 26:18 27:8
  28:1,9,17 29:12
  30:21 31:9 32:7
  34:2,21 35:13,20
  40:3 42:1,9 50:21
  69:7,14,21
  70:6,18,24 71:14
  77:10,21 78:15
  80:15,21
  82:15,21,22
  83:8,14,15,22 84:17
  85:16 87:15 95:3
  96:17 104:9 109:19
  113:9,22,23

**formal** 75:20

**fort@scotthulse.com**
  2:12

**forth** 74:17

**foundation** 30:22
  31:9 69:8

**fountain** 26:8 80:9

**Francisco** 2:10
  6:7,22 7:18 8:6
  10:17

**frequently** 34:18

**friendly** 8:16

**front** 22:21 44:22,23

53:10 81:23 104:12

**full** 110:20

---

G

**G4S** 1:9 2:9
  11:13,14,15,18
  12:2,3,12,13,15
  19:20 20:1,8,17,25
  21:12,23 23:9,10
  24:5,13,19 26:23,25
  27:5,15,21
  28:5,6,14 40:10
  58:1 69:11,19
  70:5,14 71:17
  72:6,9 73:11,19,22
  74:1 75:16 77:5,16
  78:3,14 79:4,17,25
  80:5,12,17 81:5
  85:3 87:20
  93:9,13,18

**Gage** 2:3 3:4,6 4:11
  6:5 7:12,18
  17:11,20 19:3,25
  20:4 23:23 24:5
  26:21 27:10,20
  28:5,13,24 29:14
  30:25 31:15 32:9,25
  34:6,23 35:15,24
  36:10,12 38:22
  40:10 41:7 42:4,11
  46:15,16 48:13,21
  49:14 50:25 51:14
  54:6,8,17
  55:15,18,25 57:24
  59:1 61:16,17
  63:9,23 67:21 68:21
  69:9,11,15
  70:3,10,20 71:3,16
  74:7,8 77:15
  78:1,17 79:15 80:17
  81:4,22,24 82:16
  83:1,10,19 84:1,19
  87:16 91:1 92:5
  94:13,20 95:9,14
  96:20 97:1,10
  102:5,11,15 104:11
  107:2,4,25
  108:6,23,25

109:3,5,17,24 110:1
111:14,24,25 112:22
113:12 114:2

**gain** 31:6 83:5 84:13

**garage** 99:25 101:7

**gathered** 98:8

**GCI** 16:8

**gee** 46:21 51:17
65:18 71:10 90:25

**general** 7:7 42:16

**generally** 42:14

**gentleman** 21:22
37:15 46:23 56:17
66:20 99:9

**gentlemen** 108:2

**gets** 70:17

**getting** 23:18 32:20
34:3,10 41:16 45:3
52:10 60:13 64:22

**giggled** 69:1

**giggling** 68:11,12

**given** 26:21 28:25
53:7 80:12 116:7

**giving** 74:14

**glass** 76:10

**glasses** 68:4,22

**glassy** 86:22

**Goldberg** 2:3

**gone** 113:20

**goodness** 35:25 66:4
102:18

**grab** 31:2,4 60:18

**grated** 89:11

**Great** 90:15

**ground** 48:22 49:6,15
104:20 105:13,17

**group** 83:12

**guard** 21:2 23:5

77:17

**guards** 72:12
113:13,20

**guess** 10:12 15:5
53:4,5,6,14,22 87:9
91:19 96:22

**guessing** 79:21

**gun** 33:20 92:9

**gurneys** 58:17

**guy** 59:13,14,15
86:24 87:3,4

**guys** 56:25 63:1

**guy's** 18:19

---

### H

**half** 10:22
12:5,19,20

**hallway** 54:21

**hand** 30:25

**handcuffed** 88:22

**handcuffs** 39:14
61:12 88:6,12,17

**handful** 57:2

**handle** 70:4,11

**handling** 70:8 76:23
87:20

**handout** 22:8

**handprint** 76:14

**hands** 30:19 31:17

**handwritten** 75:25

**happen** 17:22 22:11
61:17 73:20 91:1

**happened** 25:16 56:22
66:17 97:22

**hard** 40:4 76:13
103:15,16,17

**hardcore** 35:22

**harm** 83:6

**haven't** 54:6

**having** 31:25 35:18
36:20 38:25 39:2
69:13 82:2,10 83:4
84:2 101:21 103:11
105:8

**head** 41:2
43:4,9,12,13,19
44:4,10,13 45:10,13
46:6,8
47:10,12,14,19
48:7,13 51:3,8 56:1
64:21 65:1 66:14
103:12,14,17 105:13

**headquarters** 21:13

**health** 5:23 91:11

**healthy** 6:2

**hear** 6:6 43:23
57:5,6 67:13 69:2
95:19 96:5 104:25

**heard** 64:7 66:18
72:11 76:4 95:25

**Hearing** 62:10

**hearsay** 17:10 28:10

**heart** 56:21,23

**heavens** 66:6

**heavy** 46:1,2

**heavyset** 37:20

**he'll** 67:1

**help** 6:18
27:6,14,19,25
56:8,12,25
57:1,4,8,12,17,18,1
9,22 58:4,5 69:5,6
71:22,25 77:19
82:6,18 83:4,20
84:3,13 85:16 87:13
97:15 111:9 113:21

**helping** 60:2 68:8,24
93:1

**Henry** 10:6,7,9,14

**hereby** 115:16 116:4

**herein** 115:17

**here's** 71:12

**hereto** 116:12

**he's** 6:24 10:12
18:19 65:16 66:20
67:1 92:16

**Hey** 113:20

**highlights**
7:4,6,22,24

**highway** 15:17 36:3

**hills** 2:4 38:1,2,5
40:20 44:2,15,18
53:20 63:4,10,19
64:9 72:18,25
73:8,13 85:4
89:3,8,15 94:7,10
102:25 109:7,15
110:4

**hire** 73:18

**hired** 25:12

**hires** 25:7

**hiring** 11:21

**hit** 31:2 35:11 43:9

**hitting** 43:12,13

**hold** 84:5 104:22

**holding** 52:16,23

**home** 22:11 23:21
53:13

**honest** 74:13

**honestly** 27:17

**hospital** 19:12

**hotel** 21:14

**hour** 10:22 95:11

**hours** 21:6,7 66:5

**Huh** 11:7

**Hulse** 2:11

**human** 18:15 36:8
41:25

**hundred** 12:23

**hurry** 56:10

**hurt** 67:1

**hurting** 61:14

---

I

**I'd** 22:10

**I'll** 8:23 20:15
22:14,24 75:23
83:24 88:9,25 90:15
96:21 100:10 107:4

**I'm** 6:2 8:21 12:7,19
14:9 20:17 22:9
27:20 28:2 31:22
47:16,18 49:7 53:8
54:3 61:20 67:5
69:9 74:5 78:22
79:7 83:23 90:11
92:9 95:22 99:15
103:25 108:24
109:25 112:18

**imagine** 81:23

**Immigration** 11:23

**important** 5:11
47:20,24

**impression** 76:11

**Inc** 1:10 2:9

**incident** 7:8 8:4
73:22 75:21 97:21

**including** 68:25

**incoherent** 92:17

**Incorporated** 11:14

**independent** 12:3
28:21 30:7,8
42:13,15 64:18 70:2
87:17,19 96:8 97:23

**indicate** 22:21 95:19

**indicating** 36:25
48:5

**individual** 82:19

**Individually** 1:5

**individuals** 32:20
76:21 87:21

**influence** 8:13
16:2,7,11
17:9,16,24 18:17
36:5 37:1
85:17,22,25 86:5,12

**influenced** 34:18

**information** 3:16
9:23 10:15 22:18
28:25 29:1,3 74:17
75:24 76:2 86:9

**ingested** 105:24

**injure** 40:21,25 41:1

**injured**
41:9,16,19,23 44:1
47:8

**injuries** 44:13 45:10
83:20 105:18

**injuring** 40:8,12

**injury** 44:17 46:4,6
47:13 66:14 85:1
105:13,16

**ink** 76:9

**inside** 39:7 45:20
54:20 92:8 105:9
108:17 109:6,15
110:4,24

**installed** 108:16

**instruction** 54:4
80:12

**instructions** 26:21
27:23 80:18

**instructs** 6:8

**insurance** 24:6,10

**interested** 116:12

**Interstate** 21:14

**interview** 75:16,20

**interviewed** 74:8,11
75:19

**intoxicated** 8:13,18

**intoxilyzer** 16:21

**invented** 81:17

**investigations** 15:22

**involve** 4:16 23:2

**involved** 4:17 7:3
34:13 93:3

**Isn't** 10:12

**issues** 5:23 77:23

**item** 89:21 90:18

**Items** 22:18

**it's** 5:11 6:11 9:16
13:17,18 25:12 48:1
55:12 56:20 57:16
73:4 76:10 77:22
78:9,23 79:8,10,20
84:25 88:7,8 90:12
98:6 101:5 108:16
109:20

**I've** 31:13 55:16
91:20

─────────────
            J
─────────────

**jail** 36:4 40:20
44:19,21,22 45:8,9
46:17 48:22,25
49:18,23
50:3,6,9,13,14,17,1
8 51:1 55:25 57:11
58:10,14,17,22
60:13 62:12 63:20
64:1,4,12 65:21
66:20 67:14 68:7
72:13,25 73:9 76:16
77:17 78:4 80:1
93:8 94:1 95:20
96:6,11,15
97:13,15,19 98:2
99:11,18
100:7,17,18
101:20,23
102:2,6,24 103:9,21
104:1,8 105:10
108:17
112:7,10,15,23
113:4,12

**jailers** 50:8 105:5

**jails** 59:1,6

**James** 1:14 3:3,12
4:4,7 115:15,19

**January** 13:3 14:24

**jdarnell@jdarnell.co
m** 2:16

**jedarnell@jdarnell.c
om** 2:17

**Jeep** 2:15 74:4,5
77:8 81:21 82:15,22
83:8,14 84:18 92:2
94:21,24 95:7 96:17
97:6 102:4,8 104:9
107:24 112:18
113:11,22,25 114:7

**Jim** 2:14 17:10 30:23
31:11 32:22 41:6
42:2 46:10,13
48:11,19 50:22
54:14 55:14,16,19
57:23 58:24 63:8,21
67:20 74:5

**job** 13:13 15:17,20
17:7,21 19:7,8,10
25:11,24 35:18
37:11 41:17 85:19
86:2

**jobs** 25:8

**Johnson** 94:6 97:25
98:11,19
104:7,11,22

**join** 11:13,18,20

**joined** 20:8,17

**joked** 68:24

**joking** 67:14 68:7

**Jose** 1:10 2:13

**July** 13:4

**jury** 81:23

**justified** 91:23

**justify** 50:19

─────────────
            K
─────────────

**Kevin** 94:6

**kick** 31:2,18

**kill** 35:19

**killed** 32:21 33:4
45:4 74:9

**kinds** 36:21 58:17

**knew** 11:23 19:14
25:9,11,12,17
42:14,16 44:11
56:8,24 57:8 58:4
61:7 91:13

**knowledge** 17:12 60:1
73:11,20 74:15
96:24 97:4 105:19
107:9,13,23

─────────────
            L
─────────────

**laced** 106:25

**laceration** 45:13,23
46:7

**lack** 5:23 69:7

**lacks** 30:21

**laid** 25:7

**language** 86:23
87:6,9

**last** 34:5 102:9

**late** 56:20,21 66:21

**later** 95:3 113:3

**latest** 25:6

**laughed** 67:3

**law** 4:23 6:14 29:8
34:13 36:22
42:4,6,16 68:11,15
70:20,23 77:19 81:8
87:12 112:14,22
113:5

**lawsuit** 9:16,17 24:7

**lawyers** 6:6 10:23

**lay** 90:20

**laying** 49:7 51:15,20

52:1,2

**layout** 9:14

**leads** 104:8

**learn** 17:8 55:25
56:4 62:9 63:18
64:25 68:11

**learned** 65:25 91:20

**least** 32:10 55:7
63:3 75:20 79:17

**leave** 12:11 14:2,25
23:15 29:6 76:22
77:6 94:22 98:11,19

**leaves** 76:10

**legal** 50:20 91:25

**Legate** 2:6

**length** 53:12

**less** 83:6 85:1 95:11

**Let's** 23:23 55:14
94:13

**letters** 36:18

**level** 16:19 17:1,5

**license** 23:6

**lieutenants** 13:11

**life** 31:16 37:1 91:6
113:19

**lifted** 61:8

**lifting** 60:6 61:10

**lighting** 47:5

**likelihood** 85:1

**likely** 78:9 80:23
89:17 90:13 98:6

**limit** 15:19 16:16

**line** 3:17,18 16:14
22:19 55:8 115:2

**lines**
106:11,15,17,20

**lips** 56:19,20

**listed** 23:16

**listen** 5:11 30:19

**little** 13:20,22
16:15 21:15 33:14
34:19 37:20
52:15,16,23 54:21
55:9 106:18

**live** 12:23

**Livescan** 76:4,15,22
77:18

**load** 109:14 110:4

**loaded** 38:4,7

**location** 39:22 49:4
55:5

**lock** 31:5

**logic** 84:23

**long** 21:6 46:22
53:11 66:8 72:24
73:2 91:20 101:21

**longer** 73:5

**losing** 51:9

**lost** 25:7 53:20

**lot** 57:21 83:21,23
91:5 106:17

**lots** 35:9

**lowest** 13:8,10

**lunch** 6:18 9:13
10:2,15,25
11:2,3,6,8,11

---
M
---

**machine** 26:12

**Magdaleno** 96:2

**M-A-G-D-A-L-E-N-O**
96:3

**main** 2:11 15:16,17
26:1

**maintaining** 25:19

**male** 37:20 68:3,22

**man** 66:21 67:1,8
76:15

**manner** 84:4

**manual** 69:23

**March** 3:12 12:7
17:3,15 33:11,24
37:10 59:9,23 62:6
72:11,25 73:7 76:22
85:6,11,12,16
86:1,13 87:25 88:15
89:9 91:8,22 107:16
108:17 110:11

**marijuana** 36:2

**mark** 22:24 107:5

**marked** 22:18 23:14
88:9 93:24 99:15
107:3 110:8

**marks** 44:9

**material** 22:8

**materials** 21:24 22:5

**math** 12:21

**Matthews** 1:14 3:3,12
4:4,7 8:20,22 18:13
59:20 79:13 96:23
108:5 115:15,19

**may** 12:16 22:24
89:18 91:21 94:21

**maybe** 4:15 14:14
21:8,9 37:20,21
52:19 66:6,7,21
92:16

**McDonald's** 11:5

**meals** 56:15

**mean** 39:2 46:21 49:5
57:20 67:8 91:18
92:14 93:16

**meaning** 96:5

**means** 15:10,11 39:14
91:21 106:15,20

**medical**
19:1,6,9,14,17,21
20:18 42:8 43:1
65:9 66:10 96:11

**medication** 5:23

**meeting** 114:4

**Melvin** 69:1

**memo** 71:1,9

**memory** 43:6,7

**Mendez** 2:6

**mental** 86:21
  87:11,21

**mentioned** 24:18
  62:19 68:23

**Mesa** 2:15

**metal** 76:12
  88:5,12,22 89:11,12

**Mexico** 23:9

**middle** 39:10 55:12
  110:22

**miles** 72:23

**mind** 20:7 21:20
  60:17 62:3 83:20

**minute** 92:16

**minutes** 55:15 66:7
  73:4,5,8

**Mission** 38:5,7,13
  73:12 76:19

**moment** 46:15 89:18

**Monday** 1:16 4:2

**month** 12:24 14:22

**months** 8:3 18:3 37:3
  61:4,18 106:6

**mopped** 65:1

**mopping** 56:1

**morning** 4:12 5:24
  11:4 62:6 95:2

**motor** 4:17

**motorist** 15:22

**move** 36:10 61:16
  91:4 103:7

**moved** 60:18,19 111:5

**moving** 24:25 52:1
  60:16 64:20

**muscles** 91:4

**myself** 92:16,20

---
N
---

**narrative** 54:4,12

**narrow** 20:12

**necessary**
  30:4,6,9,10,11
  41:9,11 76:24
  113:17

**neither** 116:8

**nice** 59:14,15 114:4

**NM** 1:25

**nobody** 15:20 86:9

**Noe** 2:18

**nonresponsive** 36:11
  61:16

**nor** 86:9 116:9

**northbound** 103:22

**NOTARY** 115:24

**noted** 115:17

**nothing** 10:16 63:17
  87:6 111:24

**notice** 49:9 51:3

**noticed** 34:12

**nowadays** 76:10

**nurse** 65:8,13,17
  66:9,10,13
  95:17,19,23,25
  96:2,5

**nurses** 95:23

---
O
---

**oath** 4:22

**object** 17:10 32:22
  54:3,12 57:23 58:24
  63:21 88:22 89:25
  95:3 109:18 112:18

**objection** 6:7 17:18
  19:2,24 20:2 26:18
  27:8 28:1,9,17
  29:12 30:21,23
  31:9,11 32:7,24
  34:2,21 35:13,20
  38:20 40:3 41:4,6
  42:1,2,9 46:10,11
  48:9,11,17,19 49:11
  50:20 51:12 54:14
  63:6,8 67:18,20
  68:17 69:7,10,14,21
  70:6,18,24 71:14
  77:8,10,21 78:15
  80:15,21 81:21
  82:15,21,22
  83:8,14,15,22
  84:16,17 87:15
  90:23 91:25 96:17
  97:6,8 102:4,9
  104:9 109:17,24
  112:21 113:9,22,23

**objections** 6:6,11
  27:16 84:18 92:2
  113:11,25

**obligation** 4:22
  42:7,17,25

**obscene** 86:23 87:6

**obscure** 55:1

**observation** 17:25
  53:23

**obtain** 72:8 106:12

**obviously** 9:16 86:20
  87:6

**occurred**
  111:11,16,17

**occurrence** 7:25

**October** 1:16 4:2

**odor** 16:14

**odors** 17:24

**offhand** 22:6

**office** 25:5 62:11

**officer** 1:10 2:13

12:5 15:7 19:13
25:9
27:2,4,6,14,19,24,2
5 28:7,16 29:5,11
34:24 38:12,15 39:1
42:17 45:17 48:2
56:7 62:6,20 63:15
64:8 71:17 85:3
87:12 93:4 94:9
103:24 104:23
112:13 116:3

**officers** 19:18 25:4
34:14 36:19 38:9
46:17 48:5 49:18
62:10,19 63:14 64:6
68:25 77:6,20 82:18
83:4,21,23 84:2,13
85:2 93:6,24
112:15,23

**Oh** 11:3 15:15 56:24
66:6 88:20 96:25
111:25

**okay** 6:3,10 7:21
8:1,8,21 10:14
11:15 12:19 22:23
25:16 27:19 28:4
31:14 34:11,23
38:24 42:22 49:9
54:18,20 55:7,13,18
59:18 61:15 75:22
78:6,16 80:6 83:2
84:12,22 89:18
90:15 92:20 93:14
97:5 98:18 101:2
103:12 105:5,16,22
110:21 111:23

**old** 12:19 76:9

**omendez@scherrlegate
.com** 2:8

**one-legged** 16:13

**one's** 86:18 87:7

**one-ton** 39:18

**onto** 49:3

**open** 49:17,20,23
51:24 86:22 104:23

**operation** 56:16

**opinion** 85:16 91:23

**opportunity** 101:19
113:17

**opposed** 72:5 106:21

**orally** 28:25 29:3
75:25

**Oregon** 1:17 2:7

**Ortega** 2:10 3:5 9:12
17:18 19:2,24 20:2
26:18 27:8,16
28:1,9,17 29:12
30:21 31:9 32:7,24
34:2,21 35:13,20
38:20 40:3 41:4
42:1,9 46:11
48:9,17 49:11 50:20
51:12 54:3,12 63:6
67:18 68:17
69:7,14,21
70:6,18,24 71:14
77:10,21 78:15
80:15,21 82:21
83:15,22 84:16
87:15 90:23 91:25
95:6 96:23 97:8
102:12 108:4,24
109:1,4,22 110:2
111:12 112:21
113:9,23 114:6

**Oscar** 2:6

**others** 81:10 93:3

**ounces** 61:10

**outside** 92:8 98:1
99:6

**Overland**
100:21,23,24

---

P

---

**P.C** 2:11

**p.m** 1:17 4:3 7:14,17
24:1,4 55:21,24
94:16 95:13 114:10

**paces** 47:2

**page** 3:2,8,11,17,18
22:19,21 107:6
110:14,17 115:2

**palm** 26:13 76:12

**Paoli** 10:9,10

**P-A-O-L-I** 10:8

**paragraph**
110:15,19,20,22

**park** 101:19 102:6,14
103:21

**parked** 100:6,7,11,14
101:8 102:17,19
103:24

**parking** 50:13

**Parks** 66:23

**particular** 9:11 14:5
20:13,21,24 26:3
28:3,12,20,22 29:21
40:23 70:25 77:22
81:2 102:16

**parties** 116:9,12

**partly** 82:23 83:17

**partner** 70:16

**partners** 63:1

**Paso** 1:3,18
2:7,12,16 12:2,3
13:25 14:19 15:3,7
19:18 21:11 24:19
25:19,24 29:23,24
30:5 36:7
38:8,12,16,25
39:1,3 56:7
72:16,19
73:9,13,23,25
81:13,15,16
93:21,23 100:20

**Pass** 111:12

**passed** 56:6 61:25
65:24

**passenger** 39:17,25

pass-through 99:20

past 60:6

Patience 78:23

patient 18:23 19:21

patrol 11:22,23
  24:24 25:14,15 36:3
  57:20

patrolman 15:18

Patrol's 25:1

pay 13:20,21,22

PCP 36:13,17,20

PD 12:2 14:19 15:3,7
  19:18 25:24 30:5
  36:1 38:16 56:7
  71:5 73:14,23,25
  81:13,15,16 93:21
  112:12

peace 19:13

Pebble 37:25 38:2,4
  40:20 44:2,18
  63:4,10,19 64:9
  72:18,25 73:8,13
  85:4 89:3,8,15
  94:7,10 102:25
  109:7,15 110:4

penalty 6:13 107:18
  111:16

people 8:11
  16:1,20,25 21:19
  24:25 25:21 32:3
  34:25 35:3,8,9
  36:20 39:20 43:10
  45:18,19 67:13
  73:18,19
  76:17,18,20 83:7,11
  84:24 87:10,14 93:1
  99:20

percent 8:23 12:8
  51:19 61:20,23

perfect 43:7

perhaps 48:6

perjure 111:18

perjury 6:14 107:18
  111:17

person 16:19 18:11
  30:16 32:11 33:12
  34:14,17,18 48:15
  71:7,11 81:9,12
  83:6,12 84:25 85:1

personal 17:25 96:24
  97:4,5 98:8

personality 32:5

personally 35:16
  50:12 116:5

pertinent 74:17

phone 108:23 111:25
  112:5,7

phones 81:18,20

photograph 88:25

photographs 88:9
  90:22

physical 33:25 34:8
  60:3 86:21 87:11,21

physically 68:2
  103:2,7 105:9 111:5

picked 44:2,18

picture 100:8,9

pictures 90:1

piece 76:10

pinching 61:13

Plaintiff 1:7,15 2:2

plan 70:16,22 71:12

play 5:4

please 4:5 27:11
  75:22 90:16

PLLC 2:6

pocket 92:6,13,23

point 19:1 35:15
  38:18 44:6 45:24
  47:5 49:4,17
  51:4,10 52:3 58:3,4
  60:21 82:3 104:25

105:12 107:18 108:1
  114:3

points 97:25

police 12:4 14:16
  19:10 24:20
  25:19,22
  27:2,4,6,13,23
  28:7,16 29:23,24
  36:7,19
  38:8,12,15,25
  57:10,19,25 71:4,25
  72:4,5,16 74:12
  75:13,17,21,24
  82:10 93:20,23
  108:6,19

policeman 39:3

policemen 11:24
  26:24

policy 71:1

polite 18:12 59:16

port 45:2,8 49:1
  56:12

possession 36:2

possible 63:14
  77:12,22 79:8,10,15
  83:9 90:20,25 91:5

possibly 31:1 50:1
  66:7

post 76:22 77:6

potential 35:1

potentially 32:4
  35:16

precautions 43:18

prepare 6:19 10:19

presence 30:18 32:5

present 2:18 10:4
  33:4 38:17 62:25
  65:8,11 83:4

preserve 6:11 22:14
  23:14

preserved 95:4

**pretty** 10:25 13:12
  47:19

**previously** 61:18
  88:10 110:7

**prints** 26:14

**Prior** 101:23

**prison** 77:17 113:13

**prisoner** 18:23 19:21
  20:18 26:22
  27:1,5,7,13,24
  28:7,16 29:4,16,18
  30:1 37:24 38:11
  39:13 40:6,12
  42:6,25 45:16,17
  46:20 56:5 58:19,22
  59:2 72:16
  80:4,13,18,24
  82:12,17
  93:13,18,25 94:5,10
  96:6 98:19 99:2
  104:3,7 106:5 113:6

**prisoners** 20:1
  25:20,23 26:15
  29:10,13 37:12,13
  38:7,24 39:4 41:19
  59:7 70:8 72:12
  77:3 91:15 113:14

**probable** 15:23

**probably** 8:3
  14:15,23 22:3,15
  23:2,10,12 26:5
  35:4 47:13 51:17,18
  52:18 60:16 61:6
  62:21,25 65:5,14
  75:7 80:22 81:22
  97:11 98:5 108:11
  111:20 112:17

**problem** 95:6,7

**problems** 8:23 59:21
  87:10,22

**Procedure** 1:16

**proceed** 95:1

**processing** 64:16

**produce** 22:15

**profusely** 95:21

**program** 73:17 76:11

**protect** 42:17 43:19
  77:19 103:18

**provide** 9:23 10:14
  24:6 66:10

**provided** 20:25 23:21
  96:12 110:10

**providing** 27:22

**psychologically**
  18:24

**PUBLIC** 115:24

**pull** 16:1,6 33:20

**pulling** 16:20
  60:10,12

**punch**
  31:4,12,13,18,25
  33:16

**punched** 31:13 63:15

**punching** 62:6,20
  64:8

**puppy** 5:24

**pure** 106:25

**purity** 106:24

**pursuant** 1:15

**push** 92:24

**pushed** 48:6,12

**pushing** 48:15 56:16

**putting** 79:9

---

Q

**quantity** 36:2 106:3

**question** 5:4,13 6:9
  26:2 27:11 28:19
  33:9 40:5 42:10
  54:4,7,8 57:15 78:8
  83:24 84:6,9 95:3
  98:17 102:12
  108:7,10

109:11,19,21

**questioned** 92:19,20

**questions** 5:12 20:15
  107:25 109:2
  114:2,6

**quick** 20:7 67:24
  102:8

**quit** 12:25

**quite** 28:24

---

R

**radio** 57:10,19,25
  58:1 69:6,13 71:25
  72:4 81:9,25
  82:2,11 93:20
  108:14,16,21 112:11

**radioed** 108:6

**ramp** 45:1 46:23
  99:8,11,14,18
  101:1,16,20 102:22
  104:8,16

**ran** 26:20

**range** 53:24

**rank** 13:5,8,10 15:3

**rapport** 18:6

**rather** 44:15 74:1
  101:21

**reach** 13:5

**reads** 5:4

**real** 20:7 64:18
  67:24 102:8
  103:10,25 113:18

**really** 18:14,22
  20:6,14 57:17

**reask** 69:10 98:17

**reason** 5:11,19,21
  14:5 22:25 59:4
  60:9 82:2 115:2

**reasons** 5:22 62:24
  82:10,14 83:3,10

**recall** 22:4 29:2,25

37:17,19 38:14
43:13 49:13
50:1,7,24 61:4,17
63:13,17 64:2,5,6
69:18 76:1 77:24
78:2,6,8,11,12,19
79:2 81:1,6,7
90:17,19 93:1 94:7
97:24 102:12
103:2,6,9 108:7,9
109:7,10
111:19,21,23

**recalled** 47:23

**receive** 19:25 21:24
23:5 29:16,19 70:3
77:15 79:7 81:4

**received** 21:1 28:14
29:1,20 40:18 45:13
69:18 70:8 77:24
78:8,10,13,20
79:3,8,11,12,17
80:23 87:18

**receiving** 29:2,25
40:15 78:2 79:24

**recess** 7:15 24:2
55:22 94:17

**recognition** 16:4

**recognized** 19:13,16
68:23

**recollect** 97:20

**recollection**
28:11,22 30:8,9
42:13,15 63:9 64:19
70:19 75:14 85:8
87:17,19 89:3,4,7
96:8 97:23 103:11
109:22 111:9

**record** 6:4
7:12,13,17
23:21,23,25 24:4
55:20,24 74:4 78:25
94:13,15,18,21
95:10,13 116:7

**recorded** 74:20 116:5

**reference** 22:20

**referring** 87:3

**refresh** 111:9

**refuse** 102:23

**refused** 66:13 103:1
110:24 111:5

**regarding** 20:1
63:14,25 79:25 80:4

**Regardless** 42:15

**regards** 98:20

**regional** 37:25 38:2
40:20 44:3,14,18
63:4,10,19 64:9
72:19 73:12,13 85:4
89:15 90:1,6,9
102:25 103:4
109:7,15 110:5

**rejected** 96:15

**related** 116:9

**relation** 46:17
100:14

**relative** 116:11

**relevance** 81:21

**remember** 12:8 13:16
14:22 15:19 18:3,22
21:5,16,23 22:6,7
26:3,5 28:3 29:20
30:3 36:17
37:5,18,22 38:4
40:14,15,17,23
43:10 47:18 49:25
50:10 52:21 61:25
62:22
65:3,6,13,14,18,19,
20,23 66:3,22,24
68:5,6,7 69:17,23
70:2,9 71:2,15
78:10
79:12,17,20,24
80:25 81:2
88:1,20,24 89:10,12
90:11 92:8,11 93:4
95:23 98:22,23
100:24 102:16

103:14 104:4,24
105:2,3,4,5 113:1,2

**remembered** 7:24 8:2

**remembrance** 28:11

**removed** 104:1,4

**removing** 103:3

**rented** 21:17

**repeat** 27:11 83:25

**rephrase** 48:23 110:2

**report** 3:12 85:4

**Reported** 1:24

**reporter** 3:9 4:5,8
5:2 23:22 78:18,22
79:1

**reports** 36:25

**reposition** 41:13

**representation**
89:2,15 90:9 99:18

**representing** 6:23,24

**request** 1:15

**Requested** 3:16 22:18

**reserve** 114:7

**resist** 26:16,19,23
29:10,16 109:14
111:19

**resistant** 34:19

**resisted** 109:5 111:6

**resisting**
27:1,5,7,13,24
28:8,16 29:4,17
30:1 31:16 50:3
80:19 83:5 84:3
103:4,8 110:3

**resort** 31:25

**resource** 12:4

**respect** 17:23 25:23
40:2 43:12 53:17
98:14

**respond** 18:4

**response** 109:10

**restrain** 82:19

**restraining** 27:7

**restroom** 9:1
  26:7,9,17 55:17
  80:8,9

**result** 23:6

**retired** 11:24

**review** 5:5 10:19
  74:25

**right-hand** 39:16

**right-handed** 92:9

**rights** 9:21 95:2

**ring** 88:5

**roll** 71:3,6
  76:8,9,12

**Romero** 1:10 2:9
  24:12 45:17 46:18
  48:5,25 52:11 56:10
  58:4 60:10 62:18,24
  63:10 64:15 65:9
  70:10 76:23 93:5
  96:14 97:18,21
  98:12,20,25 99:5
  104:6,11 105:8

**room** 21:17,18
  52:15,23 67:4

**Rosales** 95:17

**ROSWITHA** 1:5

**RPR** 1:25

**Rules** 1:16

**running** 25:5

**rural** 15:18

――――――――――
S
――――――――――

**Saenz** 1:5,6 7:5 8:2
  9:22 17:3 32:9,18
  36:25 37:10 40:19
  57:2 58:8 59:9 73:8
  76:23 91:7,11 92:3
  98:15,21 99:1

  108:18 109:5,14
  110:3

**safe** 84:4

**safely** 82:19

**safety** 82:3 91:6,12

**sally** 45:2,8 49:1
  56:12

**saw** 19:20 44:9
  45:9,23 47:1,14,15
  50:3,9,12 51:15
  57:12,15
  66:11,12,18 98:25
  112:23 113:4

**scanning** 26:12

**scary** 86:25 87:2

**Scherr** 2:6

**school** 12:4,11 13:1
  14:1,16,17

**Scott** 2:11

**screaming** 50:5
  104:25 105:4

**SEAL** 115:22

**seat** 39:11,15,24
  110:24

**seating** 103:3,7
  111:6

**second** 23:24 32:18
  64:12,14,22 65:2

**secure** 1:9 2:9 11:14
  39:13 40:1

**secured** 39:21,23

**securely** 39:21

**security** 11:17 12:24
  19:20 21:1 27:15
  69:19 70:5,14 71:17
  72:6,9,12 77:16
  78:3,14 79:4 87:20

**seeing** 47:16 52:21
  62:1 65:6

**seek** 19:7,9

**seem** 18:24 43:24

  103:15

**seemed** 106:10

**seems** 43:8

**seen** 18:17 29:9,13
  53:14 86:15

**senior** 13:7,15,19

**sense** 19:4 42:18,24

**sensed** 57:16 58:5

**September** 11:19 12:9

**sergeants** 13:11
  25:5,7

**serious** 43:25 66:14
  83:20

**service** 13:17,18,19

**services** 96:11

**setting** 70:23

**setup** 88:16

**sheer** 53:14,22

**she'll** 23:22

**sheriff's** 53:21
  112:20

**shirt** 92:6,13,23

**shoot** 33:21 35:11,19
  106:1

**shooting** 97:22

**short** 46:13

**shortly** 48:6

**shot** 32:21 33:4 45:4
  65:25 74:9

**shoulders** 52:12
  61:9,12

**showed** 86:12

**showing** 90:5 99:15

**sic** 89:8

**sides** 39:10

**sidewalk** 98:8 101:16

**sight** 55:8

**sign** 75:6

**signature** 3:8
  107:7,10 115:1,16

**signed** 75:8 76:1
  107:13,16

**significant** 13:21

**similar** 28:24 90:14

**simple** 16:15

**simply** 5:14

**single** 60:20,25
  61:4,19 99:23

**sink** 5:24 56:23

**sir** 4:14,20,25
  5:10,16,18,21
  6:16,20 9:11,25
  10:3,16,21,24
  11:12,16 12:10,14
  15:8 16:5
  17:2,7,19,21 19:19
  20:10,20 21:3 22:1
  23:19 24:9,14,17,22
  25:15 27:3 29:6
  30:8,24 32:1
  33:1,17,19,22
  34:9,16,22
  35:2,6,14 36:23
  37:2,5,8,23
  38:10,19 43:2,21
  44:5,8,23 45:6 46:5
  47:4,6 48:12,20
  49:2,13,16,19,22
  50:24 51:5,11,23
  56:3 57:6,9
  58:2,16,23
  59:5,8,11,25
  60:4,8,12,24 61:2
  62:14 63:5,12,24
  64:10,13,24 65:3,20
  66:12,16 67:10,15
  68:10,14 69:3,25
  71:15 72:7,10,14
  73:10,24
  74:3,10,15,19,24
  75:2,5,7,11,18
  76:25 77:22 80:2
  81:1 82:1,9,13

83:17 84:17
85:5,19,23 86:2,14
87:23 88:4,14
89:4,17,24 90:3,19
91:9,13 92:4
93:10,22 94:8,12
95:16,18 96:4,8,13
97:4,17,20 98:13,24
99:3,19
100:1,5,9,12 102:3
103:5,20,23
104:10,14,18
105:7,11,15,23
106:14 107:10,15,17
108:8 109:9,12
110:13,14,18
111:10,18,20
112:9,13 113:8,16
114:1

**sit** 78:2,12,19
  79:2,16

**Site** 2:15

**sitting** 21:18 43:16
  47:16 51:14 62:1,22
  80:7

**situation** 29:4 31:24
  69:5,12 70:17 77:7

**situations** 32:4
  72:11

**sleep** 5:23

**slender** 66:22

**slinging** 47:14,19

**slow** 42:23 98:6

**slung** 47:10,12

**smaller** 39:15,18
  99:22,24 100:3
  101:7

**smell** 18:1

**snort** 106:1

**sobriety** 16:11,12
  17:14 85:15,21

**Social** 12:24

**soda** 106:25

**solid** 89:12

**Solutions** 1:9 2:9
  11:14

**somebody** 36:1
  41:22,23 82:24
  84:24 86:20

**somebody's** 68:1

**somehow** 35:9

**someone** 16:6 19:6
  57:7 86:15

**someone's** 113:19

**something-10** 71:8

**somewhat** 84:20

**somewhere** 14:14 38:3
  45:12

**sorry** 18:7 54:23
  78:22 91:19 108:24
  109:25

**sort** 30:15 31:17,19
  35:12 52:1

**sounds** 18:8 28:18
  30:15 32:2 34:23

**south** 100:18

**space** 23:15

**speak** 6:17 63:25

**speaking** 65:9

**specific** 25:24 70:7
  78:11,13,20 79:3
  80:3

**specifically** 29:22
  61:18

**speculate** 91:20
  111:22

**speculation** 28:10
  31:10 38:21 41:5
  46:10 48:18 50:23
  51:13 54:5,13 57:23
  63:7 67:19 68:18
  77:9 83:16 84:17
  90:24 92:1 97:7
  112:19 113:10,24

speed 15:19

spend 10:22

spent 5:25

spoke 6:22 11:3
   32:14 68:3 85:11

spoken 11:9

stand 16:13 58:11

standard 20:5

standing 51:14,18
   58:13 62:23 92:7

standstill 73:5

start 25:18 42:20

started 12:18,24
   13:25 39:25 70:23

startle 92:14

state 13:3,5,9,23
   15:1,2,13

stated 33:2

statement 4:21 27:25
   33:6 38:17 42:3
   44:12,16 47:21,25
   66:25 74:18,22 75:9
   76:1 78:1,5,7 85:13
   107:7,8,11,12
   110:10,15

statements 67:17
   68:21 75:12

states 1:1 110:22

station 16:23,24,25
   53:21 73:18

stationed 113:13

stay 66:25 67:2
   97:25 98:3

stayed 14:23 52:22
   56:5 98:5

steel 39:9,10 89:12

stenographic 6:4
   78:25 94:18

step 13:19

stern 30:18

steroids 68:8,24

sticks 21:20 60:17

stolen 15:24

stop 12:15,17 15:22
   40:7,8 41:12 43:18
   57:20 103:18

stopping 44:21

straight 16:14

street 57:20
   100:15,21,22,23,24,
   25 101:16

strike 33:18 35:11
   36:10 61:16

struggle 39:25

struggling 31:1
   80:14,16

stuck 5:24

subject 40:16 85:1

SUBSCRIBED 115:20

substance 76:13

substantial 46:3

substation 38:5

substations 73:19
   74:1

substitute 13:25
   14:10

substituting 14:15

successful 73:17

sudden 32:19

Suite 1:17 2:11

summon 71:17

summons 57:18 71:19

sunk 56:21

supervisor 15:9

Supplemental 3:12

supposed 26:15 27:14
   69:4,19 81:1 87:13

sure 20:14 21:1 23:1

27:12 31:22,23
41:18 47:19 48:24
51:19 61:20,23
74:16 75:3 78:17
80:6 82:4 83:24
84:1 103:25 107:21

surprise 92:15

suspect 31:1,16
   70:4,15,17 71:11
   83:5,21 84:3,4,14
   96:19,21 97:2

suspects 35:17 70:12

suspicion 96:22 97:5

sustain 69:9

swear 4:5

sworn 4:8 115:20

system 14:17 17:6
   76:15

---

T

table 53:10,13

tables 21:17,18

tackle 31:5

tak 41:8

taking 26:16 41:22
   74:5 105:22

talk 62:10 97:21

talked 8:5 54:10

talking 10:23 18:12
   19:17 20:17 30:15
   42:20 43:10 62:23
   64:7 97:24

tall 66:21

tape 74:20 75:19

taught 18:25 42:5
   70:14 71:16,19
   87:13

teacher 14:10

teaching 13:25 77:16

telephone 108:22

tend 9:2 19:10

Teri 1:25 116:16

term 76:4

terms 109:23

terrible 36:21

terribly 18:11

test 16:8,11

testified 4:8
  109:13,23 111:16

testify 96:23

testifying 4:23 6:13

testimony 5:20 48:4
  74:14 108:9
  109:17,18 116:5,6,7

tests 17:14
  85:15,21,25
  86:4,8,12

Texas 1:2,18
  2:7,12,16
  13:3,5,9,23 23:8

Thank 55:19 114:4

that's 9:1 15:21
  20:6 25:14 33:1,2,5
  34:10 35:15 40:4
  41:24 42:3 45:3
  47:12 52:16 53:4
  62:3 63:17 64:19
  66:2 68:2 70:1
  71:11 76:11,13 78:5
  79:14 80:2,11 81:2
  82:25 83:9 87:2
  92:20 97:3,11 99:20
  101:5,6 105:12,15
  109:18 111:11,15

themselves 40:9,12

theories 9:24

there's 13:21 14:6
  27:24 28:19 55:9
  57:21 62:2 76:20
  77:18 79:19 83:21
  88:11,12 89:20
  91:5,17 100:3

113:20

they'd 8:12

they're 28:7 31:7
  53:7 72:22 77:14
  80:7 87:11

third 107:6

tickets 15:21

till 14:13 35:25

today 5:1,12,20 6:3
  7:19 10:2,20
  11:10,15 78:2,12,19
  79:2,16 111:16

today's 4:2 6:19

tomorrow 94:21

ton 39:18

top 89:20 101:4

topics 81:5

towards 50:2 100:25
  104:8

toxicology 36:24

traffic 15:18 73:4

train 20:16

trained 40:10,13
  42:10 69:11,16,17

training 15:7
  20:1,9,22
  21:1,19,21,25 22:12
  23:6 24:12,15 27:22
  29:16,20,21,25
  40:15,18
  69:18,23,25
  70:3,7,11,25
  77:15,22,23,25
  78:3,9,10,11,13,20
  79:3,7,8,11,12,17,1
  8,24 80:22,23 81:5
  87:18,20

tranquilizer 36:15

trans 25:8

transcript 5:4,6
  22:10,17,20

transport 37:9,11
  38:24 39:4 63:19
  72:13 76:19

transportation
  25:4,9

transported 37:16
  38:8 58:19 64:1
  94:5

transporting 11:22
  25:21 37:12,14
  40:11,19 43:5,20
  46:9 48:2 56:14
  72:16 93:8,12,25
  94:10

treat 34:14,17 35:8

treated 9:22

treatment 19:1 66:10

trial 5:9 114:8

tried 26:16,23

trooper
  13:3,6,7,10,12,14,1
  5,20 15:2 68:25
  81:14,24 113:1

troopers 13:9,24
  14:2

true 27:25 29:23
  33:5 44:12,16
  75:4,9 78:1,5 82:12
  102:7 104:20
  107:8,11,12,21
  112:16 115:17 116:7

trustee 56:18

trustees 56:1 64:25

truth 4:23

truthful 74:13

try 26:19 31:18
  40:25 41:12,18
  60:25 73:16 95:10

trying 5:25 31:2
  40:21 41:1 49:7
  90:11 95:22
  109:6,14 110:4,23

turn 30:19 84:8
  91:13,15 99:13,14

TX 1:25

type 19:14 22:7
  47:16 89:11

typed 74:22

typical 85:3

_____

U

ugly 36:7

Uh-huh 32:13 36:14
  58:6 82:7 110:9

unable 60:9 104:19

uncomfortable 61:14

unconscious 67:14,23
  68:1,13

uncooperative 109:5

understand 4:24
  5:9,14,15 6:14
  13:21 36:9,11 40:5
  53:15 83:24

understanding 27:21
  48:16 73:15
  93:11,14,16 109:13

understood 4:25 5:17
  41:18 66:15 80:4
  98:15 107:19

unfriendly 8:16

UNITED 1:1

unless 6:7 40:8
  99:12

unprofessional 68:19

unruly 33:24 70:4,17
  80:25 113:6

updates 81:4

upright 80:7

upstairs 51:16 56:14
  96:10

urinate 87:24

urine 85:24 86:4,8

USA 1:9 2:9 11:14

usable 36:2

user 6:2 8:18,19
  106:7,21

usual 94:2

usually 106:11

_____

V

vague 50:21 80:21
  110:1 113:9,23

vaguely 30:3

Valley 38:6,7,13
  73:12 76:19

van 39:4,6,7,8,9
  40:22 41:2,12
  43:4,20
  44:3,7,14,21 46:8
  50:12,17 71:25 93:2
  98:1 100:6 101:19
  102:23 103:3,8,13
  104:2 108:15,16
  109:6,15
  110:4,23,24,25
  111:4,6

vans 39:18

vehi 93:25

vehicle 4:17 15:24

vehicles 45:20
  102:19

versus 12:22

Victory 2:4

video 4:3 89:19,22
  90:1,4

Videographer 2:18
  4:1 7:13,16 23:25
  24:3 55:20,23 94:15
  95:12 114:9

videos 89:23

videotaped 1:14 5:1

view 99:4

violence 32:15

34:1,8

violent 32:4 101:18

vision 47:3 55:1

visualize 60:15

vivid 62:1

vocal 87:9

voice 30:19

voluntarily 59:19

volunteered 63:18
  86:9

volunteering 60:2

_____

W

wait 92:16

walk 16:13 45:15
  48:25 52:13
  58:12,22 59:3 60:10
  98:7 101:21
  104:8,13

walked 45:16 46:20
  66:24

walker 98:7

walkie-talkies 81:16

walking 17:23 46:23
  58:13,19 60:14
  104:16

wall 43:4,14,20 46:8
  88:8 100:25 101:1,2
  103:12

walls 39:9 41:2

wasn't 18:15 20:14
  51:18 56:13 57:3

watch 48:24 113:14

watching 25:20,23
  80:4

water 9:1 26:7,8,16
  80:8,9

ways 53:2

weapon 92:10

wearing 68:4

**Wednesday** 94:23

**weeks** 21:8,9

**weight** 60:5

**weights** 61:8

**we'll** 11:15 22:19
 23:13,15,18 95:9
 107:4 114:7

**well-being** 91:12
 103:19

**we're** 7:13 23:25
 24:3 55:20,23 71:7
 94:15 95:12 96:1

**Wesley** 3:12 4:4

**west** 21:15

**westbound** 21:15

**WESTERN** 1:2

**whatever** 16:8 20:18
 41:11 53:25
 56:15,18 60:9 106:1
 112:4

**wheel** 76:13

**wheelchairs** 58:18
 59:7

**whenever** 8:12 14:15
 19:11 45:20,22
 47:17 106:5

**whether** 8:15 34:18
 57:25 61:11 66:22
 79:16 85:17 89:12
 90:4 93:5 105:25
 106:24

**white** 37:20 93:24

**Whoa** 67:6

**whole** 100:19

**wholeheartedly** 33:9
 34:4

**whom** 116:3

**who's** 10:7,9 84:3

**whose** 116:5

**wide** 86:22

**willingly** 111:4

**Wilson** 66:22

**window** 39:11 43:15

**windows** 101:3

**wish** 64:17 68:5

**withdraw** 20:15 44:15
 52:9 71:9

**witness** 3:2 4:6
 47:21,25 78:23
 91:21 96:25 102:13
 111:12 116:5,8

**Woodland** 2:4

**work** 11:25
 12:12,13,20 13:2
 14:3,8,16,18 15:1
 36:6 73:12
 76:18,19,20 77:2

**worked** 12:2,3,18
 19:20 24:5,13
 29:15,23,24 42:4
 56:19 66:20 70:5,20
 71:4 80:5
 81:8,13,16 82:9
 93:9

**working** 11:24
 12:15,18,21 13:1
 15:13 26:23,25 27:5
 28:14 35:22 56:14
 76:21 77:17,18
 93:18

**world** 15:15

**worry** 8:22 59:19

**wrist** 31:5

**write** 15:21

**writing** 29:1,3

**written** 21:24 22:5
 28:13

**wrong** 40:6 68:2

**wrote** 47:21
 111:10,15

---
Y
---

**yell** 65:17

**yelling** 96:5

**yet** 30:9 35:7 109:21

**YMCA** 60:2

**You-all** 67:2

**you'll** 5:3,5 6:6
 22:20 23:3 88:11

**yourself** 93:2 104:7

**you've** 15:18
 34:12,13 35:3 42:4
 53:13,14,21 81:2,8
 84:1 91:10